DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7973
Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Counsel to the Debtors
and Debtors in Possession*

*Local Counsel to the Debtors
and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **JAMES RIVER COAL COMPANY,** *et al.*, | Case No. 14-31848 (KRH) |
| **Debtors.**[1] | **(Jointly Administered)** |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (i) APPROVING THE SALES AND TRANSFERS OF CERTAIN ASSETS AND LIABILITIES RELATED TO THE MCCOY ELKHORN MINING COMPLEX FREE AND CLEAR OF ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN <u>CONNECTION THEREWITH, AND (iii) GRANTING RELATED RELIEF</u>

James River Coal Company and its subsidiaries, as debtors and debtors in

possession in these proceedings (collectively, the "**Debtors**"), respectfully represent:

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached hereto.

## Background and Jurisdiction

1.  On April 7, 2014 (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  On May 9, 2014, this Court entered an *Order (I) Approving the Strategic Transaction Bidding Procedures, (II) Scheduling Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof and (IV) Granting Related Relief* (the "**Strategic Transaction Bidding Procedures Order**") [ECF No. 254].

2.  The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

3.  By this motion (the "**Motion**"), the Debtors seek entry of orders, substantially in the forms of order attached hereto as Exhibit A (the "**Bevins Sale Order**") and Exhibit B (the "**Burke Sale Order**"), pursuant to sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, and Rule 6004-2 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "**Local Bankruptcy Rules**") (i) authorizing entry into an asset purchase agreement

2

(the "**Bevins APA**") among Debtor James River Coal Company ("**James River**"), Debtor

McCoy Elkhorn Coal Corporation ("**McCoy Elkhorn**"), any Debtor affiliate of McCoy

Elkhorn that holds any interest in the Burke Assets (as defined below), and Opes

Resources, Inc. ("**Opes**") substantially on the terms and conditions set forth in the

Summary of Terms and Conditions attached hereto as Exhibit C (the "**Bevins Term**

**Sheet**"); (ii) approving the sale and transfer of certain assets relating to the McCoy

Elkhorn mining complex (the "**Bevins Assets**") to Opes in accordance with the Bevins

APA (the "**Bevins Sale**"); (iii) authorizing entry into an asset purchase agreement (the

"**Burke APA**")[2] among James River, McCoy Elkhorn, any Debtor affiliate of McCoy

Elkhorn that holds any interest in the Burke Assets (as defined below), and Marshall

Resources, Inc. ("**Marshall Resources**" and, together with Opes, the "**Purchasers**")

substantially on the terms and conditions set forth in the Summary of Terms and

Conditions attached hereto as Exhibit D (the "**Burke Term Sheet**" and, together with the

Bevins Term Sheet, the "**Term Sheets**"); (iv) approving the sale and transfer of certain

assets relating to the McCoy Elkhorn mining complex (the "**Burke Assets**" and, together

with the Bevins Assets, the "**McCoy Elkhorn Assets**") to Marshall Resources in

accordance with the Burke APA (the "**Burke Sale**" and, together with the Bevins Sale,

the "**Sales**"); (v) authorizing the assumption and assignment of certain executory

---

[2] The Debtors intend to file copies of the Bevins APA and the Burke APA with the Court prior to the hearing on the Motion.

contracts and unexpired leases in connection with the Sales; and (vi) granting such other and further relief as is just and proper.[3]

### Preliminary Statement

4.      As part of the Debtors' ongoing efforts to consummate value-maximizing strategic transactions in these chapter 11 cases, the Debtors are seeking to sell certain non-core assets at their idled McCoy Elkhorn mining complex.  These transactions are important components of the Debtors' strategic transaction process and further the Debtors' goal of maximizing the recovery for their estates and creditors, while they continue to pursue a dual-track restructuring process for the sale of their core assets or a reorganization pursuant to a chapter 11 plan.  In addition to the consideration provided by the Purchasers, these transactions will save the Debtors approximately $1,000,000 of monthly expenditures related to these idled, non-core assets.

5.      Pursuant to the Strategic Transactions Bidding Procedures Order, the Debtors are authorized to conduct an auction for the (i) purchase of all or any part of the Debtors' businesses, including the McCoy Elkhorn Assets or (ii) contribution of capital to the Debtors in connection with a standalone plan of reorganization (the "**Auction**") on July 8, 2014 in accordance with the Strategic Transaction Bidding Procedures.  The Debtors have been actively engaged with interested parties in advance of the Auction and in connection with the Strategic Transaction Bidding Procedures, and believe that the

---

[3] Contemporaneously herewith, the Debtors have filed a motion to expedite hearing on the Motion.

Sales (as defined below) to Opes and Marshall Resources will realize greater value for the McCoy Elkhorn Assets than can be realized through the Auction.

6.      In the months leading up to the Petition Date, the Debtors experienced decreased demand for both thermal and metallurgical coal, which made it uneconomical to operate certain mining complexes, including the McCoy Elkhorn mining complex. In response to these challenges, the Debtors announced the idling of the McCoy Elkhorn mining complex in September 2013, which lowered their average cost of production.

7.      In December 2013, the Debtors began a prepetition marketing process for the sale of the assets related to the McCoy Elkhorn mining complex, which continued post-petition. As part of this process, the Debtors contacted a wide range of potential buyers and received follow-up inquiries from approximately fifteen parties, whom the Debtors engaged with informal discussions and formal presentations. A number of these parties entered into confidentiality agreements, upon which they were provided with access to an electronic data room containing confidential materials regarding the McCoy Elkhorn Assets and certain parties also conducted site visits. Ultimately, the marketing process resulted in offers to purchase certain discrete units comprising the McCoy Elkhorn mining complex: (1) an offer by Opes to purchase the Bevins Assets and (2) an offer by Marshall Resources to purchase the Burke Assets.

8.      In consideration for the Bevins Sale, Opes will pay the Debtors $3,100,000 in cash and will assume substantially all liabilities related to the Bevins Assets, including all outstanding reclamation obligations, which are currently included as an estimated $6,730,719 liability on the Debtors' balance sheet. In consideration for the

5

Burke Sale, Marshall Resources will pay the Debtors $444,970 in cash, and will assume

substantially all liabilities related to the Burke Assets, including all outstanding

reclamation obligations, which are currently included as an estimated $2,236,633 liability

on the Debtors' balance sheet.  The Debtors have concluded, in the exercise of their

sound business judgment, that the purchase price in respect of the Bevins Sale and the

Burke Sale is fair and reasonable and represents the highest or otherwise best bids for the

McCoy Elkhorn Assets, and that each of the Sales is in the best interests of their estates

and creditors.

9.      The deadline to submit Preliminary Indications of Interest set forth in the

Strategic Transaction Bidding Procedures occurred on May 22, 2014.  Based on the

Preliminary Indications of Interest that were received, the Debtors believe that the Sales

will realize greater value for the McCoy Elkhorn Assets than can be realized through the

Auction.

10.      Nonetheless, in the event that the Debtors receive a bona fide proposal

with respect to all or any portion of the McCoy Elkhorn Assets on or prior to May 30,

2014, in the case of the Bevins Sale or the Burke Sale, the Debtors may terminate either

the Term Sheet or the APA, as applicable, without liability and pursue such transaction if

the Debtors' board of directors determines in its good faith judgment that such

transaction may provide a higher and better economic recovery than the applicable Sale.

### The Bevins Sale

11.      The Bevins Sale will be governed by the Bevins APA, to be entered into

among James River, McCoy Elkhorn, any Debtor affiliate of McCoy Elkhorn that holds

any interest in the Bevins Assets and Opes substantially on the terms and conditions set

forth in the Bevins Term Sheet.  The Bevins Term Sheet includes the following salient

provisions:[4]

    (a)    <u>Structure</u>.  Opes will purchase the Bevins Assets and assume the Assumed Liabilities.

    (b)    <u>Purchase Price</u>.  $3,100,000 (USD) in cash, to be paid in full at closing.

    (c)    <u>Purchased Assets</u>.  The Purchased Assets will consist of all of James River's and its subsidiaries', including McCoy Elkhorn's, right, title and interest in, to and under all assets relating to the McCoy Elkhorn mining complex, other than the Excluded Assets.[5]

    (d)    <u>Excluded Assets</u>.  The Excluded Assets will consist of (i) James River's and its subsidiaries' and McCoy Elkhorn's right, title and interest in, to and under the assets relating to the Burke Real Property, described on Exhibit A to the Term Sheet, and certain related assets, including the real property and leases of, and other interests in, the Burke Real Property, the facilities and improvements located on the Burke Real Property (as set forth on Exhibit B to the Term Sheet) and all machinery and equipment on, within and attached to such facilities and improvements, all coal inventory located on the Burke Real Property, the licenses, permits or other governmental authorizations relating to the Burke Real Property (as set forth on Exhibit C to the Term Sheet), and all contracts, agreements, leases, licenses and commitments relating to the Burke Real Property and (ii) certain assets relating to the Harmond Branch Surface Mine, the Mare Creek Surface Mine and the Cannel Gap Surface Mine, as described on Exhibit E to the Term Sheet.

---

[4] A copy of the Bevins Term Sheet is also attached hereto as Exhibit C.  This summary of the Bevins Sale is qualified in its entirety by reference to the Bevins Term Sheet.  To the extent that there is any discrepancy between the terms contained in this Motion and those set forth in the Bevins Term Sheet, the terms of the Bevins Term Sheet shall control.  Unless otherwise defined herein, capitalized terms used in this summary shall have the meanings ascribed to such terms in the Bevins Term Sheet.

[5] The Bevins Assets shall include the right to use the name McCoy Elkhorn Coal Corporation, or some similar derivative thereof.

(e)     Assumed Liabilities.  The Assumed Liabilities will consist of (i) all reclamation liabilities and obligations, and other environmental liabilities and obligations, relating to the sale assets; (ii) all liabilities and obligations of James River and its subsidiaries under the Assumed Contracts; (iii) all liabilities arising out of Opes's use, operation, possession or ownership of the Purchased Assets following the closing; and (iv) all obligations under the Transferred Permits.

(f)     Excluded Liabilities.  The Excluded Liabilities will consist of any and all liabilities of James River and its subsidiaries other than the Assumed Liabilities.  In addition, as to former employees of McCoy Elkhorn or employees of predecessor companies for which McCoy Elkhorn is currently responsible, liabilities relating to current workers' compensation and black lung claims, whether in a pay status or in a contested status, together with any unfiled claims to the extent that any such unfiled claims may be filed in the future by prior employees of McCoy Elkhorn, and all liabilities relating to pension obligations under the James River Pension Plan applicable to McCoy Elkhorn employees, shall be retained by James River and shall be Excluded Liabilities.

(g)     Employees.  In conjunction with the Sale, (i) Opes shall have the right to either terminate McCoy Elkhorn's active employees[6] and/or extend offers of employment to such employees and any of McCoy Elkhorn's former employees, in its sole discretion; and (ii) Opes shall be obligated to assume and pay all severance and employee related obligations to all McCoy Elkhorn's active employees, other than active employees who are receiving either short term disability, long term disability or workers' compensation payments from McCoy Elkhorn as of the closing of the Sale.

(h)     Assumed Contracts.  In connection with the assignment and assumption of the Assumed Contracts, James River shall cure all defaults under such Assumed Contracts to the extent required by section 365(b) of the Bankruptcy Code.

(i)     Due Diligence. The Term Sheet remains subject to the completion of due diligence by Opes, and  may be subject to change on or

---

[6] McCoy Elkhorn presently has twenty-eight active employees.

prior to May 30, 2014, at which time Opes shall have completed its due diligence and the terms shall no longer be subject to change.

(j)    <u>Financing Covenant</u>.  Opes shall use commercially reasonable efforts to obtain the financing necessary to consummate the Acquisition, and shall secure said financing by June 30, 2014 (or such later date as may be required due to matters beyond the control of Opes or as may be consented to by James River, which consent shall not unreasonably be withheld).

(k)    <u>Conditions to Closing</u>.  The obligations of James River and Opes to consummate the Sale will be subject, *inter alia*, to the entry of the Sale Order by the Bankruptcy Court and the absence of a Material Adverse Effect.

(l)    <u>Termination</u>.  In addition to customary termination rights for transactions of this nature, (i) on or prior to May 30, 2014, James River may terminate the Term Sheet or the APA without liability if James River receives an Alternative Transaction, and James River's board of directors determines in its good faith judgment that such Alternative Transaction may provide a higher and better economic recovery than the Sale, (ii) the Term Sheet and the APA will terminate automatically upon the consummation of an Alternative Transaction to a Party other than Opes, and (iii) on or after July 1, 2014, if Opes has not obtained a commitment for the financing required to consummate the Sale, either party may terminate the Term Sheet and/or the APA prior to closing without liability so long as, in the case of a termination by Opes, Opes is not in violation of the Financing Covenant.  For the avoidance of doubt, following the entry of the Order, Opes shall have the exclusive right to acquire the Bevins Assets unless the Term Sheet and the APA have terminated according to their terms.

(m)    <u>Expenses</u>.  All costs and expenses incurred in connection with the evaluation and negotiation of the Sale shall be paid by the Party incurring such cost or expense.

### **The Burke Sale**

12.    The Burke Sale will be governed by the Burke APA, to be entered into among James River, McCoy Elkhorn, any Debtor affiliate of McCoy Elkhorn that holds any interest in the Burke Assets and Marshall Resources substantially on the terms and

conditions set forth in the Burke Term Sheet.  The Burke Term Sheet includes the

following salient provisions:[7]

(a)　　Structure.  Marshall Resources will purchase the Purchased Burke Assets and assume the Assumed Liabilities.

(b)　　Purchase Price.  $444,970.49 (USD) in cash, to be paid in full at closing.

(c)　　Purchased Burke Assets.  James River's and its subsidiaries' and McCoy Elkhorn's right, title and interest in substantially all assets relating to the McCoy Elkhorn Burke mining complex.

(d)　　Assumed Liabilities.  The Assumed Liabilities relating to the Purchased Burke Assets will consist of those liabilities expressly assumed by Marshall Resources in the APA relating to the Purchased Burke Assets.

(e)　　Employees.  Marshall Resources shall not be required to hire any of the employees of McCoy Elkhorn associated with the Burke Purchased Assets, but may do so if it chooses.

(f)　　Assumed Contracts.  In connection with the assignment and assumption of the Assumed Contracts, James River shall cure all defaults under such Assumed Contracts to the extent required by section 365(b) of the Bankruptcy Code.

(g)　　Due Diligence.  The Term Sheet remains subject to the completion of due diligence by Marshall Resources, and  may be subject to change on or prior to May 30, 2014, at which time Marshall Resources shall have completed its due diligence and the terms shall no longer be subject to change.

(h)　　Conditions to Closing. The obligations of James River and Marshall Resources to consummate the Acquisition will be subject, *inter alia*, to the satisfaction of the following conditions: (i) the Bankruptcy Court shall have entered a 363/365 Order, naming

---

[7] A copy of the Burke Term Sheet is also attached hereto as Exhibit D.  This summary of the Burke Sale is qualified in its entirety by reference to the Burke Term Sheet.  To the extent that there is any discrepancy between the terms contained in this Motion and those set forth in the Burke Term Sheet, the terms of the Burke Term Sheet shall control.  Unless otherwise defined herein, capitalized terms used in this summary shall have the meanings ascribed to such terms in the Burke Term Sheet.

Marshall Resources as a good faith purchaser of the Purchased Burke Assets entitled to the protections of Section 363(m) of the Bankruptcy Code, which 363/365 Order shall not have been stayed, modified, reversed or amended without the consent of the Parties; (ii) all representations and warranties of the other party contained in the APA shall be true and correct in all material respects on and as of the closing date, as though made on and as of the closing date, subject to a Material Adverse Effect qualifier; (iii) all covenants, agreements and obligations required by the terms of the APA to be performed by the other Party at or before the closing shall have been duly and properly performed in all material respects; (iv) no provision of any applicable law shall prohibit the consummation of the Acquisition; and (v) there shall have been no Material Adverse Effect with respect to the Purchased Burke Assets.

(i)     <u>Termination</u>.  In addition to customary termination rights for transactions of this nature, (i) James River may terminate the Term Sheet or the APA prior to closing without liability if James River receives a bona fide proposal for an Alternative Transaction, and James River's board of directors determines in its good faith judgment that such Alternative Transaction may provide a higher and better economic recovery than the Burke Sale, and (ii) the Term Sheet and the APA will terminate automatically upon the consummation of an Alternative Transaction to a Party other than Marshall Resources.

(j)     <u>Expenses</u>.  All costs and expenses incurred in connection with the evaluation and negotiation of the Acquisition shall be paid by the Party incurring such cost or expense.

### Procedures for the Assumption and Assignment of Assumed Contracts and Leases

13.     To facilitate the Sales and the assumption and assignment of the executory contracts and unexpired leases provided for in the Term Sheets (each an "**Assumed Contract**"), the Debtors will serve a notice of intent to assume and assign the Assumed Contracts, substantially in the form attached hereto as <u>Exhibit E</u> (the "**Assumption and Assignment Notice**") on all non-debtor parties to the Assumed Contracts (each a "**Contract Counterparty**") according to the following procedures:

11

(a)      **Notice of Assumption and Assignment.**  On May 23, 2014, or as soon as practicable thereafter, the Debtors shall serve an Assumption and Assignment Notice on each known Contract Counterparty by first class mail, postage prepaid, facsimile, electronic transmission, hand delivery or overnight mail.[8]  The Assumption and Assignment Notice shall set forth: (i) the intent of the Debtors to assume the Assumed Contracts and assign them to Opes or Marshall Resources, as applicable, upon the closing of the applicable Sale (subject to the right of the Debtors to withdraw such request for assumption and assignment prior to the closing of the applicable Sale); (ii) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default under the applicable Assumed Contract in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "**Cure Amount**"),[9] *provided*, that if no amount is listed on the Assumption and Assignment Notice, the Debtors believe that there is no Cure Amount due; (iii) the deadline by which any such Contract Counterparty must file an objection to the proposed assumption and assignment and proposed Cure Amount; *provided*, *however*, that the presence of any contract or lease on an Assumption and Assignment Notice does not constitute an admission that such contract or lease is an executory contract or unexpired lease.

