DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:   (212) 450-4000
Facsimile:   (212) 607-7973
Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Counsel to the Debtors*
*and Debtors in Possession*

*Local Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

**In re:**

**JAMES RIVER COAL COMPANY,** *et al.*,

**Debtors.**[1]

**Chapter 11**

**Case No. 14-31848 (KRH)**

**(Jointly Administered)**

## DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS
## TO (i) IMPLEMENT (a) KEY EMPLOYEE INCENTIVE PLAN,
## (b) KEY EMPLOYEE RETENTION PLAN AND
## (c) MODIFIED SEVERANCE PLAN AND (ii) MAKE 2013 SAFETY PAYMENTS

James River Coal Company and its subsidiaries, as debtors and debtors in

possession in these proceedings (collectively, the "**Debtors**"), respectfully represent:

### Background and Jurisdiction

1.      On April 7, 2014 (the "**Petition Date**"), each Debtor commenced with this

Court a voluntary case under chapter 11 of title 11 of the United States Code (the

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached hereto.

"**Bankruptcy Code**").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by this Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

3.      By this motion (the "**Motion**"), the Debtors seek entry of an order substantially in the form of order attached hereto as <u>Exhibit A</u> (the "**Order**"), pursuant to sections 363 and 503 of the Bankruptcy Code, (i) approving and authorizing the Debtors to implement (a) a chapter 11 key employee incentive plan (the "**KEIP**"), (b) a non-insider key employee retention plan (the "**KERP**") and (c) modifications to the Debtors' prepetition severance plan (the "**Modified Severance Plan**" and, together with the KEIP and the KERP, the "**Proposed Compensation Plans**"), (ii) authorizing the Debtors to make payments under the Proposed Compensation Plans, to the extent earned, to the participants in such plans (the "**Proposed Plan Participants**"), (iii) authorizing the Debtors to make certain payments under the Debtors' ordinary course annual incentive plan and (iv) granting certain related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the declaration of Peter T. Socha, James River Coal Company's Chairman, President and Chief Executive Officer, which is attached hereto as

<u>Exhibit B</u> and the declaration of John Dempsey, a Partner in the firm of Mercer (US) Inc.

("**Mercer**"), the Debtors' independent compensation advisor, which is attached hereto as

<u>Exhibit C</u>.

### The Strategic Transaction Process

4.      The Debtors initiated these chapter 11 cases to pursue and effectuate one

or more strategic restructuring transactions.  As part of their restructuring efforts, the

Debtors, with the assistance of their restructuring professionals, have actively and

publicly engaged in a marketing process for (i) the purchase of all or any part of the

Debtors' businesses, a process that is expected to culminate with an auction scheduled for

July 2014[2] or (ii) a contribution of capital in connection with a stand-alone plan of

reorganization.

5.      Tangible progress has been made.  However, much work remains, which

will demand extraordinary amounts of time, dedication and focus from the Debtors'

employees during the restructuring process.  The Debtors have long maintained thin

ranks of corporate staff for a company of its size, and many of the Debtors' employees

have historically fulfilled the role of what would be multiple positions at another

company.  The burden of managing the bankruptcy process and the strategic restructuring

process has been added to already demanding workloads for the Debtors' employees, in

particular those in departments such as finance and legal that are critical to the

---

[2] *See Order (i) Approving the Strategic Transaction Bidding Procedures, (ii) Scheduling Bid Deadlines and the Auction, (iii) Approving the Form and Manner of Notice Thereof and (iv) Granting Related Relief* (the "**Bidding Procedures Order**"), setting a sale hearing date for July 10, 2014.

restructuring.  Many of these employees are working tirelessly to achieve the best possible outcome for these cases.

6.      As a result, the Debtors face the very real risk that their employees may depart for other employment opportunities.  Indeed, since the Petition Date, the Debtors have experienced an increase in their attrition rate, with departing employees expressly citing the lack of job security at the Debtors as a reason for their resignations and, in at least one case, accepting positions at companies in less convenient locations in exchange for greater job security.  Some of these departing employees explained that the lack of retention compensation and/or severance at the Debtors was an important factor in their decision to leave the company.

7.      Many of the employees who have remained with the Debtors have done so with the expectation that the Debtors would implement the KERP and the Modified Severance Plan.  Without these programs, the Debtors are at risk of losing an unacceptable number of their employees to competing employers able to offer market compensation and/or job security that a company in chapter 11 cannot match.  Additional defections among the Debtors' workforce would significantly hamper their operational ability and jeopardize the restructuring.  Moreover, it is extremely unlikely that the Debtors would be able to find qualified replacements during the critical period leading up to the July 2014 auction and the consummation of any strategic transaction(s).

8.      The Debtors' ability to maintain their business operations, preserve the value of their assets and maximize creditor recoveries through a successful restructuring process hinges on the Debtors' ability to retain and incentivize key employees during this

4

critical and uncertain period.  It is now more important than ever for these employees to

remain in their positions and to perform their responsibilities at the highest level.

Anything less could well be critically damaging to the Debtors' efforts to maximize value

for all stakeholders.

### Development of the Proposed Compensation Plans

9.    With these considerations in mind, the Debtors undertook a

comprehensive analysis of the current compensation programs.  The Debtors received

input and guidance from Mercer and from the Debtors' restructuring professionals to

assess how the Debtors could best address the concerns outlined above in a manner that

aligns with market practice for similarly situated companies.  Following this review and

after discussing many options with Mercer and the Debtors' restructuring professionals,

the Debtors are seeking to establish the Proposed Compensation Plans in order to

(1) motivate and encourage key employees who are most closely tied to the effort to

maximize creditor recoveries, (2) retain key non-insider employees during this uncertain

yet critical period and (3) stabilize the Debtors' workforce so that employees will focus

their attention on achieving important business objectives during the restructuring

process.  The Proposed Compensation Plans have been specifically tailored to reflect the

business realities of the Debtors' strategic restructuring process and have been reviewed

and approved by the compensation committee of the Debtors' board of directors.

10.    Importantly, the Debtors have consulted with the official committee of

unsecured creditors appointed in these cases (the "**Creditors' Committee**") and their

advisors regarding the Proposed Compensation Plans.  The Creditors' Committee

5

provided substantial input to various iterations of the plans, which led to the reshaping of earlier forms of the plans into what is now being presented to the Court.  As a result of this process, the Creditors' Committee supports the approval of the Proposed Compensation Plans as a reasonable exercise of the Debtors' business judgment.

<u>**The Proposed Compensation Plans**</u>

A.  <u>**The KEIP**</u>

11.     In seeking to maximize creditor recoveries through the restructuring process, the efforts of the members of the Debtors' senior management team and the heads of the Debtors' mine operations will be a critical factor as they focus substantial attention on furthering the bankruptcy process and formulating and negotiating one or more strategic restructuring transactions.  For example, the three members of the Debtors' senior management and their restructuring professionals are actively analyzing the Preliminary Indications of Interest (as defined in the Bidding Procedures Order) that they have received thus far, and are negotiating with and responding to diligence requests from numerous prospective purchasers, all while continuing to solicit and pursue higher and better offers.  The incentives of those employees most involved with the sales process should be aligned with the Debtors' creditors and other stakeholders as they engage in the marketing and negotiation of a sale or reorganization of the Debtors' businesses.

12.     The Debtors, with the assistance of Mercer and their restructuring professionals, carefully formulated the KEIP to (a) motivate those employees intimately involved with the sales process (the "**KEIP Participants**") to maximize creditor

recoveries through one or more strategic transactions and (b) be consistent with market

practice.  To that end, the KEIP Participants include nine individuals, consisting of (i) the

President and Chief Executive Officer, (ii) the Chief Operating Officer, (iii) the Chief

Accounting Officer, (iv) five presidents of the Debtors' mine operations and (v) one

assistant general manager of a mine operation, who, since the departure of the mine's

former president, has been performing functions similar to those of the presidents of the

Debtors' other mine operations.

13.     Payments under the KEIP (the "**KEIP Payments**") will occur on the

earlier of consummation of (1) the sale of all or substantially all of the assets of the

Debtors in one or more sales or (2) a chapter 11 plan of reorganization (the "**Closing**

**Date**").  KEIP Payments vary based on the achievement of certain threshold amounts of

total acquisition value or total enterprise value, as applicable, achieved through a sale of

the Debtors' assets, a sponsored chapter 11 plan of reorganization, or a combination

thereof (the "**Total Value**").

14.     The KEIP Participants will earn KEIP Payments in accordance with the

Total Value thresholds set forth in Exhibit D attached hereto.[3]  If the Debtors achieve the

minimum threshold of Total Value, the KEIP Participants will receive aggregate KEIP

Payments of $892,715.  At the target threshold of Total Value, aggregate KEIP Payments

will be $1,444,040.  At the maximum threshold of Total Value, the KEIP Participants

will receive aggregate KEIP Payments of $2,711,148 (the maximum amount that can be

---

[3] The Debtors will calculate Total Value pursuant to the formula set forth on Exhibit D.
Substantially contemporaneously herewith, the Debtors have filed a motion to submit Exhibit D under seal
in order to protect sensitive commercial information.

7

earned under the KEIP).  Actual KEIP Payment will be based on a straight-line interpolation of the thresholds for any Total Value in between thresholds.