(b)      **Objections to Assumption and Assignment**.  Objections to the Assumption and Assignment of any contract and/or lease (each an "**Assumption Objection**"), including objections to any Cure Amount, **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and any case management order entered in these cases; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor, including the cure amount that the objecting party believes should be paid in connection with the assumption of the Assumed Contract (the "**Claimed Cure Amount**") and, if the objection to the proposed assumption and assignment is based on issues related to adequate assurance of future performance, what information with respect to the applicable Purchaser such Contract Counterparty requires to satisfy its adequate assurance concerns; and (d) be filed with the Court and served, so as to be actually received no later than 4:00 p.m. on the day that is ten days after the Assumption and Assignment Notice is served, on: (i) the Debtors, 901 East Byrd Street, Suite 1600, Richmond, Virginia 23219, Attn: Andrew B. Hampton, email: andrew.hampton@jamesrivercoal.com; (ii) counsel to the Debtors, Davis Polk &

---

[8] In connection with assumption and assignment of the Assumed Contracts, the Debtors seek a waiver of Bankruptcy Rule 6006(f)(6), which requires that a motion to assume or assign multiple executory contracts or unexpired leases be limited to no more than 100 executory contracts or unexpired leases.

[9] The Debtors reserve the right to modify, subtract from or supplement the Cure Amounts set forth on the Assumption and Assignment Notices as necessary prior to the closing of the Sales and shall provide affected parties with notice of such alteration as soon as practicable thereafter.

Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner and Brian M. Resnick, email: jrcc.service@davispolk.com; and (iii) local counsel to the Debtors, Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn: Tyler P. Brown, email: tpbrown@hunton.com.  If no Cure Amount is due under the Assumed Contract, and the non-debtor party to the Assumed Contract does not otherwise object to the Debtors' assumption and assignment of the Assumed Contract, no further action need be taken on the part of that non-debtor party.

(c)    **Effect of Filing an Objection to an Assumption and Assignment Notice.**  A properly filed and served objection to an Assumption and Assignment Notice will reserve such objecting party's rights against the Debtors with respect to the relevant assumption and assignment and/or objection to the Cure Amount of an Assumed Contract, but will not constitute an objection to the remaining relief requested in this Motion.

(d)    **Failure to Properly File and Serve an Objection to an Assumption and Assignment Notice.**  If an Assumption Objection is not property filed and served, the assumption and assignment of the applicable Assumed Contract will proceed without further notice at the hearing to approve the Sales.  The Debtors further request that any party that fails to properly file and serve an objection to the proposed assumption and assignment of any Assumed Contract shall be forever barred from filing any objection thereto, including (i) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults against the Debtors or their estates, (ii) asserting that the assignee of such contract or lease has not provided adequate assurances of future performance and (iii) asserting that the assignment is subject to any anti-alienation provision or other restriction on assignment.

(e)    **Dispute Resolution**. If any objection to the proposed assumption and assignment of a contract or lease or related Cure Amount is timely filed and such objection is not otherwise resolved by the parties, the Debtors request that a hearing with respect to that objection be held at the hearing to approve the Sales, to be held on June 4, 2014.  The Debtors and Purchasers shall be permitted to file a response to any Assumption Objection no less than one (1) day prior to such hearing.  The Debtors also request that Assumption Objections that object solely to a Cure Amount may not prevent or delay the assumption and assignment of the applicable Assumed Contract.  If a Contract Counterparty objects solely to a Cure Amount, the applicable Debtor may nonetheless close the Sales and assume and assign the applicable contract without further delay, *provided* that such Debtor holds the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties.  Under such circumstances, the objecting party's recourse shall be limited to the funds held in reserve.

13

## Basis for Relief

I.    The Sales are Consistent with the Debtors' Business Judgment and Should be Approved

14.    Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 does not provide explicit guidance as to when a sale or disposition of property of the estate should be authorized, courts generally authorize debtors' decisions to use, sell or lease assets outside the ordinary course of business if such use, sale or lease is based upon a sound business purpose. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *see Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales." (citing *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995))); *see also Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)* 80 B.R. 279, 285-86 (S.D.N.Y. 1987), *appeal dismissed* 838 F.2d 59 (2d Cir. 1988) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason").

15.    The business judgment rule is satisfied "when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and

14

(5) according to some courts and commentators, no abuse of discretion or waste of

corporate assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*

*(In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*,

3 F.3d 49 (2d Cir. 1993) (internal quotations omitted); *see also In re W.A. Mallory Co.,*

*Inc.*, 214 B.R. at 836 (discussing similar requirements for a section 363(b) sale under the

business judgment rule).  In fact, "[w]here the debtor articulates a reasonable basis for its

business decisions (as distinct from a decision made arbitrarily or capriciously), courts

will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-*

*Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,

60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Courts in this and other circuits have

consistently and appropriately been loath to interfere with corporate decisions "unless it

is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the

bankrupt's retained business discretion." *Lubrizol Enters., Inc. v. Richmond Metal*

*Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985) (applying the business judgment rule

to a debtor's decision to reject an executory contract); *see also In re Integrated Res. Inc.,*

147 B.R. at 656.

16.     Here, the Debtors' decision to proceed with the Sales in accordance with

the terms set out in the Term Sheets is based upon their sound business judgment.  The

McCoy Elkhorn Assets were idled in September 2013 to reduce the Debtors' production

costs and curb the effects of weakening demand for both thermal and metallurgical coal.

Despite their idling, these assets continue to require approximately $1,000,000 in

monthly expenditures.  Additionally, as borne out by the results of the robust prepetition

and postpetition marketing process for the McCoy Elkhorn Assets, including the Preliminary Indications of Interest that were received, the Debtors submit that the Term Sheets represent the highest or otherwise best offers for the McCoy Elkhorn Assets.

17.     The Debtors believe that the purchase price with respect to each of the Bevins Sale and Burke Sale, including assumed liabilities, represents the fair value of the purchased assets, and that the Sales will result in the maximum consideration for the McCoy Elkhorn Assets for the benefit of the Debtors' estates and creditors.  The Debtors conducted a robust prepetition and postpetition marketing process and entertained bids for the McCoy Elkhorn Assets pursuant to the Strategic Transaction Bidding Procedures. Given the passage of the deadline to submit Preliminary Indications of Interest, and the fact that the Sales are each subject to higher and better offers through May 30, 2014, approval of the Sales is warranted.[10]

---

[10] Even if the Sales were considered private sales despite the nature of the market-tested public sale process that was undertaken, they would be appropriate under the circumstances.  Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  By extension, a court should authorize a private sale as long as the decision to consummate such sale is made under sound business judgment.  *See, e.g., In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (approving the private sale of the debtor's tire company because the debtor showed sound business judgment).  Courts frequently have allowed chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.  *See, e.g., In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Jul. 23, 2010) [ECF No. 3366]; *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 20, 2008) [ECF No. 258]; *In re Loral Space & Commc'ns Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005) [ECF No. 2393]; *In re International Wire Grp., Inc., et al.*, Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004) [ECF No. 176]; *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619 (D. P.R. 1999) (upholding bankruptcy court approval of private sale); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

II.      The Sales Satisfy the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Encumbrances

18.      The Debtors request that the Court authorize each of the sale of the Bevins Assets and the Burke Assets free and clear of any and all liens, claims, interests and encumbrances (collectively, "**Encumbrances**"), with all such Encumbrances to attach only to the proceeds of the applicable Sale with the same priority, validity, perfection, enforceability and effect as they now have in or against the Bevins Assets or the Burke Assets, as applicable, subject to and with the full reservation of all rights by the Debtors and/or the official committee of unsecured creditors appointed in these chapter 11 cases, as applicable, to contest and/or avoid the priority, validity, perfection, enforceability and effect of such Encumbrances.  In the event any Encumbrances are successfully asserted against any of the Bevins Assets or Burke Assets, for the reasons set forth herein, the Debtors assert that the sale of the McCoy Elkhorn Assets may be approved free and clear of any such Encumbrances.

19.      Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim or interest in such property of an entity other than the estate if, among other things:

(1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

20.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the McCoy Elkhorn Assets "free and clear" of such Encumbrances.  *See, e.g.*, *In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only *one* of the enumerated conditions must be met in order for the Court to approve the proposed sale." (emphasis in original)).

21.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  While some courts have "narrowly interpreted that phrase to mean only in rem interests in property," *see, e.g., In re White Motor Credit Corp.,* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987), the Fourth Circuit has held that the scope of section 363(f) is not limited to in rem interests, and can extend to liabilities that arise under federal statute and for which a succeeding purchaser would otherwise be liable.  *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-85 (4th Cir. 1996).  Accordingly, courts in this District have given "any interest" a broad interpretation.  *See In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90, 94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens… [it] addresses sales free and clear of *any interest*." (emphasis in original)).

22.     In taking this view, courts in this District are in keeping with the trend toward "a more expansive reading of 'interests in property' which 'encompasses other

18

obligations that may flow from ownership of the property.'" *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003) (citing 3 COLLIER ON BANKRUPTCY ¶ 363.06[l]); *see also MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to sale proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtors' employees*); American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded in a sale of assets free and clear); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D. R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes).

23.    The Debtors submit that section 363(f) permits the sales of the McCoy Elkhorn Assets free and clear of all Encumbrances, except Encumbrances specifically assumed by the applicable Purchaser.  Each Encumbrance that is not the result of an assumed liability satisfies at least one, if not more, of the tests of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and defenses that the Debtors may possess with respect thereto.

III.     The Purchasers Should Be Entitled to the Protections of Section 363(m) of the
         Bankruptcy Code

24.     Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or
(c) of this section of a sale or lease of property does not affect the validity of a
sale or lease under such authorization to an entity that purchased or leased such
property in good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were stayed pending
appeal.  11 U.S.C. § 363(m).

25.     While the Bankruptcy Code does not define "good faith," in *Willemain v.
Kivitz* the Fourth Circuit, held that "[t]ypically, the misconduct that would destroy a
purchaser's good faith status at a judicial sale involves fraud, collusion between the
purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage
of other bidders".  764 F.2d 1019, 1023 (4th Cir. 1985) (quoting *In re Rock Indus. Mach.
Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the
precursor of section 363(m)).

26.     Here, each of the Sales was a result of an extensive marketing process that
began prepetition and good faith and arms'-length negotiations between the Debtors, the
applicable Purchaser and their respective professionals over the past year.  The Debtors
therefore request that the Court make a finding that, upon the closing of each of the Sales,
the applicable Purchaser will have purchased the Bevins Assets or Burke Assets, as
applicable, in good faith within the meaning of section 363(m) of the Bankruptcy Code.

IV.    Assumption and Assignment of Executory Contracts and Unexpired Leases
       Should Be Authorized

27.    The assumption and assignment of certain of the Debtors' Contracts and

Leases is an integral part of the Sales and should be approved by the Court.  Section

365(a) of the Bankruptcy Code authorizes a debtor in possession to assume and assign an

executory contract or unexpired lease subject to Court approval.  Section 365(b) of the

Bankruptcy Code requires a debtor in possession to satisfy certain requirements at the

time of assumption if a default exists under the contract to be assumed.

28.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession, "subject to the court's approval, may assume or reject any

executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  By enacting

section 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume

those leases/contracts that benefit the estate, and to reject those that are of no value or are

burdensome to the estate. *See In re Fas Mart Convenience Stores, Inc.*, 296 B.R. 414, 420

(Bankr. E.D. Va. 2002); *see also Cinicloa v.  Scharffenberger*, 248 F.3d 110, 119 (3d Cir.

2001); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983).

29.    It is well established that decisions to assume or reject executory contracts

or unexpired leases are matters within the "business judgment" of the debtor.  *See*

*Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.* (*Lubrizol Enters.*), 756 F.2d

1043, 1046-47 (4th Cir. 1985) (when reviewing a debtor's decision to assume or reject a

contract, courts "must start with the proposition that the bankrupt's decision… is to be

accorded the deference mandated by the sound business judgment rule as generally

applied by courts to discretionary actions or decisions of corporate directors.") *cert.*

*denied*, 475 U.S. 1057 (1986); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523

(1984). Accordingly, courts approve the assumption or rejection of an executory contract

or unexpired lease unless evidence is presented that the debtor's decision to assume or

reject was "so manifestly unreasonable that it could not be based on sound business

judgment, but only on bad faith, or whim or caprice." *Lubrizol Enters.*, 756 F.2d at 1047.

Indeed, to impose more exacting scrutiny would slow a debtor's reorganization, thereby

increasing its cost and undermining the "Bankruptcy Code's provisions for private

control" of the estate's administration. *Richmond Leasing Co. v. Capital Bank, N.A.*,

762 F.2d 1303, 1311 (5th Cir. 1985). Further, section 365 of the Bankruptcy Code

authorizes the assumption and assignment of contracts, provided that the defaults under

such contracts are cured and adequate assurance of future performance is provided. *See*

11 U.S.C. §§ 365(b)(1), 365(f)(2).

30. Adequate business justification exists to merit judicial approval of the

proposed assumption and assignment of the Assumed Contracts, which is an integral part

of the Sale. The Assumed Contracts are essential to the Sales. If the Debtors are unable

to assume and assign the executory contracts and unexpired leases it is likely to result in

an adjustment to the Purchase Price and may prevent the Sales from closing altogether.

In accordance with the terms of the Bevins APA and the Burke APA, all applicable Cure

Amounts, if any, in connection with the Assumed Contracts will be paid. To the extent

necessary to satisfy the Court, the Debtors believe they can demonstrate at the Sale

Hearing that all requirements for assumption and/or assignment of the Assumed

Contracts will be satisfied. Moreover, as noted above, each non-debtor party to an

Assumed Contract will receive notice of the proposed assumption and assignment, and the proposed Cure Amount, and have a reasonable opportunity to object thereto. Accordingly, the Debtors respectfully request that the Court approve any proposed assumption and assignment of the Assumed Contracts.

31.    Additionally, waiver of Bankruptcy Rule 6006(f)(6), which requires that a motion to assume or assign multiple executory contracts or unexpired leases be limited to no more than 100 executory contracts or unexpired leases, is appropriate given that the assumption and rejection of the Assumed Contracts is an integral part of the Sales. Establishing a single, integrated set of procedures ensures fair and uniform treatment of each of the Assumed Contracts, and avoid the unnecessary and costly administrative burdens that separate motions would impose on the Debtors and the Court.

32.    To assist in the assumption and assignment, or assignment, as applicable, of Assumed Contracts, the Debtors request that the Bevins Sale Order and the Burke Sale Order provide that certain anti-assignment provisions in the Assumed Contracts shall not restrict, limit or prohibit the assumption and assignment, or assignment, as applicable, of the Assumed Contracts and that such provisions are deemed and found to be unenforceable within the meaning of section 365(f) of the Bankruptcy Code.

V.    Notice of the Sales is Adequate and Reasonable Under the Circumstances

33.    Notice of this Motion has been provided to the Core Parties, the 2002 List Parties (as each such term is defined in the Notice, Case Management and Administrative Procedures approved by this Court on April 10, 2014 [ECF No. 77]).  In addition, notice of this Motion, which included a disclosure of the time and place of the hearing to

23

approve the Sales, instructions on obtaining a copy of the Motion and the deadline for

filing any objection was filed on the Debtors' entire creditor matrix and each party that

submitted a Preliminary Indication of Interest in accordance with the Strategic

Transaction Bidding Procedures.

34.    Additionally, the Assumption and Assignment Notice, which will be

served on each of the Contract Counterparties, is reasonably calculated to enable the

Contract Counterparties to object to the assumption and assignment of the Assumed

Contracts on any basis, including the Cure Amounts or the adequacy of the applicable

Purchaser's assurance of future performance, and to provide certainty to all parties in

interest regarding their obligations and rights in respect thereof.

35.    The Debtors submit that no other notice is required in connection with the

Sales of the McCoy Elkhorn Assets.

### Request for Waiver of Stay

36.    In addition, by this Motion, the Debtors seek a waiver of any stay of the

effectiveness of the order approving this Motion pursuant to any applicable Bankruptcy

Rule or Local Bankruptcy Rule pursuant to any applicable Bankruptcy Rule or Local

Bankruptcy Rule.  Specifically, pursuant to Bankruptcy Rule 6004(h), "[a]n order

authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 14 days after entry of the order, unless the court orders otherwise."

Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to

assign an executory contract or unexpired lease under §365(f) is stayed until the

expiration of 14 days after the entry of the order, unless the court orders otherwise."  The

Debtors require immediate relief in order to move forward expeditiously with the Sales

and preserve the value of their estates.  Accordingly, the Debtors submit that ample cause

exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and

6006(d) and any other applicable Bankruptcy Rule or Local Bankruptcy Rule or

otherwise applicable law, to the extent that it applies.