15.      In order for any KEIP Payment to be earned, the Debtors must meet the Minimum Threshold.  The Total Value thresholds, which were negotiated with the Creditors' Committee, reflect targets that are challenging to achieve and are designed to incentivize the KEIP Participants to obtain the highest possible recovery for creditors. Based on the expressions of interest and recent discussions with potential purchasers, the Debtors and their advisors believe that the Minimum Threshold is appropriate and achieving it will require significant efforts by the KEIP Participants.

16.      The KEIP Payments are appropriate and reasonable.  Based on a review of compensation programs for chapter 11 debtors of comparable revenue and workforce size, Mercer concluded that the KEIP is consistent with (or below) industry standards. Indeed, the maximum total program cost of the KEIP ($2,711,148) is just above the market median for chapter 11 plans identified by Mercer.  Moreover, even with implementation of the Proposed Compensation Plans, Mercer's analysis showed that total compensation opportunities for the KEIP Participants would remain below the market median for similar positions.

17.      In the event that a KEIP Participant voluntarily resigns or is involuntarily terminated for cause prior to payment of their KEIP Payment, the KEIP Participant will forfeit their KEIP Payment.  If a KEIP Participant is involuntarily terminated due to job elimination, death or long-term disability prior to payment of their KEIP Payment, the KEIP Participant will receive a pro-rata share of the KEIP Payment he would have been

entitled to receive based on the proportion of the period worked relative to the time from

the Petition Date to the Closing Date, which will be payable on the Closing Date.  In

either case, the Debtors may, in their discretion, either (1) replace the departing KEIP

Participant with an incumbent or newly hired employee of the Debtors or (2) increase the

KEIP Payment level for an existing KEIP Participant; *provided*, *however* that in no event

will the aggregate amount of KEIP Payments exceed $2,711,148.

### B.  The KERP

18.    As described above, certain key non-insider employees have been required

to undertake significant efforts to stabilize operations and lay the necessary groundwork

for a successful strategic restructuring transaction.  Maximizing the value of the Debtors'

estates will largely depend on the Debtors' ability to minimize the loss of key employees

during the restructuring process.  The employees eligible to participate in the KERP

include 39 of the Debtors' non-insider employees who are vital to the Debtors'

businesses and restructuring (the "**KERP Participants**").[4]  The loss of any of the KERP

Participants could have a material detrimental impact on the Debtors, and could mean the

difference between a mine operating profitably or incurring substantial financial losses or

facing safety issues.  Accordingly, the Debtors modeled the KERP to (a) retain

employees who are essential to the Debtors' ability to meet business objectives that will

---

[4] A list of the KERP Participants, including their respective titles, annual salaries and the proposed allocation of KERP Payments, is filed under seal as <u>Exhibit E</u>.  The Debtors are filing a motion to seal <u>Exhibit E</u> contemporaneously herewith in order to maintain the privacy of the KERP Participants and the confidentiality of the sensitive commercial information contained therein.

allow for a successful outcome in these cases, (b) achieve an appropriate balance of retaining employees critical to the restructuring efforts while protecting creditor interests and (c) be consistent with market practice.  The KERP ensures that certain non-insider key employees, without whom the Debtors could not continue to operate and could not properly effectuate a successful restructuring, remain with the Debtors throughout the restructuring process.

19.    KERP Participants were selected based on the difficulty of replacing a potential KERP Participant and the perceived risk of such KERP Participant's departure, as determined by the Debtors' senior management.  The Debtors then determined individual KERP Participant's payment under the KERP (each, a "**KERP Payment**") by placing each KERP Participant into a three-tiered schedule, with KERP Participants in each tier receiving a predetermined percentage of current base salary.  The Debtors believe that each of the KERP Participants plays an important role in their restructuring efforts and that such employees possess important experience, relationships and familiarity with the Debtors' operations and infrastructure that would be costly and disruptive to replace.

20.    The maximum cost of the KERP is $1,401,783, with 100% of the KERP Payments vesting only upon a KERP Participant's continued employment through the earlier of the (1) sale of all or substantially all of the assets of the Debtors in one or more sales or (2) consummation of a chapter 11 plan (each, a "**Vesting Event**").  Payments will be made to KERP Participants upon the occurrence of the applicable Vesting Event; *provided*, *however* that if a KERP Participant is transferred to a purchaser in connection

10

with the sale of the Debtors' assets prior to a Vesting Event, such KERP Participant's

KERP Payment shall vest upon the consummation of the asset sale in which the KERP

Participant is transferred but shall not become payable until the occurrence of a Vesting

Event.  The Debtors have aligned payment of the KERP Payments with the anticipated

consummation of the strategic restructuring transaction in order to encourage the KERP

Participants to remain with the Debtors during this challenging and uncertain period.

Indeed, the approximately $1.4 million program cost of the KERP is aligned with market

practice for chapter 11 plans identified by Mercer.

   21. Like the KEIP, the payment obligations under the KERP are appropriate

and reasonable.  In connection with the Debtors' preparation of the KERP, Mercer

reviewed the retention programs for chapter 11 debtors with sales proceeds comparable to

the proceeds expected for sales of the Debtors' assets (using the same comparator group

that was analyzed in connection with the assessment of the KEIP).  Based on this review,

Mercer concluded that the KERP was consistent with (or below) industry standards.

Moreover, even with the implementation of the KERP, Mercer's analysis showed that the

total compensation for almost all of the KERP Participants would fall below the market

median for similar positions in the Debtors' industry.

   22. As with the KEIP, in the event that a KERP Participant voluntarily resigns

or is involuntarily terminated for cause prior to payment of their KERP Payments, the

KERP Participant will forfeit their KERP Payment.  If a KERP Participant is

involuntarily terminated without cause or due to job elimination, death or long-term

disability prior to payment of their KERP Payment, the KERP Participant will receive

11

their KERP Payment in full upon termination.  In the event that a KERP Participant takes

a leave of absence from the Debtors or goes on short-term disability, the KERP

Participant will receive a pro-rata share of their KERP Payment at the same time as the

other KERP Participants, based upon the proportion of time worked relative to the time

from the Petition Date to the Vesting Date, which will be payable on the Vesting Date.

In either case, the Debtors may, in their discretion, replace the departing KERP

Participant with an incumbent or newly hired employee of the Debtors; *provided*,

*however* that in no event will the aggregate amount of KERP Payments exceed

$1,401,783.

## C.  The Severance Plan

23.    The Debtors are seeking authority to implement certain modifications to

their Prepetition Severance Plan[5] to address employee uncertainties associated with these

chapter 11 cases and ensure that employee efforts are focused on continuing the safe and

efficient operation of the Debtors' businesses while working to maximize the value of the

estates and the recoveries for creditors.  The Modified Severance Plan was specifically

developed to (a) stabilize the Debtors' workplace environment during these chapter 11

cases, (b) be consistent with market practice and (c) comport with section 503(c)(2) of

the Bankruptcy Code.  First, the Prepetition Severance Plan would be expanded to cover

---

[5] Pursuant to the Court's first-day wages order entered in these cases (the "**Wages Order**"), the Debtors are authorized to continue making ordinary course payments under a prepetition severance plan that provides severance benefits to most of the Debtors' full-time employees (the "**Prepetition Severance Plan**").  As part of their prepetition severance program, the Debtors also maintained a corporate-level severance plan, but did not seek authority to make payments under this plan pursuant to the Wages Order.

the Debtors' entire workforce in order to provide severance benefits to those employees not previously covered under the Prepetition Severance Plan.

24.    Second, payments to employees under the Modified Severance Plan will be made in accordance with the tiering schedule in the table below.  The tiering schedule reflects the Debtors' determination, in consultation with Mercer and their restructuring professionals, as to which employees are most in need of the financial reassurance that is provided by severance as they work toward a restructuring transaction.  Generally, employees will receive one week of severance per year of service, subject to certain minimum and maximum payments based on the employee's tier (as described below).  All severance payments would be subject to deductions of payments made pursuant to the Workers Adjustment and Retraining Notification Act (WARN Act), as applicable.[6]

| Tier | Severance Payment | Minimum | Maximum |
|---|---|---|---|
| 1<br>Executive Level | 26 weeks of base salary | N/A | N/A<br><br>In accordance with section 503(c)(2) of the Bankruptcy Code, the amount of payments to insiders shall not be greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made. |
| 2<br>General Corporate Level | 1 week of base salary per year of service | 13 weeks of base salary | 26 weeks of base salary |
| 3<br>Operating Level | 1 week of base salary per year of service | 8 weeks of base salary | 13 weeks of base salary |
| 4<br>Other Corporate and Operating-Level Employees | 1 week of base salary per year of service | 4 weeks of base salary | 13 weeks of base salary |
| 5<br>Full-Time Hourly Employees | 1 week of base salary per year of service | N/A | 13 weeks of base salary |

---

[6] The two individuals with severance benefits under their employment contracts would be required to waive any claim for severance thereunder in order to receive severance under the Modified Severance Plan.

25.     Payments to employees under the Modified Severance Plan will be made
only if an employee is terminated, and no payments will be made to employees who are
transferred to purchasers in connection with a sale of the Debtors' assets.  In order to
balance between providing an appropriate amount of severance while preserving the
value of the Debtors' estates, the Debtors propose to cap the aggregate payments under
the Modified Severance Plan at $3.5 million (inclusive of the severance benefits
approved pursuant to the Wages Order).  Moreover, in the event that an employee who
receives payments under the Modified Severance Plan also receives KEIP Payments
and/or KERP Payments, that employee's payments under the Modified Severance Plan
(in the case of KEIP Payments, prior to giving effect to any reduction to severance
payments pursuant to section 503(c)(2) of the Bankruptcy Code) will be reduced by 25%
of the KEIP Payments and/or KERP Payments they receive; *provided*, *however* that in no
event shall such reduction cause such employee's payments under the Modified
Severance Plan to be reduced by more than 15%.