### **No Previous Request**

37.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated:   May 23, 2014
          Richmond, Virginia

Respectfully submitted,

/s/ Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors
and Debtors in Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors
and Debtors in Possession*

**SCHEDULE 1**
(Debtor Entities)

| | | | |
|---|---|---|---|
| 1. | James River Coal Company (2012) | 18. | IRP WV Corp. (6050) |
| 2. | BDCC Holding Company, Inc. (3200) | 19. | James River Coal Sales, Inc. (3417) |
| 3. | Bell County Coal Corporation (0806) | 20. | James River Coal Service Company (2577) |
| 4. | Bledsoe Coal Corporation (4821) | 21. | James River Escrow Inc. (0314) |
| 5. | Bledsoe Coal Leasing Company (6654) | 22. | Jellico Mining, LLC (4545) |
| 6. | Blue Diamond Coal Company (3812) | 23. | Johns Creek Coal Company (9412) |
| 7. | Buck Branch Resources LLC (1459) | 24. | Johns Creek Elkhorn Coal Corporation (9199) |
| 8. | Chafin Branch Coal Company, LLC (7873) | 25. | Johns Creek Processing Company (4021) |
| 9. | Eolia Resources, Inc. (0587) | 26. | Laurel Mountain Resources LLC (1458) |
| 10. | Hampden Coal Company, LLC (4334) | 27. | Leeco, Inc. (4176) |
| 11. | International Resource Partners LP (8669) | 28. | Logan & Kanawha Coal Co., LLC (5716) |
| 12. | International Resources Holdings I LLC (9838) | 29. | McCoy Elkhorn Coal Corporation (8373) |
| 13. | International Resources Holdings II LLC (1567) | 30. | Rockhouse Creek Development, LLC (9583) |
| 14. | International Resources, LLC (2522) | 31. | Shamrock Coal Company, Incorporated (1843) |
| 15. | IRP GP Holdco LLC (5380) | 32. | Snap Creek Mining, LLC (6858) |
| 16. | IRP Kentucky LLC (1454) | 33. | Triad Mining Inc. (9005) |
| 17. | IRP LP Holdco Inc. (4447) | 34. | Triad Underground Mining, LLC (9041) |

# EXHIBIT A

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone:   (212) 450-4000

Facsimile:   (212) 607-7973

Marshall S. Huebner (admitted *pro hac vice*)

Brian M. Resnick (admitted *pro hac vice*)

Michelle M. McGreal (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia 23219

Telephone: (804) 788-8200

Facsimile: (804) 788-8218

Tyler P. Brown (VSB No. 28072)

Henry P. (Toby) Long, III (VSB No. 75134)

Justin F. Paget (VSB No. 77949)

*Counsel to the Debtors*
*and Debtors in Possession*

*Local Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| In re: | **Chapter 11** |
| **JAMES RIVER COAL COMPANY, *et al.*,** | **Case No. 14-31848 (KRH)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## ORDER (i) APPROVING THE SALES AND TRANSFERS OF CERTAIN ASSETS AND LIABILITIES RELATED TO THE McCOY ELKHORN MINING COMPLEX FREE AND CLEAR OF ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (iii) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of James River Coal Company and its

subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the

"**Debtors**"), for an order pursuant to sections 363 and 365 of chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-2 of

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia

(the "**Local Bankruptcy Rules**") (i) authorizing entry into an asset purchase agreement,

attached hereto as Exhibit 1 (the "**APA**"),[2] among Debtor James River Coal Company

("**James River**"), Debtor McCoy Elkhorn Coal Corporation ("**McCoy Elkhorn,**"), any

Debtor affiliate of McCoy Elkhorn that holds any interest in the Bevins Assets (as

defined below) (collectively with James River and McCoy Elkhorn, the "**Sellers**"), and

Opes Resources, Inc. (the "**Purchaser**") substantially on the terms and conditions set

forth in the Summary of Terms and Conditions attached as <u>Exhibit C</u> to the Motion; (ii)

approving the sale and transfer (the "**Sale**") of certain assets of the Sellers (the "**Bevins**

**Assets**") to the Purchaser in accordance with the APA; (ii) authorizing the assumption

and assignment of certain executory contracts and unexpired leases in connection

therewith; and (iii) granting such other and further relief as is just and proper, as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration

of the Motion and the requested relief being a core proceeding under 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided; and no other or further notice

need be provided; and the relief requested in the Motion being in the best interests of the

Debtors, their estates, the creditors and other parties in interest; and the Court having

reviewed the Motion and having held a hearing with appearances of parties in interest

noted in the transcript thereof (the "**Hearing**"); and the Court having determined that the

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion or the APA, as applicable.

legal and factual bases set forth in the Motion and at the Hearing establish just cause for

the relief granted herein; and upon all of the proceedings had before the Court; and after

due deliberation and sufficient cause appearing therefor,

### THE COURT HEREBY FINDS AS FOLLOWS:[3]

A.      On April 7, 2014 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

"**Chapter 11 Cases**").

B.      This Court has jurisdiction to hear and determine the Motion pursuant to

28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases and the Motion in this

District is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).

C.      The statutory predicates for the relief requested in the Motion are sections

363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local

Bankruptcy Rule 6004-2.

D.      The Debtors continue to operate their business and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.      No trustee or examiner has been appointed in the Chapter 11 Cases.

F.      As evidenced by the certification of service previously filed with the

Court, and based on the representations of counsel at the Hearing: (i) proper, timely,

adequate and sufficient notice of the Motion, the Hearing and the Sale has been provided

in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy

---

[3]       Findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

Rules 2002, 6004, 6006 and 9007; (ii) such notice was good and sufficient, and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the Hearing, the Sale or the entry of this Order shall be required.  Notice of the Motion, the Sale and the Hearing was also posted electronically on the website maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' Claims, Noticing and Balloting Agent, at *http://dm.epiq11.com/JamesRiverCoal*.

G.     The Debtors served the Notice of Sale and Assumption and Assignment Notice on each Contract Counterparty under each Assumed Contract, and such parties were provided with a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein, including the assumption and assignment of the Assumed Contracts and any Cure Amounts in respect thereof.

H.     A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities.

I.     As demonstrated by the record of the Hearing and the dockets in the Chapter 11 Cases, the Debtors have demonstrated good and sufficient reasons for the Court to approve the Motion and the Sale.

J.     The "**Bevins Assets**" will consist of James River's and its subsidiaries' and McCoy Elkhorn's right, title and interest in, to certain assets relating to the McCoy Elkhorn mining complex that are being transferred to the Purchaser pursuant to the APA.

K.     The Debtors are the sole and lawful owners of the Bevins Assets.

L.     The purchase price to be paid by the Purchaser is fair and constitutes reasonably equivalent value and reasonable market value for the Bevins Assets.

M.     The Purchaser is a purchaser in good faith with respect to the Bevins

Assets, as that term is used in section 363(m) of the Bankruptcy Code.  The APA was

negotiated, proposed and entered into by the parties in good faith, from arms' length

bargaining positions and without collusion or fraud, and the Purchaser is entitled to the

protections of section 363(m) of the Bankruptcy Code with respect to the Bevins Assets.

None of the Debtors nor the Purchaser has engaged in conduct that would cause or permit

the Sale to be voided under section 363(n) of the Bankruptcy Code.

N.     Except as specifically provided in the APA, the Purchaser shall not

assume or become liable for any Encumbrances (as defined below) relating to the Bevins

Assets being sold by the Debtors unless expressly stated in the APA or this Order.  Any

such valid and enforceable Encumbrances shall attach to the proceeds of the Sale.

O.     Sound business reasons have been articulated for performing the

obligations set forth in the APA and selling the Bevins Assets as set forth in the Motion

outside of a plan of reorganization, and it is a reasonable exercise of business judgment to

execute, deliver and consummate the APA with the Purchaser and consummate the

transactions contemplated thereby.

P.     The Debtors may sell the Bevins Assets free and clear of any

Encumbrances because, in each case, one or more of the standards set forth in section

363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of such

Encumbrances who did not object, or who withdrew their objections, to the Sale or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy

Code.

Q.      The terms and conditions set forth in the APA, including the total

consideration to be realized by the Debtors, are fair and reasonable and the transaction

contemplated by the APA is in the best interests of the Debtors, their creditors and their

estates.

R.      A valid business purpose exists for approval of the transaction

contemplated by the Motion pursuant to sections 363(b), (f) and (m) of the Bankruptcy

Code.  The Debtors may sell, transfer and assign the Bevins Assets free and clear of the

Encumbrances in accordance with section 363 of the Bankruptcy Code.  As a condition to

purchasing the Bevins Assets, the Purchaser requires that: (a) the Bevins Assets be sold

free and clear of the Encumbrances; and (b) the Purchaser shall have no liability

whatsoever for any obligations of, or claims (including without limitation as defined in

section 101(5) of the Bankruptcy Code) against, the Debtors except those expressly

provided in the APA or this Order.  The Purchaser will not enter into an APA and

consummate the transactions contemplated thereby, thus adversely affecting the Debtors'

estates, if the sale to the Purchaser was not free and clear of Encumbrances or if the

Purchaser was or would be liable for any obligations of, or claims (including without

limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors,

except as otherwise explicitly provided in the APA or this Order.

S.      The transfer of the Bevins Assets to the Purchaser is or will be a legal,

valid and effective transfer of the Bevins Assets, and will vest the Purchaser with all

right, title and interest in and to the Bevins Assets, free and clear of Encumbrances,

except those explicitly and expressly excluded in the APA or this Order.

T.      An injunction against creditors and third parties pursuing Encumbrances is necessary to induce the Purchaser to close the Sale; the issuance of such an injunction is therefore necessary to avoid irreparable injury to the Debtors' estates, and will benefit all creditors.

U.      The requirements of sections 363(b) and 363(f) of the Bankruptcy Code and any other applicable law relating to the Sale of the Bevins Assets have been satisfied.

**AND IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion is hereby GRANTED.

2.      The Motion, the APA and the transactions contemplated thereby are approved, and the Debtors are authorized and empowered to enter into the APA, to perform their obligations thereunder, and to take such action as is necessary to effectuate the terms of the APA, without any further corporate authorization or order of this Court.

3.      The Debtors are hereby authorized, empowered and directed, pursuant to sections 363(b) and (f) of the Bankruptcy Code, to sell the Bevins Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the APA, and, pursuant to section 363 of the Bankruptcy Code, title to the Bevins Assets shall pass to the Purchaser at closing, free and clear of any and all mortgages, liens, pledges, charges, security interests and encumbrances (collectively, the "**Encumbrances**").  All such Encumbrances upon the Bevins Assets to be unconditionally released, discharged and terminated, with all such Encumbrances to attach only to the proceeds of the Sale with the same priority, validity, force and effect as they existed with respect to the Bevins Assets prior to the Closing Date except as may be set forth herein.

4.     The Debtors and the Purchaser are directed to comply, and shall comply, with all provisions of the APA.

5.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the the APA or any other related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

6.     The transfer of the Bevins Assets to the Purchaser pursuant to the APA constitutes a legal, valid and effective transfer and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Bevins Assets so transferred.

7.     This Order and the APA shall be binding upon, and shall inure to the benefit of the Debtors, the Purchaser, and their respective successors and assigns, including without limitation, any chapter 11 trustee hereinafter appointed for the Debtors or any trustee appointed in a chapter 7 case, and its estate and creditors, if any of these Chapter 11 Cases are converted from chapter 11.

8.     On the date of the closing of the transactions contemplated by the APA (the "**Closing Date**"), each of the creditors of the Debtors is authorized and directed to execute such documents and take all other actions as may be necessary to release the Encumbrances against or in the Bevins Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

9.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances against or in the Bevins Assets shall not have delivered to the Debtors

prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and releases of the Encumbrances that the person or entity has with respect to the Bevins Assets or otherwise, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Bevins Assets.

10.    Effective upon the Closing Date, all parties and/or entities asserting Encumbrances or contract rights against the Debtors and/or any of the Bevins Assets are hereby permanently enjoined and precluded from, with respect to such Encumbrances: (i) asserting, commencing or continuing in any manner any action against the Purchaser or any director, officer, agent, representative or employee of the Purchaser (all such entities are collectively referred to as the "**Protected Parties**") or against any Protected Party's Bevins Assets or properties, including without limitation the Bevins Assets; (ii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award, decree or order against the Protected Parties or any properties or Bevins Assets of the Protected Parties, including without limitation the Bevins Assets; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Protected Parties or any properties or Bevins Assets of the Protected Parties, including without limitation the Bevins Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Protected Parties; and (v) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Order or the APA.

11.     The provisions of this Order authorizing the sale of the Bevins Assets free and clear of the Encumbrances (with such Encumbrances to attach to the proceeds of the Sale) shall be self-executing, and none of the Debtors, the Purchaser nor any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale; *provided, however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA.  Without in any way limiting the foregoing, the Purchaser is empowered to execute and file releases, termination statements, assignments, consents, cancellations or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale.

12.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

13.     Consummation of the Sale and the transactions contemplated by the APA does not effect a *de facto* merger or consolidation of the Debtors and the Purchaser or result in the continuation of the Debtors' business under the Purchaser's control.  The Purchaser is not, and will not become by virtue of the Sale, the alter ego of, a successor in interest to, or a continuation of the Debtors, nor is the Purchaser otherwise liable for the Debtors' debts and obligations, unless otherwise specifically provided for in the APA or pursuant to this Order.

14.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Bevins Assets are hereby directed to surrender possession of the Bevins Assets to the Purchaser on the Closing Date.

15.    Nothing contained in any plan of reorganization (or liquidation) confirmed in these cases or the order of confirmation confirming any such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

16.    The APA is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford, and is not in violation of creditors' and equity security interest holders' voting rights.

17.    The purchase by the Purchaser is a purchase in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code, and the Purchaser is entitled to the protection of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification or appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date.

18.    The sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Bevins Assets shall be deemed to constitute reasonably equivalent value and fair consideration.

19.    From and after entry of this Order, none of the Debtors nor any other person shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Bevins Assets either to the Debtors prior to the closing of the Sale for subsequent transfer to the Purchaser, or to the Purchaser in accordance with the terms and conditions of the APA and this Order.

20.    The Debtors have demonstrated that the assumption by the applicable Debtors and assignment to the Purchaser of the Assumed Contracts is in the best interests

11

of the Debtors, their creditors and their estates and represents a prudent exercise of the Debtors' business judgment.  The Assumed Contracts are an integral part of the Bevins Assets and, accordingly, such assumptions and assignments are reasonable, enhance the value of the estate and do not constitute unfair discrimination.

21.    The contracts and leases set forth on Schedule [_] to the APA (the "**Assumed Contracts**") are in full force and effect and (subject to, and upon the payment of, the Cure Amounts), no default on the part of the Debtors exists under the Assumed Contracts with respect to any material term, condition, covenant, payment obligation or other obligations thereunder, whether prepetition or postpetition in nature, other than any default existing as a result of the filing of the Chapter 11 Cases.

22.    The Debtors and the Purchaser have (i) cured, or provided adequate assurance of cure, any default by the Debtors existing prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) compensated, or provided adequate assurance of compensation, to the Contract Counterparties for any actual pecuniary loss to such party resulting from a default by the Debtors prior to the date hereof under such Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Purchaser has provided adequate assurance of its future performance of and under the Assumed Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

23.    With respect to each Assumed Contract listed on Schedule A hereto, the Cure Amount set forth on Schedule A hereto opposite such Assumed Contract is the sole amount necessary to cure all monetary defaults by the Debtors and to pay all actual

pecuniary losses, if any, with respect to such Assumed Contract pursuant to section 365(b)(1) of the Bankruptcy Code.

24.     Pursuant to section 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtors are hereby authorized to: (a)  assume the Assumed Contracts and assign such contracts to the Purchaser, effective upon the Closing Date; (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to the Purchaser, and (c) pay the required Cure Amounts, if any, at Closing (or as soon thereafter as is reasonably practicable).

25.     Upon the occurrence of the Closing Date, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. Any provision in any Assumed Contract that purports to declare a breach, default or termination as a result of a change of control of the Bevins Assets or requires the consent of any non-debtor party for the assumption and assignment thereof is hereby deemed unenforceable under section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any liability with respect to the Assumed Contracts occurring after such assignment to and assumption by the Purchaser except as expressly provided in the APA.

26.     All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the closing of the Sale (without giving effect to any

acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of

the Bankruptcy Code) shall be cured as set forth in the APA as of the Closing Date or as

soon thereafter as practicable.  The Purchaser shall have no liability or obligation for any

such defaults or other obligations arising or accruing prior to the Closing Date, except as

otherwise expressly provided in the APA.

     27.    Each Contract Counterparty that has not filed a timely objection to the

assumption and assignment of its Assumed Contract, including to any Cure Amount, is

hereby forever barred, estopped and permanently enjoined from filing any such objection

and from asserting, prosecuting or otherwise pursuing any of Debtors, the Purchaser or

any of their respective affiliates, successors or assigns or any of their respective affiliates,

agents, representatives, counsel and advisors, the Bevins Assets or any other assets or

operations of any of the Debtors or the Purchaser on the basis that any amounts in excess

of the Cure Amount set forth opposite such Assumed Contract on Schedule A hereto is

owing with respect to any defaults under such Assumed Contract and/or that any other

conditions to assumption or assignment must be satisfied in order for the Assumed

Contract to be assumed by any of the Debtors and assigned to the Purchaser.  All parties

who have failed to raise with particularity that such party's consent is required for the

Debtors to assume and assign such Assumed Contract are hereby deemed to have given

the consent contemplated by Bankruptcy Code section 365(c)(1)(B) and (f)(1) to the

assumption of such Assumed Contract by the Debtors and the assignment of such

Assumed Contract to the Purchaser.