26.     In consulting with Mercer regarding employee compensation and retention
concerns, the Debtors determined that, as is the case with other postpetition severance
plans, the Modified Severance Plan would be a desirable and cost-effective way to
achieve stability and focus among the Debtors' employees.  Instead of enhancing salaries
or payment levels under the KEIP or the KERP, the Modified Severance Plan will offer a
cost-effective method to address employee concerns about job security, as the
incremental payments are made only to departing employees.  Based on Mercer's
analysis, the Debtors also understand that the benefits offered under the Modified

14

Severance Plan are within the range of benefits offered in severance plans of comparable companies.

27.      Additionally, the payment obligations under the Modified Severance Plan are reasonable and appropriate.  In advising the Debtors on the Modified Severance Plan, Mercer analyzed the severance practices utilized by 30 chapter 11 debtors, and found that the tiering structure in the Modified Severance Plan is consistent with market practice. Mercer also concluded that the Modified Severance Plan – in areas such as benefit accrual rate and payment caps – is consistent with (or below) industry standards.  For instance, for chapter 11 debtors that used payment tiers in their severance plans, the Debtors' minimum and maximum benefit accrual rates generally fall below the 25th percentile for such plans.  Moreover, based on benchmarking performed by Mercer, even if the KEIP Participants and the KERP Participants were to receive payments under the Modified Severance Plan in addition to all possible KEIP Payments and KERP Payments, these employees would still receive total compensation below the market median for similar positions in the Debtors' industry.

28.      Through implementation of the Modified Severance Plan, the Debtors will be able to provide security to their entire workforce, which will improve employee morale and increase productivity during the pendency of the restructuring.

### The 2013 Safety Payments

29.      In the ordinary course of business, the Debtors maintain an annual corporate-level incentive plan program (the "**AIP**"), covering approximately 25 employees, to reward such employees when the Debtors achieve certain measurable

15

annual financial and safety goals.  Pursuant to the Wages Order, the Debtors received

authority to pay safety-related amounts earned but unpaid under the AIP to non-insider

employees, and estimated the aggregate amount of AIP payments at $500,000.  The

Debtors hereby seek authority to make payments to the three members of the Debtors'

senior management team in respect of earned but unpaid 2013 safety-related payments

(the "**2013 Safety Payments**").  The aggregate amount of the 2013 Safety Payments to

be paid to these three employees is $122,500.  When added to the safety-related amounts

payable to other employees pursuant to the Wages Order, the aggregate amount paid will

be approximately $423,000 (approximately $77,000 less than the estimate set forth in the

Wages Order).

   30.  The payment of the 2013 Safety Payments is reasonable and appropriate.

The safety-related goals under the AIP directly correspond to an important objective

measure of safety performance:  non-fatal days lost ("**NFDL**"), *i.e.* occupational injuries

that result in a loss of one or more days from an employee's scheduled work, or days of

limited or restricted activity while at work.  Employees are entitled to 100% of safety-

related payments only if the NFDL rate is below the national average.  In 2013, the

Debtors, led by the senior management team, succeeded in accomplishing an NFDL rate

below the national average.  The Debtors are not seeking to pay the full amount of the

$393,250 safety metric target to these employees, however.  Instead, consistent with the

safety-related bonuses paid in respect of 2012,[7] the compensation committee of the

---

[7] In 2012, the targets under the safety metric of the AIP were met, but due to the extraordinary
circumstances in the industry and at the Debtors, the Debtors' board of directors reduced payment amounts.

Debtors' board of directors seeks to pay these three employees an aggregate total of $122,500 in 2013 Safety Payments, which reflects approximately 58% to 72% less than the target amounts for these employees under the safety metric of the AIP.

### Basis for Relief

**A.  The Proposed Compensation Plans and Should Be Approved under Sections 363(b)(1) and 503(c) as Being in the Best Interest of the Debtors and their Estates and Creditors**

31.    The Proposed Compensation Plans should be approved under sections 363(b)(1) and 503(c) of the Bankruptcy Code.  As detailed herein, the Proposed Compensation Plans are essential to the Debtors' restructuring efforts, and their modest cost is more than offset by their benefits.  Thus, the Proposed Compensation Plans reflect a sound exercise of the Debtors' business judgment under section 363(b)(1) of the Bankruptcy Code, which empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

32.    The Proposed Compensation Plans may also be evaluated under section 503(c)(3) of the Bankruptcy Code, which prohibits certain transfers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."  The standards for approval under sections 503(c)(3) and 363(b) are the same – a transfer will be approved if made as a result of a sound exercise of the debtor's business judgment.  *See, e.g., In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that

the 'facts and circumstances' language of section 503(c)(3) creates a standard no different

than the business judgment standard under section 363(b).”); *In re Global Home Prods.*,

369 B.R. 778, 783 (Bankr. D. Del. 2007) (“If [the proposed plans are] intended to

incentivize management, the analysis utilizes the more liberal business judgment review

under § 363.”); *In re Viking Offshore (USA) Inc.*, Case No. 08-312-H3-11 (LZC), 2008

Bankr. LEXIS 1360, at *4 (Bankr. S.D. Tex. Apr. 30, 2008) (standard under 503(c)(3) is

substantially similar to the business judgment test).

33.    The business judgment standard requires that a debtor base its decision to

use, sell or lease assets outside the ordinary course of business upon a sound business

purpose. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,

722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a “good business reason” to approve a

sale pursuant to section 363(b)); *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D.

Va. 1997) (“This Court follows the 'sound business purpose' test when examining

§ 363(b) sales.” (citing *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)));

*see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge

determining a section 363(b) application must find from the evidence presented before

him or her a good business reason to grant such application); *In re Ionosphere Clubs,

Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining

a section 363(b) motion is “a good business reason”).

34.    Here, the Proposed Compensation Plans easily satisfy the business

judgment test as they are demonstrably in the best interests of the Debtors, their estates

and their creditors.  As described in more detail above, the efforts of the Debtors'

employees during the restructuring will be critical to preserving the value of the Debtors'

estates and maximizing creditor recoveries.  It is imperative that those employees in a

position to drive the outcome of the restructuring be properly incentivized during the

strategic transaction auction process.  It is equally critical that the Debtors' business

operations continue to run smoothly and that employees throughout the Debtors' ranks

are able to focus on performing their job functions during the Debtors' restructuring

process.

35.     The Debtors carefully designed the KEIP to balance the Debtors' need to

properly motivate the KEIP Participants through appropriate, market-competitive

compensation with the need to ensure that the Debtors' estates receive enhanced value in

exchange.  Payments under the KEIP are directly linked to value achieved through either

a sale of substantially all of the Debtors' assets or confirmation of a plan.  The program

will both beget and reward success by motivating the KEIP Participants to work towards

attaining financial targets that are critical to maximizing stakeholder recovery.

Moreover, as described above, the payment amounts under the KEIP and the total cost of

the KEIP are appropriate and reasonable.

36.     Implementation of the KERP is a similarly valid exercise of the Debtors'

business judgment as it is specifically designed to prevent attrition of essential employees

during the strategic restructuring transaction and auction process to preserve the value of

the Debtors' assets for the benefit of all stakeholders.  If the KERP Participants were to

resign, the value and benefits of these employees' experiences would be lost, and the

Debtors' operations and their pursuit of a strategic restructuring transaction would be

significantly impaired.  As confirmed by Mercer's analysis, the KERP is reasonable in light of the size of the Debtors' business and the comparability of program costs and terms to other chapter 11 retention plans.

37.     Like the KEIP and the KERP, the Modified Severance Plan is a valid exercise of the Debtors' business judgment in that it addresses the Debtors' need to stabilize their workforce during the restructuring process.  The implementation of the Modified Severance Plan – which complies fully with section 503(c)(2) of the Bankruptcy Code – will align the interests of the Debtors' employees with those of stakeholders.  The Debtors' employees are operating with burdensome workloads and severe time pressure as they manage the Debtors' sales process.  The Modified Severance Plan will reduce employee concerns regarding potential job losses, alleviate workplace stress levels and allow employees to focus on critical tasks related to the Debtors' restructuring.

38.     In *In re Dana Corp.*, the court articulated six factors to consider when evaluating approval of a compensation proposal: (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating, and authorizing the plan.  *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).

39.      Here, an analysis of the *Dana* factors supports approval of the Proposed

Compensation Plans.  The Proposed Compensation Plans are each specifically designed

to address particular concerns related to the Proposed Plan Participants:  the KEIP will

motivate key employees to maximize recoveries in the Debtors' restructuring, the KERP

will encourage employees to remain with the Debtors during the bankruptcy cases and

the Modified Severance Plan will stabilize the Debtors' workforce, allowing them to

focus on important operational and restructuring tasks.  The costs of the Proposed

Compensation Plans were deliberately set at or below market norms for organizations

comparable to the Debtors.  Second, the KEIP Participants and the KERP Participants

were specifically selected in order to align employee interests with those of creditors,

while the Modified Severance Plan provides coverage to all of the Debtors' full-time

employees.  Finally, the Debtors engaged in considerable due diligence in formulating the

Proposed Compensation Plans and identifying the Proposed Plan Participants, and

received a substantial amount of input from Mercer, a leading independent compensation

consultant, as well as the Debtors' restructuring professionals.