     28.    The failure of the Debtors or the Purchaser to enforce at any time one or

more terms or conditions of any Assumed Contract shall not constitute a waiver of any

14

such terms or conditions, or of the Debtors' or the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

29.     Upon the occurrence of the closing of the Sale, the Purchaser shall assume all liabilities associated with the Assumed Contracts in accordance with the terms of the APA.

30.     Any objections to the Motion or the relief requested therein that have not been adjourned, withdrawn or resolved are overruled in all respects on the merits.

31.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

32.     As of the time of the closing of the Sale, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.

33.     The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof; *provided*, that, (a) an order of this Court has approved such modification, amendment, or supplement; (b) such modification, amendment or supplement is not material or (c) such modification, amendment or supplement is made in the ordinary course of business.

34.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

35.     Notice of the Motion as provided therein shall be deemed good and sufficient notice.

36.     In the event of any inconsistencies between this Order, the Motion and the APA, this Order shall govern in all respects.

37.     Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rules 6004(h) and 6006(d)) or Local Bankruptcy Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  Time is of the essence in closing the Sale, and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk their appeal being foreclosed as moot.

38.     The provisions of this Order are nonseverable and mutually dependent.

39.     This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order, the APA or any document related thereto.

Richmond, Virginia

Dated:_____, 2014



_____
KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY JUDGE


Entered on Docket: _____

16

WE ASK FOR THIS:

/s/ Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
 Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors and Debtors in Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

      I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

                                              /s/ Henry P. (Toby) Long, III

17

# EXHIBIT 1

**APA**

[To come]

# SCHEDULE A

**Cure Amounts**

[To come]

# EXHIBIT B

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone:  (212) 450-4000

Facsimile:   (212) 607-7973

Marshall S. Huebner (admitted *pro hac vice*)

Brian M. Resnick (admitted *pro hac vice*)

Michelle M. McGreal (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia 23219

Telephone: (804) 788-8200

Facsimile: (804) 788-8218

Tyler P. Brown (VSB No. 28072)

Henry P. (Toby) Long, III (VSB No. 75134)

Justin F. Paget (VSB No. 77949)

*Counsel to the Debtors*
*and Debtors in Possession*

*Local Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | **Chapter 11** |
| **JAMES RIVER COAL COMPANY,** *et al.*, | **Case No. 14-31848 (KRH)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## ORDER (i) APPROVING THE SALES AND TRANSFERS OF CERTAIN ASSETS AND LIABILITIES RELATED TO THE McCOY ELKHORN MINING COMPLEX FREE AND CLEAR OF ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (iii) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of James River Coal Company and its

subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the

"**Debtors**"), for an order pursuant to sections 363 and 365 of chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-2 of

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia

(the "**Local Bankruptcy Rules**") (i) authorizing entry into an asset purchase agreement,

attached hereto as Exhibit 1 (the "**APA**"),[2] among Debtor James River Coal Company

("**James River**"), Debtor McCoy Elkhorn Coal Corporation ("**McCoy Elkhorn,**"), any

Debtor affiliate of McCoy Elkhorn that holds any interest in the Burke Assets (as defined

below) (collectively with James River and McCoy Elkhorn, the "**Sellers**"), and Marshall

Resources, Inc. (the "**Purchaser**") substantially on the terms and conditions set forth in

the Summary of Terms and Conditions attached as Exhibit D to the Motion; (ii)

approving the sale and transfer (the "**Sale**") of certain assets of the Sellers (the "**Burke**

**Assets**") to the Purchaser in accordance with the APA; (ii) authorizing the assumption

and assignment of certain executory contracts and unexpired leases in connection

therewith; and (iii) granting such other and further relief as is just and proper, as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration

of the Motion and the requested relief being a core proceeding under 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided; and no other or further notice

need be provided; and the relief requested in the Motion being in the best interests of the

Debtors, their estates, the creditors and other parties in interest; and the Court having

reviewed the Motion and having held a hearing with appearances of parties in interest

noted in the transcript thereof (the "**Hearing**"); and the Court having determined that the

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion or the APA, as applicable.

legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AS FOLLOWS:**[3]

A.      On April 7, 2014 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").

B.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

C.      The statutory predicates for the relief requested in the Motion are sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local Bankruptcy Rule 6004-2.

D.      The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.      No trustee or examiner has been appointed in the Chapter 11 Cases.

F.      As evidenced by the certification of service previously filed with the Court, and based on the representations of counsel at the Hearing: (i) proper, timely, adequate and sufficient notice of the Motion, the Hearing and the Sale has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

Rules 2002, 6004, 6006 and 9007; (ii) such notice was good and sufficient, and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the Hearing, the Sale or the entry of this Order shall be required.  Notice of the Motion, the Sale and the Hearing was also posted electronically on the website maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' Claims, Noticing and Balloting Agent, at *http://dm.epiq11.com/JamesRiverCoal*.

G.      The Debtors served the Notice of Sale and Assumption and Assignment Notice on each Contract Counterparty under each Assumed Contract, and such parties were provided with a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein, including the assumption and assignment of the Assumed Contracts and any Cure Amounts in respect thereof.

H.      A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities.

I.      As demonstrated by the record of the Hearing and the dockets in the Chapter 11 Cases, the Debtors have demonstrated good and sufficient reasons for the Court to approve the Motion and the Sale.

J.      The "**Burke Assets**" will consist of James River's and its subsidiaries' and McCoy Elkhorn's right, title and interest in, to certain assets relating to the McCoy Elkhorn mining complex that are being transferred to the Purchaser pursuant to the APA.

K.      The Debtors are the sole and lawful owners of the Burke Assets.

L.      The purchase price to be paid by the Purchaser is fair and constitutes reasonably equivalent value and reasonable market value for the Burke Assets.

4

M.      The Purchaser is a purchaser in good faith with respect to the Burke

Assets, as that term is used in section 363(m) of the Bankruptcy Code.  The APA was

negotiated, proposed and entered into by the parties in good faith, from arms' length

bargaining positions and without collusion or fraud, and the Purchaser is entitled to the

protections of section 363(m) of the Bankruptcy Code with respect to the Burke Assets.

None of the Debtors nor the Purchaser has engaged in conduct that would cause or permit

the Sale to be voided under section 363(n) of the Bankruptcy Code.

N.      Except as specifically provided in the APA, the Purchaser shall not

assume or become liable for any Encumbrances (as defined below) relating to the Burke

Assets being sold by the Debtors unless expressly stated in the APA or this Order.  Any

such valid and enforceable Encumbrances shall attach to the proceeds of the Sale.

O.      Sound business reasons have been articulated for performing the

obligations set forth in the APA and selling the Burke Assets as set forth in the Motion

outside of a plan of reorganization, and it is a reasonable exercise of business judgment to

execute, deliver and consummate the APA with the Purchaser and consummate the

transactions contemplated thereby.

P.      The Debtors may sell the Burke Assets free and clear of any

Encumbrances because, in each case, one or more of the standards set forth in section

363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of such

Encumbrances who did not object, or who withdrew their objections, to the Sale or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy

Code.

Q.      The terms and conditions set forth in the APA, including the total

consideration to be realized by the Debtors, are fair and reasonable and the transaction

contemplated by the APA is in the best interests of the Debtors, their creditors and their

estates.

R.      A valid business purpose exists for approval of the transaction

contemplated by the Motion pursuant to sections 363(b), (f) and (m) of the Bankruptcy

Code.  The Debtors may sell, transfer and assign the Burke Assets free and clear of the

Encumbrances in accordance with section 363 of the Bankruptcy Code.  As a condition to

purchasing the Burke Assets, the Purchaser requires that: (a) the Burke Assets be sold

free and clear of the Encumbrances; and (b) the Purchaser shall have no liability

whatsoever for any obligations of, or claims (including without limitation as defined in

section 101(5) of the Bankruptcy Code) against, the Debtors except those expressly

provided in the APA or this Order.  The Purchaser will not enter into an APA and

consummate the transactions contemplated thereby, thus adversely affecting the Debtors'

estates, if the sale to the Purchaser was not free and clear of Encumbrances or if the

Purchaser was or would be liable for any obligations of, or claims (including without

limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors,

except as otherwise explicitly provided in the APA or this Order.

S.      The transfer of the Burke Assets to the Purchaser is or will be a legal,

valid and effective transfer of the Burke Assets, and will vest the Purchaser with all right,

title and interest in and to the Burke Assets, free and clear of Encumbrances, except those

explicitly and expressly excluded in the APA or this Order.

T.      An injunction against creditors and third parties pursuing Encumbrances is necessary to induce the Purchaser to close the Sale; the issuance of such an injunction is therefore necessary to avoid irreparable injury to the Debtors' estates, and will benefit all creditors.

U.      The requirements of sections 363(b) and 363(f) of the Bankruptcy Code and any other applicable law relating to the Sale of the Burke Assets have been satisfied.

**AND IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion is hereby GRANTED.

2.      The Motion, the APA and the transactions contemplated thereby are approved, and the Debtors are authorized and empowered to enter into the APA, to perform their obligations thereunder, and to take such action as is necessary to effectuate the terms of the APA, without any further corporate authorization or order of this Court.

3.      The Debtors are hereby authorized, empowered and directed, pursuant to sections 363(b) and (f) of the Bankruptcy Code, to sell the Burke Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the APA, and, pursuant to section 363 of the Bankruptcy Code, title to the Burke Assets shall pass to the Purchaser at closing, free and clear of any and all mortgages, options, pledges, liens, charges, security  interests, encumbrances, restrictions, leases, licenses, easements, liabilities or adverse claims of any nature whatsoever, direct or indirect, whether accrued, absolute, contingent or otherwise (collectively, the "**Encumbrances**").  All such Encumbrances upon the Burke Assets to be unconditionally released, discharged and terminated, with all such Encumbrances to attach only to the proceeds of the Sale with the same priority,

validity, force and effect as they existed with respect to the Burke Assets prior to the Closing Date except as may be set forth herein.

4.      The Debtors and the Purchaser are directed to comply, and shall comply, with all provisions of the APA.

5.      The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the the APA or any other related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

6.      The transfer of the Burke Assets to the Purchaser pursuant to the APA constitutes a legal, valid and effective transfer and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Burke Assets so transferred.

7.      This Order and the APA shall be binding upon, and shall inure to the benefit of the Debtors, the Purchaser, and their respective successors and assigns, including without limitation, any chapter 11 trustee hereinafter appointed for the Debtors or any trustee appointed in a chapter 7 case, and its estate and creditors, if any of these Chapter 11 Cases are converted from chapter 11.

8.      On the date of the closing of the transactions contemplated by the APA (the "**Closing Date**"), each of the creditors of the Debtors is authorized and directed to execute such documents and take all other actions as may be necessary to release the Encumbrances against or in the Burke Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

8

9.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances against or in the Burke Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and releases of the Encumbrances that the person or entity has with respect to the Burke Assets or otherwise, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Burke Assets.

10.      Effective upon the Closing Date, all parties and/or entities asserting Encumbrances or contract rights against the Debtors and/or any of the Burke Assets are hereby permanently enjoined and precluded from, with respect to such Encumbrances: (i) asserting, commencing or continuing in any manner any action against the Purchaser or any director, officer, agent, representative or employee of the Purchaser (all such entities are collectively referred to as the "**Protected Parties**") or against any Protected Party's Burke Assets or properties, including without limitation the Burke Assets; (ii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award, decree or order against the Protected Parties or any properties or Burke Assets of the Protected Parties, including without limitation the Burke Assets; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Protected Parties or any properties or Burke Assets of the Protected Parties, including without limitation the Burke Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Protected Parties; and (v) taking any action, in

any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Order or the APA.

11.    The provisions of this Order authorizing the sale of the Burke Assets free and clear of the Encumbrances (with such Encumbrances to attach to the proceeds of the Sale) shall be self-executing, and none of the Debtors, the Purchaser nor any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale; *provided, however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA.  Without in any way limiting the foregoing, the Purchaser is empowered to execute and file releases, termination statements, assignments, consents, cancellations or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale.

12.    A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

13.    Consummation of the Sale and the transactions contemplated by the APA does not effect a *de facto* merger or consolidation of the Debtors and the Purchaser or result in the continuation of the Debtors' business under the Purchaser's control.  The Purchaser is not, and will not become by virtue of the Sale, the alter ego of, a successor in interest to, or a continuation of the Debtors, nor is the Purchaser otherwise liable for the Debtors' debts and obligations, unless otherwise specifically provided for in the APA or pursuant to this Order.

14.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Burke Assets are hereby directed to surrender possession of the Burke Assets to the Purchaser on the Closing Date.

15.     Nothing contained in any plan of reorganization (or liquidation) confirmed in these cases or the order of confirmation confirming any such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

16.     The APA is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford, and is not in violation of creditors' and equity security interest holders' voting rights.

17.     The purchase by the Purchaser is a purchase in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code, and the Purchaser is entitled to the protection of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification or appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date.

18.     The sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Burke Assets shall be deemed to constitute reasonably equivalent value and fair consideration.

19.     From and after entry of this Order, none of the Debtors nor any other person shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Burke Assets either to the Debtors prior to the closing of the Sale

for subsequent transfer to the Purchaser, or to the Purchaser in accordance with the terms and conditions of the APA and this Order.

20.    The Debtors have demonstrated that the assumption by the applicable Debtors and assignment to the Purchaser of the Assumed Contracts is in the best interests of the Debtors, their creditors and their estates and represents a prudent exercise of the Debtors' business judgment.  The Assumed Contracts are an integral part of the Burke Assets and, accordingly, such assumptions and assignments are reasonable, enhance the value of the estate and do not constitute unfair discrimination.

21.    The contracts and leases set forth on Schedule [_] to the APA (the "**Assumed Contracts**") are in full force and effect and (subject to, and upon the payment of, the Cure Amounts), no default on the part of the Debtors exists under the Assumed Contracts with respect to any material term, condition, covenant, payment obligation or other obligations thereunder, whether prepetition or postpetition in nature, other than any default existing as a result of the filing of the Chapter 11 Cases.

22.    The Debtors and the Purchaser have (i) cured, or provided adequate assurance of cure, any default by the Debtors existing prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) compensated, or provided adequate assurance of compensation, to the Contract Counterparties for any actual pecuniary loss to such party resulting from a default by the Debtors prior to the date hereof under such Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Purchaser has provided adequate assurance of its future performance of and under the Assumed Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

23.     With respect to each Assumed Contract listed on Schedule A hereto, the Cure Amount set forth on Schedule A hereto opposite such Assumed Contract is the sole amount necessary to cure all monetary defaults by the Debtors and to pay all actual pecuniary losses, if any, with respect to such Assumed Contract pursuant to section 365(b)(1) of the Bankruptcy Code.

24.     Pursuant to section 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtors are hereby authorized to: (a) assume the Assumed Contracts and assign such contracts to the Purchaser, effective upon the Closing Date; (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to the Purchaser, and (c) pay the required Cure Amounts, if any, at Closing (or as soon thereafter as is reasonably practicable).

25.     Upon the occurrence of the Closing Date, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. Any provision in any Assumed Contract that purports to declare a breach, default or termination as a result of a change of control of the Burke Assets or requires the consent of any non-debtor party for the assumption and assignment thereof is hereby deemed unenforceable under section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any liability with respect to

the Assumed Contracts occurring after such assignment to and assumption by the Purchaser except as expressly provided in the APA.

26.     All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the closing of the Sale (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured as set forth in the APA as of the Closing Date or as soon thereafter as practicable.  The Purchaser shall have no liability or obligation for any such defaults or other obligations arising or accruing prior to the Closing Date, except as otherwise expressly provided in the APA.

27.     Each Contract Counterparty that has not filed a timely objection to the assumption and assignment of its Assumed Contract, including to any Cure Amount, is hereby forever barred, estopped and permanently enjoined from filing any such objection and from asserting, prosecuting or otherwise pursuing any of Debtors, the Purchaser or any of their respective affiliates, successors or assigns or any of their respective affiliates, agents, representatives, counsel and advisors, the Burke Assets or any other assets or operations of any of the Debtors or the Purchaser on the basis that any amounts in excess of the Cure Amount set forth opposite such Assumed Contract on Schedule A hereto is owing with respect to any defaults under such Assumed Contract and/or that any other conditions to assumption or assignment must be satisfied in order for the Assumed Contract to be assumed by any of the Debtors and assigned to the Purchaser.  All parties who have failed to raise with particularity that such party's consent is required for the Debtors to assume and assign such Assumed Contract are hereby deemed to have given the consent contemplated by Bankruptcy Code section 365(c)(1)(B) and (f)(1) to the

14

assumption of such Assumed Contract by the Debtors and the assignment of such Assumed Contract to the Purchaser.

28.    The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not constitute a waiver of any such terms or conditions, or of the Debtors' or the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

29.    Upon the occurrence of the closing of the Sale, the Purchaser shall assume all liabilities associated with the Assumed Contracts in accordance with the terms of the APA.

30.    Any objections to the Motion or the relief requested therein that have not been adjourned, withdrawn or resolved are overruled in all respects on the merits.

31.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

32.    As of the time of the closing of the Sale, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.

33.    The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof; *provided*, that, (a) an order of this Court has approved such modification, amendment, or supplement; (b) such modification, amendment or supplement is not material or (c) such modification, amendment or supplement is made in the ordinary course of business.

34.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

35.     Notice of the Motion as provided therein shall be deemed good and sufficient notice.

36.     In the event of any inconsistencies between this Order, the Motion and the APA, this Order shall govern in all respects.

37.     Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rules 6004(h) and 6006(d)) or Local Bankruptcy Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  Time is of the essence in closing the Sale, and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk their appeal being foreclosed as moot.