40.      Courts in this district and elsewhere have routinely approved similar

programs under similar circumstances.  *See, e.g.*, *In re AMF Bowling Worldwide, Inc.*,

Case No. 12-36495 (KRH) (Bankr. E.D. Va. Jan. 18 & 28, 2013); *In re Movie Gallery,

Inc.*, Case No. 10-30696 (DOT) (Bankr. E.D. Va. Sept. 21, 2010); *In re Roper Bros.

Lumber Co.*, Case No. 09-38215 (KRH) (Bankr. E.D. Va. Feb. 25, 2010); *In re

LandAmerica Fin. Grp., Inc.*, Case No. 08-35994 (KRH) (Bankr. E.D. Va. June 22,

2009); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Mar.

25, 2009); *In re Movie Gallery, Inc.* Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 29,

2008); *In re Rowe Cos.*, Case No. 06-11142 (SSM), Docket No. 339 (Bankr. E.D. Va.

Nov. 28, 2006); *see also In re RIH Acquisitions NJ, LLC*, Case No. 13-34483 (GMB)

(Bankr. D. N.J. Dec. 17, 2013); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS)

(Bankr. D. Del. May 13, 2013); *In re Overseas Shipholding Grp., Inc.*, Case No. 12-

20000 (PJW) (Bankr. D. Del. Mar. 21, 2013); *In re Residential Capital, LLC*, Case No.

12-12020 (MG) (Bankr. S.D.N.Y. Oct. 18, 2012 & Apr. 16, 2013); *In re Velo Holdings,

Inc.*, 472 B.R. 201 (Bankr. S.D.N.Y. 2012); *In re Buffets Restaurants Holdings, Inc.*,

Case No. 12-10237 (MFW) (Bankr. D. Del. Mar. 15, 2012); *In re The Great Atl. & Pac.

Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. May 2, 2011); *In re Advanta

Corp.*, Case No. 09-13931 (KJC) (Bankr. D. Del. June 15, 2010); *In re Frontier Airlines

Holdings, Inc.* Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. June 3, 2008).

## B. **The Modified Severance Plan Complies with 503(c)(2) of the Bankruptcy Code**

41.     In accordance with section 503(c)(2) of the Bankruptcy Code, the

Modified Severance Plan is a broad-based severance program that is generally available

to all full-time employees and does not pay insiders severance payments greater than 10

times the mean severance paid to nonmanagement employees during the calendar year in

which the insider receives such payment.  As such, the Modified Severance Plan clearly

complies with the requirements of section 503(c)(2).

### C. **The 2013 Safety Payments Are in the Best Interests of the Debtors, their Estates and their Creditors**

42.    Like the Proposed Compensation Plans, the payment of the 2013 Safety Payments is authorized by section 363 of the Bankruptcy Code as an exercise of the Debtors' business judgment. Mine safety is the preeminent concern in the Debtors' businesses, and the leadership of the Debtors' senior management team was critical to the Debtors' achievement of a NFDL rate below the national average. These employees have earned their 2013 Safety Payments, and the payment of these obligations – at the greatly reduced amounts requested herein – reaffirms the Debtors' commitment to safety as a paramount concern.

### **Request for Waiver of Stay**

43.    In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion pursuant to any applicable Bankruptcy Rule or Local Rule of the United States Bankruptcy Court for the Eastern District of Virginia (the "**Local Bankruptcy Rules**"). Specifically, pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." For the reasons set forth above, the Debtors require immediate implementation of the Proposed Compensation Plans for the benefit of all parties in interest. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## Notice

44.     Notice of this Motion has been provided in accordance with the Notice,

Case Management and Administrative Procedures approved by this Court on April 10,

2014 [ECF No. 77] (the "**Case Management Procedures**").  The Debtors submit that no

other or further notice need be provided.

## No Previous Request

45.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated:    May 27, 2014
          Richmond, Virginia

                                        Respectfully submitted,

                                        /s/ Justin F. Paget
                                        Tyler P. Brown (VSB No. 28072)
                                        Henry P. (Toby) Long, III (VSB No. 75134)
                                        Justin F. Paget (VSB No. 77949)
                                        HUNTON & WILLIAMS LLP
                                        Riverfront Plaza, East Tower
                                        951 East Byrd Street
                                        Richmond, Virginia 23219
                                        Telephone: (804) 788-8200
                                        Facsimile: (804) 788-8218

                                        *Local Counsel to the Debtors
                                        and Debtors in Possession*

                                        -and-

                                        Marshall S. Huebner (admitted *pro hac vice*)
                                        Brian M. Resnick (admitted *pro hac vice*)
                                        Michelle M. McGreal (admitted *pro hac vice*)
                                        DAVIS POLK & WARDWELL LLP
                                        450 Lexington Avenue
                                        New York, New York 10017
                                        Telephone:   (212) 450-4000
                                        Facsimile:   (212) 607-7983

                                        *Counsel to the Debtors
                                        and Debtors in Possession*

# SCHEDULE 1

### Debtor Entities

1. James River Coal Company (2012)
2. BDCC Holding Company, Inc. (3200)
3. Bell County Coal Corporation (0806)
4. Bledsoe Coal Corporation (4821)
5. Bledsoe Coal Leasing Company (6654)
6. Blue Diamond Coal Company (3812)
7. Buck Branch Resources LLC (1459)
8. Chafin Branch Coal Company, LLC (7873)
9. Eolia Resources, Inc. (0587)
10. Hampden Coal Company, LLC (4334)
11. International Resource Partners LP (8669)
12. International Resources Holdings I LLC (9838)
13. International Resources Holdings II LLC (1567)
14. International Resources, LLC (2522)
15. IRP GP Holdco LLC (5380)
16. IRP Kentucky LLC (1454)
17. IRP LP Holdco Inc. (4447)
18. IRP WV Corp. (6050)
19. James River Coal Sales, Inc. (3417)
20. James River Coal Service Company (2577)
21. James River Escrow Inc. (0314)
22. Jellico Mining, LLC (4545)
23. Johns Creek Coal Company (9412)
24. Johns Creek Elkhorn Coal Corporation (9199)
25. Johns Creek Processing Company (4021)
26. Laurel Mountain Resources LLC (1458)
27. Leeco, Inc. (4176)
28. Logan & Kanawha Coal Co., LLC (5716)
29. McCoy Elkhorn Coal Corporation (8373)
30. Rockhouse Creek Development, LLC (9583)
31. Shamrock Coal Company, Incorporated (1843)
32. Snap Creek Mining, LLC (6858)
33. Triad Mining Inc. (9005)
34. Triad Underground Mining, LLC (9041)

# EXHIBIT A

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone:   (212) 450-4000

Facsimile:   (212) 607-7973

Marshall S. Huebner (admitted *pro hac vice*)

Brian M. Resnick (admitted *pro hac vice*)

Michelle M. McGreal (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia 23219

Telephone: (804) 788-8200

Facsimile: (804) 788-8218

Tyler P. Brown (VSB No. 28072)

Henry P. (Toby) Long, III (VSB No. 75134)

Justin F. Paget (VSB No. 77949)

*Counsel to the Debtors*
*and Debtors in Possession*

*Local Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **JAMES RIVER COAL COMPANY**, *et al.*, | Case No. 14-31848 (KRH) |
| | **(Jointly Administered)** |
| Debtors.[1] | |

## ORDER AUTHORIZING DEBTORS TO (i) IMPLEMENT (a) KEY EMPLOYEE INCENTIVE PLAN, (b) KEY EMPLOYEE RETENTION PLAN AND (c) MODIFIED SEVERANCE PLAN AND (ii) TO MAKE 2013 SAFETY PAYMENTS

Upon the motion (the "**Motion**")[2] of James River Coal Company and its

subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the

"**Debtors**"), for an order (a) approving and authorizing (i) a chapter 11 key employee

incentive plan (the "**KEIP**"), (ii) a non-insider key employee retention plan (the

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

"**KERP**") and (iii) modifications to their prepetition severance plan (the "**Modified Severance Plan**" and, together with the KEIP and the KERP, the "**Proposed Compensation Plans**"), (b) authorizing the Debtors to make payments under the Proposed Compensation Plans, to the extent earned, to the participants in such plans and (c) authorizing the Debtors to make certain payments under the Debtors' ordinary course annual incentive plan and (d) granting certain related relief, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the Case Management Procedures; and no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtors, their estates, their creditors and other parties in interest; and the Court having reviewed the Motion[ and having held a hearing with appearances of parties in interest noted in the transcript thereof (the "**Hearing**")]; and the Court having determined that the legal and factual bases set forth in the Motion [and at the Hearing] establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The relief requested in the Motion is hereby GRANTED.

2.      The KEIP, the KERP and the Modified Severance Plan are approved in their entirety.

3.      The Debtors are authorized, but not directed, to take all actions necessary to implement the KEIP, the KERP and the Modified Severance Plan on the terms and conditions set forth in the Motion, including making any payments pursuant to the terms of the KEIP, the KERP and the Modified Severance Plan.

4.      The Debtors are authorized, with the consent of the Creditors' Committee, to make modifications to the KERP and the Modified Severance Plan; *provided*, *however* that in no event will any such modification result in an increase to the total aggregate cost of either the KERP or the Modified Severance Plan.

5.      Any and all payments earned under the KEIP and the KERP shall constitute administrative expenses of the Debtors' estates.