38.     The provisions of this Order are nonseverable and mutually dependent.

39.     This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order, the APA or any document related thereto.

Richmond, Virginia

Dated:_____, 2014

_____
KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY JUDGE


Entered on Docket: _____

16

WE ASK FOR THIS:

/s/ Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
 Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors and Debtors in Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Henry P. (Toby) Long, III

# EXHIBIT 1

**APA**

[To come]

# SCHEDULE A

**Cure Amounts**

[To come]

# EXHIBIT C

**James River Coal Company**
**Summary of Terms and Conditions**
**For Sale of McCoy Elkhorn Assets to Opes Resources Inc.**

This term sheet ("**Term Sheet**") describes the principal terms on which James River Coal Company ("**James River**", and where used hereinafter, James River shall also mean McCoy Elkhorn Coal Corporation, "**McCoy Elkhorn**", and/or any affiliated corporation of McCoy Elkhorn, such as Johns Creek Coal Company, that holds any interest in the Purchased Assets {defined below}, as the context hereinafter may require) proposes to sell and transfer to Opes Resources Inc. or an affiliate thereof ("**Opes**", and with James River, the "**Parties**") certain assets and liabilities relating to its McCoy Elkhorn mining complex located in eastern Kentucky as described below (the "**Acquisition**").  This Term Sheet will be executed by the parties on or prior to May 22, 2014, and shall serve as a framework for further negotiations regarding a definitive agreement with respect to the Acquisition (the "**APA**").  James River will file a motion with the United States Bankruptcy Court of the Eastern District of Virginia (the "**Bankruptcy Court**") on or prior to May 23, 2014 (exhibiting the Term Sheet) seeking authority to enter into the APA and approval of the Acquisition, which motion will be heard at the currently scheduled hearing on June 4, 2014.  The Parties will use commercially reasonable efforts to execute the APA on or prior to May 30, 2014, at which time it will be filed with the Bankruptcy Court for approval on June 4, 2014.  Subject to the terms and conditions of this Term Sheet and the APA, the Parties will seek to consummate the Acquisition as promptly as possible after Opes obtains a financing commitment and the Bankruptcy Court approves the Acquisition.

Opes shall use commercially reasonable efforts to obtain the financing necessary to consummate the Acquisition, and shall secure said financing by June 30, 2014 (or such later date as may be required due to matters beyond the control of Opes or as may be consented to by James River, which consent shall not unreasonably be withheld) ("**Financing Covenant**").

This Term Sheet reflects the entire understanding of the Parties with respect to the content hereof and supersedes any and all oral, written, implied, or expressed understandings or agreements between the Parties regarding the content of this Term Sheet; *provided*, *however*, that notwithstanding anything to the contrary in the foregoing, the parties acknowledge that Opes's due diligence is not complete and the terms herein may be subject to change on or prior to May 30, 2014, at which time Opes shall have completed its due diligence and the terms herein shall no longer be subject to change, and further, the Confidentiality and Nondisclosure Agreement dated January 24, 2014 between the Parties shall continue to be a binding and enforceable agreement of the Parties.

| | |
|---|---|
| **Structure:** | The Acquisition will be structured as the purchase by Opes of the Purchased Assets (as defined below) and the assumption by Opes of the Assumed Liabilities (as defined below). |
| **Purchase Price:** | $3,100,000 (USD) in cash, to be paid in full at closing. |
| **Purchased Assets:** | The "**Purchased Assets**" will consist of James River's and |

its subsidiaries', including McCoy Elkhorn's, right, title and interest in, to and under the following assets relating to the McCoy Elkhorn mining complex:

- the real property and leases of, and other interests in, real property described on <u>Schedule A</u> (the "**Real Property**");

- all facilities, fixtures and improvements located on the Real Property as of May 1, 2014, including the mine facilities, mine infrastructure and mine apparatus;

- all personal property and trade fixtures located in the Main Office Building, Safety Building, and both Warehouse Buildings as of May 1, 2014 as described in "Exhibit B Excluded Assets";

- all machinery and equipment located on the Real Property as of May 1, 2014;

- all coal inventory located on the Real Property;

- all transferable licenses, permits or other governmental authorizations described on <u>Schedule B</u>  (the "**Transferred Permits**");

- $250,000.00 on deposit in the escrow account of Baird & Baird (relating to Non-Compliance No. 53-2851 on Transferred Permit No. 898-5616);

- the contracts, agreements, leases, licenses and commitments described on <u>Schedule A</u> (the "**Assumed Contracts**");

- all books and records related to the Purchased Assets and Assumed Liabilities; and

- also, even though the Acquisition will be structured as a purchase by Opes of the Purchased Assets, Opes also desires to acquire and have the right to use the name McCoy Elkhorn Coal Corporation, or some similar derivative thereof, and James River and Opes understand and agree that the APA shall include provisions whereby James River and Opes will covenant and agree to take any and all required actions to accomplish that result.

**Assumed Liabilities:**    The "**Assumed Liabilities**" will consist of the following

2

debts, obligations, contracts and liabilities related to the Purchased Assets:

- all reclamation liabilities and obligations, and other environmental liabilities and obligations, relating to the Purchased Assets;

- all liabilities and obligations of James River and its subsidiaries arising under the Assumed Contracts; and

- all liabilities arising out of or in connection with Opes's use, operation, possession or ownership of the Purchased Assets following the closing; *provided*, *however*, that with regard to the Transferred Permits, Opes shall assume and be responsible for all obligations under the Transferred Permits, whether such obligation occur(ed) before or after closing.

**Excluded Assets:** The "**Excluded Assets**" will consist of James River's and its subsidiaries' and McCoy Elkhorn's right, title and interest in, to and under the following assets relating to the McCoy Elkhorn Burke mining complex located on or Long Fork of Johns Creek, near the community of Kimper, in Pike County, Kentucky, and the Harmond Branch Surface Mine and Mare Creek Surface Mine located in Pike County, Kentucky and the Cannel Gap Surface Mine located in Johnson County, Kentucky, as follows:

- the real property and leases of, and other interests in, real property described on Exhibit A (the "**Burke Real Property**");

- the facilities and improvements located on the Burke Real Property, as generally described on Exhibit B, including the related mine facilities, mine infrastructure and mine apparatus presently located on the Burke Real Property;

- all machinery and equipment on, within and attached to the just above referenced facilities and improvements located on the Burke Real Property; provided, however, that Excluded Assets shall not include any and all of the personal property, equipment and trade fixtures retained by McCoy Elkhorn in a separate, contemporaneous transaction between McCoy Elkhorn and Marshall Resources, Inc. relating to the Burke Real Property;

3

- all coal inventory located on the Burke Real Property;

- the licenses, permits or other governmental authorizations relating to the Burke Real Property as set forth on <u>Exhibit C</u> ;

- all contracts, agreements, leases, licenses and commitments relating to the Burke Real Property described on <u>Exhibit D</u>;

- in addition, the Excluded Assets shall include (i) all real property and leases of, or other interests in real property, (ii) all facilities and improvements on such real property, including mine facilities, mine infrastructure and mine apparatus; (iii) all machinery and equipment; (iv) all transferable license, permits, or other governmental authorizations; and (v) all contracts, agreements, leases, licenses and commitments, all relating to the "Harmond Branch Surface Mine" and the "Mare Creek Surface Mine" of McCoy Elkhorn located in Pike County, Kentucky and the "Cannel Gap Surface Mine" of McCoy Elkhorn located in Johnson County, Kentucky.  The Excluded Assets that relate to the Harmond Branch Surface Mine, Mare Creek Branch Surface Mine and the Cannel Gap Surface Mine are more particularly described on <u>Exhibit E</u>.

- all books and records related to the Excluded Assets.

- Notwithstanding anything herein to the contrary, if there are any McCoy Elkhorn assets that are not listed as a "Purchased Asset" or an "Excluded Asset," Opes shall have the right to designate those assets as Purchased Assets, for no additional consideration.

**Excluded Liabilities:**   The "**Excluded Liabilities**" will consist of any and all liabilities of James River and its subsidiaries other than the Assumed Liabilities.  In addition, as to former employees of McCoy Elkhorn or employees of predecessor companies for which McCoy Elkhorn is currently responsible, liabilities relating to current workers' compensation and black lung claims, whether in a pay status or in a contested status, together with any unfiled claims to the extent that any such unfiled claims may be filed in the future by prior employees of McCoy Elkhorn, and all liabilities relating to pension obligations under the James River Pension Plan applicable to McCoy Elkhorn employees, shall be retained by James River

4

and shall be Excluded Liabilities.

**Employees:**          James River and Opes understand and agree that all of the operations of McCoy Elkhorn, other than limited activity by McCoy Elkhorn at the Bevins Branch Preparation Plant and Loadout Facility and limited activity on and related to the properties covered by its mining permits, are idle; that McCoy Elkhorn previously had a workforce reduction at all of its operations; and that McCoy Elkhorn presently has only twenty-eight (28) active employees, and the names of such active employees are set forth on <u>Exhibit F</u> (the "**McCoy Elkhorn Active Employees**").  James River and Opes further understand and agree, in conjunction with the Acquisition (i) that Opes shall have the right to either terminate such McCoy Elkhorn Active Employees and/or to extend offers of employment to such McCoy Elkhorn Active Employees and any former employees of McCoy Elkhorn, as Opes may choose; and (ii) that Opes shall be obligated to assume and pay any and all severance and employee related obligations to such McCoy Elkhorn Active Employees whose employment with McCoy Elkhorn and/or Opes is terminated by Opes;  *provided, however*, that Opes shall not be required to pay, and James River shall retain, any severance and employee related obligations to any of such McCoy Elkhorn Active Employees as are receiving either short term disability, long term disability or workers compensation payments from McCoy Elkhorn as of the closing of the Acquisition.

**Representations, Warranties and Covenants:**          Customary for a transaction of this nature including, but not limited to, the representation of McCoy Elkhorn that subject to Bankruptcy Court approval, it shall sell all its rights, titles and interests in the Purchased Assets free and clear of all liens, claims and encumbrances.  The Customary representations and warranties will not survive the closing.

**Conduct of Business:**          Until closing, McCoy Elkhorn shall conduct its business in the ordinary course and shall not sell or otherwise dispose of any Purchased Asset.

**Permit and Surety Bond Matters:**          With the understanding that Opes shall be responsible for all work and all expenses required to have transferred or reissued to Opes the Transferred Permits and to secure replacement financial assurances, Opes and McCoy Elkhorn shall cooperate in taking all necessary action to have transferred or reissued to Opes the Transferred Permits and

5

to secure replacement financial assurances to replace all reclamation and surety bonds and related letters of credit and other collateral relating to such Transferred Permits ("**Existing Financial Assurance**").

To the extent any Transferred Permit is maintained in its current name after the closing, Opes shall satisfy, perform and undertake all liabilities, obligations, responsibilities and requirements relating to such Transferred Permit and agrees that all environmental liabilities and obligations relating thereto, including reclamation obligations, shall constitute Assumed Liabilities.  To the extent any Existing Financial Assurance is maintained after the closing, Opes shall reimburse James River and its affiliates for all losses, expenses or costs incurred in connection with such Existing Financial Assurance, including costs to maintain such Existing Financial Assurances, amounts payable in connection with any Existing Financial Assurance to any beneficiary of or counterparty thereto and amounts otherwise incurred as a result of any Existing Financial Assurances being accessed, drawn upon or required to be performed.

**Assumed Contracts:**   Opes shall take all actions reasonably required to assist in obtaining a finding by the Bankruptcy Court that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts, including providing financial information as reasonably requested by James River in connection with the hearing on approval of the Acquisition.  In connection with the assignment and assumption of the Assumed Contracts, James River shall cure all defaults under such Assumed Contracts to the extent required by section 365(b) of title 11 of the United States Code (the "**Bankruptcy Code**").

**Regulatory Filings:**   Subject to the Bankruptcy Code and any court order, the Parties shall take all actions necessary or desirable to consummate the transactions contemplated by the APA including making and obtaining all required regulatory filings and approvals.

**Conditions to Closing:**   The obligations of James River and Opes to consummate the Acquisition will be subject to the satisfaction of the following conditions:

- No provision of any applicable law shall prohibit the consummation of the Acquisition.

- The Bankruptcy Court shall have issued an order that, among other things, authorizes James River's entry into the APA and approves the Acquisition.

- There shall have been no Material Adverse Effect (to be defined in the APA with customary exceptions) with respect to the Purchased Assets.

**Termination:**  In addition to customary termination rights for transactions of this nature, (i) on or prior to May 30, 2014, James River may terminate this Term Sheet or the APA prior to closing without liability if James River receives a bona fide proposal for the sale, lease, or other disposition, directly or indirectly, by merger consolidation, tender offer, share exchange or otherwise of any of the Purchased Assets (an "**Alternative Transaction**"), and James River's board of directors determines in its good faith judgment that such Alternative Transaction may provide a higher and better economic recovery than the Acquisition, (ii) this Term Sheet and the APA will terminate automatically upon the consummation of an Alternative Transaction to a Party other than Opes, and (iii) on or after July 1, 2014 (unless extended by James River in its sole discretion), if Opes has not obtained a commitment for the financing required to consummate the Acquisition, either Party may terminate this Term Sheet and/or the APA prior to closing without liability, so long as, in the case of Opes, Opes is not in violation of the Financing Covenant. For the avoidance of doubt, following the entry of the Sale Order, Opes shall have the exclusive right to acquire the Purchased Assets unless this Term Sheet and the APA have been terminated according to their terms.

**Due Diligence:**  Opes shall promptly commence its due diligence investigation of the Purchased Assets and Assumed Liabilities.  In connection therewith, from the date hereof until July 10, 2014, James River shall provide to Opes and its representatives and advisors reasonable access during normal business hours to its books and records relating to the Purchased Assets and Assumed Liabilities and to its employees and other representatives.

**Expenses:**  All costs and expenses incurred in connection with the evaluation and negotiation of the Acquisition shall be paid by the Party incurring such cost or expense.

**Governing Law:**  This Term Sheet and the APA shall be governed by and

7

construed in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.  The Parties hereto agree to submit to the exclusive jurisdiction of the Bankruptcy Court for any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Term Sheet, the APA or the Acquisition.

[*Signature page follows*]

By signing below, each Party hereby confirms its agreement with the terms set forth in this Term Sheet.

**JAMES RIVER COAL COMPANY**

By: _____

Name:  C. K. LANE

Title:  COO

**OPES RESOURCES INC.**

By: _____

Name: Gary J Smith

Title: President & CEO

### Schedule A
### Real Property and Assumed Contracts

**Owned Property:**

1. That certain Deed of Conveyance dated August 1, 1992 by and between Alma Land Company and Johns Creek Coal Company, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 666, Page 31;

2. That certain Deed of Conveyance dated April 5, 1971 by and between Inez Syck Scott and Homer Scott, her husband and Call & Ramsey Coal Company (said company merged with Johns Creek Coal Company), which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 502, Page 449;

3. That certain Deed of Conveyance dated March 4, 1999 by Frank Donald Varney, et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 767, Page 288;

4. That certain Deed of Conveyance dated June 17, 1997 by and between Josephine Adkins and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 743, Page 751;

5. That certain Deed of Conveyance dated June 17, 1997 by and between Ronnie Adkins and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 743, Page 741;

6. That certain Deed of Conveyance dated June 17, 1997 by and between Larry Ray and Linda Ray, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 743, Page 744;

7. That certain Deed of Conveyance dated June 17, 1997 by and between Johnny Ray, et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 743, Page 747;

8. That certain Deed of Conveyance dated November 17, 1997 by and between Pike County Resources, Inc. and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 745, Page 793;

9.     That certain Deed of Conveyance dated April 20, 1993 by and between
       Canada Coal Company, Inc. and McCoy Elkhorn Coal Corporation, which
       Deed of Conveyance is of record in the Pike County Court Clerk's Office
       in Deed Book 675, Page 803;

10.    That certain Deed of Conveyance dated September 6, 2001 by and
       between Burnetta Hall and Tommy Hall, her husband and McCoy Elkhorn
       Coal Corporation, which Deed of Conveyance is of record in the Floyd
       County Court Clerk's Office in Deed Book 464, Page 353;

11.    That certain Deed of Conveyance dated January 27, 2003 by and between
       Fred Jack Varney and Betty Varney, his wife and McCoy Elkhorn Coal
       Corporation, which Deed of Conveyance is of record in the Pike County
       Court Clerk's Office in Deed Book 550, Page 68;

12.    That certain Deed of Conveyance dated November 10, 2004 by and
       between Johns Creek Processing Company and McCoy Elkhorn Coal
       Corporation, which Deed of Conveyance is of record in the Pike County
       Court Clerk's Office in Deed Book 860, Page 321;

13.    That certain Deed of Conveyance dated November 10, 2004 by and
       between Johns Creek Processing Company and McCoy Elkhorn Coal
       Corporation, which Deed of Conveyance is of record in the Pike County
       Court Clerk's Office in Deed Book 860, Page 324;

14.    That certain Deed of Conveyance dated April 20, 2005 by and between
       Johns Creek Elkhorn Coal Corporation and McCoy Elkhorn Coal
       Corporation, which Deed of Conveyance is of record in the Pike County
       Court Clerk's Office in Deed Book 869, Page 289;

15.    That certain Deed of Conveyance dated March 23, 2006 by and between
       Clyde Justice, Trustee of Zetta Justice Family Trust, et al and McCoy
       Elkhorn Coal Corporation, which Deed of Conveyance is of record in the
       Pike County Court Clerk's Office in Deed Book 885, Page 274;

16.    That certain Deed of Conveyance dated April 28, 2006 by and between
       Henry Porter and Joyce A. Porter, his wife and McCoy Elkhorn Coal
       Corporation, which Deed of Conveyance is of record in the Floyd County
       Court Clerk's Office in Deed Book 525, Page 74; and

17.    That certain Deed of Conveyance dated April 3, 1997 by and between
       Betty Patterson, a single woman and McCoy Elkhorn Coal Corporation,
       which Deed of Conveyance is of record in the Pike County Court Clerk's
       Office in Deed Book 736, Page 234; and

18. That certain Deed of Conveyance dated April 9, 1997 by and between Janiv Blackburn, a widow and Jess David Blackburn, single and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 736, Page 229; and

19. That certain Deed of Conveyance dated April 3, 1997 by and between Sherry Phillips, a single woman and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 736, Page 242; and

20. That certain Deed of Conveyance October 17, 1997 by and between Pike County Resources, Inc. and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 745, Page 789; and

21. That certain Deed of Conveyance dated October 28, 1998 by and between Bruce Frederick Cool, et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 760, Page 229.