6.      The Debtors are authorized, but not directed, to make the 2013 Safety Payments.

7.      For the avoidance of doubt, nothing herein shall modify, alter or otherwise affect the rights or remedies of the agent or the lenders under the Debtors' postpetition debtor in possession financing facility.

8.      The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

9.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and

3

the Local Bankruptcy Rules for the Bankruptcy Court of the Eastern District of Virginia

are satisfied by such notice.

10.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of

this Order shall be immediately effective and enforceable upon its entry.

11.    This Court shall retain exclusive jurisdiction over any and all matters

arising from or related to the implementation of this Order.

Richmond, Virginia

Dated:_____, 2014

                                             _____
                                             KEVIN R. HUENNEKENS
                                             UNITED STATES BANKRUPTCY JUDGE


                                             Entered on Docket: _____

WE ASK FOR THIS:

/s/ Justin F. Paget
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors and Debtors in
Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors and Debtors in
Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Justin F. Paget

# EXHIBIT B

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone:   (212) 450-4000

Facsimile:   (212) 607-7973

Marshall S. Huebner (admitted *pro hac vice*)

Brian M. Resnick (admitted *pro hac vice*)

Michelle M. McGreal (admitted *pro hac vice*)

*Counsel to the Debtors*
*and Debtors in Possession*

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia 23219

Telephone: (804) 788-8200

Facsimile: (804) 788-8218

Tyler P. Brown (VSB No. 28072)

Henry P. (Toby) Long, III (VSB No. 75134)

Justin F. Paget (VSB No. 77949)

*Local Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **JAMES RIVER COAL COMPANY,** *et al.*, | **Case No. 14-31848 (KRH)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DECLARATION OF PETER T. SOCHA IN SUPPORT OF DEBTORS'
## MOTION FOR ORDER AUTHORIZING DEBTORS TO
## (i) IMPLEMENT (a) KEY EMPLOYEE INCENTIVE PLAN,
## (b) KEY EMPLOYEE RETENTION PLAN AND (c) MODIFIED SEVERANCE
## PLAN AND (ii) MAKE 2013 SAFETY PAYMENTS

I, Peter T. Socha, hereby declare that the following is true to the best of my

knowledge, information and belief:

1.        I am the Chairman, President and Chief Executive Officer of James River

Coal Company ("**James River Coal**"), one of the above-captioned debtors and debtors in

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

possession in these proceedings (collectively, the "**Debtors**"), which has its principal

office at 901 East Byrd Street, Suite 1600, Richmond, Virginia 23219.  I have been

employed in this position by James River Coal since 2003.  Prior to 2003, I held

executive roles at National Vision, Inc., COHR Inc., Sirrom Capital Corporation and

Stewart Foods Inc.  I am familiar with the day-to-day operations, businesses and financial

affairs of the Debtors.

2.      I participated in the development of the Debtors' (i) proposed chapter 11

key employee incentive plan (the "**KEIP**"), a program that would provide cash incentive

payments to key employees based on the achievement of specified goals related to the

Debtors' strategic transaction process, (ii) proposed non-insider key employee retention

plan (the "**KERP**"), a program that would provide cash retention payments to certain

non-insider employees that the Debtors have determined are essential to a successful

restructuring and (iii) proposed modifications to their prepetition severance plan (the

"**Modified Severance Plan**" and, together with the KEIP and the KERP, the "**Proposed**

**Compensation Plans**"), which will reduce employee uncertainty and stabilize the

Debtors' workforce.  I am duly authorized to make and submit this declaration (this

"**Declaration**") on behalf of the Debtors in support of the Debtors' Motion for Order

Authorizing Debtors to (i) Implement (a) Key Employee Incentive Plan, (b) Key

Employee Retention Plan and (c) Modified Severance Plan and (ii) Make 2013 Safety

Payments, filed contemporaneously herewith (the "**Motion**").[2]

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

3.      Except as otherwise indicated, all statements in this Declaration are based upon: my personal knowledge; information supplied or verified by personnel in departments within the Debtors' various business units; my review of the Debtors' books and records as well as other relevant documents; my discussions with other members of the Debtors' management team; information supplied by the Debtors' professional advisors; or my opinion based upon experience, expertise and knowledge of the Debtors' operations, financial condition and history.  In making statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees or professional advisors, I have relied upon these employees and professional advisors to accurately record, prepare, collect and/or verify any such documentation or information.  I am a proposed participant in the KEIP and the Modified Severance Plan, and am eligible to receive 2013 Safety Payments.  I am not being compensated for this testimony other than through payments made to me in the ordinary course of business in my position as Chairman, President and Chief Executive Officer of James River Coal.

4.      If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

5.      I believe that the nine employees selected for participation in the KEIP (the "**KEIP Participants**") will play an indispensible role in the performance of the Debtors' businesses during the restructuring process and should be incentivized to maximize the value achieved through the Debtors' strategic restructuring process.  I also believe that the retention of the 39 non-insider employees selected for participation in the

3

KERP (the "**KERP Participants**") is vital to the Debtors' business and restructuring efforts. I also believe that implementation of the Modified Severance Plan is necessary to stabilize the Debtors' workforce during this critical phase of the restructuring. Lastly, payment of the 2013 Safety Payments is reasonable and appropriate.

6.      I played a pivotal role in formulating and negotiating the terms of the Proposed Compensation Plans. I believe that the implementation of effective incentive, retention and severance plans is essential to maintaining and improving the Debtors' financial and operational performance and to achieving a restructuring that maximizes value for all stakeholders.

7.      Accordingly, I believe that the Debtors have an immediate need to (i)  implement (a) the KEIP to provide incentive opportunities that will enable the Debtors to achieve one or more strategic transactions that maximize recoveries for all stakeholders, (b) the KERP to retain the Debtors' most critical non-insider employees by compensating them at levels more commensurate with their historical compensation and industry practices and (c) modifications to the Debtors' prepetition severance plan in order to stabilize the Debtors' workforce and (ii) pay the 2013 Safety Payments. In my estimation, failure to implement the Proposed Compensation Plans would jeopardize the Debtors' prospects of a successful strategic transaction, create additional costs in hiring and training new employees and risk undermining mine safety and efficiency.

**The Strategic Transaction Process**

8.      Tangible progress has been made with respect to the Debtors' strategic transaction process. However, much work remains, which will demand extraordinary

4

amounts of time, dedication and focus from the Debtors' employees during the restructuring process. Based on my experience, the Debtors have long maintained thin ranks of corporate staff for a company of its size. As a result, many of the Debtors' employees have historically fulfilled the role of what would be multiple positions at another company. The burden of managing the bankruptcy process and the strategic restructuring process has been added to already demanding workloads for the Debtors' employees, in particular those in departments such as finance and legal that are critical to the restructuring. Many of these employees are working tirelessly to achieve the best possible outcome for these cases.

9.    It is my belief that the Debtors therefore face the very real risk that their employees may depart for other employment opportunities. Indeed, since the Petition Date, the Debtors have experienced an increase in their attrition rate, with departing employees expressly citing the lack of job security at the Debtors as a reason for their resignations and, in at least one case, accepting positions at companies in less convenient locations in exchange for greater job security. Some of these departing employees explained that the lack of retention compensation and/or severance at the Debtors was an important factor in their decision to leave the company.

10.    Many of the employees who have remained with the Debtors have done so with the expectation that the Debtors would implement the KERP and the Modified Severance Plan. Without these programs, the Debtors are at risk of losing an unacceptable number of their employees to competing employers able to offer market compensation and/or job security that a company in chapter 11 cannot match. Additional

5

defections among the Debtors' workforce would significantly hamper their operational

ability and jeopardize the restructuring.  Moreover, it is extremely unlikely that the

Debtors would be able to find qualified replacements during the critical period leading up

to the July 2014 auction and the consummation of any strategic transaction(s).  As

chapter 11 debtors, it would be difficult for the Debtors to attract talented candidates who

could replace departing employees, particularly given the ongoing sales process.

11.     The Debtors' ability to maintain their business operations, preserve the

value of their assets and maximize creditor recoveries through a successful restructuring

process hinges on the Debtors' ability to retain and incentivize key employees during this

critical and uncertain period.  It is now more important than ever for these employees to

remain in their positions and to perform their responsibilities at the highest level.

Anything less could well be critically damaging to the Debtors' efforts to maximize value

for all stakeholders.

### Development of the Proposed Compensation Plans

12.     With these considerations in mind, the Debtors undertook a

comprehensive analysis of the current compensation programs.  The Debtors received

input and guidance from Mercer (US) Inc. ("**Mercer**") and from the Debtors'

restructuring professionals to assess how the Debtors could best address the concerns

outlined above in a manner that aligns with market practice for similarly situated

companies.  Following this review and after discussing many options with Mercer and the

Debtors' restructuring professionals, the Debtors are seeking to establish the Proposed

Compensation Plans in order to (1) motivate and encourage key employees who are most

6

closely tied to the effort to maximize creditor recoveries, (2) retain key non-insider employees during this uncertain yet critical period and (3) stabilize the Debtors' workforce so that employees will focus their attention on achieving important business objectives during the restructuring process.  The Proposed Compensation Plans have been specifically tailored to reflect the business realities of the Debtors' strategic restructuring process and have been reviewed and approved by the compensation committee of the Debtors' board of directors.