## Assumed Contracts

**Leases:**

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| W.W. Burnette Heirs | 40 | Lease - U/G | Unassigned |
| Lula Ray | 72 | Lease - U/G | Mine 17 |
| Earnest Fields | 98 | Surface Agreement | Mine 15/16 |
| Trent Heirs | 102 | Lease - U/G | Mine 15 |
| Seth McCoy | 103 | Lease - U/G | Mine 15 |
| Bob Justice | 114 | Lease - U/G | Mine 16A |
| Utility Coal Co. - Bob Ratliff | 118 | Lease - U/G | Mine 15 |
| East Kentucky Energy-Clyde M Ray | 119 | Lease - U/G | Mine 17 |
| Gene Stepp (8/98) | 120 | Lease - U/G & Surface | Mine 22 |
| G. C. Rowe Heirs (11/24/99) | 127 | Lease - U/G | Mine 22 |
| Oscar and Sandra Blackburn | 129 | Surface Agreement | Mine 16 |
| Baird et al | 130 | Lease - U/G | Mine 16 |
| Appalachian Land | 134 | Lease - U/G | Unassigned |
| Appalachian Land/ Alma Land | 135 | Lease - U/G | Mine 16 |

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| Picklesimer | 145 | Lease - U/G | Mine 16 |
| Winifred Blackburn (Michael Davis) | 167 | Lease - U/G | Mine 16A |

| Appalachian Land/Alma (Glamorgan) | 171 | Lease - U/G | Mine 15 |
| Jack & Ruby Bartley | 178 | Lease - U/G | Mine 16 |
| Delores Tabor | 183 | Lease - Surface | Unassigned |
| Fon Taylor | 186 | Lease - U/G | Mine 16A |
| Doris Williamson | 188 | Lease - U/G | Mine 15 |
| Marion Walker | 193 | Lease - U/G | Unassigned |
| Big Sandy M2.467 | 194 | Lease - U/G | Mine 15 |
| Terry G Young | 195 | Lease - U/G | Mine 17 |
| Elkhorn Coal #907 | 196 | Lease - U/G | Mine 15/16A/27 |
| Corbett Salisbury | 197 | Lease - U/G | Mine 16A |
| Marie Leslie et al | 198 | Lease - U/G | Mine 23 |
| Hatcher Trimble Trust | 199 | Lease - U/G | Mine 23 |
| Scott Heirs | 200 | Lease - U/G | Mine 22 |
| Sally & Barbara Williamson | 201 | Lease - U/G | Mine 17 |
| Brookwood/Jetta Stratton | 202 | Lease - U/G | Mine 27 |
| East Kentucky Energy (ICG) | 206 | Lease - U/G | Mine 23 |
| Fairview Land Company/Kinzer Inv | 207 | Lease - U/G & Surface | Mine 23 |
| Buery Heirs | 208 | Lease - U/G | Mine 23 |
| York Lowe | 209 | Lease - Surface | Unassigned |
| Rush Scott | 210 | Lease - U/G | Mine 27 |
| Harvey Phillips | 211 | Lease - U/G | Unassigned |
| Weddington Heirs | 212 | Lease - U/G | Mine 23 |
| Betty Thompson et al | 213 | Lease - U/G | Mine 23 |
| Leroy Syck | 214 | Lease - U/G | Mine 27 |
| Burgess Smith | 219 | Lease - U/G | Mine 15 |
| Ann Carty | 222 | Lease - U/G | Mine 15 |
| Darryl Gooslin | 223 | Lease - U/G | Unassigned |
| Brookwood/Wilson (Millard) | 224 | Lease - U/G | Mine 15 |
| Elkhorn #1016 | 230 | Lease - U/G | Mine 23 |
| Roadrunner Land LLC | 233 | Lease - U/G | Mine 30 & 33 |
| Queen/Ward | 236 | Lease - U/G | Mine 16A |
| Mary Hatfield et al | 238 | Lease - U/G | Mine 15 |
| Appalachian Land Company | 239 | Lease - U/G | Mine 17 |
| Eugene King | 240 | Lease - U/G | Mine 15 |
| Joe B Smith Heirs | 241 | Lease - U/G | Mine 30 & 33 |
| Linda Young Hunt | 245 | Lease - Surface | Mine 16 |

| Lease Name | Lease # | Type | Assigned To |
| --- | --- | --- | --- |
| Thomas B Smith Estate | 247 | Lease - U/G | Mine 30 & 33 |
| Szelog/Caudill | 251 | Lease - U/G | Mine 25B |

13

| CSX Transportation | 253 | Lease - U/G | Mine 15 |
| Hope Trent et al | 260 | Lease - U/G | Mine 15 |
| Zetta Thompson et al | 262 | Lease - U/G | Mine 15 |
| Mary Syck et al | 263 | Lease - U/G | Mine 15 |
| Zettie Thompson | 265 | Lease - U/G | Mine 15 |
| Eugene King | 266 | Lease - U/G | Mine 15 |
| Jefferson Taylor | 268 | Lease - U/G | Mine 15 |
| Anna Maynard | 269 | Lease - U/G | Mine 15 |
| Fannie Bevins | 270 | Lease - U/G | Mine 15 |
| John Pinson | 271 | Lease - U/G | Mine 15 |
| Sadie Dotson (Bob Justice) Millard | 276 | Lease - U/G | Mine 15 |
| Better Rental Inc | 277 | Lease - U/G | Mine 15 |
| Thomas Roop | 281 | Lease - U/G | Mine 15 |
| Joan Webb | 282 | Lease - U/G | Mine 15 |
| Bill Meade | 285 | Lease - U/G | Mine 15 |
| Bilton Maynard | 286 | Lease - U/G | Mine 15 |
| Teddy Varney | 287 | Lease - U/G | Mine 15 |
| Arnold Maynard etal | 288 | Lease - U/G | Mine 15 |
| James Stanley | 289 | Lease - U/G | Mine 15 |
| Ricky & Debra Taylor | 290 | Lease - U/G | Mine 15 |
| Robert Lennon | 291 | Lease - U/G | Mine 16A |
| Arnold O Smith | 294 | Lease - U/G | Mine 17 |
| Thomas B Ratliff | 295 | Lease - U/G | Mine 15 |
| Otis Howard | 297 | Lease - U/G | Mine 16A |
| Noah Mullins | 298 | Lease - U/G | Mine 23 |
| Susan Evans | 298 | Lease - U/G | Mine 23 |
| Adams Heirs | 299 | Lease - U/G | Mine 16A |
| Weddington Heirs | 300 | Lease - U/G | Mine 16A |
| Deanna Hurley | 301 | Lease - U/G | Mine 15 |
| Elk Horn #1108 | 302 | Lease - U/G | Mine 16A |
| Angela & Paul Adams | 303 | Lease - U/G | Mine 16A |
| Justine Bradford | 304 | Lease - U/G | Mine 16A |
| Thelma Blackburn | 306 | Lease - U/G | Mine 16A |
| Wilson Kirk | 307 | Lease - U/G | Mine 15 |
| Horn Heirs | 309 | Lease - U/G | Mine 23 |

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| Brookwood/Jean Wilson | 181-1 | Lease - U/G | Mine 16 |
| Mary Pfieffer | 269-2 | Lease - U/G | Mine 15 |
| Hiram G Williamson | 269-3 | Lease - U/G | Mine 15 |

14

| | | | |
|---|---|---|---|
| James M Bevins | 269-4 | Lease - U/G | Mine 15 |
| Lennon/Blankenship/Davis/Justice | 291-2 | Lease - U/G | Mine 16A |
| Big Sandy M2.454 | | Lease - U/G | Mine 16 |
| TB May Farm (Wheeler/Thompson) | | Lease - U/G & Surface | Unassigned |
| Ollie and June Bevins | 1 | Surface Agreement | Unassigned |
| Tom G. and Louise Bevins | 3 | Surface Agreement | Unassigned |
| William and Betty Blackburn | 6 | Surface Agreement | Unassigned |
| J.F. Baird, Trustee for Chloe B. Learey Trust | 70 | Surface Agreement | Unassigned |
| Rebecca Hopkins | 9 | Surface Agreement | Unassigned |
| Allen and Stella Marcum | 38 | Surface Agreement | Unassigned |
| Dora Maynard and James Ferrell | 10 | Surface Agreement | Unassigned |
| Bufford and Mazola Reed | 14 | Surface Agreement | Unassigned |
| Dovie Sartin | 15 | Surface Agreement | Unassigned |
| J.C. and Audra Young | 18 | Surface Agreement | Unassigned |
| T.O. Young | 53 | Surface Agreement | Unassigned |
| Owen T. Young | 54 | Surface Agreement | Unassigned |
| R. Seth McCoy | 6 | Lease – U/G | Mine 16A |
| KYBC Land Corporation | 13 | Lease – U/G | Mine 16/16A |
| The Elk Horn Coal Corporation | 8 | Lease – U/G & Surface | Unassigned |
| Bradley and Liza Ray | 10 | Lease – U/G | Mine 16/16A |
| Owen T. Young | 15 | Lease – U/G | Mine 16/16A |
| T.O. Young | 30 | Lease – U/G | Unassigned |

**Railroad Contracts and Agreements:**

1.   Agreement No. CO L40357, Dated September 12, 1983, Crossing-Private Roadway

2.   Agreement No. CO L45268, Dated March 1, 1985, Real Estate/Land Only;

3.   Agreement No. CSX019815, Dated August 1, 1993, Land Only;

4.   Agreement No. CSX029143, Dated July 8, 1996, Track Lease/Loading/Unloading.

**Other Agreements:**

1.   Above Grade Airspace Agreement dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation, for the Mine #16 overland conveyor described as *"One corridor 8 feet in width across the right of way and centerline of Kentucky 194 at Mile Point 18.93"*.

15

2.     Above Grade Airspace Agreement dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation, for the Mine #15 overland conveyor described as *"One corridor 8 feet in width across the right of way and centerline of Kentucky 194 at Mile Point 19.18"*.

3.     Encroachment Permit #12-0229-10 dated February 2, 2011, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation.

## Schedule B
## Transferred Permits

### McCOY ELKHORN COAL CORPORATION
### KY DMRE Permits List

| KY DMRE Permit # | Operation Name | MSHA ID No. | KY State File No. | KPDES Permit No. | Status |
|---|---|---|---|---|---|
| 498-5393 | Mine No. 8, Laynes Br. | NA | NA | KYG041045 | A2 |
| 836-5396 | Mine #21/Starus #2 | NA | NA | KYG043114 | A2 |
| 898-0885 | Big Groundhog Slurry Impoundment | 15-10445 | NA | KYG042287 | A1 |
| 898-4032 | Mine No. 17 & 17A | NA | NA | KYG042220 | O2 |
| 898-4093 | Mine No. 15A & 16 | 15-19048 15-18250 | 10925.19 10925.15 | KYG045549 | A1 |
| 898-4097 | Mine No. 22 | NA | NA | KYG044292 | O2 |
| 898-4098 | Mill Branch | NA | NA | KYG044293 | P1 |
| 898-4100 | Mine No. 23 | 15-18721 | 10925.17 | KYG043771 | A1 |
| 898-4152 | Mine No. 15 | 15-18775 | 10925.18 | KYG045807 | A1 |
| 898-4237 | Mine No. 25/25B | NA | NA | KYG043829 | A2 |
| 898-4246 | Mine No. 27 (Joes Creek Fireclay) | NA | NA | KYG046234 | ND |
| 898-4324 | Mine No. 29 | 15-19313 | 18591.1 | KYG040501 | O2 |
| 898-5417 | Smith Fork No. 1 | NA | NA | KYG043146 | P1 |
| 898-5616 | Bishop Branch No. 1 | NA | NA | KYG045243 | A2 |
| 898-5948 | Bluegrass No. 1 | NA | NA | KYG045861 | P1 |
| 898-8142 | Primary Energy Loadout | NA | NA | KYG042723 | A1 |
| 898-8163 | Bevins Branch Plant | 15-10445 | NA | KY0051551 | A1 |
| 898-9117 | Lick Br. Impoundment | 15-10445 | NA | KYG046215 | A1 |
| 898-9135 | Little Groundhog Refuse Fill | 15-10445 | NA | KYG043163 | A1 |

### McCOY ELKHORN COAL CORPORATION

17

**COE Section 404 Permits**

| Hearing Agency | Type of Permit | Permit or Application No. | Related KYDNR Permit No. |
|---|---|---|---|
| COE | Section 404 | LRL-2003-257 | 898-9117 |

**McCOY ELKHORN COAL CORPORATION**
**Other Licenses and Permits**

| Issuing Agency | Type of License | License or Permit No. | Related to Operation |
|---|---|---|---|
| KY Cabinet for Health Services | Radioactive Materials License | 201-488-51 (Amendment No. 36) | Bevins Branch Plant |
| KY Department for Environmental Protection, Division of Air Quality | Air Quality Permit | S-06-258 | Primary Energy Loadout |
| KY Department for Environmental Protection, Division of Air Quality | Air Quality Permit | S-07-075 | Bevins Branch Plant |
| KY Department for Environmental Protection, Division of Water | Water Withdrawal Permit | 1498 | Bevins Branch Plant |
| KY Department for Environmental Protection, Division of Water | Water Withdrawal Permit | 1544 | Mine No. 23 |
| KY Department for Environmental Protection, Division of Water | Water Withdrawal Permit | 1545 | Mine No. 16 |

**McCOY ELKHORN COAL CORPORATION**
**MSHA ID Numbers**

| Issuing Agency | MSHA ID No. | Applicable Mine or Facility |
|---|---|---|
| MSHA | 15-10445 | Bevins Branch Preparation Plant |
| MSHA | 15-18250 | Mine No. 16 |
| MSHA | 15-18721 | Mine No. 23 |
| MSHA | 15-18775 | Mine No. 15 |
| MSHA | 15-19048 | Mine No. 15A |
| MSHA | 15-19313 | Mine No. 29 |

19

**Exhibit A**
**Excluded Assets**

1.    That certain Deed of Conveyance dated September 19, 1978 by and between Dewey Stiltner and Earlane Stiltner, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 69;

2.    That certain Deed dated March 26, 1992 by and between Donnie R. May and Pricy May, his wife and McCoy Elkhorn Coal Corporation, which Deed is of record in the Pike County Court Clerk's Office in Deed Book 659, Page 95;

3.    That certain Deed dated March 26, 1992 by and between Edward Charles and Linda Charles, his wife and McCoy Elkhorn Coal Corporation, which Deed is of record in the Pike County Court Clerk's Office in Deed Book 659, Page 97;

4.    That certain Deed of Conveyance dated June 6, 1989 by and between Pinkie May and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 625, Page 42;

5.    That certain Deed of Conveyance dated October 17, 1989 by and between Earl Worrix and Jennifer Worrix, his wife, *et al.* and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 629, Page 271;

6.    That certain Deed of Conveyance dated November 29, 1984 by and between James Marshall Justice, Jr. and Darlene Justice, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 583, Page 561;

7.    That certain Deed of Conveyance dated October 16, 1981 by and between Lawrence Bostic and Thelma Bostic, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 567, Page 237;

8.    That certain Deed of Conveyance dated October 27, 1981 by and between Bennett Hunt and Buna Hunt, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 567, Page 338;

9.   That certain Deed of Conveyance dated September 5, 1980 by and between Gay Scott, widow, and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 561, Page 274;

10.  That certain Deed of Conveyance dated July 14, 1978 by and between Tommy Coleman and Nolaine Coleman, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 548, Page 479;

11.  That certain Deed of Conveyance dated July 17, 1978 by and between Vicy Stiltner and John H. Stiltner, her husband and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 548, Page 503;

12.  That certain Deed dated November 10, 2004 by and between Johns Creek Processing Company and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 860, Page 314;

13.  That certain Deed of Conveyance dated September 19, 1978 by and between Victor Smith and Vada Smith, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 68; and

14.  That certain Deed of Conveyance dated June 11, 2000 by and between Opal Green et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 804, Page 288.

Assignment of Leases by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc., relating to the following leases:

(a)   Lease dated June 16, 2008, from Kentucky Berwind Land Company to McCoy Elkhorn Coal Corporation, of record in the Pike County Court Clerk's Office in Lease Book 959, Page 204; and

(b)   Lease dated November 1, 2008, from WPP, LLC to McCoy Elkhorn Coal Corporation, of record in the Pike County Court Clerk's Office Lease Book 932, Page 716.

Partial Assignment of Lease by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to that prior Surface Lease Agreement dated December 9, 1999, by and among McCoy Elkhorn Coal Corporation and Johns Creek Elkhorn Corporation, as lessors, and Berkeley Energy Corporation, as lessee.