## KEIP

13.     In formulating the KEIP, the Debtors recognized that the efforts of the Debtors' senior management team and the heads of the Debtors' mine operations would be a critical factor as they focus substantial attention on furthering the bankruptcy process and formulating and negotiating one or more strategic restructuring transactions.  For example, the three members of the Debtors' senior management and their restructuring professionals are actively analyzing the preliminary indications of interest that they have received in connection with the sales process, and are negotiating with and responding to diligence requests from numerous prospective purchasers, all while continuing to solicit and pursue higher and better offers.  Accordingly, the Debtors developed the KEIP in order to (a) align the interests of the KEIP Participants with the Debtors' creditors and other stakeholders and (b) be consistent with market practice.

## KERP

14.     The Debtors approached the development of the KERP with the understanding that maximizing the value of the Debtors' estates will largely depend on

the Debtors' ability to minimize the loss of key employees during the restructuring process. It is my belief that the loss of any of the KERP Participants could have a material detrimental impact on the Debtors, and could mean the difference between a mine operating profitably or incurring substantial financial losses or facing safety issues. As a result, the Debtors, with the assistance of Mercer and their restructuring professionals, modeled the KERP to (a) retain employees who are essential to the Debtors' ability to meet business objectives that will allow for a successful outcome in these cases, (b) achieve an appropriate balance of retaining employees critical to the restructuring efforts while protecting creditor interests and (c) be consistent with market practice.

15.    I and other members of senior management selected the KERP Participants based on the difficulty of replacing a KERP Participant and our perceived risk of a KERP Participant's departure. I believe that each of the KERP Participants plays an important role in the Debtors' restructuring efforts and that such employees possess important experience, relationships and familiarity with the Debtors' operations and infrastructure that would be costly and disruptive to replace. In my judgment, the KERP ensures that certain, non-insider key employees, without whom the Debtors could not continue to operate and could not properly effectuate a successful restructuring, remain with the Debtors throughout the restructuring process.

**Modified Severance Plan**

16.    The Modified Severance Plan is intended to address employee uncertainties associated with these chapter 11 cases and ensure that employee efforts are

8

focused on continuing the safe and efficient operation of the Debtors' businesses while

working to maximize the value of the estates and the recoveries for creditors.  The

Modified Severance Plan was specifically developed to (a) stabilize the Debtors'

workplace environment during these chapter 11 cases, (b) be consistent with market

practice and (c) comport with section 503(c)(2) of the Bankruptcy Code.

17.     It is my business judgment that the Modified Severance Plan would be a

desirable and cost-effective way to achieve stability and focus among the Debtors'

employees.  Instead of enhancing salaries or payment levels under the KEIP or the KERP,

the Modified Severance Plan will offer a cost-effective method to address employee

concerns about job security, as the incremental payments are made only to departing

employees.  Through implementation of the Modified Severance Plan, I am of the

opinion that the Debtors will be able to provide security to their entire workforce, which

will improve employee morale and increase productivity during the restructuring process.

18.     The payment of the 2013 Safety Payments is reasonable and

appropriate.  Mine safety is the preeminent concern of the Debtors and the safety-related

goals under the AIP directly correspond to an important objective measure of safety

performance:  non-fatal days lost ("**NFDL**"), *i.e.* occupational injuries that result in a loss

of one or more days from an employee's scheduled work, or days of limited or restricted

activity while at work.  Employees are entitled to 100% of safety-related payments only

if the NFDL rate is below the national average.  In 2013, the Debtors, led by the senior

management team, succeeded in accomplishing an NFDL rate below the national

average. The Debtors are not seeking to pay the full amount of the $393,250 safety metric

target to these employees, however.  Instead, consistent with the safety-related bonuses paid in respect of 2012,[3] the compensation committee of the Debtors' board of directors seeks to pay these three employees an aggregate total of $122,500 in 2013 Safety Payments, which reflects approximately 58% to 72% less than the target amounts for these employees under the safety metric of the AIP.

### Conclusion

19.    Based on the analysis and advice provided to me by the Debtors' management and advisors, my own experience on James River Coal's board of directors and my independent business judgment, I believe that the Proposed Compensation Plans are consistent with the Debtors' long-standing practice of providing certain critical employees with incentive-based opportunities, retention payments and severance payments upon termination.  Similarly, I believe that the Proposed Compensation Plans are reasonable and specifically targeted to achieve important goals during these chapter 11 cases:  the KEIP will motivate key employees to maximize recoveries in the Debtors' restructuring, the KERP will encourage employees to remain with the Debtors during the bankruptcy cases and the Modified Severance Plan will stabilize the Debtors' workforce, allowing them to focus on important operational and restructuring tasks.

20.    Moreover, the costs of the Proposed Compensation Plans were deliberately set at or below market norms for organizations comparable to the Debtors. Thus, the Proposed Compensation Plans come at a modest cost that is far outweighed by

---

[3] In 2012, the targets under the safety metric of the AIP were met, but due to the extraordinary circumstances in the industry and at the Debtors, the Debtors' board of directors reduced payment amounts.

the ongoing contributions these employees provide and the damage to an enterprise caused by critical employee departures.  In sum, unless the Proposed Compensation Plans are approved, the Debtors will struggle to meet performance targets that are essential to a successful restructuring.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed the 27th day of May, 2014.

/s/ Peter T. Socha
Peter T. Socha
Chairman, President and Chief Executive Officer,
James River Coal Company

# EXHIBIT C

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone:   (212) 450-4000

Facsimile:   (212) 607-7973

Marshall S. Huebner (admitted *pro hac vice*)

Brian M. Resnick (admitted *pro hac vice*)

Michelle M. McGreal (admitted *pro hac vice*)

*Counsel to the Debtors
and Debtors in Possession*

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia 23219

Telephone: (804) 788-8200

Facsimile: (804) 788-8218

Tyler P. Brown (VSB No. 28072)

Henry P. (Toby) Long, III (VSB No. 75134)

Justin F. Paget (VSB No. 77949)

*Local Counsel to the Debtors
and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **JAMES RIVER COAL COMPANY,** *et al.*, | **Case No. 14-31848 (KRH)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DECLARATION OF JOHN DEMPSEY IN SUPPORT OF DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS TO (i) IMPLEMENT (a) KEY EMPLOYEE INCENTIVE PLAN, (b) KEY EMPLOYEE RETENTION PLAN AND (c) MODIFIED SEVERANCE PLAN AND (ii) MAKE 2013 SAFETY PAYMENTS

I, John Dempsey, hereby declare and state as follows:

1.        I am a partner at Mercer (US) Inc. ("**Mercer**").  My business address is

155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606.  Mercer is a global

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

professional compensation services firm that was engaged by the above-captioned

debtors and debtors in possession (the "**Debtors**").

2.      I respectfully submit this declaration (the "**Declaration**") in support of the

*Debtors' Motion for Order Authorizing Debtors to (i) Implement (a) Key Employee*

*Incentive Plan, (b) Key Employee Retention Plan and (c) Modified Severance Plan and*

*(ii) Make 2013 Safety Payments*, filed contemporaneously herewith (the "**Motion**").[2]  The

Debtors have duly authorized me to do so.

3.      Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge, my review of relevant documents and information

provided to me by the Debtors' management and other advisors.

4.      If I were called to testify as a witness in this matter, I would testify

competently to the facts set forth herein.

### Employment and Qualifications

5.      I joined Mercer following my graduation from Yale University, and have

worked out of the firm's offices in Chicago, Cleveland and London.  I received an MBA

in 1992 from the Ohio State University.  I have been a Principal or Partner at Mercer for

approximately 14 years.  Mercer offers a wide variety of services to private and public

clients, including expert analysis of executive and management compensation.  Mercer

has access to a broad range of market compensation data, including data specific to

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

companies in chapter 11 proceedings, and has substantial expertise in designing such programs from companies in the midst of restructuring or bankruptcy.

6.      I have extensive experience advising organizations undergoing major financial transitions including bankruptcies, IPOs, LBOs and acquisitions, on compensation issues, and with designing annual and multi-year incentive programs, change in control arrangements and employment agreements.  My recent bankruptcy-related engagements include Exide Technologies, RIH Acquisitions NJ, Borders, Synagro Technologies, Nortel Networks, Tribune Company, Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion, Dana, Owens Corning, Kaiser Aluminum, Solutia, Oglebay Norton, Citation, Intermet, Venture Holdings, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation and FLAG Telecom.  I also have prior experience advising coal companies on compensation matters relating to recapitalizations, including Patriot Coal.  I am also currently advising another coal company on executive compensation matters.

7.      Additionally, I published an article entitled *Bankruptcy Blues:  Retaining Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of Workspan, and an update, *The New Challenge of Chapter 11*, with Elizabeth Stephens in August 2008.  I have been frequently quoted on issues relating to effective transitional compensation practices in such publications as HR Magazine, Cox News and the Atlanta Journal Constitution.  In addition, I have been quoted in the Dallas Morning News, the Chicago Tribune and the Milwaukee Journal Sentinel.  I have also presented at

3

the National Meeting of the Conference Board, the National Association of Stock Plan
Professionals and the National Center for Employee Ownership.

8.      I testified as an expert in connection with (i) a renewal of the KERP of
Owens Corning on September 8, 2004, (ii) the approval of Citation Corporation's KERP
on November 4, 2004, (iii) the approval of Intermet Corporation's KERP on December
22, 2004, (iv) the approval of Venture Industries' KERP on March 10, 2005, (v) the
approval of Allied Holdings' KERP on October 11, 2005, (vi) Nortel Networks' KEIP &
KERP on February 5, 2009 and (vii) the Management Incentive Plan of Tribune on
September 25, 2009.  In addition, my testimony was proffered and accepted in connection
with (i) the approval of EaglePicher's KERP on August 9, 2005, (ii) the approval of Dana
Corporation's director compensation program in 2006, (iii) the approval of the
continuation of Mesaba's Incentive and Severance plans in 2006 and (iv) the approval of
Oglebay Norton's KERP in 2004.