21

Assignment of Railroad Contracts and Agreements by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1. Billing Consolidation Agreement Dated April 12, 2006;
2. Agreement No. CSX 0011710, Dated April 3, 1990, Real Estate/Land Only;
3. Agreement No. L40724, Dated May 5, 1986 – Overhead Conveyor;
4. Agreement No. COL37730, Dated June 12, 1979, Private Road Crossing; and
5. Lease No. CO-L35596, Dated March 1, 1972, Real Estate/Land Only.

Assignment of Distance Waivers for Surface Mining Operations by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1. Waiver for Surface Mining Operations executed by David Hunt and Shelia Hunt on behalf of the Bud Hunt Jr. Heirs;
2. Waiver for Surface Mining Operations executed by Joseph A. Collins and Jessica L. Collins;
3. Waiver for Surface Mining Operations executed by Jason McCoy and Cindy McCoy;
4. Waiver for Surface Mining Operations executed by Michael Blackburn and Christine Blackburn; and
5. Waiver for Surface Mining Operations executed by Lester Varney (pending).

Assignment of Above Grade Airspace Agreement and Permit, by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1. Above Grade Airspace Agreement and Permit dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation.

**Exhibit B**
**Excluded Assets-continued**

F. M. Burke Preparation Plant and Loadout, and all appurtenances related thereto.

| Location | Asset Type | Description |
|---|---|---|
| Burke Loadout | Loadout | Loadout |
| Burke Loadout | Locomotive  Garage | 65'x20' Metal Building |
| Burke Plant | Preparation Plant | Preparation Plant |
| Burke Plant | Pump Building | Plant - Pump House |
| Burke Plant | Water Tank | 500,000 Gallon Water Tank |
| Cow Branch | Refuse Impoundment | Cow Branch Impoundment |
| Merry Branch | Coarse Refuse Fill | Merry Branch Coarse Refuse Fill |
| Main Office | Building | Main Office - 62'x63' Metal and Brick Structure - 1/2 2nd floor and does not include furnishings, personal property or trade fixtures |
| Safety | Building | Safety Office 48'x24' Brick House and does not include furnishings, personal property or trade fixtures |
| Shop | Building | 40'x60' Metal Building w/20'x16' Side Addition |
| Shop | Building | Bathhouse |
| Shop | Hoist | 10 Ton Overhead Hoist |
| Shop | Air Compressor | 10 HP |
| Warehouse | Building | Warehouse Building - 110'x50' Steel Structure, 2 Story and does not include furnishings, supplies, personal property, trade fixtures etc. |
| Warehouse | Building | Warehouse Shed, Steel Construction, 330'x18' and does not include furnishings, supplies, personal property, trade fixtures etc. |

**Exhibit C**
**Excluded Assets-continued**

**McCOY ELKHORN COAL CORPORATION PERMITS LIST**

| KYDNR Permit # | Operation Name | MSHA ID No. | KY State File No. | KPDES Permit No. | Status |
|---|---|---|---|---|---|
| **898-4031** | Mine No. 12, Wolfpin Br. | 15-19314 | 10925.2 | KYG045388 | A1 |
| **898-4243** | Burke/Loadout | 15-16958 | | KYG041804 | A1 |
| **898-4244** | Burke Plant & Merry Br. Refuse Mine 31 & Mine 32 | 15-16958 15-19492 | 18851 | KY0031402 | A1 |
| **898-8144** | Burke Plant & Loadout | 15-16958 | x-fer from 898-8124 & 8093 | KYG045821 | A1 |
| **898-9012** | Cow Br. Slurry Impoundment | 15-16958 | | KYG044814 | A1 |
| **898-9106** | Refuse Fill, Wolfpin Br. | 15-16958 | | KYG045433 | ND |

**McCOY ELKHORN COAL CORPORATION**
**COE Section 404 Permits**

| Hearing Agency | Type of Permit | Permit or Application No. | Related KYDNR Permit No. |
|---|---|---|---|
| COE | Section 404 | 200401405 | 898-9106 |
| COE | Section 404 | LRL-2010-1114-mlc | 898-4244 |

**McCOY ELKHORN COAL CORPORATION LICENSES LIST**

| Issuing Agency | Type of License | License No. | Expiration Date |
|---|---|---|---|
| Department for Environmental Protection, Division of Air Quality | Air Quality Permit | S-06-298 | |

**McCOY ELKHORN COAL CORPORATION MSHA ID NUMBERS**

| Issuing Agency | MSHA ID No. | Applicable Mine or Facility |
|:---:|:---:|:---:|
| MSHA | 15-19314 | Mine No. 12 |
| MSHA | 15-16958 | Longfork Preparation Plant |
| MSHA | 15-19492 | Mine No. 31 |

**Exhibit D**
**Excluded Assets-continued**

Assignment of Leases by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc., relating to the following leases:

    (a)    Lease dated June 16, 2008, from Kentucky Berwind Land Company to McCoy Elkhorn Coal Corporation, of record in the Pike County Court Clerk's Office  in Lease Book 959, Page 204; and

    (b)    Lease dated November 1, 2008, from WPP, LLC to McCoy Elkhorn Coal Corporation, of record in the Pike County Court Clerk's Office Lease Book 932, Page 716.

Partial Assignment of Lease by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to that prior Surface Lease Agreement dated December 9, 1999, by and among McCoy Elkhorn Coal Corporation and Johns Creek Elkhorn Corporation, as lessors, and Berkley Energy Corporation, as lessee.

Assignment of Railroad Contracts and Agreements by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

    1.    Billing Consolidation Agreement Dated April 12, 2006;
    2.    Agreement No. CSX 0011710, Dated April 3, 1990, Real Estate/Land Only;
    3.    Agreement No. L40724, Dated May 5, 1986 – Overhead Conveyor;
    4.    Agreement No. COL37730, Dated June 12, 1979, Private Road Crossing; and
    5.    Lease No. CO-L35596, Dated March 1, 1972, Real Estate/Land Only.

Assignment of Distance Waivers for Surface Mining Operations by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

    1.    Waiver for Surface Mining Operations executed by David Hunt and Shelia Hunt on behalf of the Bud Hunt Jr. Heirs;
    2.    Waiver for Surface Mining Operations executed by Joseph A. Collins and Jessica L. Collins;
    3.    Waiver for Surface Mining Operations executed by Jason McCoy and Cindy McCoy;
    4.    Waiver for Surface Mining Operations executed by Michael Blackburn and Christine Blackburn; and
    5.    Waiver for Surface Mining Operations executed by Lester Varney (pending).

Assignment of Above Grade Airspace Agreement and Permit, by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.  Above Grade Airspace Agreement and Permit dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation.

**Exhibit E**
**Excluded Assets-continued**
**Harmond Branch Surface Mine.**
**Mare Creek Surface Mine**
**and Cannel Gap Surface Mine**

(i) <u>Real Property</u> - all real property and leases of, or other interests in real property, as follows:

1. Lease dated May 13, 2010, from Blackburn Land Company to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky); and

2. Lease dated October 20, 2005, from Paul and Queenie Epling to McCoy Elkhorn Coal Corporation (unrecorded,  Pike County, Kentucky); and

3. Lease dated February 5, 2008, from Kinzer Business Realty LTD to McCoy Elkhorn Coal Corporation (unrecorded, Floyd County and Pike County, Kentucky); and

4. Lease dated July 5, 2005, from Oakie and Eunice Lawson to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky); and

5. Lease dated March 25, 2008, from James Leslie et al (Marie Leslie Heirs) to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky); and

6. Lease dated August 24, 2005, from Sally Crum et al to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky); and

7. Lease dated April 2, 2010, from Wallace Scalf et al to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky.

8. Lease dated February 5, 2014, between Laurel Mountain Resources, LLC and McCoy Elkhorn Coal Corporation.  A Memorandum of such Lease appears of record in Lease Book 116, at Page 219, in the Office of the Johnson County Court Clerk.

9. Lease and Sublease dated February 18, 2013, between Laurel Mountain Resources, LLC and McCoy Elkhorn Coal Corporation (unrecorded, Johnson County, Kentucky).

(ii) <u>Facilities and Improvements</u> - all facilities and improvements on such real property, including mine facilities, mine infrastructure and mine apparatus, as follows:

None

(iii) <u>Machinery and Equipment</u> - all machinery and equipment, as follows:

None

(iv) <u>Transferable Licenses, Permits or other Governmental Authorizations</u> - all transferable licenses, permits, or other governmental authorizations, as follows:

| KYDMRE Permit # | Operation Name | MSHA ID No. | KY State File No. | KPDES Permit No. | Status |
|---|---|---|---|---|---|
| 898-0818 | Mare Creek Strip | 15-19464 | 18704.5 | KYG046404 | A1 |
| 898-9114 | Harmond Branch Strip | 15-19464 | 18704.5 | KYG044497 | A1 |
| 858-0240 | Cannel Gap (Pending Issuance) | | | KYG046774 | ND |

(v) <u>Contracts, Agreements, Leases, Licenses and Commitments</u> - all contracts, agreements, leases, licenses and commitments, as follows:

None

29

**Exhibit F**
**McCoy Elkhorn Active Employees**

1.   Matthew B. Belcher
2.   John S. Bevins
3.   Roger D. Bevins
4.   Ivan B. Blackburn
5.   Gregory L. Clevenger
6.   Rocky G. Coleman
7.   David A. Dotson
8.   Freddie R. Dotson
9.   Larry Eperson
10.  Danny Francis
11.  Derek J. Gooslin
12.  Scott A. Hatfield
13.  Terry E. Hatfield
14.  Paul R. Hess
15.  Jeffrey L. Howell
16.  Joe T. Hyden
17.  Christopher Justice
18.  Simon M. Kinney
19.  Gary D. Lockhart
20.  Anthony Mullins
21.  George T. Norman
22.  James O. Ramey
23.  Kenny Runyon
24.  Billy P. Rowe
25.  William Spears
26.  Sheila J. Sullivan
27.  Michelle A. Tolliver
28.  Mark E. Turnmire

# EXHIBIT D

**James River Coal Company**
**Summary of Terms and Conditions**
**For Sale of McCoy Elkhorn Burke Assets to Marshall Resources, Inc.**

This term sheet ("**Term Sheet**") describes the principal terms on which James River Coal Company ("**James River**", and as used herein, "James River" shall also  mean McCoy Elkhorn Coal Corporation, referred to sometimes herein as "McCoy Elkhorn", as the context may require) proposes to sell and transfer to Marshall Resources Inc. ("**Marshall Resources**", and with James River, the "**Parties**") certain assets and liabilities relating to its McCoy Elkhorn Burke mining complex located on or near Long Fork of Johns Creek, near the community of Kimper, in Pike County, Kentucky, as described below (the "**Acquisition**").  This Term Sheet will be executed by the parties on or prior to May 23, 2014, and shall serve as the basis for further negotiations regarding a definitive agreement with respect to the Acquisition (the "**APA**").  James River will file a motion with the United States Bankruptcy Court of the Eastern District of Virginia (the "**Bankruptcy Court**") on or prior to May 23, 2014 (exhibiting the Term Sheet) seeking authority to enter into the APA and approval of the Acquisition, which motion will be heard at the currently scheduled hearing on June 4, 2014.  The Parties will use commercially reasonable efforts to execute the APA on or prior to May 30, 2014, at which time it will be filed with the Bankruptcy Court for approval on June 4, 2014.  Subject to the conditions set forth herein and the execution of the APA consistent with this Term Sheet, each Party hereto hereby agrees to take all actions reasonably necessary to negotiate, document and consummate the Acquisition as promptly as practicable.

Notwithstanding anything to the contrary in the foregoing, the Parties acknowledge that Marshall Resource's due diligence is not complete and the terms herein may be subject to change on or prior to May 30, 2014, at which time Marshall Resources shall have completed its due diligence and the terms herein shall no longer be subject to change.

The proposed principal terms of the Acquisition are as follows:

| | |
|---|---|
| **Structure:** | The Acquisition will be structured as the purchase by Marshall Resources of the Purchased Burke Assets (as defined below) and the assumption by Marshall Resources of the Assumed Liabilities (as defined below) pursuant to Section 363 of the Bankruptcy Code (as defined below). |
| **Purchase Price:** | $444,970.49 (USD) in cash, to be paid in full at closing. |
| **Purchased Burke Assets:** | "**Purchased Burke Assets**" will consist of James River's and its subsidiaries' and McCoy Elkhorn's right, title and interest in, to and under the following assets relating to the McCoy Elkhorn Burke mining complex located on or near Long Fork of Johns Creek, near the community of Kimper, in Pike County, Kentucky, free and clear of all liens, claims, encumbrances and other adverse claims: |

- the real property and leases of, and other interests in, real property described on Schedule A (the "**Real Property**");

- the facilities and improvements located on the Real Property, as generally described on Schedule B, including the mine facilities, mine infrastructure and mine apparatus, and Marshall Resources will grant a Lease back to McCoy Elkhorn relating to the Office Building, Warehouse and Safety Building (five year term), together with the Shop Building and Locomotive Garage (six months), all of such just referenced buildings being located on the Real Property; provided that all personal property, equipment (other than heating , cooling and similar) and trade fixtures of McCoy Elkhorn as are located within such buildings shall not be a part of the Purchased Burke Assets;

- all machinery and equipment at the McCoy Elkhorn Burke mining complex;

- all coal inventory located at the McCoy Elkhorn Burke mining complex;

- all transferable licenses, permits or other governmental authorizations described on Schedule C  relating to the McCoy Elkhorn Burke mining complex (the "**Transferred Permits**");

- all contracts, agreements, leases, licenses and commitments described on Schedule D (the "**Assumed Contracts**");

- all books, surveys, logs, maps, documents and other records related to the Purchased Burke Assets and Assumed Liabilities;

- All manufacturer's, vendors' and suppliers' warranties to the extent they are transferable;

- all claims and defenses that James River has or may have against third parties relating to the Purchased Burke Assets; and

- all insurance benefits, including rights and proceeds, arising from or relating to the Purchased Burke Assets or

the Assumed Liabilities.

**Assumed Liabilities:** The "**Assumed Liabilities**" relating to the Purchased Burke Assets will consist of those liabilities expressly assumed by Marshall Resources in the APA relating to the Purchased Burke Assets.

**Employees:** Marshall Resources shall not be required to hire any of the employees of McCoy Elkhorn associated with the Burke Purchased Assets, but may do so if it chooses.

**Representations, Warranties:** Customary for a transaction of this nature.  The representations and warranties will not survive the closing.

**Conduct of Business:** Until closing, the Purchased Burke Assets will be maintained by James River in the ordinary course of business.

**Permit and Surety Bond Matters:** Following closing, Marshall Resources shall take all necessary action to have transferred or reissued to Marshall Resources, or an affiliate of Marshall Resources, the Transferred Permits and to secure replacement financial assurances to replace all reclamation and surety bonds and related letters of credit and other collateral relating to such Transferred Permits ("**Existing Financial Assurance**").

To the extent any Transferred Permit is maintained in its current name after the closing, Marshall Resources shall satisfy, perform and undertake all liabilities, obligations, responsibilities and requirements relating to such Transferred Permit.  To the extent any Existing Financial Assurance is maintained after the closing, Marshall Resources shall indemnify and hold harmless James River and its affiliates against any and all losses, expenses, costs or other damages incurred in connection with such Existing Financial Assurances, including costs to maintain such Existing Financial Assurances, amounts payable in connection with any Existing Financial Assurance to any beneficiary of or counterparty thereto and amounts otherwise incurred as a result of any Existing Financial Assurances being accessed, drawn upon or required to be performed.

**Assumed Contracts:** Marshall Resources shall take all actions reasonably required to assist in obtaining a finding by the Bankruptcy Court that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts, including providing financial information as

reasonably requested by James River in connection with the hearing on approval of the Acquisition.  In connection with the assignment and assumption of the Assumed Contracts, James River shall cure all defaults under such Assumed Contracts to the extent required by section 365(b) of title 11 of the United States Code (the "**Bankruptcy Code**").

**Regulatory Filings:**   Subject to the Bankruptcy Code and any court order, the Parties shall take all actions reasonably necessary or desirable to consummate the transactions contemplated by the APA including making and obtaining all required regulatory filings and approvals.

**Conditions to Closing:**   The obligations of James River and Marshall Resources to consummate the Acquisition will be subject to the satisfaction of the following conditions:

- the Bankruptcy Court shall have entered a 363/365 Order, naming Marshall Resources as a good faith purchaser of the Purchased Burke Assets entitled to the protections of Section 363(m) of the Bankruptcy Code, which 363/365 Order shall not have been stayed, modified, reversed or amended without the consent of the Parties;

- all representations and warranties of the other party contained in the APA shall be true and correct in all material respects on and as of the closing date as though made on and as of the closing date subject to a Material Adverse Effect qualifier (to be defined in the APA with customary exceptions);

- all covenants, agreements and obligations required by the terms of the APA to be performed by the other Party at or before the closing shall have been duly and properly performed in all material respects;

- each Party shall have received all resolutions certificates if and to the extent required to be delivered under the APA;

- no provision of any applicable law shall prohibit the consummation of the Acquisition; and

- there shall have been no Material Adverse Effect (to be defined in the APA with customary exceptions) with respect to the Purchased Burke Assets.