9.      In 2010, my testimony was proffered and accepted in connection with the
approval of Nortel's "Special Incentive Plan" and Tribune's 2010 Management Incentive
Plan.  On March 11, 2011, my testimony was proffered and accepted during Tribune's
confirmation hearing.  On February 2, 2013 I testified in connection with a review of the
compensation of the CEO of Fastbucks.  On March 21, 2013, I testified in connection
with the approval of a non-executive incentive plan and other compensation and benefit
arrangements for Overseas Shipholding Group.  On April 11, 2013, my testimony was
proffered in connection with the approval of the estate KEIP in Residential Capital.  In
Exide, my testimony was proffered on August 15, 2013 in connection with the approval

of the AIP and KERP and on September 17, 2013 in connection with the KEIP.  On

December 16, 2013, I testified in connection with the approval of the KEIP for RIH

Acquisitions NJ LLC.  On January 30, 2014 my testimony was proffered in connection

with the approval of the Chief Restructuring Officer's success fee in Residential Capital.

### Overview of the KEIP

10.    The Debtors' Key Employee Incentive Plan (the "**KEIP**") provides

potential performance incentives to (i) three members of senior management, (ii) five

presidents of the Debtors' mine operations and (iii) one assistant general manager of a

mine operation, who, since the departure of the mine's former president, has been

performing functions similar to those of the presidents of the Debtors' other mine

operations (the "**KEIP Participants**") in the event that they achieve specific

restructuring targets.  Mercer assisted, advised and guided the Debtors in connection with

the development of the KEIP.

11.    In designing the KEIP, the Debtors sought to effectively incentivize those

employees who will play an indispensible role in the performances of the Debtors'

businesses during the restructuring process.  Based on their participation in the

restructuring process, the KEIP Participants are the employees who are best positioned to

help maximize the recovery of stakeholders in these cases.

12.    Payments under the KEIP (the "**KEIP Payments**") will occur on the

earlier of consummation of (1) the sale of all or substantially all of the assets of the

Debtors in one or more sales or (2) a chapter 11 plan of reorganization (the "**Closing

Date**").  KEIP Payments vary based on the achievement of certain threshold amounts of

total acquisition value or total enterprise value, as applicable, achieved through a sale of the Debtors' assets, a sponsored chapter 11 plan of reorganization, or a combination thereof (the "**Total Value**").

13.     The KEIP Participants will earn KEIP Payments in accordance with the Total Value thresholds set forth in <u>Exhibit D</u> attached to the Motion,[3] with the actual KEIP Payment to be based on a straight-line interpolation of the thresholds for any Total Value in between thresholds.[4]  If the Debtors achieve the minimum threshold of Total Value, the KEIP Participants will receive aggregate KEIP Payments of $892,715.  At the target threshold of Total Value, aggregate KEIP Payments will be $1,444,040.  At the maximum threshold of Total Value, the KEIP Participants will receive aggregate KEIP Payments of $2,711,148 (the maximum amount that can be earned under the KEIP).

---

[3] Substantially contemporaneously herewith, the Debtors have filed a motion to submit <u>Exhibit D</u> under seal.

[4] In the event that a KEIP Participant voluntarily resigns or is involuntarily terminated for cause prior to payment of their KEIP Payment, the KEIP Participant will forfeit their KEIP Payment.  If a KEIP Participant is involuntarily terminated due to job elimination, death or long-term disability prior to payment of their KEIP Payment, the KEIP Participant will receive a pro-rata share of the KEIP Payment he would have been entitled to receive based on the proportion of the time worked relative to the time from the Petition Date to the Closing Date, which will be payable on the Closing Date.  In either case, the Debtors may, in their discretion, either (1) replace the departing KEIP Participant with an incumbent or newly hired employee of the Debtors or (2) increase the KEIP Payment level for an existing KEIP Participant; provided that, in each case, the aggregate amount of KEIP Payments will not exceed $2,711,148.  In my experience, these termination provisions are consistent with such terms in most KEIPs that are built around a sales process.

## Overview of the KERP

14.    Mercer was also involved in the development of the KERP, which is designed to retain 39 of the Debtors' most essential administrative and operational employees (the "**KERP Participants**").[5]

15.    KERP Participants were selected based on the difficulty of replacing a potential KERP Participant and the perceived risk of such KERP Participant's departure, as determined by the Debtors' senior management.  Management conducted a criticality assessment of the KERP population and assigned all KERP Participants to one of three tiers based on that assessment (taking into account factors such as importance to the restructuring, operational criticality, difficulty of replacement and risk of attrition). Individual payments under the KERP (each, a "**KERP Payment**") were then calculated according to KERP tier, with each tier corresponding to a predetermined percentage of a KERP Participant's current base salary.

16.    The maximum cost of the KERP is $1,401,783, with 100% of the KERP Payments vesting only upon a KERP Participant's continued employment through the earlier of the (1) sale of all or substantially all of the assets of the Debtors in one or more sales or (2) consummation of a chapter 11 plan (each, a "**Vesting Event**").  Payments will be made to KERP Participants upon the occurrence of the applicable Vesting Event; *provided*, *however* that if a KERP Participant is transferred to a purchaser in connection with the sale of the Debtors' assets prior to a Vesting Event, such KERP Participant's

---

[5] A list of the KERP Participants, including their respective titles, annual salaries and the proposed allocation of KERP Payments, is filed under seal as Exhibit E to the Motion.

KERP Payment shall vest upon the consummation of the asset sale in which the KERP

Participant is transferred but shall not become payable until the occurrence of a Vesting

Event.[6]  The Debtors have aligned payment of the KERP Payments with the anticipated

consummation of the strategic restructuring transaction in order to encourage the KERP

Participants to remain with the Debtors during this challenging and uncertain period.

### Overview of the Modified Severance Plan

17.     Additionally, Mercer assisted the Debtors in the development of the

Modified Severance Plan.  With the Modified Severance Plan, the Debtors sought to

address employee concerns about job security and enable employees to focus on the

important operational and restructuring tasks that need to be accomplished in these cases.

18.     The Modified Severance Plan is a modification of the Debtors' prepetition

severance plan, which covered most of their full-time employees (the "**Prepetition**

**Severance Plan**").  First, the Prepetition Severance Plan would be expanded to cover the

Debtors' entire workforce in order to provide severance benefits to those employees not

previously covered under the Prepetition Severance Plan.

---

[6] As with the KEIP, in the event that a KERP Participant voluntarily resigns or is involuntarily terminated for cause prior to payment of their KERP Payment, the KERP Participant will forfeit their KERP Payment.  If a KERP Participant is involuntarily terminated without cause or due to job elimination, death or long-term disability prior to payment of their KERP Payment, the KERP Participant will receive their KERP Payment in full upon termination.  In the event that a KERP Participant takes a leave of absence from the Debtors or goes on short-term disability, the KERP Participant will receive a pro-rata share of their KERP Payment at the same time as the other KERP Participants, based upon the proportion of time worked relative to the time from the Petition Date to the Vesting Date, which will be payable on the Vesting Date.  In either case, the Debtors may, in their discretion, replace the departing KERP Participant with an incumbent or newly hired employee of the Debtors; provided that, in each case, the aggregate amount of KERP Payments will not exceed $1,401,783.  In my experience, these termination provisions are consistent with such terms in most retention plans that are built around a sales process.

19.     Second, payments to employees under the Modified Severance Plan will

be made in accordance with the tiering schedule in the table below.  Mercer worked with

the Debtors to establish the tiering schedule, which reflects the Debtors' determination as

to which employees are most in need of the financial reassurance that is provided by

severance as they work toward a restructuring transaction.  Generally, employees will

receive one week of severance per year of service, subject to certain minimum and

maximum payments based on the employee's tier.[7]  All severance payments would be

subject to deductions of payments made pursuant to the Workers Adjustment and

Retraining Notification Act (WARN Act), as applicable.

| Tier | Severance Payment | Minimum | Maximum |
|------|------|------|------|
| 1<br>Executive Level | 26 weeks of base salary | N/A | N/A<br>In accordance with section 503(c)(2) of the Bankruptcy Code, the amount of payments to insiders shall not be greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made. |
| 2<br>General Corporate Level | 1 week of base salary per year of service | 13 weeks of base salary | 26 weeks of base salary |
| 3<br>Operating Level | 1 week of base salary per year of service | 8 weeks of base salary | 13 weeks of base salary |
| 4<br>Other Corporate and Operating-Level Employees | 1 week of base salary per year of service | 4 weeks of base salary | 13 weeks of base salary |
| 5<br>Full-Time Hourly Employees | 1 week of base salary per year of service | N/A | 13 weeks of base salary |

20.     Payments to employees under the Modified Severance Plan will be made

only if an employee is terminated, and no payments will be made to employees who are

---

[7] In the development of the Modified Severance Plan, Mercer examined the severance plans of other chapter 11 companies and found that almost half of the sample had a tiered structure for determining severance payments to employee groups.

transferred to purchasers in connection with a sale of the Debtors' assets.  In conjunction

with my team, the Debtors sought to balance their desire to provide an appropriate

amount of severance with the need to preserve estate value.  Accordingly, Mercer and the

Debtors structured the Modified Severance Plan to have a $3.5 million aggregate

payment cap (inclusive of the severance benefits approved pursuant to the Wages Order).