**Termination:**

In addition to customary termination rights for transactions of this nature, (i) James River may terminate this Term Sheet or the APA prior to closing without liability if James River receives a bona fide proposal for the sale, lease, or other disposition, directly or indirectly, by merger consolidation, tender offer, share exchange or otherwise of any of the Purchased Burke Assets (an "**Alternative Transaction**"), and James River's board of directors determines in its good faith judgment that such Alternative Transaction may provide a higher and better economic recovery than the Acquisition, and (ii) this Term Sheet and the APA will terminate automatically upon the consummation of an Alternative Transaction to a Party other than Marshall Resources.

**Due Diligence:**

Marshall Resources shall promptly complete its due diligence investigation of the Purchased Burke Assets and Assumed Liabilities. In connection therewith, from the date hereof until the Acquisition is closed, James River shall continue to provide to Marshall Resources and its representatives and advisors reasonable access during normal business hours to its books and records relating to the Purchased Burke Assets and Assumed Liabilities and to its employees and other representatives.

**Expenses:**

All costs and expenses incurred in connection with the evaluation and negotiation of the Acquisition shall be paid by the Party incurring such cost or expense.

**Governing Law:**

This Term Sheet and the APA shall be governed by and construed in accordance with the laws of the State of Kentucky without giving effect to the conflict of laws principles thereof. The Parties hereto agree to submit to the exclusive jurisdiction of the Bankruptcy Court for any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Term Sheet, the APA or the Acquisition.

*[Signature page follows]*

By signing below, each Party hereby confirms its agreement with the proposed principal terms set forth in this Term Sheet, subject to the terms and conditions herein.

**JAMES RIVER COAL COMPANY**

By: _____

Name: SAMUEL M. HOPKINS
Title: VICE PRESIDENT
Dated: 5/23/2014

**MARSHALL RESOURCES, INC.**

By: _____

Name: MARK CAMPBELL
Title:
Dated: 5/23/14

## Schedule A

1. That certain Deed of Conveyance dated September 19, 1978 by and between Dewey Stiltner and Earlane Stiltner, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 69;

2. That certain Deed dated March 26, 1992 by and between Donnie R. May and Pricy May, his wife and McCoy Elkhorn Coal Corporation, which Deed is of record in the Pike County Court Clerk's Office in Deed Book 659, Page 95;

3. That certain Deed dated March 26, 1992 by and between Edward Charles and Linda Charles, his wife and McCoy Elkhorn Coal Corporation, which Deed is of record in the Pike County Court Clerk's Office in Deed Book 659, Page 97;

4. That certain Deed of Conveyance dated June 6, 1989 by and between Pinkie May and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 625, Page 42;

5. That certain Deed of Conveyance dated October 17, 1989 by and between Earl Worrix and Jennifer Worrix, his wife, *et al.* and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 629, Page 271;

6. That certain Deed of Conveyance dated November 29, 1984 by and between James Marshall Justice, Jr. and Darlene Justice, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 583, Page 561;

7. That certain Deed of Conveyance dated October 16, 1981 by and between Lawrence Bostic and Thelma Bostic, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 567, Page 237;

8. That certain Deed of Conveyance dated October 27, 1981 by and between Bennett Hunt and Buna Hunt, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 567, Page 338;

{00021483-1 }

9.  That certain Deed of Conveyance dated September 5, 1980 by and between Gay Scott, widow, and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 561, Page 274;

10. That certain Deed of Conveyance dated July 14, 1978 by and between Tommy Coleman and Nolaine Coleman, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 548, Page 479;

11. That certain Deed of Conveyance dated July 17, 1978 by and between Vicy Stiltner and John H. Stiltner, her husband and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 548, Page 503;

12. That certain Deed dated November 10, 2004 by and between Johns Creek Processing Company and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 860, Page 314;

13. That certain Deed of Conveyance dated September 19, 1978 by and between Victor Smith and Vada Smith, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 68; and

14. That certain Deed of Conveyance dated June 11, 2000 by and between Opal R. Greene, widow, *et al.* and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 804, Page 288.

Assignment of Leases by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc., relating to the following lease:

(a) Lease dated November 1, 2008, from WPP, LLC to McCoy Elkhorn Coal Corporation, of record in the Pike County Court Clerk's Office Lease Book 932, Page 716.

Partial Assignment of Lease by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to that prior Surface Lease Agreement dated December 9, 1999, by and among McCoy Elkhorn Coal Corporation and Johns Creek Elkhorn Corporation, as lessors, and Berkley Energy Corporation, as lessee.

Assignment of Railroad Contracts and Agreements by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.   Billing Consolidation Agreement Dated April 12, 2006;
2.   Agreement No. CSX 0011710, Dated April 3, 1990, Real Estate/Land Only;
3.   Agreement No. L40724, Dated May 5, 1986 – Overhead Conveyor;
4.   Agreement No. COL37730, Dated June 12, 1979, Private Road Crossing; and
5.   Lease No. CO-L35596, Dated March 1, 1972, Real Estate/Land Only.

Assignment of Distance Waivers for Surface Mining Operations by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.   Waiver for Surface Mining Operations executed by David Hunt and Shelia Hunt on behalf of the Bud Hunt Jr. Heirs;
2.   Waiver for Surface Mining Operations executed by Joseph A. Collins and Jessica L. Collins;
3.   Waiver for Surface Mining Operations executed by Jason McCoy and Cindy McCoy;
4.   Waiver for Surface Mining Operations executed by Michael Blackburn and Christine Blackburn; and
5.   Waiver for Surface Mining Operations executed by Lester Varney.

Assignment of Above Grade Airspace Agreement and Permit, by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.   Above Grade Airspace Agreement and Permit dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation.

{00021483-1 }

## Schedule B

F. M. Burke Preparation Plant and Loadout, and all appurtenances related thereto.

| Location | Asset Type | Description |
|---|---|---|
| Burke Loadout | Loadout | Loadout, including all overland conveyance systems, stacking tubes and reclaim systems, all truck scales, sampler systems that are owned and located on the Real Property Interests prior to Closing |
| Burke Loadout | Locomotive  Garage | 65'x20' Metal Building |
| Burke Plant | Preparation Plant | Preparation Plant, including all spare components and accessories heavy media vessel, all overland conveyor systems and stacking tubes, raw coal and clean coal silos and _____ reclaim systems and all refuse bins and associated hopper(s) and located on the Real Property Interests as of May 1, 2014 |
| Burke Plant | Pump Building | Plant - Pump House, including all pumps, water lines, electrical systems and other components or accessories necessary to operate the same and located on the Real Property Interests as of May 1, 2014 |
| Burke Plant | Water Tank | 500,000 Gallon Water Tank |
| Cow Branch | Refuse Impound | Cow Branch Impoundment, including all pumps, pipes, lines, electrical systems and other components or accessories necessary to operate the same and located on the Real Property Interests as of May 1, 2014 |
| Merry Branch | Coarse Refuse Fill | Merry Branch Coarse Refuse Fill |
| Main Office | Building | Main Office - 62'x63' Metal and Brick Structure - 1/2 2nd floor |
| Safety | Building | Safety Office 48'x24' Brick House |
| Shop | Building | 40'x60' Metal Building w/20'x16' Side Addition |
| Shop | Building | Bathhouse |

| | | |
|---|---|---|
| Shop | Hoist | 10 Ton Overhead Hoist |
| Shop | Aircompressor | 10 HP |
| Burke Plant | Substation | Burke Plant at Merry Branch Substation, including all existing power lines and infrastructure |
| Warehouse | Building | Warehouse Building - 110'x50' Steel Structure, 2 Story, including all shelving and other fixtures |
| Warehouse | Building | Warehouse Shed, Steel Construction, 330'x18' |
| Burke Plant | Water Treatment Systems | Water Treatment Systems servicing Burke Plant, Cow Branch Impoundment, Merry Branch Coarse Refuse and Mine Nos. 12 and 31, with all accessories and components with at least a 15-day chemical inventory |

## Schedule C

### McCOY ELKHORN COAL CORPORATION PERMITS LIST

| KYDNR Permit # | Operation Name | MSHA ID No. | KY State File No. | KPDES Permit No. | Status |
|---|---|---|---|---|---|
| 898-4031 | Mine No. 12, Wolfpin Br. | 15-19314 | 10925.2 | KYG045388 | A1 |
| 898-4243 | Burke/Loadout | 15-16958 | | KYG041804 | A1 |
| 898-4244 | Burke Plant & Merry Br. Refuse Mine 31 & Mine 32 | 15-16958 15-19492 | 18851 | KY0031402 | A1 |
| 898-8144 | Burke Plant & Loadout | 15-16958 | x-fer from 898-8124 & 8093 | KYG045821 | A1 |
| 898-9012 | Cow Br. Slurry Impoundment | 15-16958 | | KYG044814 | A1 |
| 898-9106 | Refuse Fill, Wolfpin Br. | 15-16958 | | KYG045433 | ND |

### McCOY ELKHORN COAL CORPORATION
### COE Section 404 Permits

| Hearing Agency | Type of Permit | Permit or Application No. | Related KYDNR Permit No. |
|---|---|---|---|
| COE | Section 404 | 200401405 | 898-9106 |
| COE | Section 404 | LRL-2010-1114-mlc | 898-4244 |

### McCOY ELKHORN COAL CORPORATION LICENSES LIST

| Issuing Agency | Type of License | License No. | Expiration Date |
|---|---|---|---|
| KY Cabinet for Health Services | * Radioactive Materials License | 201-488-51 (Amendment No. 36) | 6/30/2014 |
| Department for Environmental Protection, Division of Air Quality | Air Quality Permit | S-06-298 | |

\*    Marshall Resources shall be required to obtain a new or replacement Radioactive Materials License relating to the F.M. Burke Preparation Plant and

Loadout, specifically with regard to page 1(c), page 2(c) and page 3 (No. 12) set forth in such License.

**McCOY ELKHORN COAL CORPORATION MSHA ID NUMBERS**

| Issuing Agency | MSHA ID No. | Applicable Mine or Facility |
|----------------|-------------|------------------------------|
| MSHA | ** 15-19314 | Mine No. 12 |
| MSHA | ** 15-16958 | Longfork Preparation Plant |
| MSHA | ** 15-19492 | Mine No. 31 |

** McCoy Elkhorn will "abandon" these MSHA ID Nos. and the Marshall Resources will assume such MSHA ID Nos.

## Schedule D

Assignment of Leases by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc., relating to the following lease:

> (a)     Lease dated November 1, 2008, from WPP, LLC to McCoy Elkhorn Coal Corporation, of record in the Pike County Court Clerk's Office Lease Book 932, Page 716.

Partial Assignment of Lease by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to that prior Surface Lease Agreement dated December 9, 1999, by and among McCoy Elkhorn Coal Corporation and Johns Creek Elkhorn Corporation, as lessors, and Berkley Energy Corporation, as lessee.

Assignment of Railroad Contracts and Agreements by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.     Billing Consolidation Agreement Dated April 12, 2006;
2.     Agreement No. CSX 0011710, Dated April 3, 1990, Real Estate/Land Only;
3.     Agreement No. L40724, Dated May 5, 1986 – Overhead Conveyor;
4.     Agreement No. COL37730, Dated June 12, 1979, Private Road Crossing; and
5.     Lease No. CO-L35596, Dated March 1, 1972, Real Estate/Land Only.

Assignment of Distance Waivers for Surface Mining Operations by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

4.     Waiver for Surface Mining Operations executed by David Hunt and Shelia Hunt on behalf of the Bud Hunt Jr. Heirs;
5.     Waiver for Surface Mining Operations executed by Joseph A. Collins and Jessica L. Collins;
6.     Waiver for Surface Mining Operations executed by Jason McCoy and Cindy McCoy;
6.     Waiver for Surface Mining Operations executed by Michael Blackburn and Christine Blackburn; and
7.     Waiver for Surface Mining Operations executed by Lester Varney .

Assignment of Above Grade Airspace Agreement and Permit, by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.     Above Grade Airspace Agreement and Permit dated May 1, 2000, by and

between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy
Elkhorn Coal Corporation.

# EXHIBIT E

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone:  (212) 450-4000

Facsimile:  (212) 607-7973

Marshall S. Huebner (admitted *pro hac vice*)

Brian M. Resnick (admitted *pro hac vice*)

Michelle M. McGreal (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia 23219

Telephone: (804) 788-8200

Facsimile: (804) 788-8218

Tyler P. Brown (VSB. No. 28072)

Henry P. (Toby) Long, III (VSB No. 75134)

Justin F. Paget (VSB No. 77949)

*Counsel to the Debtors*
*and Debtors in Possession*

*Local Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **JAMES RIVER COAL COMPANY,** *et al.*, | Case No. 14-31848 (KRH) |
| Debtors.[1] | **(Jointly Administered)** |

## ASSUMPTION AND ASSIGNMENT NOTICE

PLEASE TAKE NOTICE that:

1.        On May 23, 2014, James River Coal Company and its subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"), filed the *Debtors' Motion for Entry of an Order (I) Approving the Sales and Transfers of Certain Assets and Liabilities Related to the McCoy Elkhorn Mining Complex Free and Clear of Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts in Connection Therewith, and (III) Granting Related Relief* (the "**Motion**")[2] with the United States Bankruptcy Court for the Eastern District of Virginia (the "**Court**").

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

2.	You are receiving this notice (the "**Assumption and Assignment Notice**") because you are listed on **Exhibit A** hereto as a counterparty to one or more contracts or leases that the corresponding Debtors intend to assume and assign to a Purchaser in connection with the Sale.  The applicable Purchaser to which such contract or lease will be assigned is also listed on Exhibit A hereto.[3]  You should locate your name and your contract in the attached Exhibit A.

3.	In connection with the assumption and assignment, the Debtors will pay the amount that the Debtors' records reflect is owing for prepetition arrearages as set forth on **Exhibit A** (the "**Cure Amounts**").  The Debtors believe that any and all defaults (other than the filing of these chapter 11 cases) under the Assumed Contracts can be cured by the payments of the Cure Amounts.

4.	Objections to the assumption and assignment of any Assumed Contract, including to any Cure Amount, must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and the *Notice, Case Management and Administrative Procedures* approved by the Court on April 10, 2014 [ECF No. 77]; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor, including the cure amount that the objecting party believes should be paid in connection with the assumption of the Assumed Contract (the "**Claimed Cure Amount**") and, if the objection to the proposed assumption and assignment is based on issues related to adequate assurance of future performance, what information with respect to the applicable Purchaser such Contract Counterparty requires to satisfy its adequate assurance concerns; and (d) be filed with the Court and served, so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on June 2, 2014, on: (i) the Debtors, 901 East Byrd Street, Suite 1600, Richmond, Virginia 23219, Attn: Andrew B. Hampton, email: andrew.hampton@jamesrivercoal.com; (ii) counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner and Brian M. Resnick, email: jrcc.service@davispolk.com; and (iii) local counsel to the Debtors, Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn: Tyler P. Brown, email: tpbrown@hunton.com.

5.	If no Cure Amount is due under the Assumed Contract, and you do not otherwise object to the Debtors' assumption and assignment of the Assumed Contract, no further action need be taken on your part.

6.	If any objection is timely filed with respect to the assumption and assignment of any Assumed Contract, including with respect to a Cure Amount, a hearing with respect to such objection will be held on June 4, 2014 (or such other date as may be fixed by the Court) before the United States Bankruptcy Court for the Eastern District of Virginia, Honorable Kevin R. Huennekens, United States Bankruptcy Court for the

---

[3] This Assumption and Assignment Notice is not an admission by the Debtors that any Assumed Contract is executory or unexpired.

Eastern District of Virginia, 701 East Broad Street, Courtroom 5000, Richmond, Virginia 23219.

7.        Objections that object solely to the Cure Amount may not prevent or delay the Debtors' assumption and assignment of any Assumed Contract.  If a party objects solely to a Cure Amount, the Debtors may, in in their sole discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties.  So long as the Debtors hold the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment of such Assumed Contract, the Debtors can, without further delay, assume and assign the Assumed Contract that is the subject of the objection.  Under such circumstances, the objecting party's recourse is limited to the Claimed Cure Amount held in reserve.

8.        Each Debtor's decision to assume and assign to a Purchaser an Assumed Contract is subject to Court approval and the closing of the applicable Sale.  Accordingly, absent such closing, any of the Assumed Contracts shall not be deemed assumed or assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.  Notwithstanding anything herein, this Assumption and Assignment Notice does not require or guarantee that the Assumed Contracts listed herein will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors with respect to such Assumed Contracts are reserved.

9.        Nothing herein (i) alters in any way the prepetition nature of the Assumed Contracts or the validity, priority or amount of any claims of a Contract Counterparty against the Debtors that may arise under such Assumed Contract, (ii) creates a postpetition contract or agreement or (iii) elevates to administrative expense priority any claims of a Contract Counterparty against the Debtors that may arise under such Assumed Contract.

<u>**Consequences of Failing To Timely File and Serve an Objection**</u>

**If no objection is timely filed and served, the Assumed Contract shall be deemed assumed and assigned to Purchaser upon the closing of the Sale and payment of the Cure Amount (if any), and the Cure Amount set forth on Exhibit A shall be final and binding upon all Contract Counterparties.  Additionally, any Contract Counterparty to an Assumed Contract who fails to timely file and serve an objection to the proposed assumption and assignment of an Assumed Contract, including in respect of the Cure Amount, shall be forever barred from asserting any objection thereto, including (i) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults against the Debtors or their estates, (ii) asserting that the assignee of such contract or lease has not provided adequate assurance of future performance and (iii) asserting that the assignment is subject to any anti-alienation provision or other restriction on assignment.**

Dated:   May __, 2014
         Richmond, Virginia

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors
and Debtors in Possession*

-and-

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors
and Debtors in Possession*