Moreover, in the event that an employee who receives payments under the Modified

Severance Plan also receives KEIP Payments and/or KERP Payments, that employee's

payments under the Modified Severance Plan (in the case of KEIP Payments, prior to

giving effect to any reduction to severance payments pursuant to section 503(c)(2) of the

Bankruptcy Code) will be reduced by 25% of the KEIP Payments and/or KERP

Payments they receive; *provided*, *however* that in no event shall such reduction cause

such employee's payments under the Modified Severance Plan to be reduced by more

than 15%.

### Mercer's Development and Analysis of the
### KEIP, KERP and Modified Severance Plan

21.    In connection with Mercer's engagement to develop the KEIP, the KERP

and the Modified Severance Plan, Mercer participated in many discussions with the

Debtors' management team and restructuring advisors to enhance Mercer's

understanding of the Debtors' business, operational history, restructuring goals, current

workforce and existing compensation programs.  This enabled Mercer to develop and

evaluate the KEIP, the KERP and the Modified Severance Plan with consideration of the

Debtors' specific structure and objectives.

10

22.     In assessing the reasonableness of the KEIP, the KERP and the Modified Severance Plan, Mercer conducted four primary analyses: (i) an analysis of the cost of the KEIP in comparison to chapter 11 comparator incentive plans, (ii) an analysis of market compensation data with respect to the KEIP Participants, (iii) an analysis of the KERP in comparison to comparator chapter 11 non-insider retention plans, (iv) an analysis of market compensation data with respect to the KERP Participants and (v) an analysis of the cost and structure of the Modified Severance Plan in comparison to chapter 11 comparator plans.

### Mercer's Review of the Reasonableness of the KEIP

23.     In connection with the analysis of the cost of the KEIP, my team reviewed market practices with respect to the design of chapter 11 incentive plans. As a comparator group, we identified in Mercer's database 27 other court-approved chapter 11 incentive plans for similarly situated debtors.[8] The debtors in these cases (i) filed for chapter 11 protection after January 1, 2009, (ii) consummated a sale of all or substantially all of the debtors' assets and (iii) implemented a key employee incentive plan that rewarded participants based on the results of the asset sales. To best assess market practice for companies of similar size to the Debtors, we identified a subset of the database that only contained companies that generated between $100 million and $500

---

[8] Mercer's database is based primarily on information in the public domain. Information in the database regarding incentive and retention plans relies principally on bankruptcy court filings, including motions, declarations, plan documents, orders and other entries on the docket. The information is limited by the nature of the information disclosed. In particular, individual payment levels are typically filed under seal and are redacted in the public domain source material. Accordingly, Mercer's analysis is based on the best available, but necessarily incomplete, information regarding market comparables.

million of sale proceeds and compared the Debtors' programs to this subset whenever

possible.  On that basis, I determined that these plans represented an appropriate

comparator group for the Debtors.

24.      Our analysis showed that the cost of the KEIP, if fully earned, would fall

just above the market median for the comparator group in terms of program cost.  We

have found that KEIPs are typically assessed according to their maximum possible cost,

but it is important to note the very low likelihood of achieving maximum payouts under

the Total Value goals of the KEIP, and the substantial value creation that would be

achieved for a maximum KEIP payout.

25.      Mercer conducted a benchmarking analysis the eight KEIP Participants for

whom direct market comparables are available, comparing the KEIP Participants' current

and proposed compensation levels with market-competitive compensation levels in

companies of the Debtors' industry and size range.[9]  Our analysis showed that these eight

KEIP Participants are currently substantially undercompensated by market standards.

Whereas the Debtors' peer firms routinely offer incentive-based cash payments to

employees holding responsibilities comparable to those of the KEIP Participants, the

KEIP Participants currently receive only base salary.  As a result, the KEIP Participants

are currently underpaid by 50-78% as compared to market median total compensation

levels.  Moreover, even if the KEIP Participants earn the maximum KEIP Payment, the

---

[9] Data was collected from Mercer's 2013 *US Mining Industry Compensation Survey.* This
industry-leading survey collects compensation data for both corporate and site-based employees at
companies in the mining industry in the United States. The survey reflects data from 65 organizations
covering over 8,500 incumbents.

KEIP Participants would receive 30-53% below the market median for similar positions in the comparator group.

26.    As a result of the foregoing, and based on my experience and the work I have done in this matter, it is my opinion that (i) the design and structure of the KEIP, including the performance thresholds, eligibility criteria and payment terms, are consistent with or more conservative than market practices, (ii) the compensation opportunities for KEIP Participants are reasonable in light of the Debtors' circumstances, (iii) the KEIP provides motivation to key employees by aligning their incentives with the Debtors' operational and restructuring goals and (iv) the KEIP is necessary to preserve and maximize the value of the Debtors' estates.

### Mercer's Review of the Reasonableness of the KERP

27.    In connection with the preparation of the KERP, Mercer assessed the reasonableness of the cost of the KERP in light of market practices.  Mercer analyzed the KERP against a comparator group of non-insider retention programs for chapter 11 debtors comparable to the size of the Debtors (using the same comparator groups that were analyzed in connection with the assessment of the KEIP).  Based on this review, Mercer concluded that the cost of the KERP is consistent with (or below) industry standards.  Indeed, the total program cost of the KERP ($1,401,783) is aligned with market practice for chapter 11 plans identified by Mercer.

28.    Moreover, based on benchmarking performed by Mercer of the KERP Participants, even with the implementation of the KERP, Mercer's analysis showed that even if KERP Participants receive their KERP Payments, these employees would remain

13

undercompensated, with total compensation for almost all of these critical employees

falling below the market median for similar positions in the Debtors' industry.  Absent

the implementation of the KERP and KEIP, the KERP Participants will be underpaid by

an average of 21% compared to the market median.

29.     Retention programs are commonly implemented by chapter 11 debtors to

prevent the attrition of their most critical employees.  Often, the departure of key

employees can lead to a cascade of resignations, which would materially impede the

Debtors' ability to consummate a successful restructuring if qualified replacements could

not be recruited.  At minimum, the Debtors would incur significant costs in recruiting and

training qualified replacements, and the cost of retaining key talent is dwarfed by the

potential cost of replacing them – even temporarily – with outside consultants or

professionals.

30.     Based upon my experience and the work I have done in these cases, it is

my opinion that the overall design and structure of the KERP are generally consistent

with market practice and properly align the KERP Participants' incentives with the

Debtors' restructuring goals and operating success.  Therefore, I believe that the KERP is

reasonable and appropriate, and necessary to retain employees critical to the Debtors'

business objectives, including a successful restructuring and the maximization of estate

value.

## Mercer's Review of the Reasonableness of the Modified Severance Plan

31.     In advising the Debtors on the development of the Modified Severance

Plan, Mercer analyzed the severance practices utilized by 30 chapter 11 debtors.  Based

on this review, Mercer concluded that the Modified Severance Plan – in areas such as benefit accrual rate, tiering structure and payment caps – is consistent with (or below) industry standards.  For instance, for chapter 11 debtors that used payment tiers in their severance plans, the Debtors' minimum and maximum benefit accrual rates generally fall below the 25th percentile for such plans.

32.    Moreover, the Modified Severance Plan is reasonable and appropriate. Based on benchmarking performed by Mercer, even if the KEIP Participants and the KERP Participants were to receive payments under the Modified Severance Plan in addition to all possible KEIP Payments and KERP Payments, these employees would still receive, in the aggregate, approximately 27% less in total compensation than the market median for similar positions in the Debtors' industry.

33.    Based upon my review of the Modified Severance Plan and in consideration of the Debtors' circumstances and market practice, I concluded that the Modified Severance Plan would be a desirable and cost-effective way to achieve stability and focus among the Debtors' employees.  Instead of enhancing salaries or payment levels under the KEIP or the KERP, the Modified Severance Plan will offer a cost-effective method to address employee concerns about job security, as the incremental payments are made only to departing employees.

34.    Based on my experience and the work I have done in these cases, it is my opinion that (i) the design and structure of the Modified Severance Plan, and the benefits offered thereunder are within the range of benefits offered in severance plans of comparable companies and (ii) the Modified Severance Plan is reasonable and

15

appropriate, and necessary to stabilize the Debtors' workplace environment in order to maximize stakeholder recoveries in one or more strategic restructuring transactions.

## Conclusion

35.     Based upon my analysis, knowledge and experience, I believe that the design and structure of the KEIP, the KERP and the Modified Severance Plan, and the proposed payouts to be made thereunder, are generally in line with market standards and practice.  Additionally, with respect to the 2013 Safety Payments proposed to be paid pursuant to the Motion, based upon my knowledge and experience, I believe that it is typical and desirable for mining organizations to include safety as a metric in annual incentive programs, including for senior executives.

36.     Based upon my analysis, knowledge and experience, I believe that the KEIP, the KERP and the Modified Severance Plan would serve to align the interests of the Debtors, their key employees and their stakeholders, in order to best achieve the Debtors' goal of a value-maximizing restructuring.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to best of my knowledge and belief.

Executed the 27th day of May, 2014.

/s/ John Dempsey
John Dempsey
155 North Wacker Drive
Suite 1500
Chicago, Illinois 60606

# EXHIBIT D

**[Filed Under Seal]**

# EXHIBIT E

**[Filed Under Seal]**