DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:   (212) 450-4000
Facsimile:   (212) 607-7973
Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Counsel to the Debtors
and Debtors in Possession*

*Local Counsel to the Debtors
and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| **JAMES RIVER COAL COMPANY,** *et al.*, | Case No. 14-31848 (KRH) |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF FILING OF (i) REVISED PROPOSED ORDER (a) APPROVING
THE SALES AND TRANSFERS OF THE BEVINS ASSETS FREE AND CLEAR
OF ENCUMBRANCES, (b) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION
THEREWITH, AND (c) GRANTING RELATED RELIEF, (ii) REVISED
PROPOSED ORDER (a) APPROVING THE SALES AND TRANSFERS OF THE
BURKE ASSETS FREE AND CLEAR OF ENCUMBRANCES,
(b) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND
(c) GRANTING RELATED RELIEF, (iii) BEVINS APA and (iv) BURKE APA**

**PLEASE TAKE NOTICE** that in connection with the Debtors' *Motion for*

*Entry of an Order (i) Approving the Sales and Transfers of Certain Assets and Liabilities*

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached hereto.

*Related to the McCoy Elkhorn Mining Complex Free and Clear of Encumbrances,*

*(ii) Authorizing the Assumption and Assignment of Certain Executory Contracts in*

*Connection Therewith, and (iii) Granting Related Relief* [ECF No. 293] (the "**Motion**"),[2]

the Debtors request entry of (a) a revised *Order (i) Approving the Sales and Transfers of*

*Certain Assets and Liabilities Related to the McCoy Elkhorn Mining Complex Free and*

*Clear of Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain*

*Executory Contracts in Connection Therewith, and (iii) Granting Related Relief* with

respect to the Bevins Assets (the "**Proposed Bevins Sale Order**") and (b) a revised

*Order (i) Approving the Sales and Transfers of Certain Assets and Liabilities Related to*

*the McCoy Elkhorn Mining Complex Free and Clear of Encumbrances, (ii) Authorizing*

*the Assumption and Assignment of Certain Executory Contracts in Connection Therewith,*

*and (iii) Granting Related Relief* with respect to the Burke Assets (the "**Proposed Burke**

**Sale Order**", and together with the Proposed Bevins Sale Order, the "**Proposed Sale**

**Orders**").  The Debtors will present the Proposed Sale Orders, or revised versions

thereof, to the Honorable Kevin R. Huennekens, in Courtroom 5000 of the United States

Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**"),

701 East Broad Street, 5th Floor, Richmond, Virginia, 23219, at a hearing to be held on

**June 4, 2014 at 1:00 p.m. (prevailing Eastern Time)**.

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

The Proposed Bevins Sale Order is attached hereto as **Annex A**.  A comparison of the Proposed Bevins Sale Order against the proposed order with respect to the Bevins Assets attached to the Motion as Exhibit A is attached hereto as **Annex A-1**.

The Proposed Burke Sale Order is attached hereto as **Annex B**.  A comparison of the Proposed Burke Sale Order against the proposed order with respect to the Burke Assets attached to the Motion as Exhibit B is attached hereto as **Annex B-1**.

PLEASE TAKE FURTHER NOTICE that the Bevins APA is attached as Exhibit 1 to the Proposed Bevins Sale Order.

PLEASE TAKE FURTHER NOTICE that the Burke APA is attached as Exhibit 1 to the Proposed Burke Sale Order.

*[Remainder of Page Intentionally Left Blank]*

Dated:  June 3, 2014
        Richmond, Virginia

Respectfully submitted,

/s/ Justin F. Paget
_____
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors*
*and Debtors in Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7983

*Counsel to the Debtors*
*and Debtors in Possession*

4

**SCHEDULE 1**
(Debtor Entities)

| | |
|---|---|
| 1. James River Coal Company | 18. IRP WV Corp. |
| 2. BDCC Holding Company, Inc. | 19. James River Coal Sales, Inc. |
| 3. Bell County Coal Corporation | 20. James River Coal Service Company |
| 4. Bledsoe Coal Corporation | 21. James River Escrow Inc. |
| 5. Bledsoe Coal Leasing Company | 22. Jellico Mining, LLC |
| 6. Blue Diamond Coal Company | 23. Johns Creek Coal Company |
| 7. Buck Branch Resources LLC | 24. Johns Creek Elkhorn Coal Corporation |
| 8. Chafin Branch Coal Company, LLC | 25. Johns Creek Processing Company |
| 9. Eolia Resources, Inc. | 26. Laurel Mountain Resources LLC |
| 10. Hampden Coal Company, LLC | 27. Leeco, Inc. |
| 11. International Resource Partners LP | 28. Logan & Kanawha Coal Co., LLC |
| 12. International Resources Holdings I LLC | 29. McCoy Elkhorn Coal Corporation |
| 13. International Resources Holdings II LLC | 30. Rockhouse Creek Development, LLC |
| 14. International Resources, LLC | 31. Shamrock Coal Company, Incorporated |
| 15. IRP GP Holdco LLC | 32. Snap Creek Mining, LLC |
| 16. IRP Kentucky LLC | 33. Triad Mining Inc. |
| 17. IRP LP Holdco Inc. | 34. Triad Underground Mining, LLC |

**ANNEX A**

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone:  (212) 450-4000

Facsimile:  (212) 607-7973

Marshall S. Huebner (admitted *pro hac vice*)

Brian M. Resnick (admitted *pro hac vice*)

Michelle M. McGreal (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia 23219

Telephone: (804) 788-8200

Facsimile: (804) 788-8218

Tyler P. Brown (VSB No. 28072)

Henry P. (Toby) Long, III (VSB No. 75134)

Justin F. Paget (VSB No. 77949)

*Counsel to the Debtors*
*and Debtors in Possession*

*Local Counsel to the Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **JAMES RIVER COAL COMPANY,** *et al.*, | Case No. 14-31848 (KRH) |
| | **(Jointly Administered)** |
| Debtors.[1] | |

## ORDER (i) APPROVING THE SALES AND TRANSFERS OF CERTAIN ASSETS AND LIABILITIES RELATED TO THE McCOY ELKHORN MINING COMPLEX FREE AND CLEAR OF ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (iii) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of James River Coal Company and its

subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the

"**Debtors**"), for an order pursuant to sections 363 and 365 of chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), and Rule 6004-2 of

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia

(the "**Local Bankruptcy Rules**") (i) authorizing entry into an asset purchase agreement,

attached hereto as <u>Exhibit 1</u> (the "**APA**"),[2] among Debtor James River Coal Company

("**James River**"), Debtor McCoy Elkhorn Coal Corporation ("**McCoy Elkhorn,**"), any

Debtor affiliate of McCoy Elkhorn that holds any interest in the Bevins Assets (as

defined below) (collectively with James River and McCoy Elkhorn, the "**Sellers**"), and

Opes Resources, Inc. (the "**Purchaser**") substantially on the terms and conditions set

forth in the Summary of Terms and Conditions attached as Exhibit C to the Motion;

(ii) approving the sale and transfer (the "**Sale**") of certain assets of the Sellers (the

"**Bevins Assets**") to the Purchaser in accordance with the APA; (ii) authorizing the

assumption and assignment of certain executory contracts and unexpired leases in

connection therewith; and (iii) granting such other and further relief as is just and proper,

as more fully described in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

consideration of the Motion and the requested relief being a core proceeding under 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided; and no other or

further notice need be provided; and the relief requested in the Motion being in the best

interests of the Debtors, their estates, the creditors and other parties in interest; and the

Court having reviewed the Motion and having held a hearing with appearances of parties

in interest noted in the transcript thereof (the "**Hearing**"); and the Court having

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion or the APA, as applicable.

determined that the legal and factual bases set forth in the Motion and at the Hearing

establish just cause for the relief granted herein; and upon all of the proceedings had

before the Court; and after due deliberation and sufficient cause appearing therefor,

#### THE COURT HEREBY FINDS AS FOLLOWS:[3]

A.      On April 7, 2014 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

"**Chapter 11 Cases**").

B.      This Court has jurisdiction to hear and determine the Motion pursuant to

28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases and the Motion in this

District is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).

C.      The statutory predicates for the relief requested in the Motion are sections

363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local

Bankruptcy Rule 6004-2.

D.      The Debtors continue to operate their business and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.      No trustee or examiner has been appointed in the Chapter 11 Cases.

F.      As evidenced by the certification of service previously filed with the

Court, and based on the representations of counsel at the Hearing: (i) proper, timely,

adequate and sufficient notice of the Motion, the Hearing and the Sale has been provided

in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

Rules 2002, 6004, 6006 and 9007; (ii) such notice was good and sufficient, and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the Hearing, the Sale or the entry of this Order shall be required.  Notice of the Motion, the Sale and the Hearing was also posted electronically on the website maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' Claims, Noticing and Balloting Agent, at *http://dm.epiq11.com/JamesRiverCoal*.

G.    The Debtors served the Notice of Sale and Assumption and Assignment Notice on each Contract Counterparty under each Assumed Contract, and such parties were provided with a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein, and have been or will be provided with reasonable opportunity to object and be heard with respect to the assumption and assignment of the Assumed Contracts and any Cure Amounts in respect thereof in accordance with the procedures set forth in the Motion (the "**Assumption Procedures**").

H.    A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities, including the following: (i) the Core Parties, (ii) the 2002 List Parties and (iii) all applicable federal, state and local taxing and regulatory authorities.

I.    The Debtors marketed the Bevins Assets to potential purchasers, both before and during the Chapter 11 Cases.  No other person, entity or group has offered to purchase the Bevins Assets for an amount that would provide a higher and better economic value to the Debtors than that being provided by the Purchaser pursuant to the APA.

J.      As demonstrated by the record of the Hearing and the dockets in the
Chapter 11 Cases, the Debtors have demonstrated good and sufficient reasons for the
Court to approve the Motion and the Sale.

K.      The "**Bevins Assets**" will consist of James River's and its subsidiaries'
and McCoy Elkhorn's right, title and interest in, to certain assets relating to the McCoy
Elkhorn mining complex that are being transferred to the Purchaser pursuant to the APA.

L.      The Debtors are the sole and lawful owners of the Bevins Assets.

M.      Subject to entry of this Order, (i) the Debtors have full corporate power
and authority to execute the APA and all other documents contemplated thereby, (ii) the
Debtors have all of the power and authority necessary to consummate the transactions
contemplated by the APA, and (iii) no government, regulatory or other consents or
approvals, other than those expressly provided for in the APA, are required for the
Debtors to enter into the APA and consummate the transactions contemplated by the
APA.

N.      The purchase price to be paid by the Purchaser is fair and constitutes
reasonably equivalent value and reasonable market value for the Bevins Assets.

O.      The Purchaser is a purchaser in good faith with respect to the Bevins
Assets, as that term is used in section 363(m) of the Bankruptcy Code.  The APA was
negotiated, proposed and entered into by the Debtors and the Purchaser without collusion,
in good faith, and from arm's–length bargaining positions, and the Purchaser is entitled to
all of the protections afforded under section 363(m) of the Bankruptcy Code and any
other applicable bankruptcy and non-bankruptcy law.  Neither the Debtors nor the
Purchaser has engaged in any conduct that would cause or permit the Sale or APA to be

5

voided under section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not

acted in a collusive manner with any person, and the purchase price was not controlled by

any agreement.  The Purchaser is not, and was not immediately prior to the Closing Date,

an "affiliate" or "insider" of the Debtors as defined in section 101 of the Bankruptcy

Code, and no common identity of incorporators, directors or stockholders existed

between the Purchasers and the Debtors immediately prior to the Closing Date.

P.       Except as specifically provided in the APA, the Purchaser shall not

assume or become liable for any Encumbrances (as defined below) relating to the Bevins

Assets being sold by the Debtors unless expressly stated in the APA or this Order.  Any

such valid and enforceable Encumbrances shall attach to the proceeds of the Sale.

Q.       Sound business reasons have been articulated for performing the

obligations set forth in the APA and selling the Bevins Assets as set forth in the Motion

outside of a plan of reorganization, it is a reasonable exercise of business judgment to

execute, deliver and consummate the APA with the Purchaser and consummate the

transactions contemplated thereby, and such acts are in the best interests of the Debtors,

their estates and all parties in interest.  The Court finds that the Debtors have articulated

good and sufficient business reasons, which include, but are not limited to, the following:

(i) the APA constitutes the highest and best offer for the Bevins Assets; (ii) the APA and

the closing thereon will present the best opportunity for the Debtors to realize the value

of the Bevins Assets; and (iii) the Sale will enable the Debtors to avoid the ongoing

expenditures related to the Bevins Assets.

R.       The Debtors may sell the Bevins Assets free and clear of any and all

Encumbrances because, in each case, one or more of the standards set forth in section

363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of such

Encumbrances who did not object, or who withdrew their objections, to the Sale or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy

Code.

S.    Except as expressly set forth in the APA, the transfer of the Assumed

Contracts to the Purchaser will not subject the Purchaser to any liability whatsoever prior

to the Closing Date or by reason of such transfer under the laws of the United States, any

state, territory, or possession thereof, or the District of Columbia, based, in whole or in

part, on any theory of law or equity.  The Debtors have demonstrated that it is an exercise

of their sound business judgment to assume and assign the Assumed Contracts to the

Purchaser in connection with the consummation of the transactions contemplated by the

APA.  The Assumed Contracts are an integral part of the Bevins Assets being purchased

by the Purchaser and, accordingly, such assumption and assignment is reasonable,

enhances the value of the estates and does not constitute unfair discrimination.  The

Debtors have cured, or provided adequate assurance of cure with respect to, any default

existing prior to the date hereof under any of the Assumed Contracts within the meaning

of section 365(b)(1)(A) and (f)(2)(A) of the Bankruptcy Code.  The Purchaser has

provided adequate assurance of future performance of and under the Assumed Contracts

within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

T.    The terms and conditions set forth in the APA, including the total

consideration to be realized by the Debtors, are fair and reasonable and the transaction

contemplated by the APA is in the best interests of the Debtors, their creditors and their

estates, and the consideration constitutes reasonably equivalent value under the

Bankruptcy Code and the laws of the United States, any state, territory, possession or the District of Columbia (including the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

U.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or other applicable laws.  The Purchaser is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, and there is no substantial continuity between the Purchaser and the Debtors.  The transactions contemplated by the APA do not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors.

V.      A valid business purpose exists for approval of the transaction contemplated by the Motion pursuant to sections 363(b), (f) and (m) of the Bankruptcy Code.  The Debtors may sell, transfer and assign the Bevins Assets free and clear of the Encumbrances in accordance with section 363 of the Bankruptcy Code.  As a condition to purchasing the Bevins Assets, the Purchaser requires that: (a) the Bevins Assets be sold free and clear of the Encumbrances; and (b) the Purchaser shall have no liability whatsoever for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors except those expressly provided in the APA or this Order.  The Purchaser will not enter into an APA and consummate the transactions contemplated thereby, thus adversely affecting the Debtors' estates, if the sale to the Purchaser was not free and clear of Encumbrances or if the Purchaser was or would be liable for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors, except as otherwise explicitly provided in the APA or this Order.

8

W.      The transfer of the Bevins Assets to the Purchaser is or will be a legal,

valid and effective transfer of the Bevins Assets, and will vest the Purchaser with all

right, title and interest in and to the Bevins Assets, free and clear of Encumbrances,

except those explicitly and expressly excluded in the APA or this Order.

X.      An injunction against creditors and third parties pursuing Encumbrances is

necessary to induce the Purchaser to close the Sale; the issuance of such an injunction is

therefore necessary to avoid irreparable injury to the Debtors' estates, and will benefit all

creditors.

Y.      The requirements of sections 363(b) and 363(f) of the Bankruptcy Code

and any other applicable law relating to the Sale of the Bevins Assets have been satisfied.

**AND IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion is hereby GRANTED.

2.      The Motion, the APA and the transactions contemplated thereby are

approved, and the Debtors are authorized and empowered to enter into the APA, to

perform their obligations thereunder, and to take such action as is necessary to effectuate

the terms of the APA, without any further corporate authorization or order of this Court.

3.      The Debtors are hereby authorized, empowered and directed, pursuant to

sections 363(b) and (f) of the Bankruptcy Code, to sell the Bevins Assets to the Purchaser

pursuant to and in accordance with the terms and conditions of the APA, and, pursuant to

section 363 of the Bankruptcy Code, title to the Bevins Assets shall pass to the Purchaser

at closing, free and clear of any and all mortgages, liens, pledges, charges, security

interests and encumbrances (collectively, the "**Encumbrances**").  All such

Encumbrances upon the Bevins Assets to be unconditionally released, discharged and

9

terminated, with all such Encumbrances to attach only to the proceeds of the Sale with the same priority, validity, force and effect as they existed with respect to the Bevins Assets prior to the Closing Date except as may be set forth herein.

4.       The Debtors and the Purchaser are directed to comply, and shall comply, with all provisions of the APA, including, but not limited to, executing and delivering the APA, together with all additional instruments and documents that may be reasonably necessary to implement the APA, in each case, in accordance with the terms of the APA.

5.       The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

6.       The transfer of the Bevins Assets to the Purchaser pursuant to the APA constitutes a legal, valid and effective transfer and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Bevins Assets so transferred.

7.       This Order also shall be construed, and constitute for any and all purposes, a complete and general assignment, conveyance and transfer of all right, title and interest of the Debtors and their estates to the Purchaser of (i) the Bevins Assets and (ii) the Assumed Contracts.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

8.       This Order and the APA shall be binding upon, and shall inure to the benefit of the Debtors, the Purchaser, and their respective successors and assigns,

including without limitation, any chapter 11 trustee hereinafter appointed for the Debtors or any trustee appointed in a chapter 7 case, and its estate and creditors, if any of these Chapter 11 Cases are converted from chapter 11.

9.      On the date of the closing of the transactions contemplated by the APA (the "**Closing Date**"), each of the creditors of the Debtors is authorized and directed to execute such documents and take all other actions as may be necessary to release the Encumbrances against or in the Bevins Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

10.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances against or in the Bevins Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and releases of the Encumbrances that the person or entity has with respect to the Bevins Assets or otherwise, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Bevins Assets.

11.      Effective upon the Closing Date, all parties and/or entities, including, but not limited to, all debt security holders, equity holders, governmental, tax and regulatory authorities, trade creditors, employees, litigation claimants and other creditors, asserting Encumbrances or contract rights against the Debtors and/or any of the Bevins Assets, including the Assumed Contracts, are hereby permanently enjoined and precluded from, with respect to such Encumbrances:  (i) asserting, commencing or continuing in any

manner any action against the Purchaser or any director, officer, agent, representative or employee of the Purchaser (all such entities are collectively referred to as the "**Protected Parties**") or against any Protected Party's Bevins Assets or properties, including without limitation the Bevins Assets; (ii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award, decree or order against the Protected Parties or any properties or Bevins Assets of the Protected Parties, including without limitation the Bevins Assets; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Protected Parties or any properties or Bevins Assets of the Protected Parties, including without limitation the Bevins Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Protected Parties; and (v) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Order or the APA.

12.    The provisions of this Order authorizing the sale of the Bevins Assets free and clear of the Encumbrances (with such Encumbrances to attach to the proceeds of the Sale) shall be self-executing, and none of the Debtors, the Purchaser nor any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale; *provided, however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA.  Without in any way limiting the foregoing, the Purchaser is empowered to execute and file releases, termination statements, assignments, consents, cancellations or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale.

13.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

14.     The Purchaser is not a "successor" of the Debtors or their estates by reason of any theory of law or equity.  Consummation of the Sale and the transactions contemplated by the APA does not effect a *de facto* merger or consolidation of the Debtors and the Purchaser or result in the continuation of the Debtors' business under the Purchaser's control.  The Purchaser is not, and will not become by virtue of the Sale, the alter ego of, a successor in interest to, or a continuation of the Debtors, nor is the Purchaser otherwise liable for the Debtors' debts and obligations or incur any liability derived from the Bevins Assets or the Assumed Contracts within the meaning of any federal, state or local revenue, pension, ERISA, tax, labor (including any WARN Act), employment, environmental or other law, rule or regulation, unless otherwise specifically provided for in the APA or pursuant to this Order.  For purposes of this paragraph of the Order, all references to the Purchaser shall include the affiliates, subsidiaries and shareholders of the Purchaser.

15.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Bevins Assets are hereby directed to surrender possession of the Bevins Assets to the Purchaser on the Closing Date.

16.     Nothing contained in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases or the order of confirmation confirming any such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

17.    The APA is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford, and is not in violation of creditors' and equity security interest holders' voting rights.

18.    The purchase by the Purchaser is a purchase in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code, and the Purchaser is entitled to the protection of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification or appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date.

19.    The sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Bevins Assets shall be deemed to constitute reasonably equivalent value and fair consideration.

20.    From and after entry of this Order, none of the Debtors nor any other person or entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Bevins Assets either to the Debtors prior to the closing of the Sale for subsequent transfer to the Purchaser, or to the Purchaser in accordance with the terms and conditions of the APA and this Order.

21.    The Debtors have demonstrated that the assumption by the applicable Debtors and assignment to the Purchaser of the Assumed Contracts is in the best interests of the Debtors, their creditors and their estates and represents a prudent exercise of the Debtors' business judgment.  The Assumed Contracts are an integral part of the Bevins

Assets and, accordingly, such assumptions and assignments are reasonable, enhance the value of the estate and do not constitute unfair discrimination.

22.    The contracts and leases set forth on Schedule 2.01(e) to the APA (the "**Assumed Contracts**") are in full force and effect and (subject to, and upon the payment of, the Cure Amounts), no default on the part of the Debtors exists under the Assumed Contracts, whether prepetition or postpetition in nature, and no counterparty to any such Assumed Contract shall be permitted to declare or enforce a default by the Debtors or the Purchaser thereunder or otherwise take action against the Purchaser as a result of any of the Debtor's financial condition, change in control, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract.

23.    The Debtors and the Purchaser have (i) cured, or provided adequate assurance of cure with respect to, any default by the Debtors existing prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) compensated, or provided adequate assurance of compensation, to the Contract Counterparties for any actual pecuniary loss to such party resulting from a default by the Debtors prior to the date hereof under such Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code in accordance with the Assumption Procedures.  The Purchaser has provided adequate assurance of its future performance of and under the Assumed Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code in accordance with the Assumption Procedures.

24.    With respect to each Assumed Contract listed on Schedule 2.01(e) to the APA, the Cure Amount set forth on Schedule A hereto or any Assumption Notice served

15

after the date hereof, as applicable, to which no timely objection is filed in accordance with the Assumption Procedures is the sole amount necessary to cure all monetary defaults by the Debtors and to pay all actual pecuniary losses, if any, with respect to such Assumed Contract pursuant to section 365(b)(1) of the Bankruptcy Code.

25.     Pursuant to section 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtors are hereby authorized to: (a)  assume the Assumed Contracts and assign such contracts to the Purchaser, effective upon the Closing Date; (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to the Purchaser, and (c) pay the required Cure Amounts, if any, at Closing (or as soon thereafter as is reasonably practicable).

26.     Upon the occurrence of the Closing Date, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. Any provision in any Assumed Contract that purports to declare a breach, default or termination as a result of a change of control of the Bevins Assets or requires the consent of any non-debtor party for the assumption and assignment thereof is hereby deemed unenforceable under section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any liability with respect to the Assumed Contracts occurring after such assignment to and assumption by the Purchaser except as expressly provided in the APA.

27.     All defaults or other obligations of the Debtors under the Assumed

Contracts arising or accruing prior to the closing of the Sale (without giving effect to any

acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of

the Bankruptcy Code) shall be cured as set forth in the APA as of the Closing Date or as

soon thereafter as practicable.  The Purchaser shall have no liability or obligation for any

such defaults or other obligations arising or accruing prior to the Closing Date, except as

otherwise expressly provided in the APA.

28.     Each Contract Counterparty that has not or does not file a timely objection

to the assumption and assignment of its Assumed Contract, including to any Cure

Amount, is hereby forever barred, estopped and permanently enjoined from filing any

such objection and from asserting, prosecuting or otherwise pursuing any of Debtors, the

Purchaser or any of their respective affiliates, successors or assigns or any of their

respective affiliates, agents, representatives, counsel and advisors, the Bevins Assets or

any other assets or operations of any of the Debtors or the Purchaser on the basis that any

amounts in excess of the Cure Amount set forth opposite such Assumed Contract on

Schedule A hereto or any Assumption Notice served after the date hereof, as applicable,

is owing with respect to any defaults under such Assumed Contract and/or that any other

conditions to assumption or assignment must be satisfied in order for the Assumed

Contract to be assumed by any of the Debtors and assigned to the Purchaser.  All parties

who have failed to raise with particularity that such party's consent is required for the

Debtors to assume and assign such Assumed Contract are hereby deemed to have given

the consent contemplated by Bankruptcy Code section 365(c)(1)(B) and (f)(1) to the

assumption of such Assumed Contract by the Debtors and the assignment of such

Assumed Contract to the Purchaser.

29.    The failure of the Debtors or the Purchaser to enforce at any time one or

more terms or conditions of any Assumed Contract shall not constitute a waiver of any

such terms or conditions, or of the Debtors' or the Purchaser's rights to enforce every

term and condition of the Assumed Contracts.

30.    Upon the occurrence of the closing of the Sale, the Purchaser shall assume

all liabilities associated with the Assumed Contracts in accordance with the terms of the

APA.

31.    Notwithstanding anything to the contrary herein, no executory contract or

lease shall be considered an Assumed Contract under this Order unless and until such

executory contract or lease shall have been assumed by the Debtors in accordance with

the assumption procedures set forth in the Motion, including, without limitation, the

Debtors having served an Assumption Notice to the non-debtor counterparty to any

executory contract or lease proposed to be assumed and provided ten (10) days from the

service of such notices for the applicable non-debtor counterparty to the file an objection.

32.    Nothing in the injunction and release provisions of this Order shall be

interpreted to bar, impair, prevent or otherwise limit any rights the Debtors' surety bond

providers may have and claim from and after the Closing, that they may claim under the

existing bonds, indemnity agreements, common law of suretyship or the Surface Mine

Control and Reclamation Act and its state analogues with regard to any failure of the

Purchaser to satisfy and perform the Assumed Liabilities from and after Closing.

33.     The Debtors will use commercially reasonable efforts to transfer the Excluded Assets that are not transferred to Marshall Resources, Inc. to Laurel Mountain Resources LLC or another Debtor affiliate promptly following the Closing Date.

34.     Nothing in this Order or the APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability (including, but not limited to, for reclamation and mitigation and any associated long-term protection requirements) to a "governmental unit" (as defined in section 101(27) of the Bankruptcy Code) that any entity could be subject to as and to the extent it is the owner or operator of property sold or transferred pursuant to this Order after the Closing Date; provided, however, that the foregoing shall not limit, diminish or otherwise alter the Debtors' or the Purchaser's defenses, claims, causes of action, or other rights under applicable nonbankruptcy law with respect to any liability that may exist to a governmental unit at owned or operated property.  Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police ore regulatory law governing such transfer or assignment.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order, subject to the Debtors' and the Purchaser's rights to assert in that forum or before this Court that any such laws are not in fact police or regulatory law or that such enforcement is impermissible under applicable law.

35.     Any objections to the Motion or the relief requested therein that have not been adjourned, withdrawn, waived, settled or otherwise resolved are hereby denied and overruled in all respects on the merits with prejudice.

36.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

37.     As of the time of the closing of the Sale, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.

38.     The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof; *provided*, that, (a) an order of this Court has approved such modification, amendment, or supplement; (b) such modification, amendment or supplement is not material or (c) such modification, amendment or supplement is made in the ordinary course of business.

39.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the Bevins Assets and the Assumed Contracts on account of the filing or pendency of the Chapter 11 Cases.

40.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

41.     Notice of the Motion as provided therein shall be deemed good and sufficient notice.

20

42.     In the event of any inconsistencies between this Order, the Motion and the APA, this Order shall govern in all respects.  However, the failure to specifically include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

43.     Nothing contained in any plan of reorganization or liquidation confirmed in the Chapter 11 Cases or any order of the Court confirming such plan or in any order in the Chapter 11 Cases, shall alter, conflict with, or derogate from, the provisions of the APA or the terms of this Order.  The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order that may be entered by the Court in the Chapter 11 Cases, and the terms and provisions of this Order and the APA, as well as the rights and interests granted pursuant to this Order and the APA, shall continue in the Chapter 11 Cases or any superseding case and shall be specifically performable and enforceable against the Debtors, their estates and the Purchaser, and each of their respective successors and permitted assigns, including any trustee or other fiduciary appointed.

44.     Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rules 6004(h) and 6006(d)) or Local Bankruptcy Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  Time is of the essence in closing the Sale, and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk their appeal being foreclosed as moot.

21

45.    The provisions of this Order are nonseverable and mutually dependent.

46.    This Court shall retain exclusive jurisdiction over any and all matters

arising from or related to the implementation or interpretation of this Order, the APA or

any document related thereto.

Richmond, Virginia

Dated:_____, 2014


                                    KEVIN R. HUENNEKENS
                                    UNITED STATES BANKRUPTCY JUDGE


                                    Entered on Docket: _____

WE ASK FOR THIS:

/s/ Justin F. Paget
Tyler P. Brown (VSB No. 28072)
 Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors and Debtors in Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Justin F. Paget

# EXHIBIT 1

**APA**

# ASSET PURCHASE AGREEMENT

dated as of

June 3, 2014

by and among

## OPES RESOURCES INC.

and

## JAMES RIVER COAL COMPANY
and certain of its Subsidiaries

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
DEFINITIONS

Section 1.01. *Definitions* ................................................................................................ 1
Section 1.02. *Other Definitional and Interpretative Provisions* ............................ 7

## ARTICLE 2
PURCHASE AND SALE

Section 2.01. *Purchase and Sale* ............................................................................ 7
Section 2.02. *Excluded Assets* ................................................................................ 9
Section 2.03. *Assumed Liabilities* .......................................................................... 10
Section 2.04. *Excluded Liabilities* ......................................................................... 11
Section 2.05. *Assignment of Assumed Contracts and Rights; Cure Amounts* ..... 11
Section 2.06. *Purchase Price; Allocation of Purchase Price* ............................... 12
Section 2.07. *Closing* .............................................................................................. 13

## ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF SELLER

Section 3.01. *Corporate Existence and Power* ...................................................... 14
Section 3.02. *Corporate Authorization* .................................................................. 14
Section 3.03. *Governmental Authorization* ............................................................ 14
Section 3.04. *Noncontravention* .............................................................................. 14
Section 3.05. *Properties* ........................................................................................... 15
Section 3.06. *Licenses and Permits* ........................................................................ 15
Section 3.07. *Environmental* .................................................................................... 15
Section 3.08. *Title to the Purchased Assets* ........................................................... 15
Section 3.09. *Assumed Contracts* ........................................................................... 15
Section 3.10. *Litigation* ............................................................................................ 16

## ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Section 4.01. *Corporate Existence and Power* ...................................................... 16
Section 4.02. *Corporate Authorization* .................................................................. 16
Section 4.03. *Governmental Authorization* ............................................................ 16
Section 4.04. *Noncontravention* .............................................................................. 16
Section 4.05. *Adequate Assurances Regarding Assumed Contracts* .................... 17
Section 4.06. *Financing* ........................................................................................... 17
Section 4.07.  *Litigation* ........................................................................................... 17
Section 4.08. *Finders' Fees* ..................................................................................... 17

PAGE

Section 4.09.  *Assurances Regarding Permits*  ..................................................... 17
Section 4.10.  *Inspections; No Other Representations* ......................................... 17

## ARTICLE 5
### COVENANTS OF SELLER

Section 5.01.  *Conduct of the Purchased Business* ............................................. 18
Section 5.02.  *Access to Information* ................................................................. 18
Section 5.03.  *Satisfaction of Outstanding Fines* ................................................ 19
Section 5.04.  *Bond Release* ............................................................................. 19
Section 5.05.  *Lease of Premises* ...................................................................... 19

## ARTICLE 6
### COVENANTS OF BUYER

Section 6.01.  *Confidentiality* ............................................................................ 19
Section 6.02.  *Access* ....................................................................................... 20
Section 6.03.  *Bankruptcy Actions* .................................................................... 20
Section 6.04.  *Financing Covenant* .................................................................... 20

## ARTICLE 7
### COVENANTS OF BUYER AND SELLER

Section 7.01.  *Further Assurance* ...................................................................... 20
Section 7.02.  *Certain Filings* ........................................................................... 21
Section 7.03.  *Permit and Surety Bond Matters* ................................................. 21
Section 7.04.  *Public Announcements* ................................................................ 22
Section 7.05.  *WARN Act* ................................................................................. 22
Section 7.06.  *Notification of Certain Events* ..................................................... 23
Section 7.07.  *Bankruptcy Court Approval* ........................................................ 23
Section 7.08.  *Buyer Name* ............................................................................... 23
Section 7.09.  *Cooperation with Buyer's Compliance with certain Mine
        Safety Matters* ........................................................................ 23

## ARTICLE 8
### TAX MATTERS

Section 8.01.  *Tax Cooperation; Allocation of Taxes* .......................................... 24

## ARTICLE 9
### EMPLOYEE BENEFITS

Section 9.01.  *Representations and Warranties* .................................................... 25
Section 9.02.  *Covenants* .................................................................................. 26
Section 9.03.  *No Third Party Beneficiaries* ....................................................... 26
Section 9.04.  *Non-Assumption* ........................................................................ 26

ii

PAGE

Section 9.05. *Non-Competition* ......................................................................... 26
Section 9.06. *Non-Solicitation* ......................................................................... 27

ARTICLE 10
CONDITIONS TO CLOSING

Section 10.01. *Conditions to Obligations of Buyer and Seller* ........................... 27
Section 10.02. *Conditions to Obligation of Buyer* .............................................. 27
Section 10.03. *Conditions to Obligation of Seller* ............................................. 28
Section 10.04. *Frustration of Closing Conditions* ............................................. 28

ARTICLE 11
TERMINATION

Section 11.01. *Grounds for Termination* ............................................................ 28
Section 11.02. *Effect of Termination* ................................................................. 29

ARTICLE 12
MISCELLANEOUS

Section 12.01. *Notices* ...................................................................................... 30
Section 12.02. *Survival* ..................................................................................... 31
Section 12.03. *Amendments and Waivers* .......................................................... 31
Section 12.04. *Expenses* .................................................................................... 31
Section 12.05. *Successors and Assigns* .............................................................. 31
Section 12.06. *Governing Law* ........................................................................... 32
Section 12.07. *Jurisdiction* ............................................................................... 32
Section 12.08. *WAIVER OF JURY TRIAL* .......................................................... 32
Section 12.09. *Counterparts; Effectiveness; Third Party Beneficiaries* .............. 32
Section 12.10. *Entire Agreement* ....................................................................... 33
Section 12.11. *Bulk Sales Laws* ......................................................................... 33
Section 12.12. *Severability* ............................................................................... 33
Section 12.13. *Disclosure Schedules* ................................................................. 33
Section 12.14. *Specific Performance* ................................................................. 33

Exhibit A       Assignment and Assumption Agreement

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "**Agreement**") dated as of June 3, 2014 by and among Opes Resources Inc., an Ontario (Canada) corporation ("**Buyer**"), and James River Coal Company, a Virginia corporation, and those of its Subsidiaries that hold an interest in the Purchased Assets (collectively, "**Seller**").

## W I T N E S S E T H :

WHEREAS, Seller and its Subsidiaries (as hereinafter defined) conduct a business that mines, processes, markets and sells metallurgical, thermal and specialty coal through mining complexes located throughout eastern Kentucky, southern West Virginia and southern Indiana;

WHEREAS, on April 7, 2014 (the "**Petition Date**"), Seller and all of its wholly owned Subsidiaries filed a voluntary petition for relief commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**");

WHEREAS, Buyer desires to purchase certain assets and assume certain liabilities relating to Seller's McCoy Elkhorn mining complex located in eastern Kentucky from Seller, and Seller desires to sell such assets and transfer such liabilities to Buyer, upon the terms and subject to the conditions hereinafter set forth (the "**Acquisition**");

WHEREAS, the parties hereto intend to effectuate the transactions contemplated by this Agreement pursuant to section 363 of the Bankruptcy Code (as hereinafter defined); and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order (as hereinafter defined).

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01.  *Definitions.*  As used herein, the following terms have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For purposes of this definition, "**control**" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "**controlling**" and "**controlled**" have correlative meanings.

"**Alternative Transaction**" means a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise to one or more third parties of any Purchased Assets.

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"**Avoidance Action**" means any avoidance, preference or recovery, claim, action or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal law.

"**Bankruptcy Case**" means the case, as jointly administered, commenced by Seller under chapter 11 of the Bankruptcy Code, styled *In re James River Coal Company, et al.*, Case No. 14-31848 (KRH) and pending before the Bankruptcy Court.

"**Bankruptcy Code**" means title 11 of the United States Code, sections 101 *et. seq.*

"**Bidding Procedures**" means the strategic transaction bidding procedures approved by the Bidding Procedures Order, together with such changes thereon, if any, as shall have been made in accordance with the Bidding Procedures Order.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court, dated May 9, 2014, approving the Bidding Procedures.

"**Black Lung Benefits Act**" means the Black Lung Benefits Act, title 30 of the United States Code, sections 901 *et seq.*, the Federal Mine Safety and Health Act of 1977, title 30 of the United States Code, sections 801 *et seq.*, the Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, 92 Stat. 95 (1978), the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, 95 Stat. 1643, and the Black Lung Consolidation of Administrative Responsibility Act, Pub. L. No. 107-275, 116 Stat. 1925.

"**Black Lung Liabilities**" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Benefits Act and

2

occupational pneumoconiosis, silicosis or other lung disease liabilities and benefits arising under Applicable Law.

"**Business Day**" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"**Closing Date**" means the date of the Closing.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"**Code**" means the Internal Revenue Code of 1986.

"**Environmental Law**" means any Applicable Law or any legally binding agreement with any Person relating to the pollution, protection or reclamation of the environment or any spill, emission, release or disposal into the environment of, or human exposure to, any pollutant, contaminant or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material.

"**Environmental Liabilities**" means any and all liabilities, obligations or commitments (including the cost of any related investigation, remediation, reclamation or monitoring of the environment), whether existing or occurring on, prior to or after the Closing, to the extent arising in connection with or in any way relating to the Purchased Business (as currently or previously conducted), the Purchased Assets, the Transferred Permits or any activities or operations occurring or conducted at the Purchased Real Property (including, in each case, offsite disposal or impacts therefrom), whether known, unknown, accrued, contingent, absolute or otherwise, that in each case arise under or relate to any Environmental Law, any Transferred Permit or any spill, emission, release or disposal into the environment of, or human exposure to, Hazardous Materials.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" of any entity means any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Code.

"**Existing Financial Assurances**" means all reclamation and surety bonds and related letters of credit, cash collateral and other collateral described on Schedule 1.01(a)(iii), in each case relating to the Purchased Business.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any transnational, domestic or foreign federal, state or local governmental, regulatory or administrative authority, department, court, agency or official, including any political subdivision thereof.

"**Hazardous Material**" means any pollutant, contaminant or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material that in each case is regulated under any Environmental Law.

"**Intellectual Property Right**" means any trademark, service mark, trade name, mask work, invention, patent, trade secret, copyright, know-how (including any registrations or applications for registration of any of the foregoing) or any other similar type of proprietary intellectual property right.

"**Knowledge**" means (i) with respect to Buyer, to the actual knowledge of the officers of Buyer listed on Schedule 1.01(a)(i) and (ii) with respect to Seller, to the actual knowledge of the officers of Seller listed on Schedule 1.01(a)(ii).

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or encumbrance in respect of such property or asset.

"**Material Adverse Effect**" means a material adverse effect on the financial condition, business or results of operations of the Purchased Business, taken as a whole, excluding any effect resulting from (A) changes in GAAP or changes in the regulatory accounting requirements applicable to any industry in which the Purchased Business operates, (B) changes in financial or securities markets or general economic or political conditions, (C) changes (including changes of Applicable Law) or conditions generally affecting the industry in which the Purchased Business operates, (D) acts of war, sabotage or terrorism or natural disasters, (E) the announcement or consummation of the transactions contemplated by this Agreement or the Transaction Documents, (F) any action taken (or omitted to be taken) at the request of Buyer or its Affiliates, (G) any failure by Seller or the Purchased Business to meet any projections or forecasts for any period occurring on or after the date hereof, (H) the filing of the Bankruptcy Case and operations of the Purchased Business in bankruptcy, (I) any action taken by Seller or any of its Subsidiaries pursuant to any order of the Bankruptcy Court or (J) any action taken by Seller or any of its Subsidiaries that is required, expressly contemplated or permitted pursuant to this Agreement.

"**Permitted Lien**" means (i) Liens that constitute Assumed Liabilities, (ii) statutory liens for Taxes and assessments not yet due and payable, including, without limitation, liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Seller (or its applicable Subsidiary) (such Taxes as are described in this subsection (ii) being Apportioned Obligations as described in Section 8.01(b)), (iii) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Liens arising in the ordinary course of business, (iv) easements,

4

covenants, conditions, restrictions and other similar matters of record affecting any Purchased Real Property, (v) any Lien or claim affecting any owned Purchased Real Property that does not individually or in the aggregate interfere in any material respect with the present use of the property subject thereto, (vi) the leasehold estate or any sublease, license, or rights of occupancy in any leased Purchased Real Property where Seller or a Subsidiary of Seller is lessor, and identified on Schedule 1.01(a)(iv), (vii) local, county, state and federal laws, ordinances or governmental regulations including Environmental Laws and regulations, local building and fire codes, and zoning, conservation, or other land use regulations now or hereafter in effect relating to any Purchased Real Property which do not, in the aggregate, materially interfere with the present use of the Purchased Real Property subject thereto.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"**Pre-Closing Tax Period**" means (i) any Tax Period ending on or before the Closing Date and (ii) with respect to a Tax Period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"**Purchased Business**" means the mining, processing, selling, shipping and related operations conducted at the mines located at the Purchased Real Property.

"**Sale Order**" means an order of the Bankruptcy Court in form and substance reasonably satisfactory to Buyer, pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, *inter alia*, the sale of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities by Buyer on the terms and conditions set forth herein and (ii) containing certain findings of facts, including a finding that Buyer is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

"**Subsidiary**" means, with respect to any Person at any time, any Person of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned or controlled by such Person.

"**Tax**" means (i) any and all taxes, charges, levies or other similar assessments or liabilities in the nature of a tax, including income, gross receipts, ad valorem, premium, value-added, net worth, capital stock, capital gains, documentary, recapture, alternative or add-on minimum, disability, estimated, registration, recording, excise, real property, personal property, extraction, sales, use, license, lease, service, service use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental, workers compensation, payroll, profits, severance, stamp,

occupation, windfall profits, customs, duties, franchise and other taxes of any kind whatsoever imposed by a Governmental Authority, and any interest, fines, penalties, assessments or additions to tax imposed with respect to such items or any contest or dispute thereof or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

"**Transaction Documents**" means the Assignment and Assumption Agreement and each other document, agreement or instrument executed and delivered in connection herewith.

"**Workers' Compensation Liabilities**" means any liabilities or benefit obligations related to workers' compensation claims and benefits arising under Applicable Law.

(a)     Each of the following terms is defined in the Section set forth opposite such term:

| <u>Term</u> | <u>Section</u> |
| --- | --- |
| Assumed Contracts | 2.01 |
| Agreement | Preamble |
| Allocation Statement | 2.06 |
| Apportioned Obligations | 8.01 |
| Assignment and Assumption Agreement | 2.07 |
| Assumed Liabilities | 2.03 |
| Bankruptcy Court | Recitals |
| Burke Real Property | 2.02(a) |
| Business Employee | 9.01 |
| Buyer | Preamble |
| Closing | 2.07 |
| Closing Date Cash Payment | 2.06 |
| Confidentiality Agreement | 6.01 |
| Covenant Period | 9.05 |
| Cure Costs | 2.05 |
| e-mail | 12.01 |
| Employee Plan | 9.01 |
| End Date | 11.01 |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.04 |
| Interim Period | 7.03 |
| New York Courts | 12.07 |
| Permits | 3.06 |
| Petition Date | Recitals |
| Post-Closing Tax Period | 8.01 |
| Purchase Price | 2.06 |
| Purchased Assets | 2.01 |
| Purchased Real Property | 2.02 |

6

| **Term** | **Section** |
|---|---|
| Seller | Preamble |
| Taxing Authority | 1.01 |
| Transferred Employees | 9.02 |
| Transferred Permits | 2.02 |
| Transfer Taxes | 8.01 |
| WARN Act | 7.05 |

Section 1.02. *Other Definitional and Interpretative Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law.

## ARTICLE 2

### PURCHASE AND SALE

Section 2.01. *Purchase and Sale.* Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase, or cause one of its Subsidiaries to purchase, from Seller and Seller agrees to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered, to Buyer at the Closing, free and clear of all Liens, other than Permitted Liens, all of Seller's and its Subsidiaries' right, title and interest in, to and under the following assets and properties owned, held or

7

used in the conduct of the Purchased Business by Seller and its Subsidiaries (the "**Purchased Assets**"):

(a)      the real property and leases of (including all amendments), and other interests in, real property listed on Schedule 2.01(a) (the "**Purchased Real Property**");

(b)      the buildings, facilities, fixtures and improvements located on the Purchased Real Property as of May 1, 2014, including the related mine facilities and infrastructure and mine apparatus;  all personal property and trade fixtures located in the Main Office Building, Safety Building, and both Warehouse Buildings as of May 1, 2014 as described on Schedule 2.01(b);

(c)      all machinery and equipment, parts, supplies, tools and other tangible assets located on the Purchased Real Property as of May 1, 2014;

(d)      all coal inventory located on the Purchased Real Property;

(e)      all contracts, agreements, leases, subleases, surface use agreements, rights-of-way, licenses, commitments, sales and purchase orders and other instruments listed on Schedule 2.01(e) (collectively, the "**Assumed Contracts**");

(f)      subject to Section 7.03, all transferable licenses, permits or other governmental authorizations, including those set forth on Schedule 2.01(f) (collectively, the "**Transferred Permits**"); *provided*, *however*, that, Buyer shall not purchase Encroachment Permit No. 12-0229-10 set forth on Schedule 2.01(f), and such permit shall not be a Transferred Permit or Purchased Asset, unless Buyer delivers to Seller a notice of election to purchase such permit on or before the Closing Date;

(g)      $250,000.00 on deposit in the escrow account of Baird & Baird (relating to Non-Compliance No. 53-2851 on Transferred Permit No. 898-5616);

(h)      all books and records, including computer programs and software licenses and other electronic files or records (but only to the extent transferable), related to the Purchased Assets and Assumed Liabilities;

(i)      all transferable rights, claims, credits, rights of recoupment, causes of action or rights of set-off against third parties relating to or arising from the Purchased Assets; and

(k)      other assets or property not specifically identified herein and not included in the Excluded Assets (as hereafter defined) that are

8

used exclusively in the conduct of the Purchased Business and which Buyer elects to include as Purchased Assets prior to Closing by providing written notice to Seller at least 3 Business Days prior to Closing.

Section 2.02. *Excluded Assets*. Notwithstanding anything herein to the contrary, Buyer expressly understands and agrees that the following assets and properties of Seller and its Subsidiaries (the "**Excluded Assets**") shall be excluded from the Purchased Assets:

(a) the real property and leases of, and other interests in, real property described on Schedule 2.02(a) (the "**Burke Real Property**");

(b) the facilities and improvements located on the Burke Real Property, as generally described on Schedule 2.02(b), including the related mine facilities, mine infrastructure and mine apparatus presently located on the Burke Real Property;

(c) all machinery and equipment on, within and attached to the facilities and improvements referred to in Section 2.02(b) above that are located on the Burke Real Property, including any and all of the personal property, equipment and trade fixtures relating to the Burke Real Property;

(d) all rights of Seller arising under this Agreement or the transactions contemplated hereby;

(e) all coal inventory located on the Burke Real Property;

(f) all refunds for Taxes incurred in a Pre-Closing Tax Period, including those relating to the Purchased Business or the Purchased Assets, and all Tax returns of Seller and any of its Subsidiaries, together with all books and records (including working papers) related thereto (however, Buyer may request copies of any such books and records (or portions thereof) that relate to the Purchased Business);

(g) all Tax assets (including duty and tax refunds and prepayments) and net operating losses of Seller or any of its Subsidiaries;

(h) the licenses, permits or other governmental authorizations relating to the Burke Real property as listed on Schedule 2.02(h);

(i) all Avoidance Actions, or proceeds thereof, with respect to the Excluded Assets;

(j) all contracts, agreements, leases, licenses and commitments relating the Burke Real Property listed on Schedule 2.02(j);

(k) all (i) real property and leases of, or other interests in real property, (ii) facilities and improvements on such real property, including

9

mine facilities, mine infrastructure and mine apparatus, (iii) machinery and equipment, (iv) transferable license, permits, or other governmental authorizations, and (v) contracts, agreements, leases, licenses and commitments, all relating to the "Harmond Branch Surface Mine" and the "Mare Creek Surface Mine" of Seller located in Pike County, Kentucky and the "Cannel Gap Surface Mine" of Seller located in Johnson County, Kentucky and particularly listed on Schedule 2.02(k);

(l)    all books and records related to the Excluded Assets but not related to the Purchased Business; and

(m)    all assets and properties of Seller and its Subsidiaries that are not owned, held or used in the conduct of the Purchased Business.

Section 2.03.  *Assumed Liabilities*.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume, or cause one of its Subsidiaries to assume, all of the following debts, obligations, contracts and liabilities of Seller and its Subsidiaries (or any predecessor of any of them or any prior owner of all or part of their businesses and assets) (the "**Assumed Liabilities**"):

(a)    all liabilities and obligations of Seller (or its applicable Subsidiary) arising under the Assumed Contracts from and after the Closing Date;

(b)    all Environmental Liabilities (except such fines and penalties as are payable by Seller in accordance with Section 5.03);

(c)    all liabilities and obligations arising pursuant to any Applicable Law relating to public or employee health or safety (including the Federal Mine Safety and Health Act of 1977) to the extent relating to the Purchased Business or any Purchased Asset, whether existing or occurring on, prior to or after the Closing (except such fines and penalties as are payable by Seller in accordance with Section 5.03);

(d)    any and all claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Transferred Employee first occurring after the Closing Date, including any and all Workers' Compensation Liabilities and Black Lung Liabilities to and with respect to the Transferred Employees for claims made after the Closing Date and compliance with any Applicable Law relating to the foregoing arising after the Closing Date; and

(e)    all liabilities arising out of or in connection with Buyer's use, operation, possession or ownership of the Purchased Assets at any time after the Closing, including during the Interim Period.

10

Section 2.04.  *Excluded Liabilities*.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of Seller or any of its Subsidiaries of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of Seller (or its applicable Subsidiary) (all such liabilities and obligations not being assumed being herein referred to as the "**Excluded Liabilities**").  Notwithstanding any provision in this Agreement or any other writing to the contrary, Excluded Liabilities include:

(a)    any liability or obligation of Seller, or any member of any consolidated, affiliated, combined or unitary group of which Seller is or has been a member, for income Taxes;

(b)    all Black Lung Liabilities and Workers' Compensation Liabilities related to the Purchased Assets, including to and with respect to Business Employees and former employees who worked or who were employed at the Purchased Assets, including, but not limited to, any such Black Lung Liabilities and Workers' Compensation Liabilities of Sellers with respect to any of Seller's predecessors;

(c)    all liabilities or obligations whether in existence as of, prior to or after the Closing Date relating to the Employee Plans, including compliance after the Closing Date with any Applicable Law relating to the foregoing;

(d)    any liability or obligation to the extent relating to an Excluded Asset.

Section 2.05.  *Assignment of Assumed Contracts and Rights; Cure Amounts*.  (a) Seller shall transfer and assign or cause to be transferred and assigned all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Seller (or its applicable Subsidiary), as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.  Buyer shall comply with all requirements of section 365 of the Bankruptcy Code necessary to permit such assignment and assumption; *provided*, *however*, that, in connection with such assignment and assumption, Seller shall cure all defaults under such Assumed Contracts to the extent required by section 365(b) of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder (such amounts, the "**Cure Costs**").  The current Cure Costs for each Assumed Contract are set forth opposite the name of each Assumed Contract set forth on Schedule 2.01(e).  To the extent any such Assumed Contract does not constitute an executory contract subject to assumption and assignment under section 365 of the Bankruptcy Code, then the rights and obligations under such Assumed Contracts shall be transferred to Buyer as part of the sale of the Purchased Assets with such rights and obligations (including all Cure Costs) being expressly assumed by Buyer.

11

(b)     The Sale Order shall provide that as of the Closing, Seller shall assign or cause to be assigned to Buyer the Assumed Contracts, each of which shall be identified by the name and date of the Assumed Contract (if available) and the other party to the Assumed Contract, all included on an exhibit attached to the Sale Order.

(c)     Notwithstanding anything herein to the contrary, to the extent the assignment of any Assumed Contract is, after giving effect to sections 363 and 365 of the Bankruptcy Code, not permitted by law or not permitted without the consent of another Person, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then (i) this Agreement shall not be deemed to constitute an assignment or attempt to assign such Assumed Contract or any right, interest or obligation thereunder if such consent is not given, and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price; (ii) no breach of this Agreement shall have occurred by virtue of the nonassignment; and (iii) if such consent is not given, Seller and Buyer will, subject to any approval of the Bankruptcy Court that may be required, cooperate in a mutually agreeable arrangement under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

Section 2.06. *Purchase Price; Allocation of Purchase Price*. (a) The purchase price for the Purchased Assets (the "**Purchase Price**") is $3,100,000 in cash. The Purchase Price shall be paid as provided in Section 2.07.

(b)     As soon as practicable following the Closing Date, Buyer shall deliver to Seller a statement (the "**Allocation Statement**"), allocating the Purchase Price (plus Assumed Liabilities, to the extent properly taken into account under Section 1060 of the Code) among the Purchased Assets in accordance with Section 1060 of the Code. If within 10 Business Days after the delivery of the Allocation Statement Seller notifies Buyer that Seller objects to the allocation set forth in the Allocation Statement, Buyer and Seller shall use commercially reasonable efforts to resolve such dispute within 20 days. In the event that Buyer and Seller are unable to resolve such dispute within 20 days, each of Buyer and Seller may allocate the Purchase Price in accordance with Section 1060 of the Code in its sole discretion.

(c)     Subject to the last sentence of Section 2.06(b), Seller and Buyer agree to (i) be bound by the Allocation Statement and (ii) act in accordance with the allocation in the preparation, filing and audit of any Tax return (including filing Form 8594 with their federal income Tax returns for the taxable year that includes the date of the Closing).

(d)     Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, each party shall deliver to the other party a copy of its Form 8594.

12

Section 2.07.  *Closing*.  The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at 1148 Long Fork Road, Kimper, Kentucky, as soon as possible, but in no event later than three Business Days, after satisfaction or, to the extent permissible, waiver by the party or parties entitled to the benefit of the conditions set forth in Article 10 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing), or at such other time or place as Buyer and Seller may agree.  At the Closing:

(a)    Buyer shall deliver to Seller the Purchase Price in immediately available funds by wire transfer to an account of Seller designated by Seller, by notice to Buyer, not later than two Business Days prior to the Closing Date.

(b)    Seller and Buyer shall enter into an Assignment and Assumption Agreement substantially in the form attached hereto as <u>Exhibit B</u> (the "**Assignment and Assumption Agreement**"), and, subject to the provisions hereof, Seller shall deliver to Buyer such deeds, bills of sale, endorsements, consents, assignments and other good and sufficient instruments of conveyance and assignment as the parties and their respective counsel shall deem reasonably necessary to vest in Buyer all right, title and interest in, to and under the Purchased Assets.

(c)    Buyer shall deliver to Seller:

(i)    to the extent not previously delivered, a duly executed counterpart to each Transaction Document to which Buyer is a party and all other documents or instruments required to be delivered by it on or prior to the Closing Date pursuant to this Agreement;

(ii)    a certificate, dated the Closing Date and signed by the Chief Executive Officer or Chief Accounting Officer of Buyer pursuant to Section 10.03(c) hereof; and

(iii)    to the extent not previously delivered, binding commitments from sureties sufficient to replace all existing reclamation and surety bonds of Sellers relating to the Transferred Permits; and

(d)    Seller shall deliver to Buyer:

(i)    to the extent not previously delivered, a duly executed counterpart to each Transaction Document to which Buyer is a party and all other documents or instruments required to be delivered by it on or prior to the Closing Date pursuant to this Agreement;

13

(ii)     a copy of the final Sale Order; and

(iii)     a certificate, dated the Closing Date and signed by the Chief Executive Officer or Chief Accounting Officer of Seller pursuant to Section 10.02(c) hereof.

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedule, Seller represents and warrants to Buyer that:

Section 3.01. *Corporate Existence and Power.* Seller is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all corporate powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted, except for those licenses, authorizations, permits, consents and approvals the absence of which would not have a Material Adverse Effect.

Section 3.02. *Corporate Authorization.* The execution, delivery and, subject to the entry of the Sale Order, performance by Seller of this Agreement and each Transaction Document and the consummation of the transactions contemplated hereby and thereby are within Seller's corporate powers and have been duly authorized by all necessary corporate action on the part of Seller. Subject to the entry of the Sale Order, each of this Agreement and the Transaction Documents constitutes a valid and binding agreement of Seller.

Section 3.03. *Governmental Authorization.* The execution, delivery and performance by Seller of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby require no action by or in respect of, or filing with, any Governmental Authority other than (i) the Bankruptcy Court; (ii) the transfer or reissuance of the Transferred Permits as contemplated by Section 7.03; and (iii) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

Section 3.04. *Noncontravention.* After giving effect to the Sale Order, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the certificate of incorporation or bylaws of Seller, (ii) assuming compliance with the matters referred to in Section 3.03, violate any Applicable Law or (iii) constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation under any Assumed Contract, with such exceptions, in the case of clause (iii), as would not have, individually or in the aggregate, a Material Adverse Effect.

14

Section 3.05.  *Properties*.  The Purchased Real Property described on Schedule 2.01(a) constitutes all real property and rights to real property used or held for use in the conduct of the Purchased Business which Seller or any of its Subsidiaries owns, leases, operates, subleases or enjoys rights under.  The Purchased Real Property includes any contracts or agreements pursuant to which the Seller is obligated to pay rents or royalties, including overriding royalties, and further includes any and all contracts, agreements and subleases pursuant to which any of the Purchased Real Property has rights.  Seller has provided Buyer with true and complete copies of each of the instruments identified on Schedule 2.01(a).

Section 3.06.  *Licenses and Permits*.  Schedule 3.06 describes each material license, franchise, permit, certificate, approval or other similar authorization that is necessary for the operation of the Purchased Business as currently conducted and the ownership of the Purchased Assets (the "**Permits**").  The Permits are valid and in full force and effect, and Seller (or its applicable Subsidiary) is not in default under, and no condition exists that with notice or lapse of time or both would constitute a default under, the Permits, except for such failures that would not have, individually or in the aggregate, a Material Adverse Effect.

Section 3.07.  *Environmental*.  (a) Except as would not have, individually or in the aggregate, a Material Adverse Effect or as otherwise described on Schedule 3.07, to the Knowledge of Seller: (i) no written notice, order, request for information, complaint or penalty has been received in the past three years by Seller with respect to the Purchased Business or the Purchased Assets, and there are no judicial, administrative or other actions, suits or proceedings pending or threatened in writing, in each case, that allege a violation by or liability of the Purchased Business of or under any Environmental Law; and (ii) the Purchased Business is in compliance with all applicable Environmental Laws.

(b)      Except as set forth in Section 3.06 and this Section 3.07, no representations or warranties are being made by Seller with respect to matters arising under or relating to Environmental Law, Environmental Liabilities or other environmental matters.

Section 3.08.  *Title to the Purchased Assets*.  Subject to the terms of the Sale Order, upon consummation of the transactions contemplated hereby, including the transfer or reissuance of the Transferred Permits as contemplated by Section 7.03, Buyer will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens, except for Permitted Liens.

Section 3.09.  *Assumed Contracts*.  Each Assumed Contract is a valid and binding agreement of Seller (or its applicable Subsidiary) and is in full force and effect, and none of Seller (or its applicable Subsidiary) or, to the Knowledge of Seller, any other party thereto is in default or breach in any respect under the

15

terms of any such Assumed Contract, except for any such defaults or breaches which would not have a Material Adverse Effect or that would be cured through payment of the Cure Costs or arising solely as a consequence of the Bankruptcy Case.

Section 3.10.  *Litigation*.  There is no action, suit, investigation or proceeding pending against, or to the Knowledge of Seller threatened against or affecting Seller relating to the Purchased Business, the Purchased Assets or the Purchased Real Property or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

Section 4.01.  *Corporate Existence and Power*.  Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

Section 4.02.  *Corporate Authorization*.  The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer.  Each of this Agreement and the Transaction Documents constitutes a valid and binding agreement of Buyer.

Section 4.03.  *Governmental Authorization*.  The execution, delivery and performance by Buyer of this Agreement and each of the Transaction Documents and the consummation of the transactions contemplated hereby and thereby require no material action by or in respect of, or material filing with, any Governmental Authority other than (i) the Bankruptcy Court and (ii) the transfer or reissuance of the Transferred Permits as contemplated by Section 7.03.

Section 4.04.  *Noncontravention*.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the certificate of incorporation or bylaws of Buyer, (ii) assuming compliance with the matters referred to in Section 4.03, violate any Applicable Law or (iii) require any consent or other action by any Person under, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit to which Buyer is entitled under any provision of any agreement or other instrument binding upon Buyer, except, in the case of this clause (iii), as would not reasonably be expected to have a material adverse effect

16

on Buyer's ability to consummate the transactions contemplated in this Agreement and, in each case, after giving effect to the Sale Order.

Section 4.05.  *Adequate Assurances Regarding Assumed Contracts*.  As of the Closing, Buyer will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.06.  *Financing*.  Buyer has, or will have prior to the Closing, sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment when due of the Purchase Price, Assumed Liabilities and any other amounts to be paid by it hereunder.

Section 4.07.  *Litigation*.  There is no action, suit, investigation or proceeding pending against, or to the Knowledge of Buyer threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

Section 4.08.  *Finders' Fees*.  There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 4.09.  *Assurances Regarding Permits*.  As of the Closing, Buyer will be capable of taking transfer of, or obtaining replacement or overlapping permits for, the Transferred Permits and will not have been denied any application for any mining license, permit or other governmental authorization by any Governmental Authority due to application of the Applicant Violator System established pursuant to the federal Surface Mining Control and Reclamation Act (or any applicable state equivalent system), other than any denial for violations that may reasonably be expected to be cured by the time of such transfer or obtaining of permits as contemplated by Section 7.03.

Section 4.10.  *Inspections; No Other Representations*.  Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.  Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer acknowledges that Seller has given Buyer complete and open access to the key employees, documents and facilities of the Purchased Business. Buyer will undertake prior to Closing such further investigation and request such additional documents and information as it deems necessary.  Buyer acknowledges and agrees that the Purchased Assets are sold "as is" and Buyer agrees to accept the Purchased Assets and the Purchased Business in the condition

17

they are in on the Closing Date based on its own inspection, examination and determination with respect to all matters, and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement.  Without limiting the generality of the foregoing, Buyer acknowledges that Seller makes no representation or warranty with respect to (i) any projections, estimates or budgets delivered to or made available to Buyer of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Purchased Business or the future business and operations of the Purchased Business or (ii) any other information or documents made available to Buyer or its counsel, accountants or advisors with respect to the Purchased Business, except as expressly set forth in this Agreement.

ARTICLE 5

COVENANTS OF SELLER

Seller agrees that:

Section 5.01.  *Conduct of the Purchased Business*.  Except as contemplated by this Agreement and to the extent not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any orders entered by the Bankruptcy Court in the Bankruptcy Case or other Applicable Law, from the date hereof until the Closing Date, Seller shall use commercially reasonable efforts to conduct the Purchased Business in the ordinary course consistent with past practice, taking into account business exigencies arising as a result of Seller's financial condition and status as a chapter 11 debtor.  For the avoidance of doubt, the pendency of the Bankruptcy Case and the effects thereof shall in no way be deemed a breach of this Section 5.01.  Notwithstanding anything herein to the contrary, Seller shall not sell or transfer any of the Purchased Assets prior to Closing.

Section 5.02.  *Access to Information*.  From the date hereof until the Closing Date, Seller will (i) give Buyer, its counsel, financial advisors, auditors and other authorized representatives reasonable access to the offices, properties, books and records of Seller and its Subsidiaries relating to the Purchased Business, (ii) furnish to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Purchased Business as such Persons may reasonably request and (iii) instruct the employees, counsel and financial advisors of Seller and its Subsidiaries to cooperate with Buyer in its investigation of the Purchased Business.  Seller acknowledges that in order for Buyer to properly investigate and evaluate the Purchased Assets, Buyer shall require access to Seller's employees, customers, suppliers, vendors, contractors and landlords.  Any investigation by Buyer or its authorized representatives pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller and its Subsidiaries.  Notwithstanding the foregoing, Buyer shall not (A)

18

have access to personnel records of Seller and its Subsidiaries relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion is sensitive or the disclosure of which could subject Seller or any of its Subsidiaries to risk of liability or (B) conduct or cause to be conducted any sampling, testing or otherwise invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media related to the Purchased Business or the Purchased Assets.  Notwithstanding the foregoing, until the Sale Order shall have been entered, except with the prior written consent of Seller, which consent shall not be unreasonably withheld, Buyer shall not, and shall cause its Affiliates and their respective representatives (including counsel, accountants and financial advisors) not to, initiate or maintain contact with any security-holder, director, officer, partner, manager, member, agent, advisor, representative, or lender of Seller or any of its Subsidiaries with respect to, or relating or referring in any way to the Purchased Business or the Purchased Assets.

Section 5.03.  *Satisfaction of Outstanding Fines*.  Seller agrees to pay, or cause to be paid, any monetary fine or monetary penalty imposed by any Governmental Authority pursuant to Environmental Law or any Applicable Law relating to public or employee health or safety, in each case to the extent such fine or penalty relates to the Purchased Business and has been issued or assessed prior to the Closing Date, whether or not an appeal is pending or same is subject to further appeal, including with respect to the proceedings pending before the Mine Safety and Health Administration: Docket Nos: Kent 2012-226; Kent 2013-980; Kent 2013-90 and Kent 2014-0384.  In connection with the foregoing, (a) Buyer shall provide, and cause its Affiliates to provide, Seller with such access, assistance, information and other cooperation as Seller may reasonably request, including in connection with any appeal process; and (b) Seller agrees to keep Buyer reasonably informed of the resolution of such fine or penalty.

Section 5.04.  *Bond Release*.  With respect to the Transferred Permits, Seller agrees to obtain a release of Bond No. 1093496, Bond No. 400KF0894, Bond No. SUR0018268 and Bond No. SUR0018270 within twenty (20) days after the Closing Date.

Section 5.05.  *Lease of Premises*.  Seller shall use reasonable efforts to allow Buyer to occupy the buildings set forth on Schedule 2.01(b) for a period of sixty (60) days following Closing.

ARTICLE 6
COVENANTS OF BUYER

Buyer agrees that:

Section 6.01.  *Confidentiality*.  Buyer and its Affiliates will hold, and will use their best efforts to cause their respective officers, directors, employees,

19

accountants, counsel, consultants, advisors and agents to hold all confidential documents and information concerning the business of Seller and its Subsidiaries furnished to Buyer or its Affiliates in connection with the transactions contemplated by this Agreement in accordance with the provisions of the Confidentiality and Nondisclosure Agreement, dated as of January 24, 2014, between Seller and Buyer (the "**Confidentiality Agreement**"), which, notwithstanding anything to the contrary contained therein, shall remain in full force and effect following the execution of this Agreement and shall survive any termination of this Agreement.

Section 6.02. *Access*. On and after the Closing Date, Buyer will afford promptly to Seller and its agents reasonable access to its properties, books, records, employees and auditors to the extent necessary to permit Seller to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date; *provided* that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer.

Section 6.03. *Bankruptcy Actions*. Buyer acknowledges that it must provide adequate assurance of future performance under the Assumed Contracts and agrees that it shall, and shall cause its Affiliates to, cooperate with Seller in connection with furnishing information or documents to Seller to satisfy the requirements of section 365(f)(2)(B) of the Bankruptcy Code. In furtherance of the foregoing, Buyer shall promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

Section 6.04. *Financing Covenant*. Buyer agrees that it shall use commercially reasonable efforts to obtain the financing necessary to consummate the Acquisition, and shall secure a bona fide commitment for such financing by June 30, 2014 (or such later date as may be required due to matters beyond the control of Buyer or as may be consented to by Seller, which consent shall not unreasonably be withheld).

ARTICLE 7
COVENANTS OF BUYER AND SELLER

Buyer and Seller agree that:

Section 7.01. *Further Assurance*. (a) Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, Seller and Buyer shall take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate

the transactions contemplated by this Agreement, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated by this Agreement, in each case, after giving effect to the Sale Order.  Seller and Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement, to vest in Buyer good title to the Purchased Assets and to assure and evidence the assumption by Buyer of the Assumed Liabilities.

(b)     Neither party shall agree (or permit any of their respective Affiliates to agree) to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the consummation of the transactions contemplated by this Agreement unless it consults with the other party in advance (to the extent reasonably practicable to do so) and, to the extent permitted by such Governmental Authority and any Applicable Law, gives the other party and its outside counsel the opportunity to attend and participate at such meeting.  Each party shall make reasonable accommodation for the other party to participate in such matters.

(c)     The fees and expenses for all filings under any necessary filings or submissions to any Governmental Authority pursuant to this Section 7.01 shall be borne in full by Buyer.

Section 7.02.  *Certain Filings*.  Seller and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.03.  *Permit and Surety Bond Matters*.  (a) Buyer and Seller shall cooperate with one another to take, or cause to be taken, all actions and do, or cause to be done, all things necessary or desirable under Applicable Law to have transferred or reissued to Buyer as promptly as reasonably possible after the Closing the Transferred Permits and to secure as promptly as reasonably possible after the Closing replacement financial assurances to replace the Existing Financial Assurances; *provided* that Buyer shall be responsible for conducting all activities, and incurring or reimbursing Seller and its Affiliates for all costs and expenses, required to accomplish such transfer, reissuance and replacement.

21

After the Closing, Seller or one or more of its Subsidiaries as appropriate shall retain the Existing Financial Assurances until such time as Buyer secures replacement financial assurance to replace such Existing Financial Assurances or such Existing Financial Assurance is no longer required by Applicable Law. Buyer and Seller shall cooperate with one another to allow Buyer, to the extent permitted by and in accordance with Applicable Law and at Buyer's sole cost and expense, to operate pursuant to such Transferred Permits from and after the Closing until such time as they are transferred or reissued to Buyer (the "**Interim Period**").  Effective as of the Closing, Buyer and Seller shall enter into an interim operating agreement in a form customary in the industry and satisfactory to Seller and Buyer.

(b)     During the Interim Period, Buyer shall satisfy, perform and undertake all liabilities, obligations, responsibilities and requirements relating to such Transferred Permits and mining activities conducted thereunder and agrees that any Environmental Liabilities relating to the Transferred Permit and all liabilities arising out of or in connection with any act, omission or circumstance occurring or existing during the Interim Period constitute Assumed Liabilities pursuant to Section 2.03.  If Seller receives notice of a violation under a Transferred Permit prior to its transfer or reissuance to Buyer, then Seller agrees to give Buyer reasonably prompt notice of such violation.  If Seller reasonably determines that Buyer will not cause such violation to be cured in a timely fashion, then Seller and its Affiliates shall have all rights necessary to cure, or cause to be cured, such violation themselves and be promptly reimbursed by Buyer for the reasonable costs of curing such violation.

(c)     With respect to any Existing Financial Assurance maintained after the Closing, Buyer shall reimburse Seller and its Affiliates for, any and all losses, expenses or costs incurred in connection with such Existing Financial Assurances, including: (i) costs to maintain such Existing Financial Assurances, whether or not any such Existing Financial Assurance is accessed, drawn upon or required to be performed; (ii) amounts payable in connection with any Existing Financial Assurance to any beneficiary of or counterparty to such Existing Financial Assurance; and (iii) amounts otherwise incurred as a result of any Existing Financial Assurances being accessed, drawn upon or required to be performed.

Section 7.04.  *Public Announcements*.  Except as may be necessary in connection with the Bankruptcy Case, the parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except for any press releases and public statements the making of which may be required by Applicable Law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

Section 7.05.  *WARN Act*.  Seller shall assume all obligations and liabilities for the provision of notice or payment in lieu of notice or any applicable

22

penalties under the Worker Adjustment and Retraining Notification Act (the "**WARN Act**") or any similar state or local law arising as a result of the transactions contemplated by this Agreement.  Seller hereby indemnifies Buyer and its Affiliates against and agrees to hold each of them harmless from any and all Damages incurred or suffered by Buyer or any of its Affiliates with respect to WARN or any similar state or local law arising as a result of the transactions contemplated by this Agreement.

Section 7.06.  *Notification of Certain Events*.  Each party shall promptly notify the other of any event, condition or circumstance of which such party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement).  During the period prior to the Closing Date, each party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

Section 7.07.  *Bankruptcy Court Approval*.  Each of Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Prior to the execution of this Agreement, Seller has filed a motion with the Bankruptcy Court seeking entry of the Sale Order.  Seller and Buyer shall cooperate with each other in seeking entry of the Sale Order.  Buyer agrees that it will, at the Buyer's own cost, promptly take all actions that are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Seller is permitted to respond to any inquiry and supply information regarding the Purchased Business and the Purchased Assets submitted by any potential counterparty to an Alternative Transaction.  Seller shall contemporaneously provide to Buyer any such information not previously provided to Buyer.

Section 7.08.  *Buyer Name*.  Each of Buyer and Seller agree to use commercially reasonable efforts to take any reasonable actions required to enable Buyer to use the name "McCoy Elkhorn Coal Corporation" or some derivative thereof in connection with Buyer's use, operation, possession or ownership of the Purchased Business after the Closing Date.

Section 7.09.  *Cooperation with Buyer's Compliance with certain Mine Safety Matters*.  From and after the Closing until the earlier of (i) the first anniversary of the Closing Date and (ii) the date on which Buyer has hired and trained sufficient personnel to establish its own "mine rescue team", to the extent that Seller employs personnel who are qualified to serve as members of a "mine rescue team", Seller agrees to make such personnel available to Buyer.  For the

23

avoidance of doubt, the foregoing shall in no way obligate Seller to employ any Persons who are qualified to serve as members of a "mine rescue team".

# ARTICLE 8
## TAX MATTERS

Section 8.01.  *Tax Cooperation; Allocation of Taxes*.  (a) Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Business and the Purchased Assets and Assumed Liabilities (including access to books and records) as is reasonably necessary for the filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets and the Assumed Liabilities for a period of at least six years following the Closing Date.  On or after the end of such period, each party shall provide the other with at least 10 days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.  Seller and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets, the Assumed Liabilities or the Purchased Business.

(b)    All real property taxes, personal property taxes and similar *ad valorem* obligations levied with respect to the Purchased Assets and Assumed Liabilities (whether said obligation is a direct obligation or arises indirectly through an Assumed Contract) for a taxable period that includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller and Buyer based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period after the Closing Date (any such portion of such taxable period, the "**Post-Closing Tax Period**").  Seller shall be liable for the proportionate amount of such taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such taxes that is attributable to the Post-Closing Tax Period.

(c)    All excise, sales, use, value added, registration stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and fees (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne by Buyer.  Buyer and Seller shall cooperate in requesting the Bankruptcy Court to, where appropriate, require Governmental Authorities to waive such Transfer Taxes and in providing each other with any appropriate resale exemption certifications and other similar documentation.  Buyer shall, at its own expense, file any Tax returns and other documentation that must be filed in connection with Transfer Taxes, and shall use its reasonable best efforts to provide such Tax

returns to Seller at least 10 Business Days prior to the date such Tax returns are due to be filed.

(d)    Apportioned Obligations and Taxes described in Section 8.01(b) or 8.01(c) shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by Applicable Law or by any of the applicable Assumed Contracts.  The paying party shall be entitled to reimbursement from the non-paying party in accordance with Section 8.01(b) or 8.01(c), as the case may be. Upon payment of any such Apportioned Obligation or Tax, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under Section 8.01(b) or 8.01(c), as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  The non-paying party shall make such reimbursement promptly but in no event later than 10 days after the presentation of such statement.  Any payment not made within such time shall bear interest at the federal underpayment rate for each day until paid.

(e)    On or before the Closing Date, Seller shall deliver to Buyer a certification that Seller is not a foreign person in accordance with Section 1445 of the Code.


## ARTICLE 9
### EMPLOYEE BENEFITS

Section 9.01.  *Representations and Warranties*.  (a) Subject to the third sentence of Section 5.02, Schedule 9.01(a) contains a complete and accurate list of the following information for each employee of Seller providing services to the Purchased Business as of the date hereof, including each employee on vacation, leave of absence, non-active or layoff status, or off work and receiving or eligible to receive benefits under any federal or state workers' compensation law, the Black Lung Benefits Act (the "**Business Employees**"): name; job title; exempt or non-exempt status; full-time or part-time status; date of commencement of employment; base compensation or base wage rate; target bonus or incentive opportunity; active or inactive status, service credited for purposes of eligibility to participate in severance benefits provided by Seller.  No Business Employee has indicated to Seller that he or she intends to resign or retire as a result of the transactions contemplated by this Agreement or is otherwise unwilling to accept an offer of employment from Buyer, if such offer is made.

(b)    Schedule 9.01(b) contains a complete and accurate list identifying Seller's severance contract, plan, arrangement or policy providing for severance benefits covering the Business Employees.

(c)    None of Seller, any ERISA Affiliate of Seller or any predecessor thereof contributes to, or has in the past five calendar years contributed to, any multiemployer plan, as defined in Section 3(37) of ERISA.

25

Section 9.02.  *Covenants*.  (a) (i) Buyer, no later than five Business Days prior to the Closing, shall offer employment to such Business Employees and at compensation as Buyer shall determine in its sole discretion.  Those Business Employees who accept Buyer's offer of employment and commence working for Buyer on the Closing Date (or upon return to work from approved vacation or leave of absence) shall hereafter be referred to as "**Transferred Employees**." Such Transferred Employees shall receive benefits and be covered by employment policies as Buyer shall determine in its sole discretion.

(ii)    In the event that Buyer does not extend an offer of employment to one or more Business Employees, Buyer shall pay or provide severance benefits to each such Business Employee in an amount not less than the amount determined under the schedule set forth in Section 2.01 of Seller's Discretionary Non-Executive Severance Plan as in effect on May 28, 2014, which amounts are shown for each Business Employee as of June 30, 2014 on Schedule 9.01(a).

(b)    Other than as expressly set forth herein, nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, any change in the employee benefits provided to any individual Transferred Employee.  Nothing in this Section 9.02 is intended to interfere with the Buyer's right from and after the Closing to terminate the employment of, or change the compensation and benefits available to, any Transferred Employee.

Section 9.03.  *No Third Party Beneficiaries*.  Without limiting the generality of Section 12.09, no provision of this Article 9 shall create any third party beneficiary or other rights in any current or former employee, independent contractor or other service provider (including any beneficiary or dependent thereof) of Seller or of any of its Subsidiaries in respect of continued employment (or resumed employment) with either Buyer, its Affiliates or the Purchased Business and no provision of this Article 9 shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any employment plan or arrangement that may be established by Buyer or any of its Affiliates.  No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of Seller, Buyer or any of their respective Affiliates.

Section 9.04.  *Non-Assumption*.  Notwithstanding anything herein to the contrary, Buyer shall have absolutely no responsibility or liability to pay any compensation, benefits or other payments to any current or former employee of the Seller other than severance benefits payable to any Business Employee that is not hired by Buyer and becomes a Transferred Employee and the Purchased Assets shall not include any employee plans or benefits maintained by the Seller.

Section 9.05.  *Non-Competition*.  In order to protect the legitimate business interests of Buyer, Seller hereby covenants and agrees that, for the period

26

beginning on the Closing Date and ending on the first anniversary of the Closing Date (the "**Covenant Period**"), neither Seller nor any of its Affiliates shall directly or indirectly (a) engage in or otherwise assist in any way in Pike County Kentucky with any business that directly competes or interferes with the business of Buyer (or any successor of Buyer) or (b) own, lease, control or invest in any interest in real property in Pike Country, Kentucky, in each case, except for Seller's and its Affiliates' existing business operations relating to the Harmond Branch Surface Mine or the Mare Creek Surface Mine as described on Schedule 2.02(k).

Section 9.06.  *Non-Solicitation*.  In order to protect the legitimate business interests of Buyer, Seller hereby covenants and agrees that, during the Covenant Period, neither Seller nor any Affiliates shall directly or indirectly request or induce any Transferred Employee to terminate his or her employment with the Buyer (or successor of the Buyer) or hire or employ, without the express written consent of Buyer, any Transferred Employee; *provided* that the foregoing will not prevent Seller from conducting any general advertisements for employment directly or through any placement or recruiting agency.

ARTICLE 10
CONDITIONS TO CLOSING

Section 10.01.  *Conditions to Obligations of Buyer and Seller*.  The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     The Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal.

(b)     No provision of any Applicable Law shall prohibit the consummation of the Closing.

Section 10.02.  *Conditions to Obligation of Buyer*.  The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)     Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date.

(b)     The representations and warranties of Seller contained in this Agreement shall be true at and as of the Closing Date, as if made at and as of such date, with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect.

27

(c)     Buyer shall have received a certificate signed by the Chief Executive Officer or Chief Accounting Officer of Seller certifying the satisfaction of the conditions set forth in the foregoing clauses (a) and (b).

Section 10.03.  *Conditions to Obligation of Seller*.  The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)     Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date.

(b)     The representations and warranties of Buyer contained in this Agreement shall be true in all material respects at and as of the Closing Date, as if made at and as of such date.

(c)     Seller shall have received a certificate signed by the Chief Executive Officer or Chief Financial Officer of Buyer certifying the satisfaction of the conditions set forth in the foregoing clauses (a) and (b).

Section 10.04.  *Frustration of Closing Conditions*.  No party may rely on the failure of any condition set forth in this Article 10 to be satisfied to excuse such party's obligation to effect the Closing if such failure was caused by such party's breach of this Agreement.


ARTICLE 11
TERMINATION

Section 11.01.  *Grounds for Termination*.  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Seller and Buyer;

(b)     by either Seller or Buyer if the Closing shall not have been consummated on or before July 31, 2014 (the "**End Date**"); *provided*, *however*, that, at the time of such termination, the party seeking to terminate shall not be in material breach of its obligations under this Agreement, including its obligation to consummate the Closing on the terms and subject to the conditions set forth herein;

(c)     on or after July 1, 2014, by either Seller or Buyer if Buyer has not obtained a bona fide commitment for the financing in form and substance reasonably satisfactory to Seller required to consummate the Acquisition; *provided*, however, that at the time of such termination, the party seeking to terminate shall not be in material breach of its obligations under this Agreement, including its obligation to consummate the Closing

28

on the terms and subject to the conditions set forth herein, and so long as, in the case of termination by Buyer, Buyer is not in violation of Section 6.04;

(d)      by either Seller or Buyer if consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

(e)      by Seller if (i) a breach of any representation or warranty or failure to perform any covenant or agreement on the part of Buyer set forth in this Agreement shall have occurred that would cause any of the conditions set forth in Section 10.01 or 10.03 not to be satisfied and (ii) such condition is incapable of being cured or, if curable, is not cured by Buyer by the earlier of (A) within 20 days after the giving of written notice of such breach or failure and (B) the End Date; *provided*, that at the time of such termination, Seller shall not be in material breach of its obligations under this Agreement;

(f)      by Buyer if (i) a breach of any representation or warranty or failure to perform any covenant or agreement on the part of Seller set forth in this Agreement shall have occurred that would cause any of the conditions set forth in Section 10.01 or 10.02 not to be satisfied and (ii) such condition is incapable of being cured or, if curable, is not cured by Seller by the earlier of (A) within 20 days after the giving of written notice of such breach or failure and (B) the End Date; *provided*, that at the time of such termination, Buyer shall not be in material breach of its obligations under this Agreement; or

(g)      (i) on or prior to the later of (A) May 30, 2014 and (B) one Business Day after the expiration of the two Business Day period referred to below, by Seller if Seller receives a bona fide proposal for an Alternative Transaction, which, in the good faith judgment of Seller's board of directors, may provide a higher and better economic recovery than the Acquisition; *provided* that Seller will provide notice by e-mail to Buyer promptly after receipt of such a bona fide proposal and provide Buyer with two Business Days to propose a revised transaction or (ii) automatically if an Alternative Transaction is consummated with any party other than Buyer.

The party desiring to terminate this Agreement pursuant to Section 11.01(b), 11.01(c), 11.01(d), 11.01(e) or 11.01(f) shall give notice of such termination to the other party.

Section 11.02.  *Effect of Termination*.  If this Agreement is terminated as permitted by Section 11.01 or 12.12, such termination shall be without liability of either party (or any stockholder, director, officer, employee, agent, consultant or

29

representative of such party) to the other party to this Agreement; *provided* that if such termination shall result from the willful (i) failure of either party to fulfill a condition to the performance of the obligations of the other party, (ii) failure to perform a covenant of this Agreement or (iii) breach by either party hereto of any representation or warranty or agreement contained herein, such party shall be fully liable for any and all damages, losses and expenses (including reasonable expenses of investigation and reasonable attorneys' fees and expenses) incurred or suffered by the other party as a result of such failure or breach.  The provisions of Sections 6.01 and 7.04, this Section 11.02 and Article 12 shall survive any termination hereof pursuant to Section 11.01 or 12.12.

ARTICLE 12
MISCELLANEOUS

Section 12.01. *Notices*.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission and electronic mail ("**e-mail**") transmission) and shall be given,

if to Buyer, to:

> Opes Resources Inc.
> P.O. Box 247
> 5600 BSG Drive, Suite 129
> Wise, Virginia 24293
> Attention: Gary Smith
> E-mail: gsmith@opesresources.com

with a copy to:

> John R. Rhorer, Jr.
> Dinsmore & Shohl LLP
> Lexington Financial Center
> 250 West Main Street, Suite 1400
> Lexington, KY 40507
> Phone No.:  859-425-1000
> Facsimile No.:  859-425-1099
> E-mail: john.rhorer@dinsmore.com

if to Seller, to:

> James River Coal Company
> 901 E. Byrd Street, Suite 1600
> Richmond, VA. 23219
> Attention: Gary G. White
> E-mail: gary.white@jamesrivercoal.com

30

with a copy to:

> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attention: Brian M. Resnick
>             Michael Davis
> Facsimile No.: (212) 701-5800
> E-mail: brian.resnick@davispolk.com
>         michael.davis@davispolk.com

or such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto.  All notices and other communications given in accordance with the provisions of this Agreement shall be deemed to have been given and received when delivered by hand or transmitted by facsimile (with confirmation of transmission) or e-mail, three Business Days after the same are sent by certified or registered mail, postage prepaid, return receipt requested or one Business Day after the same are sent by a reliable overnight courier service, with acknowledgement of receipt.

Section 12.02. *Survival*.  The representations, warranties and agreements contained herein and in any certificate or other writing delivered pursuant hereto shall not survive the Closing, except for the agreements which by their terms are to be performed by the parties following the Closing (including, for the avoidance of doubt, Sections 7.03, 9.05 and 9.06).

Section 12.03. *Amendments and Waivers*.  (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.04. *Expenses*.  Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

Section 12.05. *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

31

Section 12.06. *Governing Law*. This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

Section 12.07. *Jurisdiction*. To the fullest extent permitted by Applicable Law, the parties hereto (a) agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought (i) in the Bankruptcy Court, if brought prior to the entry of a final decree closing the Bankruptcy Case and (ii) in the United States District Court for the Southern District of New York or any New York State court sitting in New York City (the "**New York Courts**"), if brought after entry of such final decree closing the Bankruptcy Case, and shall not be brought, in each case, in any other state or federal court in the United States, (b) agree to submit to the exclusive jurisdiction of the Bankruptcy Court or the New York Courts, as applicable, pursuant to the preceding clauses (a)(i) and (a)(ii), for purposes of all suits, actions or proceedings arising out of, or in connection with this Agreement or the Transaction Documents or the transactions contemplated hereby and thereby, (c) waive and agree not to assert any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 12.01 shall be deemed effective service of process on such party.

Section 12.08. *WAIVER OF JURY TRIAL*. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.09. *Counterparts; Effectiveness; Third Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

32

Section 12.10.  *Entire Agreement*.  This Agreement, the Transaction Documents and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

Section 12.11.  *Bulk Sales Laws*.  Buyer and Seller each hereby waive compliance by Seller with the provisions of the "bulk sales," "bulk transfer" or similar laws of any state.

Section 12.12.  *Severability*.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 12.13.  *Disclosure Schedules*.  Seller has set forth information on the Disclosure Schedule in a section thereof that corresponds to the section of this Agreement to which it relates.  A matter set forth in one section of a Schedule need not be set forth in any other section so long as its relevance to such other section of the Schedule or section of the Agreement is reasonably apparent on the face of the information disclosed therein to the Person to which such disclosure is being made.  The parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Buyer and (ii) the disclosure by Seller of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

Section 12.14.  *Specific Performance*.  The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

33

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**JAMES RIVER COAL COMPANY**, on behalf of Seller

By: _____

Name: SAMUEL M. HOPKINS

Title: VICE PRESIDENT

**OPES RESOURCES INC.**, on behalf of Buyer

By: _____

Name: Gary J Smith

Title: President To KEO

**EXHIBIT A**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of [●], 2014, between James River Coal Company, a Virginia corporation ("**Seller**"), and [BUYER], a [●] corporation ("**Buyer**").

### W I T N E S S E T H :

WHEREAS, Buyer and Seller have concurrently herewith consummated the purchase by Buyer of the Purchased Assets pursuant to the terms and conditions of the Asset Purchase Agreement dated [●], 2014 between Buyer and Seller, (the "**Asset Purchase Agreement**"; terms defined in the Asset Purchase Agreement and not otherwise defined herein being used herein as therein defined);

WHEREAS, pursuant to the Asset Purchase Agreement, Buyer has agreed to assume certain liabilities and obligations of Seller with respect to the Purchased Assets and the Purchased Business;

NOW, THEREFORE, in consideration of the sale of the Purchased Assets and in accordance with the terms of the Asset Purchase Agreement, Buyer and Seller agree as follows:

1.      (a) Seller does hereby sell, transfer, assign and deliver to Buyer all of the right, title and interest of Seller in, to and under the Purchased Assets; *provided* that no sale, transfer, assignment or delivery shall be made of any or any material portion of any Purchased Asset if an attempted sale, assignment, transfer or delivery, without the consent of a third party, would constitute a breach or other contravention thereof or in any way adversely affect the rights of Buyer or Seller thereunder (after giving effect to the Sale Order).

(b)      Buyer does hereby accept all the right, title and interest of Seller in, to and under all of the Purchased Assets (except as aforesaid) and Buyer assumes and agrees to pay, perform and discharge promptly and fully when due all of the Assumed Liabilities and to perform all of the obligations of Seller to be performed under the Assumed Contracts except to the extent liabilities thereunder constitute Excluded Liabilities.

2.      This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

3.      This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**JAMES RIVER COAL COMPANY**, on behalf of Seller

By: _____
       Name:
       Title:

**OPES RESOURCES INC.**, on behalf of Buyer

By: _____
       Name:
       Title:

**DISCLOSURE SCHEDULE**

to the

**ASSET PURCHASE AGREEMENT**

dated as of

June 3, 2014

by and among

**OPES RESOURCES, INC.**

and

**JAMES RIVER COAL COMPANY**
and certain of its Subsidiaries

## <u>INTRODUCTION</u>

Reference is made to the Asset Purchase Agreement (the "**Agreement**") dated as of June 3, 2014 between Opes Resources, Inc., an Ontario (Canadian) corporation ("**Buyer**"), and James River Coal Company, a Virginia corporation ("**Seller**").  Capitalized terms used, but not otherwise defined, herein shall have the respective meanings ascribed to such terms in the Agreement.

This Disclosure Schedule and the information and disclosures contained herein are intended to qualify and limit the representations, warranties and covenants of Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any such representations, warranties or covenants.  This Disclosure Schedule is not intended to constitute, and shall not be construed as constituting, representations, warranties, covenants or agreements of Seller or any of its Affiliates, except as and to the extent provided in the Agreement.

Seller has set forth information on this Disclosure Schedule in a section thereof that corresponds to the section of the Agreement to which it relates.  A matter set forth in one section of this Disclosure Schedule need not be set forth in any other section so long as its relevance to such other section of this Disclosure Schedule or section of the Agreement is reasonably apparent on the face of the information disclosed therein to the Person to which such disclosure is being made.  Buyer and Seller acknowledge and agree that (i) the Schedules to this Disclosure Schedule may include certain items and information solely for informational purposes for the convenience of Buyer and (ii) the disclosure by Seller of any matter in this Disclosure Schedule shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of the Agreement or that the matter is material.

The information contained in this Disclosure Schedule is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party thereto to any third party of any matter whatsoever, including of any violation of Applicable Law or breach of any agreement.  All references in this Disclosure Schedule to the enforceability of agreements with third parties, the existence or non-existence of third-party rights, the absence or existence of breaches or defaults by Seller or third parties, or similar matters or statements, are intended only to allocate rights and risks among Seller and Buyer and are not intended to be admissions against interests, give rise to any inference or proof of accuracy or be admissible against any party to the Agreement by or in favor of any Person who is not a party to the Agreement.

Headings have been inserted on the sections of this Disclosure Schedule for convenience of reference only and shall not have the effect of amending or changing the express description of the sections set forth in the Agreement.

<u>Schedule 1.01(a)(i)</u>

**Knowledge of the Buyer**

Gary J. Smith
Darryl Levitt

Schedule 1.01(a)(ii)

**Knowledge of the Seller**

Randall K. Taylor
William Spears
Matthew Belcher
John Bevins

<u>Schedule 1.01(a)(iii)</u>

**Existing Financial Assurances**

| BOND NUMBER | PRINCIPAL | OBLIGEE | BOND TYPE | BOND AMOUNT | EFF. DATE | EXP. DATE | DESCRIPTION |
|---|---|---|---|---|---|---|---|
| 1065261 | McCoy Elkhorn Coal Corporation | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $ 39,200.00 | 7/1/2013 | 7/1/2014 | Permit No. 498-5393, Inc. #1, 2.1700 Acres, Pike County, KY |
| 1065262 | McCoy Elkhorn Coal Corporation | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $296,900.00 | 7/1/2013 | 7/1/2014 | Permit No. 498-5393, Inc. #2, 7.5600 Acres, Pike County, KY |
| 1065263 | McCoy Elkhorn Coal Corporation | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $ 97,500.00 | 7/1/2013 | 7/1/2014 | Permit No. 498-5393, Inc. #3, 20.5000 Acres, Pike County, KY |
| 1092534 | McCoy Elkhorn Coal Corporation | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $ 75,000.00 | 4/24/2014 | 4/24/2015 | Permit #836-5396 Incr#3, 15.69 acres in Floyd County |
| 1065264 | McCoy Elkhorn Coal Corporation | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $250,000.00 | 7/1/2013 | 7/1/2014 | Permit No. 836-5396, Inc. #1, 50.88 Acres, Floyd/Pike Counties, KY |
| 011-003473 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $109,700.00 | 6/15/2011 | 6/15/2014 | PERMIT NO. 898-0885, INC. #1 |
| 011-003469 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $11,500.00 | 6/15/2011 | 6/15/2014 | PERMIT NO. 898-0885, INC. #2 |
| 011-003472 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $70,200.00 | 6/15/2011 | 6/15/2014 | PERMIT NO. 898-0885, INC. #2 |
| 011-003470 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $198,600.00 | 6/15/2011 | 6/15/2014 | PERMIT NO. 898-0885, INC. #3 |
| 011-003474 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $204,500.00 | 6/15/2011 | 6/15/2014 | PERMIT NO. 898-0885, INC. #3 |
| 011-003471 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $3,700.00 | 6/15/2011 | 6/15/2014 | PERMIT NO. 898-0885, INC. #4 |
| 011-001922 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $50,700.00 | 6/18/2007 | 6/18/2014 | PERMIT NO. 898-4032 |
| SUR0015585 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $30,100.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-4032 |
| 011-001543 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $3,600.00 | 9/19/2006 | 9/19/2014 | PERMIT NO. 898-4093 |
| 011-001105 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $34,800.00 | 6/20/2006 | 6/20/2014 | PERMIT NO. 898-4093, INC. #3 |
| 011-001742 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $100.00 | 11/15/2006 | 11/15/2014 | PERMIT NO. 898-4093, INC. #4 |
| SUR0015591 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $45,300.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-4093 |
| SUR0015590 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $75,000.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-4097 |

| BOND NUMBER | PRINCIPAL | OBLIGEE | BOND TYPE | BOND AMOUNT | EFF. DATE | EXP. DATE | DESCRIPTION |
|---|---|---|---|---|---|---|---|
| 011-001544 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $10,000.00 | 9/19/2006 | 9/19/2014 | PERMIT NO. 898-4100, INC. #4 |
| 011-001513 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $182,800.00 | 9/14/2006 | 9/14/2014 | PERMIT NO. 898-4100, INC. #5, AM#3 |
| 011-001514 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $149,100.00 | 9/14/2006 | 9/14/2014 | PERMIT NO. 898-4100, INC. #6, AM#3 |
| 1093497 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $75,800.00 | 10/11/2013 | 10/11/2014 | Permit #898-4100 Incr#1, 19.56 acres in Pike County |
| 1093498 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $1,400.00 | 10/11/2013 | 10/11/2014 | Permit #898-4100 Incr#2, 1.60 acres in Pike County |
| 1093499 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $1,300.00 | 10/11/2013 | 10/11/2014 | Permit #898-4100 Incr#3 Amendment 2, 1.29 acres in Pike County |
| 1093264 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $ 92,300.00 | 6/3/2013 | 6/3/2014 | Permit #898-4100 MR #14, Pike County |
| SUR0018276 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $182,400.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-4152 |
| SUR0018279 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $45,100.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-4237 |
| 011-001906 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $46,200.00 | 6/7/2007 | 6/7/2014 | PERMIT NO. 898-4246 |
| 011-001963 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $120,500.00 | 8/31/2007 | 8/31/2014 | PERMIT NO. 898-4324 |
| SUR0018287 | JOHNS CREEK COAL COMPANY | COMMONWEALTH OF KENTUCKY | License & Permit | $65,400.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-5417 |
| SUR0015582 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $80,100.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-5616, INC. #2 |
| 011-001540 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $35,700.00 | 9/19/2006 | 9/19/2014 | PERMIT NO. 898-5948, INC. #2 |
| 011-001541 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $9,200.00 | 9/19/2006 | 9/19/2014 | PERMIT NO. 898-5948, INC. #3 |
| 011-001539 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $9,900.00 | 9/19/2006 | 9/19/2014 | PERMIT NO. 898-5948, INC. 1 |
| SUR0018280 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $10,000.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-8142 |
| SUR0018283 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $155,800.00 | 2/17/2012 | 2/17/2015 | PERMIT NO. 898-8163 (TRANSFER) |
| 011-002446 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $50,000.00 | 11/4/2009 | 11/4/2014 | PERMIT NO. 898-9117 |
| 011-002447 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $50,000.00 | 11/4/2009 | 11/4/2014 | PERMIT NO. 898-9117 |

2

| BOND NUMBER | PRINCIPAL | OBLIGEE | BOND TYPE | BOND AMOUNT | EFF. DATE | EXP. DATE | DESCRIPTION |
|---|---|---|---|---|---|---|---|
| 011-002216 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $546,800.00 | 6/20/2008 | 6/20/2014 | PERMIT NO. 898-9117, INC. #1 |
| 011-002217 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $75,100.00 | 6/20/2008 | 6/20/2014 | PERMIT NO. 898-9117, INC. #2 |
| 011-002218 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $107,300.00 | 6/20/2008 | 6/20/2014 | PERMIT NO. 898-9117, INC. #3 |
| 011-002219 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $79,600.00 | 6/20/2008 | 6/20/2014 | PERMIT NO. 898-9117, INC. #4 |
| 011-002220 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $27,200.00 | 6/20/2008 | 6/20/2014 | PERMIT NO. 898-9117, INC. #5 |
| 011-002221 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $41,200.00 | 6/20/2008 | 6/20/2014 | PERMIT NO. 898-9117, INC. #6 |
| 011-002454 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Reclamation - Coal | $3,700.00 | 11/17/2009 | 11/17/2014 | PERMIT NO. 898-9117, INC. #7 |
| 011-003572 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $169,600.00 | 5/4/2012 | 5/4/2015 | PERMIT NO. 898-9135 |
| 011-001841 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Excess Weight and Other Highway and Street Permits | $5,000.00 | 2/28/2007 | 2/28/2015 | ENCROACHMENT PERMIT BOND |
| 011-002956 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | Excess Weight and Other Highway and Street Permits | $250,000.00 | 12/16/2010 | 12/16/2014 | ENCROACHMENT PERMIT BOND |
| SUR0015593 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $25,000.00 | 2/17/2014 | 2/17/2015 | ENCROACHMENT PERMIT NO. 12-0075-00 |
| SUR0015594 | MCCOY ELKHORN COAL CORPORATION | COMMONWEALTH OF KENTUCKY | License & Permit | $25,000.00 | 2/17/2014 | 2/17/2015 | ENCROACHMENT PERMIT NO. 12-0074-00 |

3

<u>Schedule 1.01(a)(iv)</u>

**Permitted Liens**

Amended and Supplemental Sublease Agreement dated January 17, 1997 between
Johns Creek Coal Company and Citation Coal Corporation  Grace Call, Elkhorn
Coal Corporation, Owen Young and Bradley Properties)

Schedule 2.01(a)

**Purchased Real Property**

**Owned Property:**

1.    That certain Deed of Conveyance dated August 1, 1992 by and between Alma Land Company and Johns Creek Coal Company, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 666, Page 31;

2.    That certain Deed of Conveyance dated April 5, 1971 by and between Inez Syck Scott and Homer Scott, her husband and Call & Ramsey Coal Company (said company merged with Johns Creek Coal Company), which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 502, Page 449;

3.    That certain Deed of Conveyance dated March 4, 1999 by Frank Donald Varney, et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 767, Page 288;

4.    That certain Deed of Conveyance dated June 17, 1997 by and between Josephine Adkins and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 743, Page 751;

5.    That certain Deed of Conveyance dated June 17, 1997 by and between Ronnie Adkins and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 743, Page 741;

6.    That certain Deed of Conveyance dated June 17, 1997 by and between Larry Ray and Linda Ray, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 743, Page 744;

7.    That certain Deed of Conveyance dated June 17, 1997 by and between Johnny Ray, et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the

Pike County Court Clerk's Office in Deed Book 743, Page 747;

8.  That certain Deed of Conveyance dated November 17, 1997 by and between Pike County Resources, Inc. and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 745, Page 793;

9.  That certain Deed of Conveyance dated April 20, 1993 by and between Canada Coal Company, Inc. and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 675, Page 803;

10.  That certain Deed of Conveyance dated September 6, 2001 by and between Burnetta Hall and Tommy Hall, her husband and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Floyd County Court Clerk's Office in Deed Book 464, Page 353;

11.  That certain Deed of Conveyance dated January 27, 2003 by and between Fred Jack Varney and Betty Varney, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 68;

12.  That certain Deed of Conveyance dated November 10, 2004 by and between Johns Creek Processing Company and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 860, Page 321;

13.  That certain Deed of Conveyance dated November 10, 2004 by and between Johns Creek Processing Company and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 860, Page 324;

14.  That certain Deed of Conveyance dated April 20, 2005 by and between Johns Creek Elkhorn Coal Corporation and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 869, Page 289;

2

15.     That certain Deed of Conveyance dated March 23, 2006 by and between Clyde Justice, Trustee of Zetta Justice Family Trust, et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 885, Page 274;

16.     That certain Deed of Conveyance dated April 28, 2006 by and between Henry Porter and Joyce A. Porter, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Floyd County Court Clerk's Office in Deed Book 525, Page 74;

17.     That certain Deed of Conveyance dated April 3, 1997 by and between Betty Patterson, a single woman and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 736, Page 234;

18.     That certain Deed of Conveyance dated April 9, 1997 by and between Janiv Blackburn, a widow and Jess David Blackburn, single and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 736, Page 229;

19.     That certain Deed of Conveyance dated April 3, 1997 by and between Sherry Phillips, a single woman and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 736, Page 242;

20.     That certain Deed of Conveyance October 17, 1997 by and between Pike County Resources, Inc. and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 745, Page 789; and

21.     That certain Deed of Conveyance dated October 28, 1998 by and between Bruce Frederick Cool, et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 760, Page 229.

Schedule 2.01(b)
**Personal Property**

1.    Main Office Building - 62 foot by 63 foot, metal and brick (1/2 story second floor) Office Building located at 1148 Long Fork Road, Kimper, Kentucky 41539 (the "**Office Building**").

2.    Warehouse No. 1 – 110 foot by 50 foot steel structure, second floor, located near the Office Building.

3.    Warehouse No. 2 – 330 foot by 18 foot warehouse shed located near the Office Building.

4.    Safety Building – 48 foot by 24 foot brick house located adjacent to the Office Building.

Schedule 2.01(e)
**Assumed Contracts**
**(followed by Cure Costs as to certain Assumed Contracts)**

**Leases:**

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| W.W. Burnette Heirs | 40 | Lease - U/G | Unassigned |
| Lula Ray | 72 | Lease - U/G | Mine 17 |
| Earnest Fields | 98 | Surface Agreement | Mine 15/16 |
| Trent Heirs | 102 | Lease - U/G | Mine 15 |
| Seth McCoy | 103 | Lease - U/G | Mine 15 |
| Bob Justice | 114 | Lease - U/G | Mine 16A |
| Utility Coal Co. - Bob Ratliff | 118 | Lease - U/G | Mine 15 |
| East Kentucky Energy-Clyde M Ray | 119 | Lease - U/G | Mine 17 |
| Gene Stepp (8/98) | 120 | Lease - U/G & Surface | Mine 22 |
| G. C. Rowe Heirs (11/24/99) | 127 | Lease - U/G | Mine 22 |
| Oscar and Sandra Blackburn | 129 | Surface Agreement | Mine 16 |
| Baird et al | 130 | Lease - U/G | Mine 16 |
| Appalachian Land | 134 | Lease - U/G | Unassigned |
| Appalachian Land/ Alma Land | 135 | Lease - U/G | Mine 16 |

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| Picklesimer | 145 | Lease - U/G | Mine 16 |
| Winifred Blackburn (Michael Davis) | 167 | Lease - U/G | Mine 16A |
| Appalachian Land/Alma (Glamorgan) | 171 | Lease - U/G | Mine 15 |
| Jack & Ruby Bartley | 178 | Lease - U/G | Mine 16 |
| Delores Tabor | 183 | Lease - Surface | Unassigned |
| Fon Taylor | 186 | Lease - U/G | Mine 16A |
| Doris Williamson | 188 | Lease - U/G | Mine 15 |
| Marion Walker | 193 | Lease - U/G | Unassigned |
| Big Sandy M2.467 | 194 | Lease - U/G | Mine 15 |
| Terry G Young | 195 | Lease - U/G | Mine 17 |
| Elkhorn Coal #907 | 196 | Lease - U/G | Mine 15/16A/27 |
| Corbett Salisbury | 197 | Lease - U/G | Mine 16A |
| Marie Leslie et al | 198 | Lease - U/G | Mine 23 |
| Hatcher Trimble Trust | 199 | Lease - U/G | Mine 23 |
| Scott Heirs | 200 | Lease - U/G | Mine 22 |
| Sally & Barbara Williamson | 201 | Lease - U/G | Mine 17 |

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| Brookwood/Jetta Stratton | 202 | Lease - U/G | Mine 27 |
| East Kentucky Energy (ICG) | 206 | Lease - U/G | Mine 23 |
| Fairview Land Company/Kinzer Inv | 207 | Lease - U/G & Surface | Mine 23 |
| Buery Heirs | 208 | Lease - U/G | Mine 23 |
| York Lowe | 209 | Lease - Surface | Unassigned |
| Rush Scott | 210 | Lease - U/G | Mine 27 |
| Harvey Phillips | 211 | Lease - U/G | Unassigned |
| Weddington Heirs | 212 | Lease - U/G | Mine 23 |
| Betty Thompson et al | 213 | Lease - U/G | Mine 23 |
| Leroy Syck | 214 | Lease - U/G | Mine 27 |
| Burgess Smith | 219 | Lease - U/G | Mine 15 |
| Ann Carty | 222 | Lease - U/G | Mine 15 |
| Darryl Gooslin | 223 | Lease - U/G | Unassigned |
| Brookwood/Wilson (Millard) | 224 | Lease - U/G | Mine 15 |
| Elkhorn #1016 | 230 | Lease - U/G | Mine 23 |
| Roadrunner Land LLC | 233 | Lease - U/G | Mine 30 & 33 |
| Queen/Ward | 236 | Lease - U/G | Mine 16A |
| Mary Hatfield et al | 238 | Lease - U/G | Mine 15 |
| Appalachian Land Company | 239 | Lease - U/G | Mine 17 |
| Eugene King | 240 | Lease - U/G | Mine 15 |
| Joe B Smith Heirs | 241 | Lease - U/G | Mine 30 & 33 |
| Linda Young Hunt | 245 | Lease - Surface | Mine 16 |

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| Thomas B Smith Estate | 247 | Lease - U/G | Mine 30 & 33 |
| Szelog/Caudill | 251 | Lease - U/G | Mine 25B |
| CSX Transportation | 253 | Lease - U/G | Mine 15 |
| Hope Trent et al | 260 | Lease - U/G | Mine 15 |
| Zetta Thompson et al | 262 | Lease - U/G | Mine 15 |
| Mary Syck et al | 263 | Lease - U/G | Mine 15 |
| Zettie Thompson | 265 | Lease - U/G | Mine 15 |
| Eugene King | 266 | Lease - U/G | Mine 15 |
| Jefferson Taylor | 268 | Lease - U/G | Mine 15 |
| Anna Maynard | 269 | Lease - U/G | Mine 15 |
| Fannie Bevins | 270 | Lease - U/G | Mine 15 |

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| John Pinson | 271 | Lease - U/G | Mine 15 |
| Sadie Dotson (Bob Justice) Millard | 276 | Lease - U/G | Mine 15 |
| Better Rental Inc | 277 | Lease - U/G | Mine 15 |
| Thomas Roop | 281 | Lease - U/G | Mine 15 |
| Joan Webb | 282 | Lease - U/G | Mine 15 |
| Bill Meade | 285 | Lease - U/G | Mine 15 |
| Bilton Maynard | 286 | Lease - U/G | Mine 15 |
| Teddy Varney | 287 | Lease - U/G | Mine 15 |
| Arnold Maynard etal | 288 | Lease - U/G | Mine 15 |
| James Stanley | 289 | Lease - U/G | Mine 15 |
| Ricky & Debra Taylor | 290 | Lease - U/G | Mine 15 |
| Robert Lennon | 291 | Lease - U/G | Mine 16A |
| Arnold O Smith | 294 | Lease - U/G | Mine 17 |
| Thomas B Ratliff | 295 | Lease - U/G | Mine 15 |
| Otis Howard | 297 | Lease - U/G | Mine 16A |
| Noah Mullins | 298 | Lease - U/G | Mine 23 |
| Susan Evans | 298 | Lease - U/G | Mine 23 |
| Adams Heirs | 299 | Lease - U/G | Mine 16A |
| Weddington Heirs | 300 | Lease - U/G | Mine 16A |
| Deanna Hurley | 301 | Lease - U/G | Mine 15 |
| Elk Horn #1108 | 302 | Lease - U/G | Mine 16A |
| Angela & Paul Adams | 303 | Lease - U/G | Mine 16A |
| Justine Bradford | 304 | Lease - U/G | Mine 16A |
| Thelma Blackburn | 306 | Lease - U/G | Mine 16A |
| Wilson Kirk | 307 | Lease - U/G | Mine 15 |
| Horn Heirs | 309 | Lease - U/G | Mine 23 |

| Lease Name | Lease # | Type | Assigned To |
|---|---|---|---|
| Brookwood/Jean Wilson | 181-1 | Lease - U/G | Mine 16 |
| Mary Pfieffer | 269-2 | Lease - U/G | Mine 15 |
| Hiram G Williamson | 269-3 | Lease - U/G | Mine 15 |
| James M Bevins | 269-4 | Lease - U/G | Mine 15 |
| Lennon/Blankenship/Davis/Justice | 291-2 | Lease - U/G | Mine 16A |
| Big Sandy M2.454 | | Lease - U/G | Mine 16 |
| TB May Farm (Wheeler/Thompson) | | Lease - U/G & Surface | Unassigned |

3

| Lease Name | Lease # | Type | Assigned To |
|------------|---------|------|-------------|
| Ollie and June Bevins | 1 | Surface Agreement | Unassigned |
| Tom G. and Louise Bevins | 3 | Surface Agreement | Unassigned |
| William and Betty Blackburn | 6 | Surface Agreement | Unassigned |
| J.F. Baird, Trustee for Chloe B. Learey Trust | 70 | Surface Agreement | Unassigned |
| Rebecca Hopkins | 9 | Surface Agreement | Unassigned |
| Allen and Stella Marcum | 38 | Surface Agreement | Unassigned |
| Dora Maynard and James Ferrell | 10 | Surface Agreement | Unassigned |
| Bufford and Mazola Reed | 14 | Surface Agreement | Unassigned |
| Dovie Sartin | 15 | Surface Agreement | Unassigned |
| J.C. and Audra Young | 18 | Surface Agreement | Unassigned |
| T.O. Young | 53 | Surface Agreement | Unassigned |
| Owen T. Young | 54 | Surface Agreement | Unassigned |
| R. Seth McCoy | 6 | Lease – U/G | Mine 16A |
| KYBC Land Corporation | 13 | Lease – U/G | Mine 16/16A |
| The Elk Horn Coal Corporation | 8 | Lease – U/G & Surface | Unassigned |
| Bradley and Liza Ray | 10 | Lease – U/G | Mine 16/16A |
| Owen T. Young | 15 | Lease – U/G | Mine 16/16A |
| T.O. Young | 30 | Lease – U/G | Unassigned |

## Railroad Contracts and Agreements:

1.      Agreement No. CO L40357, Dated September 12, 1983, Crossing-Private Roadway

2.      Agreement No. CO L45268, Dated March 1, 1985, Real Estate/Land Only;

3.      Agreement No. CSX019815, Dated August 1, 1993, Land Only;

4.      Agreement No. CSX029143, Dated July 8, 1996, Track Lease/Loading/Unloading.

## Other Agreements:

1.      Above Grade Airspace Agreement dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation, for the Mine #16 overland conveyor described as *"One corridor 8 feet in width across the right of way and centerline of Kentucky 194 at Mile Point 18.93"*.

2.      Above Grade Airspace Agreement dated June 24, 2005, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation, for the Mine #15

4

overland conveyor described as *"One corridor width approximately 195 feet along the full right of way and width of Kentucky 194 beginning at Mile Point 19.12"*.

3.  Encroachment Permit #12-0229-10 dated February 2, 2011, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation.

4.  A portion of the property covered by the Surface Lease Agreement dated December 9, 1999 by and among Johns Creek Elkhorn Coal Corporation and McCoy Elkhorn Coal Corporation, known therein collectively as "Lessor," and Berkeley Energy Corporation.

**Sublease on which Seller or a Subsidiary of Seller is a Lessor/Sublessor:**

1.  Amended and Supplemental Sublease Agreement dated January 17, 1997 between Johns Creek Coal Company and Citation Coal Corporation  Grace Call, Elkhorn Coal Corporation, Owen Young and Bradley Properties)

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| ALICE JANE ADKINS<br>POA FOR JEFFERSON FRANKLIN TAY<br>405 YEAGER AVENUE<br>WILLIAMSON, WV 25661 | Lease #268 JeffersonTaylor | McCoy Elkhorn Coal Corporation | $1,000.00 | Opes Resources Inc. |
| ALICE RIVARD<br>15360 PHEASANT RUN<br>SOUTHGATE, MI 48195 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| ALMA LAND COMPANY<br>750 TOWN MOUNTAIN ROAD<br>PIKEVILLE, KY 41501-0000 | Lease #171, #170 Alma Land | McCoy Elkhorn Coal Corporation | $83,569.39 | Opes Resources Inc. |
| ANDREW B. SAUNDERS<br>1106 FAIRWAY DRIVE<br>CHESAPEAKE, VA 23320 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $10.38 | Opes Resources Inc. |
| ANITA MAYNARD<br>502 EVANS AVENUE<br>MIAMISBURG, OH 45342 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| ANN E CARTY<br>180 RIVERVIEW DRIVE<br>PIKEVILLE, KY 41501 | Lease #222 Ann Carty | McCoy Elkhorn Coal Corporation | $6,000.00 | Opes Resources Inc. |
| ANNETTE & KEITH GUTTORMSEN<br>16 SWAN STREET<br>CALAIS, ME 04619-1425 | Lease #211 Harvey Phillips | McCoy Elkhorn Coal Corporation | $125.00 | Opes Resources Inc. |
| APPALACHIAN LAND COMPANY<br>750 TOWN MOUNTAIN ROAD<br>PIKEVILLE, KY 41501 | Lease #239 Appalachian Land | McCoy Elkhorn Coal Corporation | $18,985.06 | Opes Resources Inc. |
| BALLARD FRIEND<br>3617 PINECREST CR.<br>DULUTH, GA 30096 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $369.83 | Opes Resources Inc. |
| BALLARD W CASSADY LIFE TENANT<br>C/O MR BALLARD W CASSADY JR<br>& MR BEN CASSADY ATTYS IN FACT<br>143 WALNUT DRIVE<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $1,333.33 | Opes Resources Inc. |
| BARBARA FRAZURE<br>2029 KY ROUTE 979<br>HAROLD, KY 41635 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $61.63 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| BARBARA THACKER<br>235 SCOTT FORK<br>PIKEVILLE, KY 41501 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| BENNETT WEST<br>PO BOX 29<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $116.66 | Opes Resources Inc. |
| BETTY BEVINS<br>74 BEVINS LANE<br>PIKEVILLE, KY 41501-3508 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| BETTY FRANCIS JOHNSON<br>181 WEST KEYSER HEIGHTS<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $89.89 | Opes Resources Inc. |
| BETTY JAMES<br>302 GLOUCESTER AVENUE<br>PORTSMOUTH, VA 23702 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.46 | Opes Resources Inc. |
| BETTY JANE HALL<br>PO BOX 2316<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| BEVERLY HAUN<br>922 KERNS AVENUE<br>LEBANON, OH 45036 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $100.00 | Opes Resources Inc. |
| BIG SANDY COMPANY, LP<br>PO BOX 566<br>PIKEVILLE, KY 41502 | Lease #194 Big Sandy $348,837.15, Lease #146 Big Sandy M2.454 $183,013.32 | McCoy Elkhorn Coal Corporation | $531,850.47 | Opes Resources Inc. |
| BILLIE SUSAN HATFIELD<br>225 BAKER AVENUE<br>HAZARD, KY 41749 | Lease #238 Mary Hatfield etal | McCoy Elkhorn Coal Corporation | $500.00 | Opes Resources Inc. |
| BLANCHE MAYNARD<br>7161 ZEBULON HIGHWAY<br>PIKEVILLE, KY 41501 | Lease #288 Arnold Maynard etal | McCoy Elkhorn Coal Corporation | $422.86 | Opes Resources Inc. |
| BRADLEY AND MARY ELLEN ADKINS<br>9961 ALLEN POINTE DRIVE<br>ALLEN PARK, MI 48101 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $30.82 | Opes Resources Inc. |
| BRANDON L. BEVINS<br>195 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $44.44 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
| --- | --- | --- | --- | --- |
| BRIAN AND AMANDA MULLINS<br>996 BEVERLY DRIVE<br>ABINGDON, VA 24210 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $154.09 | Opes Resources Inc. |
| BRIAN R ELLIOTT<br>22 SPENCER DRIVE<br>MORRISTOWN, NJ 07960 | Lease #102, #117 Trent | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| BROOKWOOD WILSON<br>C/O JOHN S BEVINS<br>195 SCOTT FORK RD<br>PIKEVILLE, KY 41501 | Lease #226 Brookwood/Wilson | McCoy Elkhorn Coal Corporation | $12,000.00 | Opes Resources Inc. |
| BRYAN JOHN BOBINCHUCK<br>49 COBBLESTONE COURT<br>HILTON HEAD, SC 29928 | Lease #15, #19 Owen T Young | Johns Creek Coal Company | $500.00 | Opes Resources Inc. |
| CARL T BEVINS<br>331 NORTH LINCOLN PARK<br>WARSAW, IN 46582 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |
| CARLA FIELDS<br>PO BOX 3202<br>PIKEVILLE, KY 41502 | Lease #288 Arnold Maynard etal | McCoy Elkhorn Coal Corporation | $422.85 | Opes Resources Inc. |
| CAROL SMITH FERRELL<br>PO BOX 11<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $23.80 | Opes Resources Inc. |
| CAROLYN A. SMITH<br>1312 SYCAMORE COURT<br>CHARLOTTESVILLE, VA 22901 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $577.88 | Opes Resources Inc. |
| CAROLYN FRIEND AND ALAN BESSON<br>130 PRESTWICK DRIVE<br>GEORGETOWN, KY 40324 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $123.27 | Opes Resources Inc. |
| CATHERINE NEWMAN<br>1360 GRISTMILL DRIVE<br>CHARLOTTESVILLE, VA 22902-7201 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $15.88 | Opes Resources Inc. |
| CHARLES AND FAYE VANHOOSE<br>149 THOMPSON ROAD<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| CHARLES BUSH<br>101 WIMBLEDON<br>FRANKFORT, KY 40601 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $6,102.45 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| CHARLES J BAIRD<br>PO BOX 351<br>PIKEVILLE, KY 41502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| CLAIRE L LESZCZYNSKI<br>16071 EUCLID AVE<br>ALLEN PARK, MI 48101 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $100.00 | Opes Resources Inc. |
| CLARRISA & DAVID SCALF<br>PO BOX 411<br>SIDNEY, KY 41564 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $33.34 | Opes Resources Inc. |
| CLYDE CALVIN & GINGER RAY<br>5124 RIGHT FORK OF BRUSHY RD<br>VERNEY, KY 41571 | Lease #119, #123 Clyde M Ray | McCoy Elkhorn Coal Corporation | $1,000.00 | Opes Resources Inc. |
| CLYDE DAWSON RAMSEY<br>1121 NANDINO COURT<br>TALLAHASSEE, FL 32308 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $222.22 | Opes Resources Inc. |
| CLYDE TAYLOR JR<br>PO BOX 3226<br>PIKEVILLE, KY 41501-0000 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,340.57 | Opes Resources Inc. |
| DAN STAMPER, JR.<br>PO BOX 801<br>PIKEVILLE, KY 41502 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| DANIEL LESLIE BUTLER<br>3041 SOUTH FREEMAN ROAD<br>WILLIAMSBURG, VA 23185 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $41.50 | Opes Resources Inc. |
| DANITA AND RALPH EASTER<br>120 HIGLAWN HEIGHTS<br>RIPLEY, WV 25271 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $308.20 | Opes Resources Inc. |
| DANNY SIMPSON<br>269 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #162 ANNA MAYNARD | McCoy Elkhorn Coal Corporation | $0.00 | Opes Resources Inc. |
| DARRELL GOOSLIN<br>2349 STONE COAL RD.<br>PIKEVILLE, KY 41501 | Lease #223 Darryl Gooslin | McCoy Elkhorn Coal Corporation | $500.00 | Opes Resources Inc. |
| DAVID & ROSE BEVINS<br>124 LEFT FORK UPPER CHLOE RD.<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $4.27 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
| --- | --- | --- | --- | --- |
| DAVID H AND DARLENE TRENT<br>301 MADDOX PLACE<br>CANTON, GA 30114 | Lease #102, #117 Trent | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| DAVID LEE MAYNARD<br>PO BOX 599<br>IRONTON, OH 45638-0599 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.66 | Opes Resources Inc. |
| DAVID RUNYON<br>PO BOX 25<br>CANADA, KY 41519-0025 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $47.63 | Opes Resources Inc. |
| DEBORAH & BILLY SPARKS<br>1737 MEADOW RIDGE CIRCLE<br>SEVIERVILLE, TN 37862 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $33.34 | Opes Resources Inc. |
| DEBORAH L. AND CHARLES SCAGGS<br>295 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| DELORES & LEROY TABOR<br>PO BOX 394<br>GATLINBURG, TN 37738 | Lease #183 Delores Tabor | McCoy Elkhorn Coal Corporation | $1,200.00 | Opes Resources Inc. |
| DONNIE AND ZONDA BEVINS<br>250 GRIGGS ROAD<br>WACO, KY 40385 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $6.82 | Opes Resources Inc. |
| DOROTHY HALL<br>146 HAPPY VALLEY ROAD<br>SOUTH WILLIAMSO, KY 41503 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| DOUGLAS C AND JUDITH BEVINS<br>10924 BENT BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| DOUGLAS MACK JUSTICE<br>2012 HART RD.<br>LEXINGTON, KY 40502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $4,000.00 | Opes Resources Inc. |
| DREXEL L AND MARY BEVINS<br>3850 CARRINGTON WAY<br>HAMILTON, OH 45011 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| EARNEST & GEORGIA FIELDS<br>896 STATE HIGHWAY 194 W<br>PIKEVILLE, KY 41501-0000 | Lease #98 Earnest & Georgia Fields | McCoy Elkhorn Coal Corporation | $75.00 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| EDITH J HUBER<br>3901 GREEN HAVEN LANE<br>GOSHEN, KY 40026 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $2,000.00 | Opes Resources Inc. |
| EDWARD BEVINS FORRESTER<br>1398 HIGHLAND LANE<br>BEAVERCREEK TNP, OH 45385-7049 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $29.62 | Opes Resources Inc. |
| ELK HORN COAL CORPORATION<br>544 SOUTH LAKE DRIVE<br>PRESTONSBURG, KY 41653 | Lease #196 Elkhorn #907 | McCoy Elkhorn Coal Corporation | $33,364.75 | Opes Resources Inc. |
| ELSA & IRVIN SMITH<br>986 UPPER BLACKBERRY ROAD<br>RAMSON, KY 41558 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $6.82 | Opes Resources Inc. |
| EMMABELLE LESLIE<br>5476 NORTH MAYO TRAIL<br>PIKEVILLE, KY 41501-2957 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,438.28 | Opes Resources Inc. |
| EUGENE KING<br>275 STATE HWY. 194E<br>PIKEVILLE, KY 41501 | Lease #240 Eugene King | McCoy Elkhorn Coal Corporation | $1,200.00 | Opes Resources Inc. |
| EUNICE AND THOMAS PENNYBACKER<br>2559 GARAZI STREET<br>TRACEY, CA 95304-5843 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $308.20 | Opes Resources Inc. |
| EUNICE RUTH AND ROBERT WARD<br>1172 PRITCHARD ROAD<br>KIMPER, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| FON MICHAEL JOHNSON<br>PO BOX 665<br>PIKEVILLE, KY 41502 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $134.83 | Opes Resources Inc. |
| FRANCES CUNNINGHAM LEWIS<br>6284 APPLEGATE CT<br>NORCROSS, GA 30092 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $83.01 | Opes Resources Inc. |
| FRANKLIN D SMITH<br>PO BOX 11<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $11.90 | Opes Resources Inc. |
| GAIL B. WARD<br>2913 RUNNYMEDE WAY<br>LEXINGTON, KY 40503 | Lease #306 Thelma Blackburn | McCoy Elkhorn Coal Corporation | $130.03 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| GENE AND PAT MAYNARD<br>2280 WIENBURG DRIVE<br>MORAINE, OH 45439 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| GINGER P. ROBERTSON<br>PO BOX 862<br>GRUNDY, VA 24614 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $577.88 | Opes Resources Inc. |
| GREGORY & CHERYL HOWARD<br>11200 N. BETHEL RD.<br>MOORESVILLE, IN 46158 | Lease #297 Ottis Howard | McCoy Elkhorn Coal Corporation | $5,000.00 | Opes Resources Inc. |
| H. FRANK HATCHER AND ROGER KEN<br>CO-TRUSTEES OF HATCHER-TRIMBLE<br>PO BOX 1020<br>PIKEVILLE, KY 41502 | Lease #199 Hatcher Trimble Trust | McCoy Elkhorn Coal Corporation | $4,016.85 | Opes Resources Inc. |
| HAROLD & ANN BUSH<br>5009 LUPREESE PLACE<br>VERSAILLES, KY 40383 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $6,102.45 | Opes Resources Inc. |
| HAROLD F AND INA JEAN BOGAR<br>PO BOX 74<br>SIDNEY, KY 41564 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $111.12 | Opes Resources Inc. |
| HAROLDEAN AND RUSSELL CHAPMAN<br>1260 WEDDINGTON BRANCH RD.<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $61.63 | Opes Resources Inc. |
| HELEN B MOORE<br>100 LOMBARDY DRIVE<br>FREDERICKSBURG, VA 22408-1526 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $111.12 | Opes Resources Inc. |
| HELEN S. MUNDY<br>812 STARDALE DRIVE<br>CHESAPEAKE, VA 23322 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $10.34 | Opes Resources Inc. |
| HUBERT & AMANDA HOBSON<br>8718 META HIGHWAY<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| J.C. MULLINS<br>PO BOX 222<br>KIMPER, KY 41539 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $61.63 | Opes Resources Inc. |
| JACK FOSTER & GRACE MULLINS<br>229 KINNIKINICK ROAD<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,130.10 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| JACK HAMILTON SR.<br>139 MAPLE ROAD<br>HAROLD, KY 41635 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| JAMES AND CONNIE RITZ<br>680 HAMBLEY BLVD. APT. 300<br>PIKEVILLE, KY 41501-3803 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $15.88 | Opes Resources Inc. |
| JAMES FLOYD THOMPSON<br>PO BOX 3443<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| JAMES K CULTON<br>30 EAST LAKE DR SE<br>ATLANTA, GA 30317 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $2.31 | Opes Resources Inc. |
| JAMES LARRY BEVINS<br>PO BOX 574<br>PRESTONSBURG, KY 41653-0574 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |
| JAMES LESLIE<br>3427 THOMPSON DR<br>ASHLAND, KY 41102 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $27.67 | Opes Resources Inc. |
| JAMES PATTON RAMSEY, III<br>WILLIAM N. RAMSEY AS POA<br>85 WEDDINGTON BRANCH RD.<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $222.22 | Opes Resources Inc. |
| JAMES S WILLIAMSON<br>1039 MAIN ST. #1<br>WILTON, ME 04294-0000 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $93.74 | Opes Resources Inc. |
| JAMES THOMAS AND SHERRY ROOP<br>651 STATE HIGHWAY 194 EAST<br>PIKEVILLE, KY 41501 | Lease #281 Thomas Roop | McCoy Elkhorn Coal Corporation | $500.00 | Opes Resources Inc. |
| JAMES V. MAYNARD<br>PO BOX 151<br>PEDRO, OH 45659 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.68 | Opes Resources Inc. |
| JAMES W. FRIEND<br>198 ROSEMONT GARDEN<br>LEXINGTON, KY 40503 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| JAMI L. AND WILLIAM OSBORNE<br>224 TOWNSHIP ROAD 344<br>IRONTON, OH 45368-8709 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.66 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| JAMIE RAMEY<br>379 BOONE AVENUE<br>WINCHESTER, KY 40391 | Lease #178 Jack & Ruby Bartley | McCoy Elkhorn Coal Corporation | $71.42 | Opes Resources Inc. |
| JANE BAIRD EVANS<br>PO BOX 351<br>PIKEVILLE, KY 41502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| JANET MARIE PAUL<br>PO BOX 114<br>SOUTH POINT, OH 45680 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $83.34 | Opes Resources Inc. |
| JANIS K. FRIEND<br>858 RIDGEVIEW DRIVE<br>FRANKFORT, KY 40601 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| JANIVE BLACKBURN<br>787 COWPEN ROAD<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $4,314.84 | Opes Resources Inc. |
| JENNIFER L. FRIEND<br>103 CHURCH STREET<br>COLUMBIA, KY 42728 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $123.56 | Opes Resources Inc. |
| JERRY AND CAROLYN BEVINS<br>1436 MUDLICK ROAD<br>HARDY, KY 41531 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $6.82 | Opes Resources Inc. |
| JESSIE EVELYN F. NEWSOME<br>224 SADDLE RIDGE CIRCLE<br>DANVILLE, KY 40422-3216 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $154.09 | Opes Resources Inc. |
| JILL M. CORNELIUS<br>785 S.E. ELWOOD AVE.<br>PORT ST. LUCIE, FL 34983 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,130.10 | Opes Resources Inc. |
| JIMMY AND JUDY LINDON<br>509 SUN VALLEY TERRACE<br>HAZARD, KY 41701 | Lease #238 Mary Hatfield etal | McCoy Elkhorn Coal Corporation | $500.00 | Opes Resources Inc. |
| JIMMY AND TERRA JOHNSON<br>PO BOX 4412<br>PIKEVILLE, KY 41502 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $134.83 | Opes Resources Inc. |
| JOAN AND KENNETH WEBB<br>16525 GRAPEVINE ROAD<br>PHYLLIS, KY 41554 | Lease #282 Joan Webb | McCoy Elkhorn Coal Corporation | $100.00 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| JOAN C & JAMES ASHCRAFT<br>44 MT. DELLA ROAD<br>SPENCER, TN 38585 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| JOE B. RAMSEY<br>354 WEDDINGTON BRANCH RD.<br>SUITE 1<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $888.89 | Opes Resources Inc. |
| JOHN & NANCY BEVINS<br>195 SCOTT FORK<br>PIKEVILLE, KY 41501 | Lease #222 Ann Carty | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| JOHN B. FRIEND<br>5728 BELESKI LANE<br>WAHIAWA, HI 96786 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| JOHN E AND ANGELA MAYNARD<br>1024 COUNTRY ROAD 55<br>IRONTON, OH 45638 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.68 | Opes Resources Inc. |
| JOHN H BAIRD<br>PO BOX 351<br>PIKEVILLE, KY 41502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| JOHN H SCOTT III MD<br>PO BOX 2617<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $666.66 | Opes Resources Inc. |
| JOHN HENRY SMITH<br>PO BOX 458<br>JENKINS, KY 41537-0458 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $177.77 | Opes Resources Inc. |
| JOHN N. AND DEBORAH PINSON<br>PO BOX 230<br>PAINTSVILLE, KY 41240 | Lease #271 John Pinson | McCoy Elkhorn Coal Corporation | $1,000.00 | Opes Resources Inc. |
| JOHNNY & DELANE MULLINS<br>14 MULLINS FIRST ST.<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $308.20 | Opes Resources Inc. |
| JOHNNY AND JUDY MULLINS<br>33002 ROGERS RD.<br>FULSHEAR, TX 77441 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $61.63 | Opes Resources Inc. |
| JULIUS D & LINDA D LOWE<br>211 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| KAREN AND JOHN LAUGHON<br>6225 S. PUGET SOUND<br>TACOMA, WA 98409 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $77.04 | Opes Resources Inc. |
| KATHY COCHRAN<br>PO BOX 184<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $47.62 | Opes Resources Inc. |
| KEITH & OMEKI BECKNELL<br>2352 URIAH PLACE<br>MURFREESBORO, TN 37129 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| KENDRA RICHEY<br>PO BOX 313<br>LARAMIE, WY 82073 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $18.45 | Opes Resources Inc. |
| KENNETH WEST<br>PO BOX 4<br>SIDNEY, KY 41564 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $116.66 | Opes Resources Inc. |
| KIMBERLY AND JAMES WAGNER<br>14649 GEORGIA STREET<br>RIVERVIEW, MI 48193 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $30.82 | Opes Resources Inc. |
| KINZER INVESTMENT REALTY LTD<br>PO BOX 460<br>ALLEN, KY 41601 | Lease #207 KINZER | McCoy Elkhorn Coal Corporation | $0.00 | Opes Resources Inc. |
| KYBC LAND CORPORATION<br>750 TOWN MOUNTAIN ROAD<br>PIKEVILLE, KY 41501 | Lease #13, #15 KYBC | Johns Creek Coal Company | $15,494.40 | Opes Resources Inc. |
| LAURA & RUSTY SHANKLIN<br>128 CEDAR HILLS DR.<br>PIKEVILLE, KY 41501-8704 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $11.90 | Opes Resources Inc. |
| LESLIE & GLORETTA MCGUIRE<br>168 WOLF BRANCH ROAD<br>VARNEY, KY 41571 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| LESLIE A CULTON<br>2153 GLENDALE DRIVE<br>DECATOR, GA 30032 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $2.31 | Opes Resources Inc. |
| LEW WALLACE FRIEND<br>817 BELAIR DRIVE<br>GALLON, OH 44833 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $369.83 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| LINDA G YOUNG HUNT<br>P O BOX 1064<br>BELFRY, KY 41514 | Lease #15, #19 Owen T Young | Johns Creek Coal Company | $125.00 | Opes Resources Inc. |
| LINDA G YOUNG HUNT<br>PO BOX 915<br>PIKEVILLE, KY 41502 | Linda Young Hunt | McCoy Elkhorn Coal Corporation | $450.00 | Opes Resources Inc. |
| LISA M. CAIN<br>8104 FAIRVIEW BLUFF<br>ALPHARETTA, GA 30022 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $2.31 | Opes Resources Inc. |
| LISA WINLAND<br>48101 HEY CROSS DRIVE<br>GROVE CITY, OH 43123-9334 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.66 | Opes Resources Inc. |
| LOIS WILLIS<br>1222 DOLPHIN STREET<br>CHILLICOTHE, OH 45602 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| LULA RAY<br>992 LEFT FORK JOES CREEK<br>PIKEVILLE, KY 41501 | Lease #10, #17 Liza Ray | Johns Creek Coal Company | $750.00 | Opes Resources Inc. |
| MARK C. SAUNDERS<br>15 EMILY COURT<br>THOMASVILLE, NC 27360 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $10.38 | Opes Resources Inc. |
| MARY RUTH HATFIELD<br>1318 CANNONSBURG ROAD<br>ASHLAND, KY 41102 | Lease #238 Mary Hatfield etal | McCoy Elkhorn Coal Corporation | $1,000.00 | Opes Resources Inc. |
| MATTHEW A. BEVINS<br>195 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $44.44 | Opes Resources Inc. |
| MAVIS MCALPIN<br>203 MCNABB RD. SW<br>CALLMAN, AL 35055 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $56.82 | Opes Resources Inc. |
| MELINDA BRANHAM<br>269 SCOTT FORK RD.<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| MELISSA MARIE JIMENEZ<br>5631 KNG ARTHUR DRIVE<br>CENTERVILLE, OH 45429 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $29.72 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| MICHAEL AND DEANA MAYNARD<br>315 PLEASURE ISLE DRIVE<br>ERLANGER, KY 41017 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $83.33 | Opes Resources Inc. |
| MICHAEL AND RAMONA AUXIER<br>523 EMMA ROAD<br>EMMA, KY 41653 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,136.36 | Opes Resources Inc. |
| MICHAEL C. RAMSEY<br>PO BOX 5660<br>EUGENE, OR 97405 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| MICHAEL HELVEY<br>5575 JOES CREEK RD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $3.82 | Opes Resources Inc. |
| MICHELLE DOTSON<br>121 MARGO LANE<br>CELINA, OH 45822 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $3.36 | Opes Resources Inc. |
| MITCHELL HELVEY<br>649 CECIL WAY<br>LEXINGTON, KY 40503 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $3.82 | Opes Resources Inc. |
| NANCY AND JERRY BARROWMAN<br>4552 MAJESTIC MAGNOLIA LN.<br>MORRISTOWN, TN 37814 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| NANCY SMITH<br>88 SKYVIEW DRIVE<br>TURKEY CREEK, KY 41570 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $47.62 | Opes Resources Inc. |
| NATHAN CARL GARRETT<br>5631 KUING ARTHUR DRIVE<br>CENTERVILLE, OH 45429 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $29.62 | Opes Resources Inc. |
| NELL M TAYLOR<br>327 JOHN'S CREEK RD<br>PIKEVILLE, KY 41501 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $475.00 | Opes Resources Inc. |
| NOAH STEVEN AND PHYLLIS FRIEND<br>102 MYRA BARNES AVE.<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $123.27 | Opes Resources Inc. |
| OLLIE G. WAGNER<br>3303 ROXBURY DRIVE<br>LEXINGTON, KY 40503 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $431.48 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| OLLIE JONES<br>617 MULBERRY STREET<br>WILLIAMSON, WV 25661 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |
| OSCAR W. THOMPSON, III<br>PO BOX 3510<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| PAM HUNT<br>472 LOCUST<br>LEXINGTON, KY 40505 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $308.20 | Opes Resources Inc. |
| PATRICIA GRIFFITH<br>1165 MERRI MAC PECK RD.<br>ELK HORN, KY 42733 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| PATRICIA R. MCNAMEE<br>1360 GRISTMILL DRIVE<br>CHARLOTTESVILLE, VA 22902-7201 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $15.88 | Opes Resources Inc. |
| PATTY SOWARDS<br>132 COMBS DR<br>PIKEVILLE, KY 41501 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $27.67 | Opes Resources Inc. |
| PAUL D BEVINS<br>16233 CHRIS DRIVE<br>BERNIE, MO 63822 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |
| PAUL L. MAYNARD<br>1065 WEST SOOKEYS CREEK<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $83.34 | Opes Resources Inc. |
| PAULA AND JOEY MAY<br>113 COMBS DRIVE<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $83.33 | Opes Resources Inc. |
| PENELOPE M. DAVIS<br>788 MEADOW VIEW RD.<br>ELIZABETH, TN 37620 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $113.63 | Opes Resources Inc. |
| RANDALL & KIMBERLY TAYLOR<br>PO BOX 2015<br>PIKEVILLE, KY 41502 | Lease #222 Ann Carty | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| REBECCA HESS<br>341 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| RICHARD & TAMMY BOGAR<br>24 DIX FORK ROAD<br>SIDNEY, KY 41564-0098 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $33.34 | Opes Resources Inc. |
| RICHARD M AND SUSAN D TRENT<br>3725 RYAN'S BLUFF DRIVE<br>CUMMING, GA 30040 | Lease #102, #117 Trent | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| RITA & BOB SCOTT<br>PO BOX 426<br>HARDY, KY 41531 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $33.34 | Opes Resources Inc. |
| ROADRUNNER LAND COMPANY, LLC.<br>131 SUMMIT DRIVE<br>PIKEVILLE, KY 41501 | Lease #233 Roadrunner Land LLC | McCoy Elkhorn Coal Corporation | $6,805.74 | Opes Resources Inc. |
| ROBERT AND PEGGY STANLEY<br>8418 HUDSON LANE<br>LOUISVILLE, KY 40291 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $56.82 | Opes Resources Inc. |
| ROBERT DURIE<br>114 OAK RIDGE DRIVE<br>SHARPSBURG, GA 30277 | Lease #222 Ann Carty | McCoy Elkhorn Coal Corporation | $3,000.00 | Opes Resources Inc. |
| ROBERT HELVEY<br>5555 JOES CREEK RD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $3.82 | Opes Resources Inc. |
| ROBERT L. MAYNARD<br>246 MAYNARD HILL<br>PIKEVILLE, KY 41501 | Lease #288 Arnold Maynard etal | McCoy Elkhorn Coal Corporation | $422.87 | Opes Resources Inc. |
| ROENA FRIEND<br>454 KINNIKINNICK BR.<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| RONNIE MULLINS, JR.<br>97 EAST HARRIS ST.<br>PRESTONSBURG, KY 41653 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $154.09 | Opes Resources Inc. |
| RUBY JEAN SCOTT<br>11101 BENT BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $34.08 | Opes Resources Inc. |
| SANDRA BLACKBURN<br>PO BOX 117<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $83.34 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| SETH MCCOY<br>507 CROSS CREEK CIRCLE<br>SEBASTIAN, FL 32958-8312 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $9,153.68 | Opes Resources Inc. |
| SETH MCCOY<br>507 CROSS CREEK CIRCLE<br>SEBASTIAN, FL 32958-8312 | Lease #6, #8 Grace Call/Seth McCoy | Johns Creek Coal Company | $2,000.00 | Opes Resources Inc. |
| SHARON BEVINS BLANKENSHIP<br>45 WEARS VALLEY ROAD<br>PIGEON FORGE, TN 37863 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $6.82 | Opes Resources Inc. |
| SHARON CAMPBELL<br>635 W. PROSPECT RD.<br>FT. COLLINS, CO 80526 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $77.04 | Opes Resources Inc. |
| SHARON HALL<br>88 MOUNT VERNON DRIVE<br>BRISTOL, VA 24614 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $113.63 | Opes Resources Inc. |
| SHEILA AND JOE DAUGHTERY<br>1234 TOWE STRING RD<br>JACKSBORO, TN 37757 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| SHEILA JAMES<br>PO BOX 43<br>SHELBIANA, KY 41562 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $34.08 | Opes Resources Inc. |
| SHEILA K BALL<br>3549 19TH STREET<br>WYANDOTTE, MI 48192-6322 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $100.00 | Opes Resources Inc. |
| SHEILAH POWERS<br>PO BOX 221<br>GRUNDY, VA 24614 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $577.88 | Opes Resources Inc. |
| SHIRLEY A. WHITT<br>165 COOL SPRING ROAD`<br>CHARLOTTESVILLE, VA 22901 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $577.88 | Opes Resources Inc. |
| SHIRLEY AND BILLY JOE JUSTICE<br>5445 N. MAYO TRAIL<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| STEVE AND RITA BEVINS<br>151 SKYLINE DRIVE<br>DANDRIDGE, TN 37725 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $4.31 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| STEVEN D. AND TERRI MAYNARD<br>1233 COUNTRY ROAD 26<br>IRONTON, OH 45638 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.66 | Opes Resources Inc. |
| STUART RICHEY<br>495 NORTHVIEW DR<br>SANFORD, NC 27332-1504 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $2.31 | Opes Resources Inc. |
| SUSAN AND DAVID ALDRICH<br>85 WEDDINGTON BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $296.29 | Opes Resources Inc. |
| SUSAN J. ALDRICH, SEPARATE TRU<br>85 WEDDINGTON BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $3,051.23 | Opes Resources Inc. |
| SUZY AND GERALD DELONG<br>276 YORKWOOD FOREST DR<br>PIKEVILLE, KY 41501-1539 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $1,058.85 | Opes Resources Inc. |
| TAYLOR INVESTMENTS, LLC<br>1136 HAVERHILL DRIVE<br>BRENTWOOD, TN 37027 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $425.00 | Opes Resources Inc. |
| TEDDY COLLEY<br>PO BOX 2141<br>PIKEVILLE, KY 41502 | Lease #212 Weddington $296.36, Lease #208 Buery Heirs $3051.22 | McCoy Elkhorn Coal Corporation | $3,347.58 | Opes Resources Inc. |
| TERESA TILLEY<br>PO BOX 247<br>BELFRY, KY 41514 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $1.68 | Opes Resources Inc. |
| TERRY G YOUNG<br>5900 ZEBULON HWY<br>PIKEVILLE, KY 41502 | Lease #15, #19 Owen T Young | Johns Creek Coal Company | $187.50 | Opes Resources Inc. |
| THELMA STANLEY<br>2306 LONG STREET<br>FLATWOODS, KY 41139 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $56.82 | Opes Resources Inc. |
| THOMAS A YOUNG<br>3945 FORREST GREEN DRIVE<br>LEXINGTON, KY 40517 | Lease #15, #19 Owen T Young | Johns Creek Coal Company | $187.50 | Opes Resources Inc. |
| THOMAS B. RATLIFF, TRUSTEE<br>PO BOX 460<br>SHELBIANA, KY 41562 | Lease #295 Thomas B Ratliff Trust | McCoy Elkhorn Coal Corporation | $6,754.38 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| THOMAS J. AND BETTY SMITH<br>4308 NW 76 TERRACE<br>GAINSVILLE, FL 32606 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $333.33 | Opes Resources Inc. |
| THOMAS JOSEPH SMITH<br>11911 STANFORD WAY<br>LEESBURG, FL 34788 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $177.77 | Opes Resources Inc. |
| THOMAS PRESTON BEVINS<br>73 PIEDMONT DRIVE<br>WHITESBURG, KY 41858-7668 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $22.72 | Opes Resources Inc. |
| TIFFANY BURCHETT<br>POA FOR DONNA SUE JUSTICE<br>435 NORTH MAYO TRAIL<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,130.10 | Opes Resources Inc. |
| TIMOTHY SAUNDERS<br>4992 RAVENSWOOD ROAD<br>VIRGINIA BEACH, VA 23462 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $10.38 | Opes Resources Inc. |
| TRAVIS M. BUSH MARITAL TRUST<br>HAROLD BUSH, TRUSTEE<br>5009 LUPREESE PLACE<br>VERSAILLES, KY 40383 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $6,102.45 | Opes Resources Inc. |
| VIRGINIA & CHARLES LOWE, SR.<br>P.O. BOX 69<br>PIKEVILLE, KY 41502 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| VIRGINIA ELLIOTT FRANKEL<br>18303 BOWSPRIT POINTE DR<br>CORNELIUS, NC 28031 | Lease #102, #117 Trent | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| WILL T. SCOTT<br>PO BOX 1316<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $1,569.53 | Opes Resources Inc. |
| WILLIAM AND GERALDINE FRIEND<br>217 LITTLE CREEK<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| WILLIAM AND GINGER VANHOOSE<br>176 E CEDAR DRIVE<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $1,059.26 | Opes Resources Inc. |
| WILLIAM CLAY BEVINS<br>11596 BENT BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| WILLIAM J.III AND KATHERYN R.<br>PO BOX 351<br>PIKEVILLE, KY 41502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| WILLIAM N. AND SANDRA RAMSEY,<br>85 WEDDINGTON BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $296.29 | Opes Resources Inc. |
| WILLIAM N. RAMSEY JR., SEPARAT<br>85 WEDDINGTON BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $3,051.23 | Opes Resources Inc. |
| WILLIAM T. AND KIMBERLY SMITH<br>4930 BONSAI CIRCLE<br>PALM BCH GDNS, FL 33418-6771 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $47.60 | Opes Resources Inc. |
| WOODROW JR. AND PATRICIA FRIEN<br>126 PADDOCK DRIVE<br>NICHOLASVILLE, KY 40356 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $184.90 | Opes Resources Inc. |
| YVONNE R. BOGAR<br>REVOCABLE LIVING TRUST<br>2720 ANGELA DRIVE<br>SEVIERVILLE, TN 37876 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $111.12 | Opes Resources Inc. |

Schedule 2.01(f)

**Transferred Permits**
**McCOY ELKHORN COAL CORPORATION**
**KY DMRE Permits List**

| KY DMRE Permit # | Operation Name | MSHA ID No. | KY State File No. | KPDES Permit No. | Status |
|---|---|---|---|---|---|
| 498-5393 | Mine No. 8, Laynes Br. | NA | NA | KYG041045 | A2 |
| 836-5396 | Mine #21/Starus #2 | NA | NA | KYG043114 | A2 |
| 898-0885 | Big Groundhog Slurry Impoundment | 15-10445 | NA | KYG042287 | A1 |
| 898-4032 | Mine No. 17 & 17A | NA | NA | KYG042220 | O2 |
| 898-4093 | Mine No. 15A & 16 | 15-19048 15-18250 | 10925.19 10925.15 | KYG045549 | A1 |
| 898-4097 | Mine No. 22 | NA | NA | KYG044292 | O2 |
| 898-4098 | Mill Branch | NA | NA | KYG044293 | P1 |
| 898-4100 | Mine No. 23 | 15-18721 | 10925.17 | KYG043771 | A1 |
| 898-4152 | Mine No. 15 | 15-18775 | 10925.18 | KYG045807 | A1 |
| 898-4237 | Mine No. 25/25B | NA | NA | KYG043829 | A2 |
| 898-4246 | Mine No. 27 (Joes Creek Fireclay) | NA | NA | KYG046234 | ND |
| 898-4324 | Mine No. 29 | 15-19313 | 18591.1 | KYG040501 | O2 |
| 898-5417 | Smith Fork No. 1 | NA | NA | KYG043146 | P1 |
| 898-5616 | Bishop Branch No. 1 | NA | NA | KYG045243 | A2 |
| 898-5948 | Bluegrass No. 1 | NA | NA | KYG045861 | P1 |
| 898-8142 | Primary Energy Loadout | NA | NA | KYG042723 | A1 |
| 898-8163 | Bevins Branch Plant | 15-10445 | NA | KY0051551 | A1 |
| 898-9117 | Lick Br. Impoundment | 15-10445 | NA | KYG046215 | A1 |
| 898-9135 | Little Groundhog Refuse Fill | 15-10445 | NA | KYG043163 | A1 |

### McCOY ELKHORN COAL CORPORATION
### COE Section 404 Permits

| Hearing Agency | Type of Permit | Permit or Application No. | Related KYDNR Permit No. |
|---|---|---|---|
| COE | Section 404 | LRL-2003-257 | 898-9117 |

### McCOY ELKHORN COAL CORPORATION
### Other Licenses and Permits

| Issuing Agency | Type of License | License or Permit No. | Related to Operation |
|---|---|---|---|
| KY Cabinet for Health Services | Radioactive Materials License | 201-488-51 (Amendment No. 36) | Bevins Branch Plant |
| KY Department for Environmental Protection, Division of Air Quality | Air Quality Permit | S-06-258 | Primary Energy Loadout |
| KY Department for Environmental Protection, Division of Air Quality | Air Quality Permit | S-07-075 | Bevins Branch Plant |
| KY Department for Environmental Protection, Division of Water | Water Withdrawal Permit | 1498 | Bevins Branch Plant |
| KY Department for Environmental Protection, Division of Water | Water Withdrawal Permit | 1544 | Mine No. 23 |
| KY Department for Environmental Protection, Division of Water | Water Withdrawal Permit | 1545 | Mine No. 16 |

2

**McCOY ELKHORN COAL CORPORATION**
**MSHA ID Numbers**

| Issuing Agency | MSHA ID No. | Applicable Mine or Facility |
|---|---|---|
| MSHA | 15-10445 | Bevins Branch Preparation Plant |
| MSHA | 15-18250 | Mine No. 16 |
| MSHA | 15-18721 | Mine No. 23 |
| MSHA | 15-18775 | Mine No. 15 |
| MSHA | 15-19048 | Mine No. 15A |
| MSHA | 15-19313 | Mine No. 29 |

**McCOY ELKHORN COAL CORPORATION**
**Encroachment Permits***

| Permit No. |
|---|
| Encroachment 1213488, McCoy Mine #9A Undermining KY 199 |
| Encroachment 898-4246, McCoy Mine #27 |
| Encroachment 12-0229-10, McCoy Mine #16 Undermining of US 119 |
| Encroachment 12-0242-98, McCoy Middle Whitesburg Mine #1 - Released |
| Encroachment 12-0242-98, McCoy Middle Whitesburg Mine #1 - Released |
| Encroachment 12-0075-00, McCoy Mine #15 Above Ground Conveyor over KY 194 |
| Encroachment 12-0074-00, McCoy Mine #16 Above Ground Conveyor over KY 194 |
| Encroachment 122288, McCoy Mine #9A Undermining KY 632 |
| Encroachment 12-421-86, McCoy Mine #2A Undermining KY 1758 |

\*  To the extent that any of the just above referenced Encroachment Permits relate to any of the other Transferred Permits in this Schedule 2.01(f), such Encroachment Permits shall be a part of the Purchased Assets and be included in the Acquisition for all purposes.

3

Schedule 2.02(a)

**Excluded Assets**
**Burke Real Property**

1.    That certain Deed of Conveyance dated September 19, 1978 by and between Dewey Stiltner and Earlane Stiltner, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 69;

2.    That certain Deed dated March 26, 1992 by and between Donnie R. May and Pricy May, his wife and McCoy Elkhorn Coal Corporation, which Deed is of record in the Pike County Court Clerk's Office in Deed Book 659, Page 95;

3.    That certain Deed dated March 26, 1992 by and between Edward Charles and Linda Charles, his wife and McCoy Elkhorn Coal Corporation, which Deed is of record in the Pike County Court Clerk's Office in Deed Book 659, Page 97;

4.    That certain Deed of Conveyance dated June 6, 1989 by and between Pinkie May and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 625, Page 42;

5.    That certain Deed of Conveyance dated October 17, 1989 by and between Earl Worrix and Jennifer Worrix, his wife, *et al.* and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 629, Page 271;

6.    That certain Deed of Conveyance dated November 29, 1984 by and between James Marshall Justice, Jr. and Darlene Justice, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 583, Page 561;

7.    That certain Deed of Conveyance dated October 16, 1981 by and between Lawrence Bostic and Thelma Bostic, his wife and McCoy Elkhorn Coal Corporation, which Deed of

Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 567, Page 237;

8.      That certain Deed of Conveyance dated October 27, 1981 by and between Bennett Hunt and Buna Hunt, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 567, Page 338;

9.      That certain Deed of Conveyance dated September 5, 1980 by and between Gay Scott, widow, and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 561, Page 274;

10.     That certain Deed of Conveyance dated July 14, 1978 by and between Tommy Coleman and Nolaine Coleman, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 548, Page 479;

11.     That certain Deed of Conveyance dated July 17, 1978 by and between Vicy Stiltner and John H. Stiltner, her husband and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 548, Page 503;

12.     That certain Deed dated November 10, 2004 by and between Johns Creek Processing Company and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 860, Page 314;

13.     That certain Deed of Conveyance dated September 19, 1978 by and between Victor Smith and Vada Smith, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 68; and

14.     That certain Deed of Conveyance dated June 11, 2000 by and between Opal Green et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 804, Page 288.

2

<u>Schedule 2.02(b)</u>

**Excluded Assets
Facilities and Improvements**

F. M. Burke Preparation Plant and Loadout, and all appurtenances related thereto.

| Location | Asset Type | Description |
|---|---|---|
| Burke Loadout | Loadout | Loadout |
| Burke Loadout | Locomotive  Garage | 65'x20' Metal Building |
| Burke Plant | Preparation Plant | Preparation Plant |
| Burke Plant | Pump Building | Plant - Pump House |
| Burke Plant | Water Tank | 500,000 Gallon Water Tank |
| Cow Branch | Refuse Impoundment | Cow Branch Impoundment |
| Merry Branch | Coarse Refuse Fill | Merry Branch Coarse Refuse Fill |
| Main Office | Building | Main Office - 62'x63' Metal and Brick Structure - 1/2 2nd floor and does not include furnishings, personal property or trade fixtures |
| Safety | Building | Safety Office 48'x24' Brick House and does not include furnishings, personal property or trade fixtures |
| Shop | Building | 40'x60' Metal Building w/20'x16' Side Addition |
| Shop | Building | Bathhouse |
| Shop | Hoist | 10 Ton Overhead Hoist |
| Shop | Air Compressor | 10 HP |
| Warehouse | Building | Warehouse Building - 110'x50' Steel Structure, 2 Story and does not include furnishings, supplies, personal property, trade fixtures etc. |
| Warehouse | Building | Warehouse Shed, Steel Construction, 330'x18' and does not include furnishings, supplies, personal property, trade fixtures etc. |

Schedule 2.02(h)

**Excluded Assets**
**Licenses, Permits or other Governmental Authorizations**

McCOY ELKHORN COAL CORPORATION PERMITS LIST

| KYDNR Permit # | Operation Name | MSHA ID No. | KY State File No. | KPDES Permit No. | Status |
|---|---|---|---|---|---|
| 898-4031 | Mine No. 12, Wolfpin Br. | 15-19314 | 10925.2 | KYG045388 | A1 |
| 898-4243 | Burke/Loadout | 15-16958 | | KYG041804 | A1 |
| 898-4244 | Burke Plant & Merry Br. Refuse Mine 31 & Mine 32 | 15-16958 15-19492 | 18851 | KY0031402 | A1 |
| 898-8144 | Burke Plant & Loadout | 15-16958 | x-fer from 898-8124 & 8093 | KYG045821 | A1 |
| 898-9012 | Cow Br. Slurry Impoundment | 15-16958 | | KYG044814 | A1 |
| 898-9106 | Refuse Fill, Wolfpin Br. | 15-16958 | | KYG045433 | ND |

McCOY ELKHORN COAL CORPORATION
COE Section 404 Permits

| Hearing Agency | Type of Permit | Permit or Application No. | Related KYDNR Permit No. |
|---|---|---|---|
| COE | Section 404 | 200401405 | 898-9106 |
| COE | Section 404 | LRL-2010-1114-mlc | 898-4244 |

McCOY ELKHORN COAL CORPORATION LICENSES LIST

| Issuing Agency | Type of License | License No. | Expiration Date |
|---|---|---|---|
| Department for Environmental Protection, Division of Air Quality | Air Quality Permit | S-06-298 | |

**McCOY ELKHORN COAL CORPORATION MSHA ID NUMBERS**

| Issuing Agency | MSHA ID No. | Applicable Mine or Facility |
|---|---|---|
| MSHA | 15-19314 | Mine No. 12 |
| MSHA | 15-16958 | Long Fork Preparation Plant |
| MSHA | 15-19492 | Mine No. 31 |

2

<u>Schedule 2.02(j)</u>

**Excluded Assets
Contracts, Agreements, Leases, Licenses and Commitments**

Assignment of Leases by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc., relating to the following leases:

      (a)    Lease dated June 16, 2008, from Kentucky Berwind Land Company to McCoy Elkhorn Coal Corporation, of record in the Pike County Court Clerk's Office in Lease Book 959, Page 204; and

      (b)    Lease dated November 1, 2008, from WPP, LLC to McCoy Elkhorn Coal Corporation, of record in the Pike County Court Clerk's Office Lease Book 932, Page 716.

Partial Assignment of Lease by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to that prior Surface Lease Agreement dated December 9, 1999, by and among McCoy Elkhorn Coal Corporation and Johns Creek Elkhorn Corporation, as lessors, and Berkeley Energy Corporation, as lessee.

Assignment of Railroad Contracts and Agreements by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

    1.    Billing Consolidation Agreement Dated April 12, 2006;
    2.    Agreement No. CSX 0011710, Dated April 3, 1990, Real Estate/Land Only;
    3.    Agreement No. L40724, Dated May 5, 1986 – Overhead Conveyor;
    4.    Agreement No. COL37730, Dated June 12, 1979, Private Road Crossing; and
    5.    Lease No. CO-L35596, Dated March 1, 1972, Real Estate/Land Only.

Assignment of Distance Waivers for Surface Mining Operations by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

    1.    Waiver for Surface Mining Operations executed by David Hunt and Shelia Hunt on behalf of the Bud Hunt Jr. Heirs;
    2.    Waiver for Surface Mining Operations executed by Joseph A. Collins and Jessica L. Collins;
    3.    Waiver for Surface Mining Operations executed by Jason McCoy and Cindy McCoy;

    4.      Waiver for Surface Mining Operations executed by Michael Blackburn and Christine Blackburn; and

    5.      Waiver for Surface Mining Operations executed by Lester Varney (pending).

Assignment of Above Grade Airspace Agreement and Permit, by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

    1.      Above Grade Airspace Agreement and Permit dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation.

<u>Schedule 2.02(k)</u>

**Excluded Assets**
**Real Property relating to the Mare Creek Surface Mine and**
**the Cannel Gap Surface Mine**

(i) <u>Real Property</u> - all real property and leases of, or other interests in real property, as follows:

1.  Lease dated May 13, 2010, from Blackburn Land Company to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky);

2.  Lease dated October 20, 2005, from Paul and Queenie Epling to McCoy Elkhorn Coal Corporation (unrecorded,  Pike County, Kentucky);

3.  Lease dated February 5, 2008, from Kinzer Business Realty LTD to McCoy Elkhorn Coal Corporation (unrecorded, Floyd County and Pike County, Kentucky);

4.  Lease dated July 5, 2005, from Oakie and Eunice Lawson to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky);

5.  Lease dated March 25, 2008, from James Leslie et al (Marie Leslie Heirs) to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky);

6.  Lease dated August 24, 2005, from Sally Crum et al to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky);

7.  Lease dated April 2, 2010, from Wallace Scalf et al to McCoy Elkhorn Coal Corporation (unrecorded, Pike County, Kentucky);

8.  Lease dated February 5, 2014, between Laurel Mountain Resources, LLC and McCoy Elkhorn Coal Corporation.  A Memorandum of such Lease appears of record in Lease Book 116, at Page 219, in the Office of the Johnson County Court Clerk; and

9.  Lease and Sublease dated February 18, 2013, between Laurel Mountain Resources, LLC and McCoy Elkhorn Coal Corporation (unrecorded, Johnson County, Kentucky).

(ii) <u>Facilities and Improvements</u> - all facilities and improvements on such real property, including mine facilities, mine infrastructure and mine apparatus, as follows:

    None

(iii) <u>Machinery and Equipment</u> - all machinery and equipment, as follows:

    None

(iv) <u>Transferable Licenses, Permits or other Governmental Authorizations</u> - all transferable licenses, permits, or other governmental authorizations, as follows:

| KYDMRE Permit # | Operation Name | MSHA ID No. | KY State File No. | KPDES Permit No. | Status |
|---|---|---|---|---|---|
| 898-0818 | Mare Creek Strip | 15-19464 | 18704.5 | KYG046404 | A1 |
| 898-9114 | Harmond Branch Strip | 15-19464 | 18704.5 | KYG044497 | A1 |
| 858-0240 | Cannel Gap (Pending Issuance) | | | KYG046774 | ND |

(v) <u>Contracts, Agreements, Leases, Licenses and Commitments</u> - all contracts, agreements, leases, licenses and commitments, as follows:

       None

2

Schedule 3.06

**Licenses And Permits**

See the permits listed on Schedule 2.01(f).

<u>Schedule 3.07</u>

**Environmental**

N/C 53-2851 relating to Permit 898-5616, relating to the requirement to replace/restore a domestic water supply to certain property owners located on Upper Pompey Branch in Pike County, Kentucky.

Permit No. 498-5393 - Mine 8A (Laynes Branch) Ongoing remediation since 1993 treating elevated dissolved iron concentrations.  The remediation site is on property owned by McCoy Elkhorn.

Permit No. 898-4093 - Mine 16 (Bent Branch) Remediation needed to treat elevated dissolved iron concentrations attributable to McCoy Elkhorn's Mine #16 that is seeping along the Elkhorn #2 seam outcrop located on Bent Branch of Johns Creek.  The remediation project will be located on properties presently leased from Billy Young and Linda Young Hunt.  The remediation site is subject to a non-compliance which requires McCoy Elkhorn to permit the site with the KY Department of Natural Resources, Division of Permits.

<u>Schedule 9.01(a)</u>

**Business Employees**

[REDACTED]

Schedule 9.01(b)

**Business Employees Severance Benefit**

[REDACTED]

# SCHEDULE A

**Cure Amounts**

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| ALICE JANE ADKINS<br>POA FOR JEFFERSON FRANKLIN TAY<br>405 YEAGER AVENUE<br>WILLIAMSON, WV 25661 | Lease #268 JeffersonTaylor | McCoy Elkhorn Coal Corporation | $1,000.00 | Opes Resources Inc. |
| ALICE RIVARD<br>15360 PHEASANT RUN<br>SOUTHGATE, MI 48195 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| ALMA LAND COMPANY<br>750 TOWN MOUNTAIN ROAD<br>PIKEVILLE, KY 41501-0000 | Lease #171, #170 Alma Land | McCoy Elkhorn Coal Corporation | $83,569.39 | Opes Resources Inc. |
| ANDREW B. SAUNDERS<br>1106 FAIRWAY DRIVE<br>CHESAPEAKE, VA 23320 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $10.38 | Opes Resources Inc. |
| ANITA MAYNARD<br>502 EVANS AVENUE<br>MIAMISBURG, OH 45342 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| ANN E CARTY<br>180 RIVERVIEW DRIVE<br>PIKEVILLE, KY 41501 | Lease #222 Ann Carty | McCoy Elkhorn Coal Corporation | $6,000.00 | Opes Resources Inc. |
| ANNETTE & KEITH GUTTORMSEN<br>16 SWAN STREET<br>CALAIS, ME 04619-1425 | Lease #211 Harvey Phillips | McCoy Elkhorn Coal Corporation | $125.00 | Opes Resources Inc. |
| APPALACHIAN LAND COMPANY<br>750 TOWN MOUNTAIN ROAD<br>PIKEVILLE, KY 41501 | Lease #239 Appalachian Land | McCoy Elkhorn Coal Corporation | $18,985.06 | Opes Resources Inc. |
| BALLARD FRIEND<br>3617 PINECREST CR.<br>DULUTH, GA 30096 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $369.83 | Opes Resources Inc. |
| BALLARD W CASSADY LIFE TENANT<br>C/O MR BALLARD W CASSADY JR<br>& MR BEN CASSADY ATTYS IN FACT<br>143 WALNUT DRIVE<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $1,333.33 | Opes Resources Inc. |
| BARBARA FRAZURE<br>2029 KY ROUTE 979<br>HAROLD, KY 41635 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $61.63 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| BARBARA THACKER<br>235 SCOTT FORK<br>PIKEVILLE, KY 41501 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| BENNETT WEST<br>PO BOX 29<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $116.66 | Opes Resources Inc. |
| BETTY BEVINS<br>74 BEVINS LANE<br>PIKEVILLE, KY 41501-3508 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| BETTY FRANCIS JOHNSON<br>181 WEST KEYSER HEIGHTS<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $89.89 | Opes Resources Inc. |
| BETTY JAMES<br>302 GLOUCESTER AVENUE<br>PORTSMOUTH, VA 23702 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.46 | Opes Resources Inc. |
| BETTY JANE HALL<br>PO BOX 2316<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| BEVERLY HAUN<br>922 KERNS AVENUE<br>LEBANON, OH 45036 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $100.00 | Opes Resources Inc. |
| BIG SANDY COMPANY, LP<br>PO BOX 566<br>PIKEVILLE, KY 41502 | Lease #194 Big Sandy $348,837.15, Lease #146 Big Sandy M2.454 $183,013.32 | McCoy Elkhorn Coal Corporation | $531,850.47 | Opes Resources Inc. |
| BILLIE SUSAN HATFIELD<br>225 BAKER AVENUE<br>HAZARD, KY 41749 | Lease #238 Mary Hatfield etal | McCoy Elkhorn Coal Corporation | $500.00 | Opes Resources Inc. |
| BLANCHE MAYNARD<br>7161 ZEBULON HIGHWAY<br>PIKEVILLE, KY 41501 | Lease #288 Arnold Maynard etal | McCoy Elkhorn Coal Corporation | $422.86 | Opes Resources Inc. |
| BRADLEY AND MARY ELLEN ADKINS<br>9961 ALLEN POINTE DRIVE<br>ALLEN PARK, MI 48101 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $30.82 | Opes Resources Inc. |
| BRANDON L. BEVINS<br>195 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $44.44 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| BRIAN AND AMANDA MULLINS<br>996 BEVERLY DRIVE<br>ABINGDON, VA 24210 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $154.09 | Opes Resources Inc. |
| BRIAN R ELLIOTT<br>22 SPENCER DRIVE<br>MORRISTOWN, NJ 07960 | Lease #102, #117 Trent | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| BROOKWOOD WILSON<br>C/O JOHN S BEVINS<br>195 SCOTT FORK RD<br>PIKEVILLE, KY 41501 | Lease #226 Brookwood/Wilson | McCoy Elkhorn Coal Corporation | $12,000.00 | Opes Resources Inc. |
| BRYAN JOHN BOBINCHUCK<br>49 COBBLESTONE COURT<br>HILTON HEAD, SC 29928 | Lease #15, #19 Owen T Young | Johns Creek Coal Company | $500.00 | Opes Resources Inc. |
| CARL T BEVINS<br>331 NORTH LINCOLN PARK<br>WARSAW, IN 46582 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |
| CARLA FIELDS<br>PO BOX 3202<br>PIKEVILLE, KY 41502 | Lease #288 Arnold Maynard etal | McCoy Elkhorn Coal Corporation | $422.85 | Opes Resources Inc. |
| CAROL SMITH FERRELL<br>PO BOX 11<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $23.80 | Opes Resources Inc. |
| CAROLYN A. SMITH<br>1312 SYCAMORE COURT<br>CHARLOTTESVILLE, VA 22901 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $577.88 | Opes Resources Inc. |
| CAROLYN FRIEND AND ALAN BESSON<br>130 PRESTWICK DRIVE<br>GEORGETOWN, KY 40324 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $123.27 | Opes Resources Inc. |
| CATHERINE NEWMAN<br>1360 GRISTMILL DRIVE<br>CHARLOTTESVILLE, VA 22902-7201 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $15.88 | Opes Resources Inc. |
| CHARLES AND FAYE VANHOOSE<br>149 THOMPSON ROAD<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| CHARLES BUSH<br>101 WIMBLEDON<br>FRANKFORT, KY 40601 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $6,102.45 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| CHARLES J BAIRD<br>PO BOX 351<br>PIKEVILLE, KY 41502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| CLAIRE L LESZCZYNSKI<br>16071 EUCLID AVE<br>ALLEN PARK, MI 48101 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $100.00 | Opes Resources Inc. |
| CLARRISA & DAVID SCALF<br>PO BOX 411<br>SIDNEY, KY 41564 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $33.34 | Opes Resources Inc. |
| CLYDE CALVIN & GINGER RAY<br>5124 RIGHT FORK OF BRUSHY RD<br>VERNEY, KY 41571 | Lease #119, #123 Clyde M Ray | McCoy Elkhorn Coal Corporation | $1,000.00 | Opes Resources Inc. |
| CLYDE DAWSON RAMSEY<br>1121 NANDINO COURT<br>TALLAHASSEE, FL 32308 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $222.22 | Opes Resources Inc. |
| CLYDE TAYLOR JR<br>PO BOX 3226<br>PIKEVILLE, KY 41501-0000 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,340.57 | Opes Resources Inc. |
| DAN STAMPER, JR.<br>PO BOX 801<br>PIKEVILLE, KY 41502 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| DANIEL LESLIE BUTLER<br>3041 SOUTH FREEMAN ROAD<br>WILLIAMSBURG, VA 23185 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $41.50 | Opes Resources Inc. |
| DANITA AND RALPH EASTER<br>120 HIGLAWN HEIGHTS<br>RIPLEY, WV 25271 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $308.20 | Opes Resources Inc. |
| DANNY SIMPSON<br>269 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #162 ANNA MAYNARD | McCoy Elkhorn Coal Corporation | $0.00 | Opes Resources Inc. |
| DARRELL GOOSLIN<br>2349 STONE COAL RD.<br>PIKEVILLE, KY 41501 | Lease #223 Darryl Gooslin | McCoy Elkhorn Coal Corporation | $500.00 | Opes Resources Inc. |
| DAVID & ROSE BEVINS<br>124 LEFT FORK UPPER CHLOE RD.<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $4.27 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| DAVID H AND DARLENE TRENT<br>301 MADDOX PLACE<br>CANTON, GA 30114 | Lease #102, #117 Trent | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| DAVID LEE MAYNARD<br>PO BOX 599<br>IRONTON, OH 45638-0599 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.66 | Opes Resources Inc. |
| DAVID RUNYON<br>PO BOX 25<br>CANADA, KY 41519-0025 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $47.63 | Opes Resources Inc. |
| DEBORAH & BILLY SPARKS<br>1737 MEADOW RIDGE CIRCLE<br>SEVIERVILLE, TN 37862 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $33.34 | Opes Resources Inc. |
| DEBORAH L. AND CHARLES SCAGGS<br>295 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| DELORES & LEROY TABOR<br>PO BOX 394<br>GATLINBURG, TN 37738 | Lease #183 Delores Tabor | McCoy Elkhorn Coal Corporation | $1,200.00 | Opes Resources Inc. |
| DONNIE AND ZONDA BEVINS<br>250 GRIGGS ROAD<br>WACO, KY 40385 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $6.82 | Opes Resources Inc. |
| DOROTHY HALL<br>146 HAPPY VALLEY ROAD<br>SOUTH WILLIAMSO, KY 41503 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| DOUGLAS C AND JUDITH BEVINS<br>10924 BENT BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| DOUGLAS MACK JUSTICE<br>2012 HART RD.<br>LEXINGTON, KY 40502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $4,000.00 | Opes Resources Inc. |
| DREXEL L AND MARY BEVINS<br>3850 CARRINGTON WAY<br>HAMILTON, OH 45011 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| EARNEST & GEORGIA FIELDS<br>896 STATE HIGHWAY 194 W<br>PIKEVILLE, KY 41501-0000 | Lease #98 Earnest & Georgia Fields | McCoy Elkhorn Coal Corporation | $75.00 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| EDITH J HUBER<br>3901 GREEN HAVEN LANE<br>GOSHEN, KY 40026 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $2,000.00 | Opes Resources Inc. |
| EDWARD BEVINS FORRESTER<br>1398 HIGHLAND LANE<br>BEAVERCREEK TNP, OH 45385-7049 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $29.62 | Opes Resources Inc. |
| ELK HORN COAL CORPORATION<br>544 SOUTH LAKE DRIVE<br>PRESTONSBURG, KY 41653 | Lease #196 Elkhorn #907 | McCoy Elkhorn Coal Corporation | $33,364.75 | Opes Resources Inc. |
| ELSA & IRVIN SMITH<br>986 UPPER BLACKBERRY ROAD<br>RAMSON, KY 41558 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $6.82 | Opes Resources Inc. |
| EMMABELLE LESLIE<br>5476 NORTH MAYO TRAIL<br>PIKEVILLE, KY 41501-2957 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,438.28 | Opes Resources Inc. |
| EUGENE KING<br>275 STATE HWY. 194E<br>PIKEVILLE, KY 41501 | Lease #240 Eugene King | McCoy Elkhorn Coal Corporation | $1,200.00 | Opes Resources Inc. |
| EUNICE AND THOMAS PENNYBACKER<br>2559 GARAZI STREET<br>TRACEY, CA 95304-5843 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $308.20 | Opes Resources Inc. |
| EUNICE RUTH AND ROBERT WARD<br>1172 PRITCHARD ROAD<br>KIMPER, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| FON MICHAEL JOHNSON<br>PO BOX 665<br>PIKEVILLE, KY 41502 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $134.83 | Opes Resources Inc. |
| FRANCES CUNNINGHAM LEWIS<br>6284 APPLEGATE CT<br>NORCROSS, GA 30092 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $83.01 | Opes Resources Inc. |
| FRANKLIN D SMITH<br>PO BOX 11<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $11.90 | Opes Resources Inc. |
| GAIL B. WARD<br>2913 RUNNYMEDE WAY<br>LEXINGTON, KY 40503 | Lease #306 Thelma Blackburn | McCoy Elkhorn Coal Corporation | $130.03 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| GENE AND PAT MAYNARD<br>2280 WIENBURG DRIVE<br>MORAINE, OH 45439 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| GINGER P. ROBERTSON<br>PO BOX 862<br>GRUNDY, VA 24614 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $577.88 | Opes Resources Inc. |
| GREGORY & CHERYL HOWARD<br>11200 N. BETHEL RD.<br>MOORESVILLE, IN 46158 | Lease #297 Ottis Howard | McCoy Elkhorn Coal Corporation | $5,000.00 | Opes Resources Inc. |
| H. FRANK HATCHER AND ROGER KEN<br>CO-TRUSTEES OF HATCHER-TRIMBLE<br>PO BOX 1020<br>PIKEVILLE, KY 41502 | Lease #199 Hatcher Trimble Trust | McCoy Elkhorn Coal Corporation | $4,016.85 | Opes Resources Inc. |
| HAROLD & ANN BUSH<br>5009 LUPREESE PLACE<br>VERSAILLES, KY 40383 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $6,102.45 | Opes Resources Inc. |
| HAROLD F AND INA JEAN BOGAR<br>PO BOX 74<br>SIDNEY, KY 41564 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $111.12 | Opes Resources Inc. |
| HAROLDEAN AND RUSSELL CHAPMAN<br>1260 WEDDINGTON BRANCH RD.<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $61.63 | Opes Resources Inc. |
| HELEN B MOORE<br>100 LOMBARDY DRIVE<br>FREDERICKSBURG, VA 22408-1526 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $111.12 | Opes Resources Inc. |
| HELEN S. MUNDY<br>812 STARDALE DRIVE<br>CHESAPEAKE, VA 23322 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $10.34 | Opes Resources Inc. |
| HUBERT & AMANDA HOBSON<br>8718 META HIGHWAY<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| J.C. MULLINS<br>PO BOX 222<br>KIMPER, KY 41539 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $61.63 | Opes Resources Inc. |
| JACK FOSTER & GRACE MULLINS<br>229 KINNIKINICK ROAD<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,130.10 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| JACK HAMILTON SR.<br>139 MAPLE ROAD<br>HAROLD, KY 41635 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| JAMES AND CONNIE RITZ<br>680 HAMBLEY BLVD. APT. 300<br>PIKEVILLE, KY 41501-3803 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $15.88 | Opes Resources Inc. |
| JAMES FLOYD THOMPSON<br>PO BOX 3443<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| JAMES K CULTON<br>30 EAST LAKE DR SE<br>ATLANTA, GA 30317 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $2.31 | Opes Resources Inc. |
| JAMES LARRY BEVINS<br>PO BOX 574<br>PRESTONSBURG, KY 41653-0574 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |
| JAMES LESLIE<br>3427 THOMPSON DR<br>ASHLAND, KY 41102 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $27.67 | Opes Resources Inc. |
| JAMES PATTON RAMSEY, III<br>WILLIAM N. RAMSEY AS POA<br>85 WEDDINGTON BRANCH RD.<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $222.22 | Opes Resources Inc. |
| JAMES S WILLIAMSON<br>1039 MAIN ST. #1<br>WILTON, ME 04294-0000 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $93.74 | Opes Resources Inc. |
| JAMES THOMAS AND SHERRY ROOP<br>651 STATE HIGHWAY 194 EAST<br>PIKEVILLE, KY 41501 | Lease #281 Thomas Roop | McCoy Elkhorn Coal Corporation | $500.00 | Opes Resources Inc. |
| JAMES V. MAYNARD<br>PO BOX 151<br>PEDRO, OH 45659 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.68 | Opes Resources Inc. |
| JAMES W. FRIEND<br>198 ROSEMONT GARDEN<br>LEXINGTON, KY 40503 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| JAMI L. AND WILLIAM OSBORNE<br>224 TOWNSHIP ROAD 344<br>IRONTON, OH 45368-8709 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.66 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| JAMIE RAMEY<br>379 BOONE AVENUE<br>WINCHESTER, KY 40391 | Lease #178 Jack & Ruby Bartley | McCoy Elkhorn Coal Corporation | $71.42 | Opes Resources Inc. |
| JANE BAIRD EVANS<br>PO BOX 351<br>PIKEVILLE, KY 41502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| JANET MARIE PAUL<br>PO BOX 114<br>SOUTH POINT, OH 45680 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $83.34 | Opes Resources Inc. |
| JANIS K. FRIEND<br>858 RIDGEVIEW DRIVE<br>FRANKFORT, KY 40601 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| JANIVE BLACKBURN<br>787 COWPEN ROAD<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $4,314.84 | Opes Resources Inc. |
| JENNIFER L. FRIEND<br>103 CHURCH STREET<br>COLUMBIA, KY 42728 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $123.56 | Opes Resources Inc. |
| JERRY AND CAROLYN BEVINS<br>1436 MUDLICK ROAD<br>HARDY, KY 41531 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $6.82 | Opes Resources Inc. |
| JESSIE EVELYN F. NEWSOME<br>224 SADDLE RIDGE CIRCLE<br>DANVILLE, KY 40422-3216 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $154.09 | Opes Resources Inc. |
| JILL M. CORNELIUS<br>785 S.E. ELWOOD AVE.<br>PORT ST. LUCIE, FL 34983 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,130.10 | Opes Resources Inc. |
| JIMMY AND JUDY LINDON<br>509 SUN VALLEY TERRACE<br>HAZARD, KY 41701 | Lease #238 Mary Hatfield etal | McCoy Elkhorn Coal Corporation | $500.00 | Opes Resources Inc. |
| JIMMY AND TERRA JOHNSON<br>PO BOX 4412<br>PIKEVILLE, KY 41502 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $134.83 | Opes Resources Inc. |
| JOAN AND KENNETH WEBB<br>16525 GRAPEVINE ROAD<br>PHYLLIS, KY 41554 | Lease #282 Joan Webb | McCoy Elkhorn Coal Corporation | $100.00 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| JOAN C & JAMES ASHCRAFT<br>44 MT. DELLA ROAD<br>SPENCER, TN 38585 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| JOE B. RAMSEY<br>354 WEDDINGTON BRANCH RD.<br>SUITE 1<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $888.89 | Opes Resources Inc. |
| JOHN & NANCY BEVINS<br>195 SCOTT FORK<br>PIKEVILLE, KY 41501 | Lease #222 Ann Carty | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| JOHN B. FRIEND<br>5728 BELESKI LANE<br>WAHIAWA, HI 96786 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| JOHN E AND ANGELA MAYNARD<br>1024 COUNTRY ROAD 55<br>IRONTON, OH 45638 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.68 | Opes Resources Inc. |
| JOHN H BAIRD<br>PO BOX 351<br>PIKEVILLE, KY 41502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| JOHN H SCOTT III MD<br>PO BOX 2617<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $666.66 | Opes Resources Inc. |
| JOHN HENRY SMITH<br>PO BOX 458<br>JENKINS, KY 41537-0458 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $177.77 | Opes Resources Inc. |
| JOHN N. AND DEBORAH PINSON<br>PO BOX 230<br>PAINTSVILLE, KY 41240 | Lease #271 John Pinson | McCoy Elkhorn Coal Corporation | $1,000.00 | Opes Resources Inc. |
| JOHNNY & DELANE MULLINS<br>14 MULLINS FIRST ST.<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $308.20 | Opes Resources Inc. |
| JOHNNY AND JUDY MULLINS<br>33002 ROGERS RD.<br>FULSHEAR, TX 77441 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $61.63 | Opes Resources Inc. |
| JULIUS D & LINDA D LOWE<br>211 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| KAREN AND JOHN LAUGHON<br>6225 S. PUGET SOUND<br>TACOMA, WA 98409 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $77.04 | Opes Resources Inc. |
| KATHY COCHRAN<br>PO BOX 184<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $47.62 | Opes Resources Inc. |
| KEITH & OMEKI BECKNELL<br>2352 URIAH PLACE<br>MURFREESBORO, TN 37129 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| KENDRA RICHEY<br>PO BOX 313<br>LARAMIE, WY 82073 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $18.45 | Opes Resources Inc. |
| KENNETH WEST<br>PO BOX 4<br>SIDNEY, KY 41564 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $116.66 | Opes Resources Inc. |
| KIMBERLY AND JAMES WAGNER<br>14649 GEORGIA STREET<br>RIVERVIEW, MI 48193 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $30.82 | Opes Resources Inc. |
| KINZER INVESTMENT REALTY LTD<br>PO BOX 460<br>ALLEN, KY 41601 | Lease #207 KINZER | McCoy Elkhorn Coal Corporation | $0.00 | Opes Resources Inc. |
| KYBC LAND CORPORATION<br>750 TOWN MOUNTAIN ROAD<br>PIKEVILLE, KY 41501 | Lease #13, #15 KYBC | Johns Creek Coal Company | $15,494.40 | Opes Resources Inc. |
| LAURA & RUSTY SHANKLIN<br>128 CEDAR HILLS DR.<br>PIKEVILLE, KY 41501-8704 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $11.90 | Opes Resources Inc. |
| LESLIE & GLORETTA MCGUIRE<br>168 WOLF BRANCH ROAD<br>VARNEY, KY 41571 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $88.88 | Opes Resources Inc. |
| LESLIE A CULTON<br>2153 GLENDALE DRIVE<br>DECATOR, GA 30032 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $2.31 | Opes Resources Inc. |
| LEW WALLACE FRIEND<br>817 BELAIR DRIVE<br>GALLON, OH 44833 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $369.83 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| LINDA G YOUNG HUNT<br>P O BOX 1064<br>BELFRY, KY 41514 | Lease #15, #19 Owen T Young | Johns Creek Coal Company | $125.00 | Opes Resources Inc. |
| LINDA G YOUNG HUNT<br>PO BOX 915<br>PIKEVILLE, KY 41502 | Linda Young Hunt | McCoy Elkhorn Coal Corporation | $450.00 | Opes Resources Inc. |
| LISA M. CAIN<br>8104 FAIRVIEW BLUFF<br>ALPHARETTA, GA 30022 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $2.31 | Opes Resources Inc. |
| LISA WINLAND<br>48101 HEY CROSS DRIVE<br>GROVE CITY, OH 43123-9334 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.66 | Opes Resources Inc. |
| LOIS WILLIS<br>1222 DOLPHIN STREET<br>CHILLICOTHE, OH 45602 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| LULA RAY<br>992 LEFT FORK JOES CREEK<br>PIKEVILLE, KY 41501 | Lease #10, #17 Liza Ray | Johns Creek Coal Company | $750.00 | Opes Resources Inc. |
| MARK C. SAUNDERS<br>15 EMILY COURT<br>THOMASVILLE, NC 27360 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $10.38 | Opes Resources Inc. |
| MARY RUTH HATFIELD<br>1318 CANNONSBURG ROAD<br>ASHLAND, KY 41102 | Lease #238 Mary Hatfield etal | McCoy Elkhorn Coal Corporation | $1,000.00 | Opes Resources Inc. |
| MATTHEW A. BEVINS<br>195 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $44.44 | Opes Resources Inc. |
| MAVIS MCALPIN<br>203 MCNABB RD. SW<br>CALLMAN, AL 35055 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $56.82 | Opes Resources Inc. |
| MELINDA BRANHAM<br>269 SCOTT FORK RD.<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| MELISSA MARIE JIMENEZ<br>5631 KNG ARTHUR DRIVE<br>CENTERVILLE, OH 45429 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $29.72 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| MICHAEL AND DEANA MAYNARD<br>315 PLEASURE ISLE DRIVE<br>ERLANGER, KY 41017 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $83.33 | Opes Resources Inc. |
| MICHAEL AND RAMONA AUXIER<br>523 EMMA ROAD<br>EMMA, KY 41653 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,136.36 | Opes Resources Inc. |
| MICHAEL C. RAMSEY<br>PO BOX 5660<br>EUGENE, OR 97405 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| MICHAEL HELVEY<br>5575 JOES CREEK RD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $3.82 | Opes Resources Inc. |
| MICHELLE DOTSON<br>121 MARGO LANE<br>CELINA, OH 45822 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $3.36 | Opes Resources Inc. |
| MITCHELL HELVEY<br>649 CECIL WAY<br>LEXINGTON, KY 40503 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $3.82 | Opes Resources Inc. |
| NANCY AND JERRY BARROWMAN<br>4552 MAJESTIC MAGNOLIA LN.<br>MORRISTOWN, TN 37814 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| NANCY SMITH<br>88 SKYVIEW DRIVE<br>TURKEY CREEK, KY 41570 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $47.62 | Opes Resources Inc. |
| NATHAN CARL GARRETT<br>5631 KUING ARTHUR DRIVE<br>CENTERVILLE, OH 45429 | Lease #270 Fannie Bevins | McCoy Elkhorn Coal Corporation | $29.62 | Opes Resources Inc. |
| NELL M TAYLOR<br>327 JOHN'S CREEK RD<br>PIKEVILLE, KY 41501 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $475.00 | Opes Resources Inc. |
| NOAH STEVEN AND PHYLLIS FRIEND<br>102 MYRA BARNES AVE.<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $123.27 | Opes Resources Inc. |
| OLLIE G. WAGNER<br>3303 ROXBURY DRIVE<br>LEXINGTON, KY 40503 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $431.48 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| OLLIE JONES<br>617 MULBERRY STREET<br>WILLIAMSON, WV 25661 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |
| OSCAR W. THOMPSON, III<br>PO BOX 3510<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $444.44 | Opes Resources Inc. |
| PAM HUNT<br>472 LOCUST<br>LEXINGTON, KY 40505 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $308.20 | Opes Resources Inc. |
| PATRICIA GRIFFITH<br>1165 MERRI MAC PECK RD.<br>ELK HORN, KY 42733 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| PATRICIA R. MCNAMEE<br>1360 GRISTMILL DRIVE<br>CHARLOTTESVILLE, VA 22902-7201 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $15.88 | Opes Resources Inc. |
| PATTY SOWARDS<br>132 COMBS DR<br>PIKEVILLE, KY 41501 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $27.67 | Opes Resources Inc. |
| PAUL D BEVINS<br>16233 CHRIS DRIVE<br>BERNIE, MO 63822 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |
| PAUL L. MAYNARD<br>1065 WEST SOOKEYS CREEK<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $83.34 | Opes Resources Inc. |
| PAULA AND JOEY MAY<br>113 COMBS DRIVE<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $83.33 | Opes Resources Inc. |
| PENELOPE M. DAVIS<br>788 MEADOW VIEW RD.<br>ELIZABETH, TN 37620 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $113.63 | Opes Resources Inc. |
| RANDALL & KIMBERLY TAYLOR<br>PO BOX 2015<br>PIKEVILLE, KY 41502 | Lease #222 Ann Carty | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| REBECCA HESS<br>341 SCOTT FORK ROAD<br>PIKEVILLE, KY 41501 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| RICHARD & TAMMY BOGAR<br>24 DIX FORK ROAD<br>SIDNEY, KY 41564-0098 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $33.34 | Opes Resources Inc. |
| RICHARD M AND SUSAN D TRENT<br>3725 RYAN'S BLUFF DRIVE<br>CUMMING, GA 30040 | Lease #102, #117 Trent | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| RITA & BOB SCOTT<br>PO BOX 426<br>HARDY, KY 41531 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $33.34 | Opes Resources Inc. |
| ROADRUNNER LAND COMPANY, LLC.<br>131 SUMMIT DRIVE<br>PIKEVILLE, KY 41501 | Lease #233 Roadrunner Land LLC | McCoy Elkhorn Coal Corporation | $6,805.74 | Opes Resources Inc. |
| ROBERT AND PEGGY STANLEY<br>8418 HUDSON LANE<br>LOUISVILLE, KY 40291 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $56.82 | Opes Resources Inc. |
| ROBERT DURIE<br>114 OAK RIDGE DRIVE<br>SHARPSBURG, GA 30277 | Lease #222 Ann Carty | McCoy Elkhorn Coal Corporation | $3,000.00 | Opes Resources Inc. |
| ROBERT HELVEY<br>5555 JOES CREEK RD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $3.82 | Opes Resources Inc. |
| ROBERT L. MAYNARD<br>246 MAYNARD HILL<br>PIKEVILLE, KY 41501 | Lease #288 Arnold Maynard etal | McCoy Elkhorn Coal Corporation | $422.87 | Opes Resources Inc. |
| ROENA FRIEND<br>454 KINNIKINNICK BR.<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| RONNIE MULLINS, JR.<br>97 EAST HARRIS ST.<br>PRESTONSBURG, KY 41653 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $154.09 | Opes Resources Inc. |
| RUBY JEAN SCOTT<br>11101 BENT BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $34.08 | Opes Resources Inc. |
| SANDRA BLACKBURN<br>PO BOX 117<br>CANADA, KY 41519 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $83.34 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| SETH MCCOY<br>507 CROSS CREEK CIRCLE<br>SEBASTIAN, FL 32958-8312 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $9,153.68 | Opes Resources Inc. |
| SETH MCCOY<br>507 CROSS CREEK CIRCLE<br>SEBASTIAN, FL 32958-8312 | Lease #6, #8 Grace Call/Seth McCoy | Johns Creek Coal Company | $2,000.00 | Opes Resources Inc. |
| SHARON BEVINS BLANKENSHIP<br>45 WEARS VALLEY ROAD<br>PIGEON FORGE, TN 37863 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $6.82 | Opes Resources Inc. |
| SHARON CAMPBELL<br>635 W. PROSPECT RD.<br>FT. COLLINS, CO 80526 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $77.04 | Opes Resources Inc. |
| SHARON HALL<br>88 MOUNT VERNON DRIVE<br>BRISTOL, VA 24614 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $113.63 | Opes Resources Inc. |
| SHEILA AND JOE DAUGHTERY<br>1234 TOWE STRING RD<br>JACKSBORO, TN 37757 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $8.51 | Opes Resources Inc. |
| SHEILA JAMES<br>PO BOX 43<br>SHELBIANA, KY 41562 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $34.08 | Opes Resources Inc. |
| SHEILA K BALL<br>3549 19TH STREET<br>WYANDOTTE, MI 48192-6322 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $100.00 | Opes Resources Inc. |
| SHEILAH POWERS<br>PO BOX 221<br>GRUNDY, VA 24614 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $577.88 | Opes Resources Inc. |
| SHIRLEY A. WHITT<br>165 COOL SPRING ROAD`<br>CHARLOTTESVILLE, VA 22901 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $577.88 | Opes Resources Inc. |
| SHIRLEY AND BILLY JOE JUSTICE<br>5445 N. MAYO TRAIL<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| STEVE AND RITA BEVINS<br>151 SKYLINE DRIVE<br>DANDRIDGE, TN 37725 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $4.31 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| STEVEN D. AND TERRI MAYNARD<br>1233 COUNTRY ROAD 26<br>IRONTON, OH 45638 | Lease #269 Anna Maynard | McCoy Elkhorn Coal Corporation | $41.66 | Opes Resources Inc. |
| STUART RICHEY<br>495 NORTHVIEW DR<br>SANFORD, NC 27332-1504 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $2.31 | Opes Resources Inc. |
| SUSAN AND DAVID ALDRICH<br>85 WEDDINGTON BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $296.29 | Opes Resources Inc. |
| SUSAN J. ALDRICH, SEPARATE TRU<br>85 WEDDINGTON BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $3,051.23 | Opes Resources Inc. |
| SUZY AND GERALD DELONG<br>276 YORKWOOD FOREST DR<br>PIKEVILLE, KY 41501-1539 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $1,058.85 | Opes Resources Inc. |
| TAYLOR INVESTMENTS, LLC<br>1136 HAVERHILL DRIVE<br>BRENTWOOD, TN 37027 | Lease #186, #185 Fon Taylor | McCoy Elkhorn Coal Corporation | $425.00 | Opes Resources Inc. |
| TEDDY COLLEY<br>PO BOX 2141<br>PIKEVILLE, KY 41502 | Lease #212 Weddington $296.36, Lease #208 Buery Heirs $3051.22 | McCoy Elkhorn Coal Corporation | $3,347.58 | Opes Resources Inc. |
| TERESA TILLEY<br>PO BOX 247<br>BELFRY, KY 41514 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $1.68 | Opes Resources Inc. |
| TERRY G YOUNG<br>5900 ZEBULON HWY<br>PIKEVILLE, KY 41502 | Lease #15, #19 Owen T Young | Johns Creek Coal Company | $187.50 | Opes Resources Inc. |
| THELMA STANLEY<br>2306 LONG STREET<br>FLATWOODS, KY 41139 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $56.82 | Opes Resources Inc. |
| THOMAS A YOUNG<br>3945 FORREST GREEN DRIVE<br>LEXINGTON, KY 40517 | Lease #15, #19 Owen T Young | Johns Creek Coal Company | $187.50 | Opes Resources Inc. |
| THOMAS B. RATLIFF, TRUSTEE<br>PO BOX 460<br>SHELBIANA, KY 41562 | Lease #295 Thomas B Ratliff Trust | McCoy Elkhorn Coal Corporation | $6,754.38 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| THOMAS J. AND BETTY SMITH<br>4308 NW 76 TERRACE<br>GAINSVILLE, FL 32606 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $333.33 | Opes Resources Inc. |
| THOMAS JOSEPH SMITH<br>11911 STANFORD WAY<br>LEESBURG, FL 34788 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $177.77 | Opes Resources Inc. |
| THOMAS PRESTON BEVINS<br>73 PIEDMONT DRIVE<br>WHITESBURG, KY 41858-7668 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $22.72 | Opes Resources Inc. |
| TIFFANY BURCHETT<br>POA FOR DONNA SUE JUSTICE<br>435 NORTH MAYO TRAIL<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $1,130.10 | Opes Resources Inc. |
| TIMOTHY SAUNDERS<br>4992 RAVENSWOOD ROAD<br>VIRGINIA BEACH, VA 23462 | Lease #198 Marie Leslie | McCoy Elkhorn Coal Corporation | $10.38 | Opes Resources Inc. |
| TRAVIS M. BUSH MARITAL TRUST<br>HAROLD BUSH, TRUSTEE<br>5009 LUPREESE PLACE<br>VERSAILLES, KY 40383 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $6,102.45 | Opes Resources Inc. |
| VIRGINIA & CHARLES LOWE, SR.<br>P.O. BOX 69<br>PIKEVILLE, KY 41502 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $269.68 | Opes Resources Inc. |
| VIRGINIA ELLIOTT FRANKEL<br>18303 BOWSPRIT POINTE DR<br>CORNELIUS, NC 28031 | Lease #102, #117 Trent | McCoy Elkhorn Coal Corporation | $250.00 | Opes Resources Inc. |
| WILL T. SCOTT<br>PO BOX 1316<br>PIKEVILLE, KY 41502 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $1,569.53 | Opes Resources Inc. |
| WILLIAM AND GERALDINE FRIEND<br>217 LITTLE CREEK<br>PIKEVILLE, KY 41501 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $92.44 | Opes Resources Inc. |
| WILLIAM AND GINGER VANHOOSE<br>176 E CEDAR DRIVE<br>PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $1,059.26 | Opes Resources Inc. |
| WILLIAM CLAY BEVINS<br>11596 BENT BRANCH ROAD<br>PIKEVILLE, KY 41501 | Lease #269-4 James M Bevins | McCoy Elkhorn Coal Corporation | $11.36 | Opes Resources Inc. |

| Name / Address | Contract / Lease # and Name | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|
| WILLIAM J.III AND KATHERYN R. PO BOX 351 PIKEVILLE, KY 41502 | Lease #130, #138 Baird etal | McCoy Elkhorn Coal Corporation | $1,500.00 | Opes Resources Inc. |
| WILLIAM N. AND SANDRA RAMSEY, 85 WEDDINGTON BRANCH ROAD PIKEVILLE, KY 41501 | Lease #300 Weddington | McCoy Elkhorn Coal Corporation | $296.29 | Opes Resources Inc. |
| WILLIAM N. RAMSEY JR., SEPARAT 85 WEDDINGTON BRANCH ROAD PIKEVILLE, KY 41501 | Lease #208 Buery Heirs | McCoy Elkhorn Coal Corporation | $3,051.23 | Opes Resources Inc. |
| WILLIAM T. AND KIMBERLY SMITH 4930 BONSAI CIRCLE PALM BCH GDNS, FL 33418-6771 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $47.60 | Opes Resources Inc. |
| WOODROW JR. AND PATRICIA FRIEN 126 PADDOCK DRIVE NICHOLASVILLE, KY 40356 | Lease #298 Evans/Mullins | McCoy Elkhorn Coal Corporation | $184.90 | Opes Resources Inc. |
| YVONNE R. BOGAR REVOCABLE LIVING TRUST 2720 ANGELA DRIVE SEVIERVILLE, TN 37876 | Lease #241 Joe B Smith Heirs | McCoy Elkhorn Coal Corporation | $111.12 | Opes Resources Inc. |

**ANNEX A-1**

| | |
|---|---|
| DAVIS POLK & WARDWELL LLP | HUNTON & WILLIAMS LLP |
| 450 Lexington Avenue | Riverfront Plaza, East Tower |
| New York, New York 10017 | 951 East Byrd Street |
| Telephone:  (212) 450-4000 | Richmond, Virginia 23219 |
| Facsimile:    (212) 607-7973 | Telephone: (804) 788-8200 |
| Marshall S. Huebner (admitted *pro hac vice*) | Facsimile: (804) 788-8218 |
| Brian M. Resnick (admitted *pro hac vice*) | Tyler P. Brown (VSB No. 28072) |
| Michelle M. McGreal (admitted *pro hac vice*) | Henry P. (Toby) Long, III (VSB No. 75134) |
| | Justin F. Paget (VSB No. 77949) |

*Counsel to the Debtors*　　　　　　　　　　　　　*Local Counsel to the Debtors*
*and Debtors in Possession*　　　　　　　　　　　*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **JAMES RIVER COAL COMPANY**, *et al.*, | Case No. 14-31848 (KRH) |
| Debtors.[1] | (Jointly Administered) |

## ORDER (i) APPROVING THE SALES AND TRANSFERS OF CERTAIN ASSETS AND LIABILITIES RELATED TO THE McCOY ELKHORN MINING COMPLEX FREE AND CLEAR OF ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (iii) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of James River Coal Company and its

subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the

"**Debtors**"), for an order pursuant to sections 363 and 365 of chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), and Rule 6004-2 of

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia

(the "**Local Bankruptcy Rules**") (i) authorizing entry into an asset purchase agreement,

attached hereto as Exhibit 1 (the "**APA**"),[2] among Debtor James River Coal Company

("**James River**"), Debtor McCoy Elkhorn Coal Corporation ("**McCoy Elkhorn,**"), any

Debtor affiliate of McCoy Elkhorn that holds any interest in the Bevins Assets (as

defined below) (collectively with James River and McCoy Elkhorn, the "**Sellers**"), and

Opes Resources, Inc. (the "**Purchaser**") substantially on the terms and conditions set

forth in the Summary of Terms and Conditions attached as Exhibit C to the Motion;

(ii) approving the sale and transfer (the "**Sale**") of certain assets of the Sellers (the

"**Bevins Assets**") to the Purchaser in accordance with the APA; (ii) authorizing the

assumption and assignment of certain executory contracts and unexpired leases in

connection therewith; and (iii) granting such other and further relief as is just and proper,

as more fully described in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

consideration of the Motion and the requested relief being a core proceeding under 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided; and no other or

further notice need be provided; and the relief requested in the Motion being in the best

interests of the Debtors, their estates, the creditors and other parties in interest; and the

Court having reviewed the Motion and having held a hearing with appearances of parties

in interest noted in the transcript thereof (the "**Hearing**"); and the Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion or the APA, as applicable.

2

establish just cause for the relief granted herein; and upon all of the proceedings had

before the Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AS FOLLOWS:**[3]

A.      On April 7, 2014 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

"**Chapter 11 Cases**").

B.      This Court has jurisdiction to hear and determine the Motion pursuant to

28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases and the Motion in this

District is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).

C.      The statutory predicates for the relief requested in the Motion are sections

363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local

Bankruptcy Rule 6004-2.

D.      The Debtors continue to operate their business and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.      No trustee or examiner has been appointed in the Chapter 11 Cases.

F.      As evidenced by the certification of service previously filed with the

Court, and based on the representations of counsel at the Hearing: (i) proper, timely,

adequate and sufficient notice of the Motion, the Hearing and the Sale has been provided

in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy

Rules 2002, 6004, 6006 and 9007; (ii) such notice was good and sufficient, and

appropriate under the particular circumstances; and (iii) no other or further notice of the

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

Motion, the Hearing, the Sale or the entry of this Order shall be required.  Notice of the

Motion, the Sale and the Hearing was also posted electronically on the website

maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' Claims, Noticing and

Balloting Agent, at *http://dm.epiq11.com/JamesRiverCoal*.

      G.     The Debtors served the Notice of Sale and Assumption and Assignment

Notice on each Contract Counterparty under each Assumed Contract, and such parties

were provided with a reasonable opportunity to object and be heard with respect to the

Motion and the relief requested therein, ~~including~~and have been or will be provided with

reasonable opportunity to object and be heard with respect to the assumption and

assignment of the Assumed Contracts and any Cure Amounts in respect thereof in

accordance with the procedures set forth in the Motion (the "**Assumption Procedures**").

      H.     A reasonable opportunity to object or be heard regarding the relief

requested in the Motion has been afforded to all interested persons and entities, including

the following: (i) the Core Parties, (ii) the 2002 List Parties and (iii) all applicable

federal, state and local taxing and regulatory authorities.

      I.     The Debtors marketed the Bevins Assets to potential purchasers, both

before and during the Chapter 11 Cases.  No other person, entity or group has offered to

purchase the Bevins Assets for an amount that would provide a higher and better

economic value to the Debtors than that being provided by the Purchaser pursuant to the

APA.

      ~~I~~J.     As demonstrated by the record of the Hearing and the dockets in the

Chapter 11 Cases, the Debtors have demonstrated good and sufficient reasons for the

Court to approve the Motion and the Sale.

~~J~~K.    The "**Bevins Assets**" will consist of James River's and its subsidiaries' and McCoy Elkhorn's right, title and interest in, to certain assets relating to the McCoy Elkhorn mining complex that are being transferred to the Purchaser pursuant to the APA.

~~K~~L.    The Debtors are the sole and lawful owners of the Bevins Assets.

M.    Subject to entry of this Order, (i) the Debtors have full corporate power and authority to execute the APA and all other documents contemplated thereby, (ii) the Debtors have all of the power and authority necessary to consummate the transactions contemplated by the APA, and (iii) no government, regulatory or other consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to enter into the APA and consummate the transactions contemplated by the APA.

~~L~~N.    The purchase price to be paid by the Purchaser is fair and constitutes reasonably equivalent value and reasonable market value for the Bevins Assets.

~~M~~O.    The Purchaser is a purchaser in good faith with respect to the Bevins Assets, as that term is used in section 363(m) of the Bankruptcy Code.  The APA was negotiated, proposed and entered into by the ~~parties~~Debtors and the Purchaser without collusion, in good faith, ~~from arms' length~~and from arm's–length bargaining positions~~and without collusion or fraud~~, and the Purchaser is entitled to all of the protections ~~of~~afforded under section 363(m) of the Bankruptcy Code ~~with respect to the Bevins Assets.  None of~~and any other applicable bankruptcy and non-bankruptcy law.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Sale or APA to be voided under section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person, and the purchase price

was not controlled by any agreement.  The Purchaser is not, and was not immediately prior to the Closing Date, an "affiliate" or "insider" of the Debtors as defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchasers and the Debtors immediately prior to the Closing Date.

NP.    Except as specifically provided in the APA, the Purchaser shall not assume or become liable for any Encumbrances (as defined below) relating to the Bevins Assets being sold by the Debtors unless expressly stated in the APA or this Order.  Any such valid and enforceable Encumbrances shall attach to the proceeds of the Sale.

OQ.    Sound business reasons have been articulated for performing the obligations set forth in the APA and selling the Bevins Assets as set forth in the Motion outside of a plan of reorganization, and it is a reasonable exercise of business judgment to execute, deliver and consummate the APA with the Purchaser and consummate the transactions contemplated thereby, and such acts are in the best interests of the Debtors, their estates and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons, which include, but are not limited to, the following: (i) the APA constitutes the highest and best offer for the Bevins Assets; (ii) the APA and the closing thereon will present the best opportunity for the Debtors to realize the value of the Bevins Assets; and (iii) the Sale will enable the Debtors to avoid the ongoing expenditures related to the Bevins Assets.

PR.    The Debtors may sell the Bevins Assets free and clear of any and all Encumbrances because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of such

6

Encumbrances who did not object, or who withdrew their objections, to the Sale or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy

Code.

S.      Except as expressly set forth in the APA, the transfer of the Assumed

Contracts to the Purchaser will not subject the Purchaser to any liability whatsoever prior

to the Closing Date or by reason of such transfer under the laws of the United States, any

state, territory, or possession thereof, or the District of Columbia, based, in whole or in

part, on any theory of law or equity.  The Debtors have demonstrated that it is an exercise

of their sound business judgment to assume and assign the Assumed Contracts to the

Purchaser in connection with the consummation of the transactions contemplated by the

APA.  The Assumed Contracts are an integral part of the Bevins Assets being purchased

by the Purchaser and, accordingly, such assumption and assignment is reasonable,

enhances the value of the estates and does not constitute unfair discrimination.  The

Debtors have cured, or provided adequate assurance of cure with respect to, any default

existing prior to the date hereof under any of the Assumed Contracts within the meaning

of section 365(b)(1)(A) and (f)(2)(A) of the Bankruptcy Code.  The Purchaser has

provided adequate assurance of future performance of and under the Assumed Contracts

within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

QT.      The terms and conditions set forth in the APA, including the total

consideration to be realized by the Debtors, are fair and reasonable and the transaction

contemplated by the APA is in the best interests of the Debtors, their creditors and their

estates, and the consideration constitutes reasonably equivalent value under the

Bankruptcy Code and the laws of the United States, any state, territory, possession or the

District of Columbia (including the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

U.    The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or other applicable laws. The Purchaser is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, and there is no substantial continuity between the Purchaser and the Debtors. The transactions contemplated by the APA do not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors.

~~R~~V.    A valid business purpose exists for approval of the transaction contemplated by the Motion pursuant to sections 363(b), (f) and (m) of the Bankruptcy Code. The Debtors may sell, transfer and assign the Bevins Assets free and clear of the Encumbrances in accordance with section 363 of the Bankruptcy Code. As a condition to purchasing the Bevins Assets, the Purchaser requires that: (a) the Bevins Assets be sold free and clear of the Encumbrances; and (b) the Purchaser shall have no liability whatsoever for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors except those expressly provided in the APA or this Order. The Purchaser will not enter into an APA and consummate the transactions contemplated thereby, thus adversely affecting the Debtors' estates, if the sale to the Purchaser was not free and clear of Encumbrances or if the Purchaser was or would be liable for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors, except as otherwise explicitly provided in the APA or this Order.

~~S~~W.     The transfer of the Bevins Assets to the Purchaser is or will be a legal, valid and effective transfer of the Bevins Assets, and will vest the Purchaser with all right, title and interest in and to the Bevins Assets, free and clear of Encumbrances, except those explicitly and expressly excluded in the APA or this Order.

~~T~~X.     An injunction against creditors and third parties pursuing Encumbrances is necessary to induce the Purchaser to close the Sale; the issuance of such an injunction is therefore necessary to avoid irreparable injury to the Debtors' estates, and will benefit all creditors.

~~U~~Y.     The requirements of sections 363(b) and 363(f) of the Bankruptcy Code and any other applicable law relating to the Sale of the Bevins Assets have been satisfied.

**AND IT IS HEREBY ORDERED THAT:**

1.     The relief requested in the Motion is hereby GRANTED.

2.     The Motion, the APA and the transactions contemplated thereby are approved, and the Debtors are authorized and empowered to enter into the APA, to perform their obligations thereunder, and to take such action as is necessary to effectuate the terms of the APA, without any further corporate authorization or order of this Court.

3.     The Debtors are hereby authorized, empowered and directed, pursuant to sections 363(b) and (f) of the Bankruptcy Code, to sell the Bevins Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the APA, and, pursuant to section 363 of the Bankruptcy Code, title to the Bevins Assets shall pass to the Purchaser at closing, free and clear of any and all mortgages, liens, pledges, charges, security interests and encumbrances (collectively, the "**Encumbrances**").  All such Encumbrances upon the Bevins Assets to be unconditionally released, discharged and

9

terminated, with all such Encumbrances to attach only to the proceeds of the Sale with

the same priority, validity, force and effect as they existed with respect to the Bevins

Assets prior to the Closing Date except as may be set forth herein.

4.      The Debtors and the Purchaser are directed to comply, and shall comply,

with all provisions of the APA, including, but not limited to, executing and delivering the

APA, together with all additional instruments and documents that may be reasonably

necessary to implement the APA, in each case, in accordance with the terms of the APA.

5.      The Purchaser shall not be required to seek or obtain relief from the

automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies

under the ~~the~~ APA or any other related document.  The automatic stay imposed by

section 362 of the Bankruptcy Code is modified solely to the extent necessary to

implement the preceding sentence.

6.      The transfer of the Bevins Assets to the Purchaser pursuant to the APA

constitutes a legal, valid and effective transfer and shall vest the Purchaser with all right,

title and interest of the Debtors in and to the Bevins Assets so transferred.

7.      This Order also shall be construed, and constitute for any and all purposes,

a complete and general assignment, conveyance and transfer of all right, title and interest

of the Debtors and their estates to the Purchaser of (i) the Bevins Assets and (ii) the

Assumed Contracts.  Each and every federal, state, and local governmental agency or

department is hereby directed to accept any and all documents and instruments necessary

and appropriate to consummate the transactions contemplated by the APA.

~~7~~8.      This Order and the APA shall be binding upon, and shall inure to the

benefit of the Debtors, the Purchaser, and their respective successors and assigns,

10

including without limitation, any chapter 11 trustee hereinafter appointed for the Debtors or any trustee appointed in a chapter 7 case, and its estate and creditors, if any of these Chapter 11 Cases are converted from chapter 11.

8<u>9</u>.     On the date of the closing of the transactions contemplated by the APA (the "**Closing Date**"), each of the creditors of the Debtors is authorized and directed to execute such documents and take all other actions as may be necessary to release the Encumbrances against or in the Bevins Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

9<u>10</u>.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances against or in the Bevins Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and releases of the Encumbrances that the person or entity has with respect to the Bevins Assets or otherwise, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Bevins Assets.

10<u>11</u>.   Effective upon the Closing Date, all parties and/or entities<u>, including, but not limited to, all debt security holders, equity holders, governmental, tax and regulatory authorities, trade creditors, employees, litigation claimants and other creditors,</u> asserting Encumbrances or contract rights against the Debtors and/or any of the Bevins Assets<u>, including the Assumed Contracts,</u> are hereby permanently enjoined and precluded from, with respect to such Encumbrances:  (i) asserting, commencing or continuing in any

manner any action against the Purchaser or any director, officer, agent, representative or employee of the Purchaser (all such entities are collectively referred to as the "**Protected Parties**") or against any Protected Party's Bevins Assets or properties, including without limitation the Bevins Assets; (ii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award, decree or order against the Protected Parties or any properties or Bevins Assets of the Protected Parties, including without limitation the Bevins Assets; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Protected Parties or any properties or Bevins Assets of the Protected Parties, including without limitation the Bevins Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Protected Parties; and (v) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Order or the APA.

11 12.   The provisions of this Order authorizing the sale of the Bevins Assets free and clear of the Encumbrances (with such Encumbrances to attach to the proceeds of the Sale) shall be self-executing, and none of the Debtors, the Purchaser nor any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale; *provided, however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA.  Without in any way limiting the foregoing, the Purchaser is empowered to execute and file releases, termination statements, assignments, consents, cancellations or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale.

12 13.  A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

13 14.  The Purchaser is not a "successor" of the Debtors or their estates by reason of any theory of law or equity.  Consummation of the Sale and the transactions contemplated by the APA does not effect a *de facto* merger or consolidation of the Debtors and the Purchaser or result in the continuation of the Debtors' business under the Purchaser's control.  The Purchaser is not, and will not become by virtue of the Sale, the alter ego of, a successor in interest to, or a continuation of the Debtors, nor is the Purchaser otherwise liable for the Debtors' debts and obligations or incur any liability derived from the Bevins Assets or the Assumed Contracts within the meaning of any federal, state or local revenue, pension, ERISA, tax, labor (including any WARN Act), employment, environmental or other law, rule or regulation, unless otherwise specifically provided for in the APA or pursuant to this Order.  For purposes of this paragraph of the Order, all references to the Purchaser shall include the affiliates, subsidiaries and shareholders of the Purchaser.

14 15.  All entities that are presently, or on the Closing Date may be, in possession of some or all of the Bevins Assets are hereby directed to surrender possession of the Bevins Assets to the Purchaser on the Closing Date.

15 16.  Nothing contained in any plan of reorganization (or liquidation) confirmed in these cases the Chapter 11 Cases or the order of confirmation confirming any such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

13

1617.   The APA is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford, and is not in violation of creditors' and equity security interest holders' voting rights.

1718.   The purchase by the Purchaser is a purchase in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code, and the Purchaser is entitled to the protection of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification or appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date.

1819.   The sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Bevins Assets shall be deemed to constitute reasonably equivalent value and fair consideration.

1920.   From and after entry of this Order, none of the Debtors nor any other person or entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Bevins Assets either to the Debtors prior to the closing of the Sale for subsequent transfer to the Purchaser, or to the Purchaser in accordance with the terms and conditions of the APA and this Order.

2021.   The Debtors have demonstrated that the assumption by the applicable Debtors and assignment to the Purchaser of the Assumed Contracts is in the best interests of the Debtors, their creditors and their estates and represents a prudent exercise of the Debtors' business judgment.  The Assumed Contracts are an integral part of the Bevins

Assets and, accordingly, such assumptions and assignments are reasonable, enhance the value of the estate and do not constitute unfair discrimination.

2122.   The contracts and leases set forth on Schedule [ ]2.01(e) to the APA (the "**Assumed Contracts**") are in full force and effect and (subject to, and upon the payment of, the Cure Amounts), no default on the part of the Debtors exists under the Assumed Contracts with respect to any material term, condition, covenant, payment obligation or other obligations thereunder, whether prepetition or postpetition in nature, other than anyand no counterparty to any such Assumed Contract shall be permitted to declare or enforce a default existingby the Debtors or the Purchaser thereunder or otherwise take action against the Purchaser as a result of the filing of the Chapter 11 Casesany of the Debtor's financial condition, change in control, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract.

2223.   The Debtors and the Purchaser have (i) cured, or provided adequate assurance of cure with respect to, any default by the Debtors existing prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) compensated, or provided adequate assurance of compensation, to the Contract Counterparties for any actual pecuniary loss to such party resulting from a default by the Debtors prior to the date hereof under such Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code in accordance with the Assumption Procedures.  The Purchaser has provided adequate assurance of its future performance of and under the Assumed Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code in accordance with the Assumption Procedures.

23 24.   With respect to each Assumed Contract listed on Schedule A hereto 2.01(e) to the APA, the Cure Amount set forth on Schedule A hereto opposite such Assumed Contract or any Assumption Notice served after the date hereof, as applicable, to which no timely objection is filed in accordance with the Assumption Procedures is the sole amount necessary to cure all monetary defaults by the Debtors and to pay all actual pecuniary losses, if any, with respect to such Assumed Contract pursuant to section 365(b)(1) of the Bankruptcy Code.

24 25.   Pursuant to section 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtors are hereby authorized to: (a)  assume the Assumed Contracts and assign such contracts to the Purchaser, effective upon the Closing Date; (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to the Purchaser, and (c) pay the required Cure Amounts, if any, at Closing (or as soon thereafter as is reasonably practicable).

25 26.   Upon the occurrence of the Closing Date, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. Any provision in any Assumed Contract that purports to declare a breach, default or termination as a result of a change of control of the Bevins Assets or requires the consent of any non-debtor party for the assumption and assignment thereof is hereby deemed unenforceable under section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k)

of the Bankruptcy Code, the Debtors shall be relieved from any liability with respect to the Assumed Contracts occurring after such assignment to and assumption by the Purchaser except as expressly provided in the APA.

2627.   All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the closing of the Sale (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured as set forth in the APA as of the Closing Date or as soon thereafter as practicable.  The Purchaser shall have no liability or obligation for any such defaults or other obligations arising or accruing prior to the Closing Date, except as otherwise expressly provided in the APA.

2728.   Each Contract Counterparty that has not filedor does not file a timely objection to the assumption and assignment of its Assumed Contract, including to any Cure Amount, is hereby forever barred, estopped and permanently enjoined from filing any such objection and from asserting, prosecuting or otherwise pursuing any of Debtors, the Purchaser or any of their respective affiliates, successors or assigns or any of their respective affiliates, agents, representatives, counsel and advisors, the Bevins Assets or any other assets or operations of any of the Debtors or the Purchaser on the basis that any amounts in excess of the Cure Amount set forth opposite such Assumed Contract on Schedule A hereto or any Assumption Notice served after the date hereof, as applicable, is owing with respect to any defaults under such Assumed Contract and/or that any other conditions to assumption or assignment must be satisfied in order for the Assumed Contract to be assumed by any of the Debtors and assigned to the Purchaser.  All parties who have failed to raise with particularity that such party's consent is required for the

Debtors to assume and assign such Assumed Contract are hereby deemed to have given the consent contemplated by Bankruptcy Code section 365(c)(1)(B) and (f)(1) to the assumption of such Assumed Contract by the Debtors and the assignment of such Assumed Contract to the Purchaser.

2829.   The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not constitute a waiver of any such terms or conditions, or of the Debtors' or the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

2930.   Upon the occurrence of the closing of the Sale, the Purchaser shall assume all liabilities associated with the Assumed Contracts in accordance with the terms of the APA.

31.    Notwithstanding anything to the contrary herein, no executory contract or lease shall be considered an Assumed Contract under this Order unless and until such executory contract or lease shall have been assumed by the Debtors in accordance with the assumption procedures set forth in the Motion, including, without limitation, the Debtors having served an Assumption Notice to the non-debtor counterparty to any executory contract or lease proposed to be assumed and provided ten (10) days from the service of such notices for the applicable non-debtor counterparty to the file an objection.

32.    Nothing in the injunction and release provisions of this Order shall be interpreted to bar, impair, prevent or otherwise limit any rights the Debtors' surety bond providers may have and claim from and after the Closing, that they may claim under the existing bonds, indemnity agreements, common law of suretyship or the Surface Mine

Control and Reclamation Act and its state analogues with regard to any failure of the Purchaser to satisfy and perform the Assumed Liabilities from and after Closing.

33.     The Debtors will use commercially reasonable efforts to transfer the Excluded Assets that are not transferred to Marshall Resources, Inc. to Laurel Mountain Resources LLC or another Debtor affiliate promptly following the Closing Date.

34.     Nothing in this Order or the APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability (including, but not limited to, for reclamation and mitigation and any associated long-term protection requirements) to a "governmental unit" (as defined in section 101(27) of the Bankruptcy Code) that any entity could be subject to as and to the extent it is the owner or operator of property sold or transferred pursuant to this Order after the Closing Date; provided, however, that the foregoing shall not limit, diminish or otherwise alter the Debtors' or the Purchaser's defenses, claims, causes of action, or other rights under applicable nonbankruptcy law with respect to any liability that may exist to a governmental unit at owned or operated property.  Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police ore regulatory law governing such transfer or assignment.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order, subject to the Debtors' and the Purchaser's rights to assert in that forum or before this Court that any such laws are not in fact police or regulatory law or that such enforcement is impermissible under applicable law.

3035.   Any objections to the Motion or the relief requested therein that have not been adjourned, withdrawn or, waived, settled or otherwise resolved are hereby denied and overruled in all respects on the merits with prejudice.

3136.   The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

3237.   As of the time of the closing of the Sale, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.

3338.   The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof; *provided*, that, (a) an order of this Court has approved such modification, amendment, or supplement; (b) such modification, amendment or supplement is not material or (c) such modification, amendment or supplement is made in the ordinary course of business.

39.   To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the Bevins Assets and the Assumed Contracts on account of the filing or pendency of the Chapter 11 Cases.

3440.   The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

3541.   Notice of the Motion as provided therein shall be deemed good and sufficient notice.

3642.   In the event of any inconsistencies between this Order, the Motion and the APA, this Order shall govern in all respects.  However, the failure to specifically include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

43.   Nothing contained in any plan of reorganization or liquidation confirmed in the Chapter 11 Cases or any order of the Court confirming such plan or in any order in the Chapter 11 Cases, shall alter, conflict with, or derogate from, the provisions of the APA or the terms of this Order.  The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order that may be entered by the Court in the Chapter 11 Cases, and the terms and provisions of this Order and the APA, as well as the rights and interests granted pursuant to this Order and the APA, shall continue in the Chapter 11 Cases or any superseding case and shall be specifically performable and enforceable against the Debtors, their estates and the Purchaser, and each of their respective successors and permitted assigns, including any trustee or other fiduciary appointed.

3744.   Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rules 6004(h) and 6006(d)) or Local Bankruptcy Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  Time is of the essence in closing the Sale, and the Debtors and the Purchaser intend to close the Sale as soon as practicable. Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk their appeal being foreclosed as moot.

~~38~~45.   The provisions of this Order are nonseverable and mutually dependent.

~~39~~46.   This Court shall retain exclusive jurisdiction over any and all matters

arising from or related to the implementation or interpretation of this Order, the APA or

any document related thereto.


Richmond, Virginia

Dated:_____, 2014



KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY JUDGE


                                        Entered on Docket: _____

WE ASK FOR THIS:

/s/ ~~Henry P. (Toby) Long, III~~Justin F. Paget

Tyler P. Brown (VSB No. 28072)
 Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors and Debtors in
Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac
vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors and Debtors in
Possession*

## <u>CERTIFICATION OF ENDORSEMENT</u>
## <u>UNDER LOCAL BANKRUPTCY RULE 9022-1(C)</u>

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

 /s/ ~~Henry P. (Toby) Long, III~~Justin F. Paget

| Summary report: Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 6/3/2014 6:12:40 PM | |
|---|---|
| **Style name:** Color Legislative + Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/85925934/20 | |
| **Modified DMS:** iw://DMS/AmericasActive/85925934/26 | |
| **Changes:** | |
| Add | 96 |
| Delete | 69 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 165 |

**ANNEX B**

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone:   (212) 450-4000

Facsimile:   (212) 607-7973

Marshall S. Huebner (admitted *pro hac vice*)

Brian M. Resnick (admitted *pro hac vice*)

Michelle M. McGreal (admitted *pro hac vice*)

*Counsel to the Debtors
and Debtors in Possession*

HUNTON & WILLIAMS LLP

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia 23219

Telephone: (804) 788-8200

Facsimile: (804) 788-8218

Tyler P. Brown (VSB No. 28072)

Henry P. (Toby) Long, III (VSB No. 75134)

Justin F. Paget (VSB No. 77949)

*Local Counsel to the Debtors
and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>**JAMES RIVER COAL COMPANY**, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 14-31848 (KRH)<br><br>(Jointly Administered) |

## ORDER (i) APPROVING THE SALES AND TRANSFERS OF CERTAIN ASSETS AND LIABILITIES RELATED TO THE McCOY ELKHORN MINING COMPLEX FREE AND CLEAR OF ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (iii) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of James River Coal Company and its

subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the

"**Debtors**"), for an order pursuant to sections 363 and 365 of chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), and Rule 6004-2 of

the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia

(the "**Local Bankruptcy Rules**") (i) authorizing entry into an asset purchase agreement,

attached hereto as <u>Exhibit 1</u> (the "**APA**"),[2] among Debtor James River Coal Company

("**James River**"), Debtor McCoy Elkhorn Coal Corporation ("**McCoy Elkhorn,**"), any

Debtor affiliate of McCoy Elkhorn that holds any interest in the Burke Assets (as defined

below) (collectively with James River and McCoy Elkhorn, the "**Sellers**"), and Marshall

Resources, Inc. (the "**Purchaser**") substantially on the terms and conditions set forth in

the Summary of Terms and Conditions attached as Exhibit D to the Motion;

(ii) approving the sale and transfer (the "**Sale**") of certain assets of the Sellers (the

"**Burke Assets**") to the Purchaser in accordance with the APA; (ii) authorizing the

assumption and assignment of certain executory contracts and unexpired leases in

connection therewith; and (iii) granting such other and further relief as is just and proper,

as more fully described in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

consideration of the Motion and the requested relief being a core proceeding under 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided; and no other or

further notice need be provided; and the relief requested in the Motion being in the best

interests of the Debtors, their estates, the creditors and other parties in interest; and the

Court having reviewed the Motion and having held a hearing with appearances of parties

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion or the APA, as applicable.

in interest noted in the transcript thereof (the "**Hearing**"); and the Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing

establish just cause for the relief granted herein; and upon all of the proceedings had

before the Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AS FOLLOWS:**[3]

A.      On April 7, 2014 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

"**Chapter 11 Cases**").

B.      This Court has jurisdiction to hear and determine the Motion pursuant to

28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases and the Motion in this

District is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).

C.      The statutory predicates for the relief requested in the Motion are sections

363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local

Bankruptcy Rule 6004-2.

D.      The Debtors continue to operate their business and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.      No trustee or examiner has been appointed in the Chapter 11 Cases.

F.      As evidenced by the certification of service previously filed with the

Court, and based on the representations of counsel at the Hearing: (i) proper, timely,

adequate and sufficient notice of the Motion, the Hearing and the Sale has been provided

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9007; (ii) such notice was good and sufficient, and appropriate under the particular circumstances; and (iii) no other or further notice of the Motion, the Hearing, the Sale or the entry of this Order shall be required.  Notice of the Motion, the Sale and the Hearing was also posted electronically on the website maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' Claims, Noticing and Balloting Agent, at *http://dm.epiq11.com/JamesRiverCoal*.

G.    The Debtors served the Notice of Sale and Assumption and Assignment Notice on each Contract Counterparty under each Assumed Contract, and such parties were provided with a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein, and have been or will be provided with reasonable opportunity to object and be heard with respect to the assumption and assignment of the Assumed Contracts and any Cure Amounts in respect thereof in accordance with the procedures set forth in the Motion (the "**Assumption Procedures**").

H.    A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities, including the following: (i) the Core Parties, (ii) the 2002 List Parties and (iii) all applicable federal, state and local taxing and regulatory authorities.

I.    The Debtors marketed the Burke Assets to potential purchasers, both before and during the Chapter 11 Cases.  No other person, entity or group has offered to purchase the Burke Assets for an amount that would provide a higher and better economic value to the Debtors than that being provided by the Purchaser pursuant to the APA.

J.      As demonstrated by the record of the Hearing and the dockets in the

Chapter 11 Cases, the Debtors have demonstrated good and sufficient reasons for the

Court to approve the Motion and the Sale.

K.      The "**Burke Assets**" will consist of James River's and its subsidiaries' and

McCoy Elkhorn's right, title and interest in, to certain assets relating to the McCoy

Elkhorn mining complex that are being transferred to the Purchaser pursuant to the APA.

L.      The Debtors are the sole and lawful owners of the Burke Assets.

M.      Subject to entry of this Order, (i) the Debtors have full corporate power

and authority to execute the APA and all other documents contemplated thereby, (ii) the

Debtors have all of the power and authority necessary to consummate the transactions

contemplated by the APA, and (iii) no government, regulatory or other consents or

approvals, other than those expressly provided for in the APA, are required for the

Debtors to enter into the APA and consummate the transactions contemplated by the

APA.

N.      The purchase price to be paid by the Purchaser is fair and constitutes

reasonably equivalent value and reasonable market value for the Burke Assets.

O.      The Purchaser is a purchaser in good faith with respect to the Burke

Assets, as that term is used in section 363(m) of the Bankruptcy Code. The APA was

negotiated, proposed and entered into by the Debtors and the Purchaser without collusion,

in good faith, and from arm's–length bargaining positions, and the Purchaser is entitled to

all of the protections afforded under section 363(m) of the Bankruptcy Code and any

other applicable bankruptcy and non-bankruptcy law.  Neither the Debtors nor the

Purchaser has engaged in any conduct that would cause or permit the Sale or APA to be

voided under section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not

acted in a collusive manner with any person, and the purchase price was not controlled by

any agreement.  The Purchaser is not, and was not immediately prior to the Closing Date,

an "affiliate" or "insider" of the Debtors as defined in section 101 of the Bankruptcy

Code, and no common identity of incorporators, directors or stockholders existed

between the Purchasers and the Debtors immediately prior to the Closing Date.

P.        Except as specifically provided in the APA, the Purchaser shall not

assume or become liable for any obligation, claim, cause of action, charge, right of setoff,

recoupment, rebate, chargeback, credit, return, interest, mortgage, option, pledge, lien,

charge, security  interest, encumbrance, restriction, lease, license, easement, liability or

adverse claim of any nature whatsoever, direct or indirect, whether accrued, absolute,

contingent or otherwise ( collectively, an "**Encumbrance**" or "**Encumbrances**") relating

to the Burke Assets being sold by the Debtors unless expressly stated in the APA or this

Order.  Any such valid and enforceable Encumbrances shall attach to the proceeds of the

Sale.

Q.        Sound business reasons have been articulated for performing the

obligations set forth in the APA and selling the Burke Assets as set forth in the Motion

outside of a plan of reorganization, it is a reasonable exercise of business judgment to

execute, deliver and consummate the APA with the Purchaser and consummate the

transactions contemplated thereby, and such acts are in the best interests of the Debtors,

their estates and all parties in interest.  The Court finds that the Debtors have articulated

good and sufficient business reasons, which include, but are not limited to, the following:

(i) the APA constitutes the highest and best offer for the Burke Assets; (ii) the APA and

the closing thereon will present the best opportunity for the Debtors to realize the value

of the Burke Assets; and (iii) the Sale will enable the Debtors to avoid the ongoing

expenditures related to the Burke Assets.

R.    The Debtors may sell the Burke Assets free and clear of any and all

Encumbrances because, in each case, one or more of the standards set forth in section

363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of such

Encumbrances who did not object, or who withdrew their objections, to the Sale or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy

Code.

S.    Except as expressly set forth in the APA, the transfer of the Assumed

Contracts to the Purchaser will not subject the Purchaser to any liability whatsoever prior

to the Closing Date or by reason of such transfer under the laws of the United States, any

state, territory, or possession thereof, or the District of Columbia, based, in whole or in

part, on any theory of law or equity.  The Debtors have demonstrated that it is an exercise

of their sound business judgment to assume and assign the Assumed Contracts to the

Purchaser in connection with the consummation of the transactions contemplated by the

APA.  The Assumed Contracts are an integral part of the Burke Assets being purchased

by the Purchaser and, accordingly, such assumption and assignment is reasonable,

enhances the value of the estates and does not constitute unfair discrimination.  The

Debtors have cured, or provided adequate assurance of cure with respect to, any default

existing prior to the date hereof under any of the Assumed Contracts within the meaning

of section 365(b)(1)(A) and (f)(2)(A) of the Bankruptcy Code.  The Purchaser has

provided adequate assurance of future performance of and under the Assumed Contracts

within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

      T.    The terms and conditions set forth in the APA, including the total

consideration to be realized by the Debtors, are fair and reasonable and the transaction

contemplated by the APA is in the best interests of the Debtors, their creditors and their

estates, and the consideration constitutes reasonably equivalent value under the

Bankruptcy Code and the laws of the United States, any state, territory, possession or the

District of Columbia (including the Uniform Fraudulent Conveyance Act and the

Uniform Fraudulent Transfer Act).

      U.    The APA was not entered into for the purpose of hindering, delaying or

defrauding creditors under the Bankruptcy Code or other applicable laws.  The Purchaser

is not a mere continuation, and is not holding itself out as a mere continuation, of any of

the Debtors or their respective estates, and there is no substantial continuity between the

Purchaser and the Debtors.  The transactions contemplated by the APA do not amount to

a consolidation, merger or de facto merger of the Purchaser and the Debtors.

      V.    A valid business purpose exists for approval of the transaction

contemplated by the Motion pursuant to sections 363(b), (f) and (m) of the Bankruptcy

Code.  The Debtors may sell, transfer and assign the Burke Assets free and clear of the

Encumbrances in accordance with section 363 of the Bankruptcy Code.  As a condition to

purchasing the Burke Assets, the Purchaser requires that: (a) the Burke Assets be sold

free and clear of the Encumbrances; and (b) the Purchaser shall have no liability

whatsoever for any obligations of, or claims (including without limitation as defined in

section 101(5) of the Bankruptcy Code) against, the Debtors except those expressly

provided in the APA or this Order.  The Purchaser will not enter into an APA and consummate the transactions contemplated thereby, thus adversely affecting the Debtors' estates, if the sale to the Purchaser was not free and clear of Encumbrances or if the Purchaser was or would be liable for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors, except as otherwise explicitly provided in the APA or this Order.

W.      The transfer of the Burke Assets to the Purchaser is or will be a legal, valid and effective transfer of the Burke Assets, and will vest the Purchaser with all right, title and interest in and to the Burke Assets, free and clear of Encumbrances, except those explicitly and expressly excluded in the APA or this Order.

X.      An injunction against creditors and third parties pursuing Encumbrances is necessary to induce the Purchaser to close the Sale; the issuance of such an injunction is therefore necessary to avoid irreparable injury to the Debtors' estates, and will benefit all creditors.

Y.      The requirements of sections 363(b) and 363(f) of the Bankruptcy Code and any other applicable law relating to the Sale of the Burke Assets have been satisfied.

**AND IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion is hereby GRANTED.

2.      The Motion, the APA and the transactions contemplated thereby are approved, and the Debtors are authorized and empowered to enter into the APA, to perform their obligations thereunder, and to take such action as is necessary to effectuate the terms of the APA, without any further corporate authorization or order of this Court.

9

3.     The Debtors are hereby authorized, empowered and directed, pursuant to sections 363(b) and (f) of the Bankruptcy Code, to sell the Burke Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the APA, and, pursuant to section 363 of the Bankruptcy Code, title to the Burke Assets shall pass to the Purchaser at closing, free and clear of any and all Encumbrances, of any nature whatsoever, direct or indirect, whether accrued, absolute, contingent, known, unknown, or otherwise, whether arising before or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including federal or state laws or doctrines of successor or transferee liability.  All such Encumbrances upon the Burke Assets to be unconditionally released, discharged and terminated, with all such Encumbrances to attach only to the proceeds of the Sale with the same priority, validity, force and effect as they existed with respect to the Burke Assets prior to the Closing Date except as may be set forth herein.

4.     The Debtors and the Purchaser are directed to comply, and shall comply, with all provisions of the APA, including, but not limited to, executing and delivering the APA, together with all additional instruments and documents that may be reasonably necessary to implement the APA, in each case in accordance with the terms of the APA.

5.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

6.     The transfer of the Burke Assets to the Purchaser pursuant to the APA constitutes a legal, valid and effective transfer and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Burke Assets so transferred.

7.     This Order also shall be construed, and constitute for any and all purposes, a complete and general assignment, conveyance and transfer of all right, title and interest of the Debtors and their estates to the Purchaser of (i) the Burke Assets and (ii) the Assumed Contracts.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

8.     This Order and the APA shall be binding upon, and shall inure to the benefit of the Debtors, the Purchaser, and their respective successors and assigns, including without limitation, any chapter 11 trustee hereinafter appointed for the Debtors or any trustee appointed in a chapter 7 case, and its estate and creditors, if any of these Chapter 11 Cases are converted from chapter 11.

9.     On the date of the closing of the transactions contemplated by the APA (the "**Closing Date**"), each of the creditors of the Debtors is authorized and directed to execute such documents and take all other actions as may be necessary to release the Encumbrances against or in the Burke Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

10.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances against or in the Burke Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, and releases of the Encumbrances that the person or entity has with respect to the Burke Assets or otherwise, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Burke Assets.

11.      Effective upon the Closing Date, all parties and/or entities, including, but not limited to, all debt security holders, equity holders, governmental, tax and regulatory authorities, trade creditors, employees, litigation claimants and other creditors, asserting Encumbrances or contract rights against the Debtors and/or any of the Burke Assets, including the Assumed Contracts, are hereby permanently enjoined and precluded from, with respect to such Encumbrances:  (i) asserting, commencing or continuing in any manner any action against the Purchaser or any director, officer, agent, representative or employee of the Purchaser (all such entities are collectively referred to as the "**Protected Parties**") or against any Protected Party's Burke Assets or properties, including without limitation the Burke Assets; (ii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award, decree or order against the Protected Parties or any properties or Burke Assets of the Protected Parties, including without limitation the Burke Assets; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Protected Parties or any properties or Burke Assets of the Protected Parties, including without limitation the Burke Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Protected Parties; and (v) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Order or the APA.

12.     The provisions of this Order authorizing the sale of the Burke Assets free and clear of the Encumbrances (with such Encumbrances to attach to the proceeds of the Sale) shall be self-executing, and none of the Debtors, the Purchaser nor any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale; *provided, however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA.  Without in any way limiting the foregoing, the Purchaser is empowered to execute and file releases, termination statements, assignments, consents, cancellations or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale.

13.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

14.     The Purchaser is not a "successor" of the Debtors or their estates by reason of any theory of law or equity.  Consummation of the Sale and the transactions contemplated by the APA does not effect a *de facto* merger or consolidation of the Debtors and the Purchaser or result in the continuation of the Debtors' business under the Purchaser's control.  The Purchaser is not, and will not become by virtue of the Sale, the alter ego of, a successor in interest to, or a continuation of the Debtors, nor is the Purchaser otherwise liable for the Debtors' debts and obligations or incur any liability derived from the Burke Assets or the Assumed Contracts within the meaning of any federal, state or local revenue, pension, ERISA, tax, labor (including any WARN Act), employment, environmental or other law, rule or regulation,  unless otherwise

13

specifically provided for in the APA or pursuant to this Order.  For purposes of this paragraph of the Order, all references to the Purchaser shall include the affiliates, subsidiaries and shareholders of the Purchaser.

15.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Burke Assets are hereby directed to surrender possession of the Burke Assets to the Purchaser on the Closing Date.

16.    Nothing contained in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases or the order of confirmation confirming any such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

17.    The APA is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford, and is not in violation of creditors' and equity security interest holders' voting rights.

18.    The purchase by the Purchaser is a purchase in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code, and the Purchaser is entitled to the protection of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification or appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date.

19.    The sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Burke Assets shall be deemed to constitute reasonably equivalent value and fair consideration.

20.    From and after entry of this Order, none of the Debtors nor any other person or entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Burke Assets either to the Debtors prior to the closing of the Sale for subsequent transfer to the Purchaser, or to the Purchaser in accordance with the terms and conditions of the APA and this Order.

21.    The Debtors have demonstrated that the assumption by the applicable Debtors and assignment to the Purchaser of the Assumed Contracts is in the best interests of the Debtors, their creditors and their estates and represents a prudent exercise of the Debtors' business judgment.  The Assumed Contracts are an integral part of the Burke Assets and, accordingly, such assumptions and assignments are reasonable, enhance the value of the estate and do not constitute unfair discrimination.

22.    The contracts and leases set forth on Schedule 2.1(e) to the APA (the "**Assumed Contracts**") are in full force and effect and (subject to, and upon the payment of, the Cure Amounts), no default on the part of the Debtors exists under the Assumed Contracts, whether prepetition or postpetition in nature, and no counterparty to any such Assumed Contract shall be permitted to declare or enforce a default by the Debtors or the Purchaser thereunder or otherwise take action against the Purchaser as a result of any of the Debtor's financial condition, change in control, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract.

23.    The Debtors and the Purchaser have (i) cured, or provided adequate assurance of cure with respect to, any default by the Debtors existing prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) compensated, or provided adequate assurance of

15

compensation, to the Contract Counterparties for any actual pecuniary loss to such party resulting from a default by the Debtors prior to the date hereof under such Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code in accordance with the Assumption Procedures.  The Purchaser has provided adequate assurance of its future performance of and under the Assumed Contracts within the meaning of section 365(b)(1)(C) of the Bankruptcy Code in accordance with the Assumption Procedures .

24.    With respect to each Assumed Contract listed on Schedule 2.1(e) to the APA, the Cure Amount set forth on such schedule opposite such Assumed Contract to which no timely objection is filed in accordance with the Assumption Procedures is the sole amount necessary to cure all monetary defaults by the Debtors and to pay all actual pecuniary losses, if any, with respect to such Assumed Contract pursuant to section 365(b)(1) of the Bankruptcy Code.

25.    Pursuant to section 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtors are hereby authorized to: (a) assume the Assumed Contracts and assign such contracts to the Purchaser, effective upon the Closing Date; (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to the Purchaser, and (c) pay the required Cure Amounts, if any, at Closing (or as soon thereafter as is reasonably practicable).

26.    Upon the occurrence of the Closing Date, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such

16

Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of

the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.

Any provision in any Assumed Contract that purports to declare a breach, default or

termination as a result of a change of control of the Burke Assets or requires the consent

of any non-debtor party for the assumption and assignment thereof is hereby deemed

unenforceable under section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k)

of the Bankruptcy Code, the Debtors shall be relieved from any liability with respect to

the Assumed Contracts occurring after such assignment to and assumption by the

Purchaser except as expressly provided in the APA.

27.    All defaults or other obligations of the Debtors under the Assumed

Contracts arising or accruing prior to the closing of the Sale (without giving effect to any

acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of

the Bankruptcy Code) shall be cured as set forth in the APA as of the Closing Date or as

soon thereafter as practicable.  The Purchaser shall have no liability or obligation for any

such defaults or other obligations arising or accruing prior to the Closing Date, except as

otherwise expressly provided in the APA.

28.    Each Contract Counterparty that has not or does not file a timely objection

to the assumption and assignment of its Assumed Contract, including to any Cure

Amount, is hereby forever barred, estopped and permanently enjoined from filing any

such objection and from asserting, prosecuting or otherwise pursuing any of Debtors, the

Purchaser or any of their respective affiliates, successors or assigns or any of their

respective affiliates, agents, representatives, counsel and advisors, the Burke Assets or

any other assets or operations of any of the Debtors or the Purchaser on the basis that any

17

amounts in excess of the Cure Amount set forth opposite such Assumed Contract on

Schedule 2.1(e) to the APA is owing with respect to any defaults under such Assumed

Contract and/or that any other conditions to assumption or assignment must be satisfied

in order for the Assumed Contract to be assumed by any of the Debtors and assigned to

the Purchaser.  All parties who have failed to raise with particularity that such party's

consent is required for the Debtors to assume and assign such Assumed Contract are

hereby deemed to have given the consent contemplated by Bankruptcy Code section

365(c)(1)(B) and (f)(1) to the assumption of such Assumed Contract by the Debtors and

the assignment of such Assumed Contract to the Purchaser.

29.     The failure of the Debtors or the Purchaser to enforce at any time one or

more terms or conditions of any Assumed Contract shall not constitute a waiver of any

such terms or conditions, or of the Debtors' or the Purchaser's rights to enforce every

term and condition of the Assumed Contracts.

30.     Upon the occurrence of the closing of the Sale, the Purchaser shall assume

all liabilities associated with the Assumed Contracts in accordance with the terms of the

APA.

31.     Notwithstanding anything to the contrary herein, no executory contract or

lease shall be considered an Assumed Contract under this Order unless and until such

executory contract or lease shall have been assumed by the Debtors in accordance with

the assumption procedures set forth in the Motion, including, without limitation, the

Debtors having served an Assumption Notice to the non-debtor counterparty to any

executory contract or lease proposed to be assumed and provided ten (10) days from the

service of such notices for the applicable non-debtor counterparty to the file an objection.

32.     Nothing in the injunction and release provisions of this Order shall be interpreted to bar, impair, prevent or otherwise limit any rights the Debtors' surety bond providers may have and claim from and after the Closing, that they may claim under the existing bonds, indemnity agreements, common law of suretyship or the Surface Mine Control and Reclamation Act and its state analogues with regard to any failure of the Purchaser to satisfy and perform the Assumed Liabilities from and after Closing.

33.     The Debtors will use commercially reasonable efforts to transfer the Excluded Assets that are not transferred to Opes Resources Inc. to Laurel Mountain Resources LLC or another Debtor affiliate promptly following the Closing Date.

34.     Nothing in this Order or the APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability (including, but not limited to, for reclamation and mitigation and any associated long-term protection requirements) to a "governmental unit" (as defined in section 101(27) of the Bankruptcy Code) that any entity could be subject to as and to the extent it is the owner or operator of property sold or transferred pursuant to this Order after the Closing Date; provided, however, that the foregoing shall not limit, diminish or otherwise alter the Debtors' or the Purchaser's defenses, claims, causes of action, or other rights under applicable nonbankruptcy law with respect to any liability that may exist to a governmental unit at owned or operated property.  Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police ore regulatory law governing such transfer or assignment.  Nothing in this Order divests any tribunal of any jurisdiction it may have

19

under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order, subject to the Debtors' and the Purchaser's rights to assert in that forum or before this Court that any such laws are not in fact police or regulatory law or that such enforcement is impermissible under applicable law.

35.     Any objections to the Motion or the relief requested therein that have not been adjourned, withdrawn, waived, settled or otherwise resolved are hereby denied and overruled in all respects on the merits with prejudice.

36.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

37.     As of the time of the closing of the Sale, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.

38.     The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof; *provided*, that, (a) an order of this Court has approved such modification, amendment, or supplement; (b) such modification, amendment or supplement is not material or (c) such modification, amendment or supplement is made in the ordinary course of business.

39.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the Burke Assets and the Assumed Contracts on account of the filing or pendency of the Chapter 11 Cases.

40.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

41.     Notice of the Motion as provided therein shall be deemed good and sufficient notice.

42.     In the event of any inconsistencies between this Order, the Motion and the APA, this Order shall govern in all respects.  However, the failure to specifically include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

43.     Nothing contained in any plan of reorganization or liquidation confirmed in the Chapter 11 Cases or any order of the Court confirming such plan or in any order in the Chapter 11 Cases, shall alter, conflict with, or derogate from, the provisions of the APA or the terms of this Order.  The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order that may be entered by the Court in the Chapter 11 Cases, and the terms and provisions of this Order and the APA, as well as the rights and interests granted pursuant to this Order and the APA, shall continue in the Chapter 11 Cases or any superseding case and shall be specifically performable and enforceable against the Debtors, their estates and the Purchaser, and each of their respective successors and permitted assigns, including any trustee or other fiduciary appointed.

44.     Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rules 6004(h) and 6006(d)) or Local Bankruptcy Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be

immediately effective and enforceable upon its entry.  Time is of the essence in closing

the Sale, and the Debtors and the Purchaser intend to close the Sale as soon as

practicable.  Therefore, any party objecting to this Order must exercise due diligence in

filing an appeal and pursuing a stay, or risk their appeal being foreclosed as moot.

45.     The provisions of this Order are nonseverable and mutually dependent.

46.     This Court shall retain exclusive jurisdiction over any and all matters

arising from or related to the implementation or interpretation of this Order, the APA or

any document related thereto.


Richmond, Virginia

Dated:_____, 2014




_____
KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY JUDGE


Entered on Docket: _____

WE ASK FOR THIS:

/s/ Justin F. Paget
Tyler P. Brown (VSB No. 28072)
 Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors and Debtors in
Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac
vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors and Debtors in
Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Justin F. Paget

# EXHIBIT 1

**APA**

**AGREEMENT FOR PURCHASE AND SALES OF ASSETS**

**dated as of June 3, 2014**

**by and among**

**James River Coal Corporation**
**and certain of its subsidiaries**

**and**

**Marshall Resources, Inc.**

# TABLE OF CONTENTS

**Page**

SECTION 1- DEFINITIONS ......................................................................................1

    1.1    Definitions...........................................................................................1

SECTION 2 - PURCHASE AND SALE OF ASSETS .........................................5

    2.1    Conveyance of Assets .........................................................................5
    2.2    Excluded Assets ..................................................................................7

SECTION 3 - ASSUMPTION OF LIABILITIES.................................................7

SECTION 4 – PURCHASE PRICE.......................................................................8

SECTION 5 - CLOSING .........................................................................................9

SECTION 6 - REPRESENTATIONS AND WARRANTIES OF SELLER .........9

SECTION 7 - REPRESENTATIONS AND WARRANTIES OF BUYER ........14

SECTION 8 - COVENANTS AND AGREEMENTS ..........................................15

    8.1    Obligations of Seller Prior to Closing..............................................15
    8.2    Obligations of Buyer Prior to Closing ............................................16
    8.3    Post-Closing Obligations .................................................................17
    8.4    Insurance………………………………………………………………18
    8.5    Defense of Pending Litigation .........................................................18
    8.6    Publicity ...........................................................................................18
    8.7    HSR Act Notification.......................................................................18
    8.8    WARN Act........................................................................................18
    8.9    Bulk Sales Act Compliance .............................................................19

SECTION 9 - CONDITIONS PRECEDENT ......................................................19

    9.1    Conditions Precedent to Buyer's Obligations .................................19
    9.2    Conditions Precedent to Seller's Obligations .................................20
    9.3    Waiver...............................................................................................20

SECTION 10 - SELLER'S CLOSING DELIVERIES .........................................21

SECTION 11 - BUYER'S CLOSING DELIVERIES ...........................................22

SECTION 12 - PERMIT TRANSFERS AND INTERIM OPERATIONS ..........23

    12.1    Permit Transfers...............................................................................23
    12.2    Interim Operations ...........................................................................23
    12.3    Surety Bonds ....................................................................................24

SECTION 13 - TAXES AND EXPENSES ...................................................................25

    13.1   Taxes ...............................................................................................................25

    13.2   Expenses .........................................................................................................26

SECTION 14 - SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS ...................................................................26

SECTION 15 - TERMINATION ..............................................................................26

    15.1   Termination Events.........................................................................................26

    15.2   Effect of Termination......................................................................................27

    15.3   Fees and Expenses ..........................................................................................27

SECTION 16 - PRORATIONS AND ADJUSTMENTS ....................................................27

    16.1   Prorations and Adjustments ...........................................................................27

SECTION 17 - MISCELLANEOUS ..............................................................................28

    17.1   Records ...........................................................................................................28

    17.2   Exhibits and Schedules ..................................................................................28

    17.3   Notices ...........................................................................................................28

    17.4   Governing Law ..............................................................................................29

    17.5   Consent to Jurisdiction...................................................................................29

    17.6   Counterparts ...................................................................................................29

    17.7   Headings ........................................................................................................29

    17.8   Construction...................................................................................................29

    17.9   Binding Effect ...............................................................................................29

    17.10  No Third Party Beneficiaries .........................................................................30

    17.11  Amendment and Waiver .................................................................................30

    17.12  Assignment ....................................................................................................30

    17.13  Severability ....................................................................................................30

    17.14  Entire Agreement ...........................................................................................30

    17.15  Time of the Essence .......................................................................................30

## <u>SCHEDULES</u>

| | |
|---|---|
| 2.1(a) | Permits and Licenses |
| 2.1(b) | Real Property Interests |
| 2.1(c) | Improvements |
| 2.1(d) | Personal Property |
| 2.1(e) | Designated Agreements |
| 2.2 | Excluded Assets |
| 6.1(c) | Conflicts (Seller) |
| 6.1(d) | Consents (Seller) |
| 6.1(e) | Real Property Interests– Encumbrances and other burdens |
| 6.1(f) | Personal Property and Improvements – Encumbrances and other burdens |
| 6.1(g) | Good Standing of Real Property Leases |
| 6.1(h) | Permit Compliance |
| 6.1(i) | Legal Proceedings |
| 6.1(k) | Bonds |
| 6.1(l) | Real Property Interests that are conveyed with No Warranty of Title |
| 6.1(m) | Environmental Law Compliance |
| 6.1(n) | Subsidence Disclosure |
| 7.1(c) | Conflicts (Buyer) |
| 7.1(d) | Consents (Buyer) |
| 7.1(e) | No Knowledge of Misrepresentations or Omissions by Buyer |
| 10.1(f) | Consents Required for Closing |

**THIS AGREEMENT FOR PURCHASE AND SALE OF ASSETS** (the "Agreement") is made and entered into this 3rd day of June 2014 by and among James River Coal Company, a Virginia corporation, with an address of 1148 Long Fork Road, Kimper, Kentucky 41539, and those of its subsidiaries that hold an interest in the Assets (collectively, the "Seller"), and Marshall Resources, Inc., a Kentucky corporation, with an address of P.O. Box 2100, Pikeville, Kentucky 41502 (the "Buyer").

## W I T N E S S E T H:

**WHEREAS**, Seller owns or controls certain real property interests, mining rights, and other assets, including certain mines, coal processing and loading facilities, contracts, permits, governmental authorizations and licenses, employed in connection with certain coal mining operations of Seller located in Pike County, Kentucky;

**WHEREAS**, on April 7, 2014, Seller, its parent company and such parent company's consolidated subsidiaries, each filed a jointly administered voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (Richmond) (the "Bankruptcy Court"), under case number 14-31848 (KRH) (the "Bankruptcy Case") and continue to manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1008 of the Bankruptcy Code;

**WHEREAS**, the Seller desires to sell, and the Buyer desires to buy and acquire the Assets owned or controlled by Seller, as more particularly described herein, in accordance with and subject to the terms and conditions of this Agreement; and

**WHEREAS**, on May 23, 2014, the Seller filed a motion in the Bankruptcy Case pursuant to Sections 105, 363 and 365 of the Bankruptcy Code to sell the Assets and assume and assign the Designated Agreements pursuant to the terms and conditions contained in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants, representations and warranties herein contained, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Seller and the Buyer hereby agree as follows:

## SECTION 1
## DEFINITIONS

1.1     Definitions.     Unless the context otherwise requires, the following terms shall have the following meanings for all purposes of this Agreement.  Certain terms defined in the text of this Agreement similarly shall have the meanings therein given for all purposes of this Agreement:

"Affiliate" means a Person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with the Person specified or is otherwise an "affiliate" under the definition set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"Agreement" shall have the meaning set forth in the preamble.

"Alternative Transaction" means a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise to one or more third parties of any Assets.

"Application Period" shall have the meaning set forth in Section 12.2.

"Assets" shall have the meaning set forth in Section 2.1.

"Assumed Liabilities" shall have the meaning set forth in Section 3.1.

"Buyer" shall have the meaning set forth in the preamble.

"Buyer's Deliverables" shall mean the documents to be delivered or executed and delivered by Buyer at Closing as provided in Section 11.

"Change of Operator Applications" shall have the meaning set forth in Section 12.2.

"Closing" shall have the meaning set forth in Section 5.1.

"Closing Date" means the date of the Closing.

"COE" means the U.S. Army Corps of Engineers, Louisville District.

"Cure Costs" means any payments necessary to be made to parties to Designated Agreements in order to satisfy the requirements of Section 365(b) of the Bankruptcy Code.

"Damages" means all losses, damages, penalties, fines, judgments, costs, amounts paid in settlement, expenses and fees, including reasonable attorneys' and accountants' fees and expenses.

"Designated Agreements" shall have the meaning ascribed to it in Section 2.1(e) below.

"KYDNR" means the Kentucky Department for Natural Resources and its various Divisions.

"Encumbrance" or "Encumbrances" means any obligation, claim, cause of action, charge, right of set off, recoupment, rebate, chargeback, credit, return, interest, mortgage, option, pledge, lien, charge, security interest, encumbrance, restriction, lease, license, easement, liability or adverse claim of any nature whatsoever, direct or indirect, whether accrued, absolute, contingent or otherwise.

"Environmental Laws" means the following laws (including all rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings and changes thereunder or in connection therewith), each as amended:  (a) the Comprehensive Environmental Response, Compensation

and Liability Act of 1980, (b) the Hazardous Material Transportation Act, (c) the Resource Conservation and Recovery Act of 1976, (d) the Clean Water Act, (e) the Clean Air Act, (f) the Toxic Substances Control Act, (g) the Endangered Species Act, (h) the Federal Insecticide, Fungicide and Rodenticide Act, (i) the Safe Drinking Water Act, (j) the Atomic Energy Act, and all other laws, regulations, and orders of federal, state, local, and foreign governments concerning pollution or protection of the environment or public health and safety, excluding, however, SMCRA.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"GAAP" means generally accepted United States accounting principles, as in effect from time to time.

"Governmental Authority" shall mean any governmental, quasi-governmental, judicial, quasi-judicial, administrative or regulatory authority.

"Governmental Order" shall mean any order, writ, judgment, injunction, decree, stipulation, determination or award issued or entered by or with any Governmental Authority on or prior to the date of this Agreement.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Improvements" shall have the meaning set forth in Section 2.1(c).

"Interim Operating and Permit Agreement" shall have the meaning set forth in Section 12.2 (a).

"Knowledge," "known", "belief", or variances thereof when used with respect to the Seller shall mean the actual knowledge possessed as of the Closing Date by those persons listed on Exhibit A, and when used with respect to Buyer, such terms shall mean the actual knowledge possessed as of the Closing Date by those persons listed on Exhibit B.  A person will be deemed to have "actual knowledge" for purposes of this definition if: (i) the individual is actually aware of that fact or matter; or (ii) a prudent individual would be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonably comprehensive investigation regarding the accuracy of any representation or warranty contained in this Agreement.

"Laws" shall mean any and all federal, state, local or municipal laws, ordinances, principles of common law, codes, regulations, statutes or treaties.

"Legal Proceedings" shall mean any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative), whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Liability" with respect to any Person, any liability or obligation of such Person of any

kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"Licenses" shall mean those licenses set forth on <u>Schedule 2.1(a)</u>.

"Mine Act" means the Federal Mine Safety and Health Act of 1977, as amended, and the rules and regulations promulgated thereunder.

"MSHA" shall mean the U.S. Department of Labor, Mine Safety and Health Administration.

"Non-Real Estate Encumbrances" shall have the meaning set forth in Section 6.1(f).

"Order" shall mean any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Ordinary Course of Business" shall mean the ordinary course of business consistent with standard industry practice or the past custom and practice of Seller with respect to the Assets, taking into account business exigencies arising as a result of Seller's financial condition and status as a chapter 11 debtor.

"Permits" shall have the meaning set forth in Section 2.1(a).

"Permittee" shall mean the Person to which the Permits are issued.

"Permit Transfer Applications" shall have the meaning set forth in Section 12.

"Permitted Encumbrances" shall mean the Permitted Real Estate Encumbrances, together with the Permitted Non-Real Estate Encumbrances.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, trust, association, unincorporated organization, other entity, group or Governmental Authority.

"Personal Property" shall have the meaning set forth in Section 2.1(d).

"Plans" shall have the meaning set forth in Section 2.1(a).

"Purchase Price" shall have the meaning set forth in Section 4.1.

"Real Estate Encumbrances" shall have meaning set forth in Section 6.1(e).

"Real Property Interests" shall have the meaning set forth in Section 2.1(b).

"Safety Laws" shall mean any federal, state or local statute, law, rule, regulation, ordinance, code, guideline or written policy in effect as of the date hereof, excluding Environmental Laws and Surface Mining Laws, or any rule of common law now in effect and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to public or employee health or safety, including, without limitation, the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. and the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq.

"Scheduled Bonds" shall have the meaning set forth in Section 12.3(a).

"Seller" shall have the meaning set forth in the preamble.

"Seller Deliverables" shall mean the documents to be delivered or executed and delivered by Seller at Closing as provided in Section 10.

"SMCRA" means the federal Surface Mining Control and Reclamation Act, as amended, and any similar state or local laws, provided, however "SMCRA" shall not include any of the Environmental Laws.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, as amended, and the rules and regulations promulgated thereunder.

## SECTION 2
## PURCHASE AND SALE OF ASSETS

2.1    Conveyance of Assets.    On and subject to the terms and conditions of this Agreement, Buyer agrees to purchase and accept from Seller, and Seller agrees to sell, transfer, convey, and deliver to Buyer, pursuant to Sections 105 (a), 363 and 365 of the Bankruptcy Code, free and clear of any Encumbrance other than Permitted Encumbrances, all right, title, and interest in and to the following assets of Seller (the assets being transferred hereunder, exclusive of the Excluded Assets, as defined in Section 2.2 hereof, are referred to herein as the "Assets") on the Closing Date:

(a)    Permits and Licenses.    The mining permits, licenses, environmental permits, waivers, exemptions and other authorizations and governmental approvals of Seller described on Schedule 2.1(a) (the "Permits"), together with any renewals, extensions, or modifications thereof and applications therefor, and together with all plans that have been approved by any regulatory agency ("Plans") for any of the operations covered by any of the Permits relating to any of the Improvements, roof control, ventilation and any other similar methods of operations as are in place, or as the same may be modified from time to time.

(b)    Real Property.    All right, title, and interest of Seller in and to the real property interests listed and described on Schedule 2.1(b) (the "Real Property Interests"), together with all rights Seller may possess to access, mine, remove and/or transport coal therefrom and to recoup any advance or minimum royalties.

(c)    <u>Improvements</u>.  The buildings, facilities, warehouses, structures and other fixtures and improvements described in <u>Schedule 2.1(c)</u> ("Improvements").

(d)    <u>Personal Property</u>.  The tangible personal property described in <u>Schedule 2.1(d)</u> ("Personal Property").

(e)    <u>Contracts and Leases</u>.  The contracts, agreements and leases described on <u>Schedule 2.1(e)</u> (the "Designated Agreements") shall be assumed by Seller as of the Closing Date.  On the Closing Date, Seller shall assign to Buyer, free and clear of Encumbrances, the Designated Agreements.  Seller and Buyer, as applicable, shall comply with all requirements of Section 365 of the Bankruptcy Code necessary to permit such assumption and assignment, including providing adequate assurance of future performance under the Designated Agreements; *provided*, *however*, that, in connection with such assumption and assignment, any Cure Costs required to be paid to permit Buyer to assume the Designated Agreements shall be paid by Seller.  Buyer agrees that it shall, and shall cause its Affiliates to, cooperate with Seller in connection with furnishing information or documents to Seller to satisfy the requirements of section 365(f)(2)(B) of the Bankruptcy Code.  In furtherance of the foregoing, Buyer shall promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.   To the extent any such Designated Agreement does not constitute an executory contract subject to assumption and assignment under Section 365 of the Bankruptcy Code, then the rights and obligations under such Designated Agreements shall be transferred to Buyer as part of the sale of the Assets with such rights and obligations being expressly assumed by Buyer, except for any cure costs, which shall remain the sole responsibility of the Seller.

(f)    <u>Warranties</u>.  All manufacturers', vendors' and suppliers' warranties, to the extent they exist and are transferable, in respect of any item of equipment, machinery, tools, components and the like which are included in the Assets.

(f)    <u>Books and Records</u>.  All records which pertain to the Assets and which will be necessary in connection with the use and ownership of the Assets, including books, files, documents, correspondence, written contracts, surveys, agreements, drill logs, commitments, equipment maintenance records, understandings, mine plans and maps, permitting records, plats, reserve studies, engineering reports, environmental assessments, title opinions, reports or other title documentation and other records of Seller, provided, however, that the foregoing list does not include and specifically excludes any and all consolidated or consolidating financial statements of the Seller.

(g)    <u>Claims Against Third Parties</u>.  All claims and defenses that Seller has or

may have against third parties with respect to the Assets transferred hereby, whether choate or inchoate, known or unknown, contingent or noncontingent.

Notwithstanding the foregoing, the transfer of the Assets pursuant to this Agreement shall not include the assumption of any Liability related to the Assets unless Buyer expressly assumes that Liability pursuant to Section 3 below.

2.2     Excluded Assets.   Seller reserves and shall retain, and there is excluded from the Assets sold to the Buyer the "Excluded Assets", which shall mean: (a) Seller's rights against Buyer under or in connection with this Agreement; (b)  other than the Assets listed on Schedules 2.1(a), 2.1(b), 2.1(c) and 2.1(d), any other permits and licenses, real property and tangible personal property of Seller; and (c) any and all other property, interests, rights or assets, of any nature, of Seller not specifically enumerated in the preceding Section 2.1.  Further, Seller and Buyer understand and agree that Seller shall retain the right to continue to use and occupy, pursuant to a lease agreement, its current (i) office building and its parking lot; (ii) warehouse and its parking lot; (iii) safety building and its parking lot; (iv) locomotive garage and (v) shop building, all of which are located on portions of the real property covered by the Real Property Interests, all in accordance with the terms and conditions of a lease from Buyer to Seller in the form and substance of Exhibit I attached to this Agreement.

## SECTION 3
## ASSUMPTION OF LIABILITIES

3.1     On and subject to the terms and conditions of this Agreement, Buyer agrees, as of the Closing Date, to assume and become responsible for the debts, obligations and liabilities of the Seller as set forth below (the "Assumed Liabilities"):

(a)     all debts, obligations and liabilities under the Permits and Licenses, except for any outstanding non-compliances relating to the Permits and Licenses and any safety violations, all of which shall be retained by Seller as Retained Liabilities (defined below);

(b)     debts, obligations and liabilities under the Real Property Interests accruing and arising after the Closing Date relating to Buyer's operations after the Closing Date;

(c)     with respect to the Assets, all obligations and liabilities arising under any Environmental Laws which arise from or are related to activities, events, operations or time periods after the Closing Date, subject to Section 3.1(e) below;

(d)     except as otherwise set forth in this section 3.1, all debts, obligations and liabilities of any kind or character  resulting from or arising in connection with (i) the Buyer's use, operation or ownership of the Assets following Closing or, or (ii) the Buyer's activities and operations upon the Permits or Real Property Interests, following the Closing;

(e)     with respect to the Permits and the Real Property Interests, and not as to

7

any other Asset or Designated Agreement, all existing and future reclamation, restoration, mine closure, remediation and revegetation liabilities and obligations, arising under SMCRA or other similar applicable federal, state or local laws or regulations, regardless of whether such obligations or liabilities are related to activities, events, operations, or time periods before (for example, existing obligations to treat water on Permit No. 898-4031) or after the Closing Date, including, without limitation, backfilling, grading, soil replacement and other measures necessary or required to restore, remediate or maintain affected lands, mine openings, buildings, facilities, impoundments, primary and secondary sedimentation control structures, embankments, cuts, fills, spoil storage areas, roads or highways;

(f)      all existing and future obligations and liabilities arising as a consequence of the subsidence of the surface or any strata as it relates to Alma Mine Nos. 12 and 31.   All other subsidence obligations shall remain with and be the responsibility of the Seller; and

(g)      as of the Closing Date, all obligations and liabilities in connection with all ad valorem, real property, unmined minerals, and similar taxes and assessments imposed on the Assets which first become due and payable after the Closing Date, subject to the provisions of Section 16.1(a) below.

3.2      Except to the extent set forth in this Agreement or in any document or agreement delivered herewith or at the Closing, the Buyer assumes no other Liability of the Seller with respect to the Assets or otherwise.  The Retained Liabilities (defined below) shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Seller. "Retained Liabilities" shall mean every liability of Seller (whether incurred prior to or following the Closing Date) other than the Assumed Liabilities.

## SECTION 4
## PURCHASE PRICE

4.1      The Purchase Price consideration to be paid and given by Buyer to Seller in exchange for the sale and transfer of the Assets by Seller to Buyer shall be Four Hundred and Forty-four Thousand Nine Hundred and Ninety-Seven Dollars and Forty-nine cents ($444,997.49) (USD), allocated as follows:

(a)      On the Closing Date, Buyer shall pay to Seller the amount of Two Hundred Nineteen Thousand Nine Hundred Ninety-Seven Dollars and 49/100 ($219,997.49), which aggregate amount represents the current recoupable balance (as of the date of this Agreement) of prepaid royalties under the lease that is a part of the Real Property Interests;

(b)      On the Closing Date, Buyer shall pay to Seller the amount of One Hundred and Twenty-five Thousand Dollars ($125,000.00), which amount represents the costs incurred to date by Seller with regard to KYDNR Permit No. 898-9106 and COE Section 404 Permit No. 200401405 for the proposed refuse fill in Wolfpin

8

Branch; and

(c)      On the Closing Date, Buyer shall pay to Seller the amount of One Hundred Thousand Dollars ($100,000.00), which amount represents the value attributed by Buyer to the "Honey Fork Surface Property" that appears as item number 14 to the Special Warranty Deed referenced on Schedule 2.1(b).

4.2      As additional consideration for the sale, transfer, conveyance, assignment and delivery of the Assets by Seller to Buyer, and the payment by Buyer to Seller of the amounts set forth in Section 4.1 above, Buyer shall pay, perform, assume, and discharge the Assumed Liabilities as provided in Section 3.1 of this Agreement.

## SECTION 5
## CLOSING

5.1      The closing (the "Closing") and the consummation of the transactions contemplated by this Agreement shall take place at 10:00 a.m., local time, at 1148 Long Fork Road, Kimper, Kentucky on June 30, 2014 or at such other place or time as the Seller and the Buyer may mutually agree upon in writing, in each case, solely to the extent there has been satisfaction of the conditions set forth in Section 9 (or, to the extent permissible, waiver by the party entitled to the benefit of the condition) other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at Closing.

## SECTION 6
## REPRESENTATIONS AND WARRANTIES OF SELLER

6.1      The Seller hereby represents and warrants to the Buyer as follows:

(a)      <u>Corporate Standing</u>.      Seller is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Kentucky.

(b)      <u>Power and Authority of Seller; Authorization</u>.      Seller has all requisite corporate power and authority, to enter into and, subject to the entry of the 363/365 Order, to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement and Seller's Deliverables and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Seller.  This Agreement and Seller's Deliverables have been, or will be, duly executed and delivered by Seller and, subject to the entry of the 363/365 Order, constitute the legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application referring to or affecting the enforcement of creditors' rights, or by general equitable principles.

9

(c)     <u>No Conflict</u>.  After giving effect to the 363/365 Order, except as set forth in <u>Schedule 6.1(c)</u>, and except for the assignment of those leases and agreements requiring third party consent or approval to assignment set forth on <u>Schedule 6.1(d),</u> which consents or approvals will be delivered by Seller at Closing, neither the execution, delivery, nor performance of this Agreement by Seller shall conflict with, result in a default under, create a right to accelerate or loss of right under, or result in the creation of any lien, charge, or encumbrance pursuant to any provisions of the Articles of Incorporation or Bylaws of Seller or any franchise, mortgage, deed of trust, lease, license, agreement, law, rule, or regulation or any order, judgment, or decree to which  Seller is a party or by which the Assets may be bound.

(d)     <u>Consents</u>.  Except as set forth in <u>Schedule 6.1(d)</u> and except for approvals necessary for transfer of the Permits, after giving effect to the 363/365 Order, no consent, approval, order or authorization of, or registration, declaration or filing with, any Person, is required by or with respect to Seller in connection with (i) the execution and delivery of this Agreement, (ii) transferring any Assets from Seller to Buyer, or (iii) consummation by Seller of the transactions contemplated hereby.

(e)     <u>Real Property</u>.  The Real Property Interests are not subject to any Encumbrance except for (i) matters set forth on <u>Schedule 6.1(e)</u> which shall be released prior to or at Closing; (ii) liens for current real and personal property taxes not yet due and payable; (iii) statutory liens of warehousemen, mechanics and materialman and other like statutory liens, which arose in the Ordinary Course of Business and are for obligations not yet due and payable and will be paid in full by Seller on or before their due date; (iv) those matters, including the rights of third parties, recorded in the counties where the Real Property Interest are located or which would be disclosed or apparent from a physical inspection or survey of the Real Property Interests, and (v) those Encumbrances, imperfections of title, easements (including easements for power lines, telephone lines, and railways), rights-of way, servitudes, conditions, covenants and restrictions, if any, which (A) are not substantial in character, amount or extent and do not materially detract from the value of the Real Property Interests, (B) do not materially interfere with the use of the Real Property Interests for coal mining purposes, and (C) have arisen only in the Ordinary Course of Business (collectively, items (ii) to (v) above shall be referred to as "Real Estate Encumbrances"). On the Closing Date, the Real Property Interests shall be free and clear of all Encumbrances, other than the Real Estate Encumbrances (collectively, the "Permitted Real Estate Encumbrances").  There are no underground storage tanks or other structures designed for the storage of hazardous or regulated substances located in, on or under any of the Real Property Interests.

(f)     <u>Personal Property; Improvements</u>.  The Personal Property and Improvements are not subject to any Encumbrance, except for (i) matters set forth on <u>Schedule 6.1(f)</u>, which shall be released at or prior to Closing, and (ii) those imperfections of title and Encumbrances, if any, which (A) are not substantial in character, amount or extent and do not materially detract from the value of the

10

Personal Property or Improvements subject thereto, (B) do not materially interfere with either the present or continued use of such Personal Property or Improvements for coal mining purposes, and (C) have arisen only in the Ordinary Course of Business (collectively, the matters referred to in item (ii) above shall be referred to as, "Non-Real Estate Encumbrances").   On the Closing Date, the Personal Property and Improvements shall be free and clear of all Encumbrances, other than the Non-Real Estate Encumbrances (collectively, the "Permitted Non-Real Estate Encumbrances").  There exists no restriction on the use or transfer of the Personal Property or Improvements.  There are no insurance claims pending relating to any of the Personal Property or Improvements.

(g)    Good Standing of Real Property Interests, Leases.  To the best of Seller's Knowledge, (i) there are no existing defaults with respect to any of the real property leases set forth on Schedule 2.1(b) by any party thereto; and (ii) no event has occurred with respect to any of the real property leases set forth on Schedule 2.1(b) which (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a default thereunder by Seller or, to Seller's Knowledge, by any other party thereto, except for matters set forth on Schedule 6.1(g) and those defaults or events, if any, which (A) are not substantial in character, amount or extent and do not materially detract from the value of the real property leases, (B) do not materially interfere with the use of such real property leases for coal mining purposes, and (C) have arisen only in the Ordinary Course of Business.

(h)    Permits. Except as set forth on Schedule 6.1(h), Seller has not received any citations, notices of non-compliance, or notices of violation pertaining to the Permits from any Governmental Authority which remain outstanding and under protest, uncured, or otherwise unresolved, and to the best of Seller's Knowledge and belief Seller is in substantial compliance with the terms and provisions of the Permits.   All fines, penalties and similar charges imposed on or assessed with respect to the Permits by any Governmental Authority have been paid in full, excepting only those payable with respect to citations, notices of non-compliance or notices of violation which are listed in Schedule 6.1(h) and designated as still outstanding and unresolved, and Seller and Buyer understand and agree that Seller shall retain the obligations to any Governmental Authority to be responsible for, and to pay, any and all such fines, penalties and similar charges with regard to such citations, notices of non-compliance or notices of violation as are set forth on Schedule 6.1(h).  There are no cessation orders or cease and desist orders issued by any Governmental Authority with respect to the Permits.

(i)    Legal Proceedings and Orders.  Except as set forth on Schedule 6.1(i), other than the Bankruptcy Case, there is currently no Legal Proceeding filed against the Seller: (a) relating to the Assets or the business operated by Seller with the Assets, (b) that challenges, or that have the effect of preventing, delaying, making illegal or otherwise interfering with the transactions contemplated by this Agreement.  To the Knowledge of Seller, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the

commencement of any Legal Proceeding that challenges, or that have the effect of preventing, delaying, making illegal or otherwise interfering with the transactions contemplated by this Agreement. There are no Legal Proceedings listed or required to be listed on Schedule 6.1(i) that could have a material adverse effect on the Assets or Buyer's ability to use or operate the Assets in connection with its proposed coal mining operations other than the Bankruptcy Case.  There is no Order to which Seller, its business or any of its assets is subject that would reasonably be expected to materially and adversely affect the Assets or Buyer's ability to use or operate the Assets in connection with its proposed coal mining operations.

(j)      Brokers.  Neither the Seller, nor any of its officers, directors or employees, has employed any broker, finder or financial advisor or incurred any liability for fees or commissions payable to any broker, finder or financial advisor in connection with the negotiations relating to or the transactions contemplated by this Agreement.

(k)      Bonds.  Schedule 6.1(k) lists all bonds, including reclamation bonds, in force as of the Closing Date with respect to the Permits.

(l)      Warranty of Title.  Except for any lien, claim, liability, right, restriction, Encumbrance or other matter identified in this Section 6 or on any schedule provided pursuant to this Section 6, Seller warrants that it has and will transfer at the Closing good and marketable title to all Assets free and clear of Encumbrances.   Provided, however, Seller shall convey the Real Property Interests with special warranty of title, except for the Real Property Interests set forth on Schedule 6.1(l), which shall be conveyed with no warranty of title.

(m)      Compliance with Laws. With respect to the Assets, except as set forth on Schedule 6.1(m), Seller is in substantial compliance with all Laws, including, without limitation, all Environmental Laws.

(n)      Subsidence Disclosure.  Schedule 6.1(n) sets forth all obligations and liabilities known to Seller as of the Closing Date arising as a consequence of the subsidence of the surface or any strata overlying or adjoining any of the Real Property Interests.

(o)      Designated Agreements.  With respect to the Designated Agreements, other than with respect to the Bankruptcy Case, and after giving effect to the 363/365 Order (a) each Designated Agreement is transferable (and that any necessary consent to transfer and assign any rights in any such Designated Agreement has been obtained) and Seller is authorized to assign and transfer to Buyer all of its rights in such Designated Agreement; (b) each Designated Agreement is valid, in full force and effect and enforceable in accordance with its terms; (c) each of Seller and, to Seller's Knowledge, each other party to the Designated Agreements has been in compliance, in all material respects, with the Designated Agreements since the effective date of such Designated Agreements;

12

and (d) no event has occurred or circumstance exists that (with or without notice or lapse of time) would result in a breach of, or give any person the right to declare a default or exercise any remedy under, or accelerate the performance of, or cancel, terminate or modify any right that Seller is entitled under the Designated Agreements.

(p)     <u>Title Opinions and Abstracts</u>.     WITH RESPECT TO ANY TITLE OPINIONS AND ABSTRACTS DELIVERED BY SELLER TO BUYER UNDER THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY NATURE WHATSOEVER REGARDING SUCH TITLE OPINIONS AND ABSTRACTS, OR THE ACCURACY OR VALIDITY OF ANY FACTS, STATEMENTS OR OPINIONS SET FORTH THEREIN.

(q)     <u>Safety Matters</u>.  Seller is in substantial compliance with the Safety Laws, except for any non-compliance which would not be reasonably likely to result in any material liability, cost or penalty.  There are no citations, notices of non-compliance, cessation orders, notices of violation and consent decrees relating to Safety Laws and affecting the Permits that remain unabated as of the date hereof.

(r)     <u>Sufficiency of Assets</u>.  The Assets constitute all of the assets, tangible and intangible, of any nature whatsoever that were in place on the Real Property Interests as of MAY 1, 2014.

(s)     <u>Disclosure Limitations.</u> Buyer will rely on an order of the Bankruptcy Court approving this Agreement and authorizing the sale of the Assets and the assumption and assignment of the Designated Agreements pursuant to Sections 105, 363(b), 363(f), 365, 1123 and 1129 of the Bankruptcy Code (the 363/365 Order").   Subject to the foregoing, and except for the representations and warranties contained this Agreement, Seller makes no other representations or any warranties, express or implied, about or pertaining to any of the Assets, including as to the condition (physical or otherwise) of the Assets, the present use of the Assets or suitability for use in Buyer's intended use or operation of the Assets, the existence, size, extent, quantity, quality, value or mining feasibility of any coal or timber on any part of the Assets, or the presence or absence of any "hazardous substances", "hazardous wastes" or "underground storage tanks" as those may be defined under any federal, state or local statutes.  **Seller hereby expressly disclaims any other representations and all other warranties of any kind or nature whatsoever with respect to the Assets, including any warranties of merchantability and fitness for a particular purpose, which warranties are hereby expressly disclaimed.  The Assets are sold and conveyed to Buyer AS IS AND WITH ALL FAULTS.**

13

## SECTION 7
## REPRESENTATIONS AND WARRANTIES OF BUYER

7.1     The Buyer hereby represents and warrants to Seller as follows:

(a)     <u>Corporate Standing</u>.    Buyer is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Kentucky.

(b)     <u>Power and Authority of Buyer; Authorization</u>.    Buyer has all requisite power and authority, corporate or otherwise, to enter into and to consummate the transactions contemplated by this Agreement.    The execution and delivery of this Agreement and the Buyer's Deliverables and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Buyer.    This Agreement and Buyer's Deliverables have been, or will be, duly executed and delivered by the Buyer and constitute the legal, valid and binding obligations of the Buyer enforceable against the Buyer in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application referring to or affecting the enforcement of creditors' rights, or by general equitable principles.

(c)     <u>No Conflict</u>.    Except as set forth in <u>Schedule 7.1(c)</u>, neither the execution, delivery, nor performance of this Agreement by Buyer shall conflict with, result in a default under, create a right to accelerate or loss of right under, or result in the creation of any lien, charge, or encumbrance pursuant to any provisions of the Articles of Incorporation or Bylaws of Buyer or any franchise, mortgage, deed of trust, lease, license, agreement, law, rule or regulation or any order, judgment, or decree to which Buyer is a party or by which it or the assets of Buyer may be bound or affected.

(d)     <u>Consents</u>.    Except as set forth in Schedule 7.1(d), no consent, approval, order or authorization of, or registration, declaration or filing with, any Person, is required by or with respect to Buyer in connection with the execution and delivery of this Agreement, or the consummation by Buyer of the transactions contemplated hereby.

(e)     <u>Brokers</u>.    No broker, finder or agent has acted for or on behalf of Buyer or its members, officers, directors or employees in connection with this Agreement or the transactions contemplated hereby and no such party is entitled to any finder's fee or brokerage or other commission in connection therewith based on any agreement, arrangement or understanding with Buyer.

(f)     <u>Buyer's Investigation</u>.    Without limiting the express representations and warranties of Seller herein, Buyer has made its own limited independent inspection and investigation of the Assets and the Assumed Liabilities. Furthermore, without limiting the express representations and warranties of Seller herein upon which Buyer is entitled to rely (except as otherwise set forth in this Agreement) and

14

subject to the 363/365 Order, Buyer acknowledges and agrees that it is acquiring the Assets **AS IS AND WITH ALL FAULTS.** BUYER ACKNOWLEDGES AND AGREES THAT SELLER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE SELLER MAKES NO REPRESENTATIONS AND DISCLAIMS ANY WARRANTIES AS TO THE EXISTENCE, QUANTITY, QUALITY, MINEABILITY OR MERCHANTABILITY OF ANY COAL RESERVES, INCLUDED IN THE REAL PROPERTY INTERESTS.

(g)      <u>Buyer's Qualifications to Hold Permits.</u>  Neither the Buyer, its Affiliates, nor any Person which "owns or controls" the Buyer or its Affiliates is prevented by any laws, rules or regulations of any federal, state, or local governmental authority from obtaining and holding permits for surface coal mining operations. Further, there is no pending or threatened action by the U.S. Department of Interior, Office of Surface Mining, or the agency of any state administering SMCRA, seeking to revoke the eligibility (i.e., permit block) of Buyer, its Affiliates, or any Person which "owns or controls" the Buyer or its Affiliates from receiving surface mining permits.

(h)      <u>No Litigation Conflict.</u>  Other than the Bankruptcy Case, there is no action, suit or proceeding pending or, to Buyer's knowledge, threatened against or affecting Buyer or any of its Affiliates or any of their respective properties or assets, at law or in equity, or before any Governmental Authority, which would be reasonably likely to have a material adverse effect on Buyer or to interfere with Buyer's ability to consummate this Agreement or the transactions contemplated hereby.

**SECTION 8**
**COVENANTS AND AGREEMENTS**

8.1      <u>Obligations of Seller Prior to Closing</u>.  From the date of this Agreement and until the Closing Date, to the extent not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any orders entered by the Bankruptcy Court in the Bankruptcy Case or other applicable Laws, Seller shall:

(a)      use commercially reasonable efforts to conduct its business and the operations in connection with the Assets in accordance with the Seller's Ordinary Course of Business;

(b)      use commercially reasonable efforts to maintain and operate the Assets in accordance with the Seller's Ordinary Course of Business, normal wear and tear excepted;

(c)      sell, transfer, sublease, license or otherwise dispose of the Assets or the Designated Agreements other than in the Ordinary Course of Business;

15

(d)     take all actions and do all things reasonably necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, using its commercially reasonable efforts to obtain entry by the Bankruptcy Court on or before June 30, 2014 of a 363/365 Order which shall be in form and substance reasonably satisfactory to Buyer and which shall, among other things:

(i)     Approve each of the terms and conditions of this Agreement;

(ii)     Approve a sale of the Assets to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of Encumbrances;

(iii)     Contain findings of fact and provide, among other things, that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and that Buyer is not a successor of the Seller;

(iv)     Authorize the assumption by Seller and assignment to Buyer each of the Designated Agreements free and clear of Encumbrances; and

(v)     Otherwise be reasonably acceptable to Buyer.

(d)     upon reasonable notice from Buyer, afford Buyer reasonable access during normal business hours to the offices, equipment, mines, personnel, facilities, reserves, records, files, contracts, agreements, books of account, and other such documents and information relating to the Assets;

(e)     not knowingly take any action or omit to take any action which will result in the material breach by Seller of any of the representations and warranties of Seller set forth in this Agreement, any Designated Agreement or any lease, agreement, contract, or commitment to which Seller is a party and relating to the Assets;  and

(f)     use commercially reasonable efforts, with assistance and input from Buyer, to obtain prior to Closing all consents by third parties necessary to permit the consummation of the transactions contemplated by this Agreement and cooperate fully with Buyer in connection with Buyer's requests and applications for the governmental authorizations, approvals and consents which are necessary for the transfer of Permits, and the use, ownership and operation of the Assets following the Closing Date.

8.2     Obligations of Buyer Prior to Closing.  From the date of this Agreement and until the Closing Date, Buyer shall:

(a)     take all actions and do all things reasonably necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement, including taking all actions, at Buyer's own cost, that are reasonably

16

requested by Seller to assist in obtaining entry of the 363/365 Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court;

(b)        not knowingly take any action or omit to take any action which will result in the material breach by Buyer of any of the representations and warranties of Buyer set forth in this Agreement;

(c)        use commercially reasonable efforts to obtain prior to Closing all consents (other than those consents specifically required under this Agreement to be obtained by Seller) by third parties necessary to permit the consummation of the transactions contemplated by this Agreement; and

(d)        cooperate fully with Seller in connection with Seller's requests and applications for governmental authorizations, approvals and consents which are necessary for Buyer's use, ownership and operation of the Assets following the Closing.

8.3        <u>Post-Closing Obligations of Buyer and Seller</u>.

(a)        <u>Further Assurances</u>. At and after the Closing, the parties will, without further consideration, execute and deliver such other instruments and documents and do all other acts and things as the other party may reasonably request in order to effectuate or confirm the transactions contemplated by this Agreement.

(b)        <u>Title Opinions and Abstracts</u>.  Not later than fifteen (15) days following the Closing Date, Seller shall deliver, or cause to be delivered, to the Buyer copies of any title opinions and abstracts in the possession of Seller relating to the Real Property Interests.  BUYER ACKNOWLEDGES AND AGREES THAT THE SELLER IS MAKING NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE REGARDING THE TITLE OPINIONS AND ABSTRACTS DELIVERED BY SELLER HEREUNDER.  BUYER DOES HEREBY FULLY AND FINALLY RELEASE ANY AND ALL CLAIMS OR CAUSES OF ACTION WHICH BUYER MAY HAVE OR ACQUIRE AGAINST SELLER OR THE PREPARER OF SUCH TITLE OPINIONS OR ABSTRACTS.

(c)        <u>Books and Records</u>.  Not later than ten (10) days following the Closing Date, Seller shall deliver, or cause to be delivered, to the Buyer the books, files and payment records in the possession of Seller relating to the Real Property Interests, as well as the books, files and records relating to the Assets.

(d)        <u>Cooperation</u>.  From and after the Closing, Buyer shall provide, and cause its Affiliates to provide, Seller with such access, assistance, information and other cooperation as Seller may reasonably request in connection with any Retained Liabilities, including any non-compliances relating to the Permits and Licenses and any safety violations that may constitute Retained Liabilities.

17

(e)    Satisfaction of Certain Retained Liabilities.  From and after the Closing, Seller shall satisfy or cause to be satisfied, outstanding non-compliances relating to the Permits and Licenses and any safety violations, in each case that constitute, Retained Liabilities and, if not satisfied, would have an adverse impact on Buyer.

8.4    Insurance.

(a)    It is understood and agreed that any and all insurance policies relating to or covering the Assets and/or the Designated Agreements or business operations of Seller in connection with the Assets, other than such insurance as Seller is required to maintain pursuant to the terms and conditions of the lease attached hereto as Exhibit M, shall be canceled at the time of Closing and any refunds due as a result of such cancellations shall be payable to Seller.

(b)    As of the Closing Date, Buyer shall be responsible for obtaining and maintaining separate insurance policies and coverages insuring its interests and obligations in and/or under all of the Permits and Licenses and its operations and liabilities associated therewith. As of the Closing Date, Buyer shall be responsible for obtaining and maintaining any and all separate insurance policies and coverages insuring its interests and obligations in respect to all of the Assets and its operations and liabilities associated therewith.

8.5    Defense of Pending Litigation.  Seller shall provide for the defense of any pending litigation shown on Schedule 6.1(i) throughout the pendency of such litigation.  Seller shall have the benefit of any favorable award or judgment in any such litigation.

8.6    Publicity.  During the period prior to the Closing, except as may be required by applicable laws, the parties shall consult in advance of all public announcements which are not required by law in respect to the subject matter of  this Agreement.  The content of any such announcements shall require the mutual agreement of the parties prior to publication, such agreement not to be unreasonably withheld or delayed, except to the extent any such content may be required by applicable laws.

8.7    HSR Act Notification.  If necessary, Seller and Buyer shall promptly file, no later than ten (10) business days after the date of this Agreement, with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice any reports or forms required for the transactions contemplated hereby pursuant to the HSR Act.  The parties shall furnish to each other such necessary information and reasonable assistance as may be requested in connection with the preparation of any filing required to be made under the HSR Act.  Each party shall use its reasonable best efforts to obtain early termination of the applicable waiting period under the HSR Act.

8.8    WARN Act.   Seller shall assume responsibility for providing any required notice under the WARN Act relative to any covered acts or omissions occurring at or before the Closing and shall indemnify and hold harmless Buyer against all obligations and liabilities arising out of or related to the WARN Act or Seller's failure to comply therewith.

18

8.9     <u>Bulk Sales Compliance</u>.   Seller warrants to Buyer compliance with all bulk sales or bulk transfer laws of the Commonwealth of Kentucky or any other applicable jurisdictions and Seller, notwithstanding any limitations upon its obligations to indemnify Buyer, hereby agrees to unconditionally and without limitation as to the amount, defend, indemnify and hold harmless the Buyer of and from all Damages Buyer may suffer or incur by reason of such non-compliance, including without limitation, Damages arising out of any claims by creditors of Seller.

**SECTION 9**
**CONDITIONS PRECEDENT**

9.1     <u>Conditions Precedent to Buyer's Obligations</u>.   The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     the Bankruptcy Court shall have entered the 363/365 Order, on proper notice to all parties in interest, authorizing the sale of the Assets to the Buyer and the assumption and assignment of each of the Designated Agreements to the Buyer from the Seller, in form substantially similar to that contemplated by Section 8.1(c) herein, which 363/365 Order shall not be subject to a stay pending appeal;

(b)     each Designated Agreement shall have been assumed and assigned or, to the extent any such Designated Agreement does not constitute an executory contract subject to assumption and assignment under Section 365 of the Bankruptcy Code, then the rights and obligations under such Designated Agreements shall be subject to transfer to Buyer;

(c)     all representations and warranties of Seller contained herein shall be true and correct in all material respects on and as of the Closing Date, as though made on and as of the Closing Date;

(d)     all covenants, agreements and obligations required by the terms of this Agreement to be performed by Seller at or before the Closing shall have been duly and properly performed in all material respects, with only such exceptions as would not in the aggregate reasonably be expected to have a material adverse effect;

(e)     Seller shall have delivered to Buyer a certificate as to the fulfillment of the conditions set forth in Sections 9.1(a), (b) and (c);

(f)     the Buyer shall have received all resolutions, certificates, consents, approvals and other documents required to be delivered under Section 10;

(g)     no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any law or Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions; <u>provided,</u>

19

*however,* that the parties hereto shall use their reasonable efforts to have any such Governmental Order vacated; and

(h)      any applicable waiting period (and any extensions thereof) under the HSR Act shall have expired or otherwise been terminated.

9.2      <u>Conditions Precedent to Seller's Obligations</u>.   The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)      all representations and warranties of Buyer contained herein shall be true and correct in all material respects on and as of the Closing Date, as though made on and as of the Closing Date;

(b)      all covenants, agreements and obligations required by the terms of this Agreement to be performed by Buyer at or before the Closing shall have been duly and properly performed in all material respects;

(c)      Buyer shall have delivered to Seller a certificate as to the fulfillment of the conditions set forth in Sections 9.2(a) and (b);

(d)      the Seller shall have received all resolutions, certificates, consents, approvals and other documents required to be delivered under Section 11;

(e)      no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any law or Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions; <u>provided, however,</u> that the parties hereto shall use their reasonable efforts to have any such Governmental Order vacated;

(f)      any applicable waiting period (and any extensions thereof) under the HSR Act shall have expired or otherwise been terminated;

(g)      the Bankruptcy Court shall have entered the 363/365 Order, naming Buyer as the purchaser of the Assets, in form substantially similar to that contemplated by Section 8.1(c) herein, which 363/365 Order shall not be subject to a stay pending appeal; and

(h)      each Designated Agreement shall have been assumed and assigned or, to the extent any such Designated Agreement does not constitute an executory contract subject to assumption and assignment under Section 365 of the Bankruptcy Code, then the rights and obligations under such Designated Agreements shall be subject to transfer to Buyer.

9.3      <u>Waiver</u>.  Buyer may waive in writing fulfillment of any or all of the conditions set forth in Section 9.1 of this Agreement.  Seller may waive in writing fulfillment of any or all of the conditions set forth in Section 9.2 of this Agreement.

## SECTION 10
## SELLER'S CLOSING DELIVERIES

10.1    At or prior to the Closing, Seller shall have delivered, or caused to be delivered, to Buyer the following, all of which shall be in a form and substance reasonably acceptable to Buyer:

(a)    copies of resolutions of the Board of Directors of the Seller authorizing, approving and consenting to the execution and delivery of this Agreement, the consummation of the transactions contemplated herein, and the performance of the agreements set forth herein, certified as to the due adoption and continuing effect by the Corporate Secretary of Seller;

(b)    the deeds and assignments duly executed and acknowledged by Seller as necessary to convey to Buyer the Real Property Interests, substantially in the form attached to this Agreement as Exhibit C, Exhibit D, Exhibit D-1, Exhibit D-2; Exhibit D-3 and Exhibit D-4;

(c)    the bill of sale duly executed by Seller, substantially in the form attached to this Agreement as Exhibit E and, such other documents as may be reasonably requested by Buyer in connection with the sale of the Assets to Buyer and the transfer of those Assets to Buyer;

(d)    transfer applications and approved operator applications (which shall have been prepared in advance by Buyer, at its sole cost and expense) relating to the Permits, duly executed by Seller, substantially in the form attached to this Agreement as Exhibit F, Exhibit F-1, and Exhibit F-2;

(e)    the Interim Operating and Permits Agreement duly executed by Seller in the form attached to this Agreement as Exhibit K;

(f)    to the extent required after giving effect to the 363/365 Order, the consents identified on Schedule 10.1(f) each duly executed and delivered by each Person whose consent is required or appropriate;

(g)    a certificate of valid existence and good standing of Seller issued not earlier than seven (7) days prior to the Closing Date;

(h)    the Closing Certificate of Seller duly executed and substantially in the form attached to this Agreement as Exhibit G;

(i)    the lease, duly executed by Seller, substantially in the form of Exhibit I to this Agreement;

(j)    the 363/365 Order as entered by the Bankruptcy Court; and

(k)    such further instruments of conveyance, assignments, approvals, waivers,

consents, confirmations, releases and other documents as may be reasonably requested by Buyer, or as may be necessary to effectuate the sale and transfer of all title, ownership, and possessory rights in and to the Assets to Buyer and the assumption and assignment of the Designated Agreements to Buyer free and clear of Encumbrances, and to otherwise consummate and evidence the capacity and authority of Seller to consummate the transactions contemplated hereby.

## SECTION 11
## BUYER'S CLOSING DELIVERIES

11.1   At or prior to the Closing, Buyer shall have delivered, or caused to be delivered, to the Seller the following, all of which shall be in a form and substance reasonably acceptable to Seller:

(a)   copies of resolutions of the Buyer's Board of Directors authorizing, approving, and consenting to the execution and delivery of this Agreement, the consummation of the transactions contemplated herein, and the performance of the agreements set forth herein, certified as to the due adoption and continuing effect by the official record keeper of Buyer;

(b)   the assignments and bill of sale duly executed by the Buyer, substantially in the form attached to this Agreement as Exhibit D, Exhibit D-1, Exhibit D-2, Exhibit D-3, Exhibit D-4 and Exhibit F, and such other documents as may be reasonably necessary to consummate the sale and transfer of the Assets to Buyer;

(c)   transfer applications and approved operator applications relating to the Permits, duly executed by the Buyer, substantially in the form attached to this Agreement as Exhibit F, Exhibit F-1, and Exhibit F-2;

(d)   the Interim Operating and Permits Agreement duly executed by Buyer in the form attached to this Agreement as Exhibit K;

(e)   all consents of Buyer as set forth in Schedule 7.1(d);

(f)   a certificate of valid existence and good standing of Buyer issued not earlier than seven (7) days prior to the Closing Date;

(g)   the Closing Certificate of Buyer duly executed and substantially in the form attached to this Agreement as Exhibit H;

(h)   the lease, duly executed by Buyer, substantially in the form attached as Exhibit I to this Agreement; and

(i)   such further instruments of conveyance, assignments, approvals, waivers, consents, confirmations, releases and other documents as may be reasonably requested by Seller, or as may be necessary to effectuate the sale and transfer of all title, ownership, and possessory rights in and to the Assets from Seller, and to otherwise consummate and evidence the capacity and authority of Buyer to

22

consummate the transactions contemplated hereby.

## SECTION 12
## PERMIT TRANSFERS AND INTERIM OPERATIONS

12.1    <u>Permit Transfers</u>.  At the Closing, Seller shall deliver to Buyer partially completed Applications for Transfer, Assignment or Sale of Permit, KYDNR Form No. MPA-07 ("Permit Transfer Applications"), signed by the Permittee for each Permit. Within twenty (20) days after Closing, Buyer shall (or shall cause its Affiliate to) properly complete and submit all paperwork necessary to constitute complete, separate Permit Transfer Applications to KYDNR as to each Permit, to replace the obligations of Seller on all of the Permits listed in <u>Schedule 2.1(a)</u>, so that Seller may be entirely relieved therefrom as to each Permit upon the transfer of each such Permit.  Buyer shall provide Seller with written notice certifying that the Permit Transfer Applications have been submitted within thirty (30) days.  Any necessary filing fees for the Permit Transfer Applications, the costs of advertisements for the filing of the applications, and any other costs payable to any Governmental Authority, or Consultant(s) for Buyer or other entity with respect to the processing and completion of the Permit Transfer Applications through final approval and transfer from Seller to Buyer or Buyer's applicable Affiliate by the Governmental Authority shall be borne by Buyer.

12.2    <u>Interim Operations</u>.

(a)      On the Closing Date, Seller and Buyer shall cooperate in preparing, and Seller and Buyer shall (or Buyer shall cause its Affiliate to) execute and, within ten (10) days after the Closing Date, Buyer shall (or shall cause its Affiliate to) submit to KYDNR, properly completed Applications for Change of Operator KYDNR Form Nos. MPA-08 and MPA-02 ("Change of Operator Applications"), for all of the Permits which require such filings. Upon submission of the Change of Operator Applications, to the extent allowed under applicable regulations and provided that Buyer shall diligently pursue to completion the transfer to Buyer or its applicable Affiliate of each of the Permits and the approval of KYDNR of the transfer of the Permits, then, while the Permit Transfer Applications are pending (the "Application Period"), Buyer or its applicable Affiliate shall have the right to operate the Assets under the Permits until such time as the transfer of the Permits to Buyer or its applicable Affiliate is approved by KYDNR and successor operator permits are issued to Buyer or its applicable Affiliate.  Buyer shall, and shall cause its applicable Affiliates to, conduct its operations of the Assets under the Permits during the Application Period in compliance with the terms and conditions of the Permits and any applicable laws, rules and regulations relating thereto and in accordance with the Interim Operating and Permits Agreement in the form of <u>Exhibit K</u> attached to this Agreement.

(b)      Notwithstanding anything herein to the contrary, in the event that Buyer or its applicable Affiliate has not obtained final approval for transfer or replacement of the Permits within one hundred fifty (150) days after the date of submittal of the Permit Transfer Applications as required in Section 12.1 hereof, then at the sole discretion of Seller, any right of Buyer or its applicable Affiliate to operate

the Assets under the Permits shall, after notice by Seller, terminate and Buyer shall, and shall cause its Affiliates to, immediately cease all operations pursuant to the Permits (other than remedial actions required by any Governmental Authority) until such time as the Permits have been transferred or replaced. Buyer shall indemnify, defend and hold Seller harmless from any and all liability and Buyer shall reimburse Seller for any costs, expenses, and penalties incurred by or levied against Seller or its Affiliates as a result of Buyer's and its Affiliates' operations under the Permits after the Closing Date. Buyer shall be responsible for any reclamation required or arising under the Permits or SMCRA as a result of Buyer's and its Affiliates' operations after the Closing Date.

(c)      On the Closing Date, (i) Seller shall have "abandoned" and Buyer shall, or shall cause its applicable Affiliate to, have obtained in its own name the MSHA ID number(s) covering all of its operations on or relating to any of the Assets; and (ii) Buyer shall, or shall cause its applicable Affiliate to, have provided written notification to the local MSHA office that Buyer or its applicable Affiliate is solely responsible for such operations.

12.3   Surety Bonds.

(a)      Replacement of Surety Bonds.  Within twenty (20) days after the Closing Date, Buyer shall, or shall cause one of its Affiliates to, post a replacement letter of credit or surety bond or other appropriate collateral in form and substance satisfactory to Seller, and any applicable Governmental Authority, in respect of each letter of credit, surety bond and other obligation listed on Schedule 6.1(k) (collectively, the "Scheduled Bonds"). Following the Closing, the Buyer and Seller shall cooperate and cause its respective Affiliates to cooperate for the purpose of giving effect to the replacement of the Scheduled Bonds and the full release and discharge of Seller, its parent and any Affiliates with respect thereto. Buyer shall take all reasonable steps necessary to insure that Seller, and any affiliates, shall be released and discharged from all liability and obligations under the Scheduled Bonds as promptly as possible following Closing. Seller and Buyer understand and agree that the amount of each Scheduled Bond is subject to adjustment from time to time by the applicable regulatory authority, and in the event of any such adjustment(s) that occur prior to Closing, that Buyer shall be obligated to post a replacement bond in any such adjusted amount(s).

(b)      Indemnification after Closing.  Buyer shall indemnify, defend and hold harmless Seller, its parent and any affiliates from and against any and all liabilities or losses in respect of (i) any of the Scheduled Bonds after the execution of this Agreement and/or the Closing, as the case may be, including any liabilities or losses arising out of a draw made by any beneficiary of such Scheduled Bond or instrument after the Closing Date, or (ii) any action, suit, claim, investigation or proceeding relating to any Scheduled Bonds, arising by reason of Buyer's or its Affiliates' use of or operation on the Permits after the execution of this Agreement or the Closing Date, as the case may be. Any payment required to be made by Buyer under this Section 12.3(b) shall be made within ten (10) business

days of Buyer's receipt of written notice from Seller describing in reasonable detail the amount then due.  Amounts due by Buyer shall accrue interest at the rate of eight percent (8%) per annum from the date when due until the date of repayment.

12.4    Buyer shall indemnify the Seller from and against any Damages arising out of or related to (i) the use of the Permits by Buyer, its agents, contractors, lessees, sublessees, Affiliates, invitees, permitees, successors, and assigns (the "Permit Users"), and their coal mining, processing and related activities thereunder; (ii) the failure by the Permit Users to comply with all applicable laws, rules and regulations relating thereto; (iii) the failure by the Permit Users to comply with the terms and conditions of the Permits; or (iv) the breach or non-fulfillment of any covenant or agreement upon Buyer's part to be performed or observed under this Section 12.

12.5    <u>Insurance Requirements During Application Period</u>. As of the Closing Date and during the Application Period, Buyer shall be subject to the insurance requirements set forth in <u>Exhibit J</u> attached hereto and made a part hereof.

12.6    Buyer acknowledges and agrees that the Seller shall have the right to injunctive relief in the event Buyer or any of its Affiliates, prior to completion of the transfer of the Permits to Buyer, fails to comply with the terms and conditions of the Permits.

12.7    For such time as Buyer or any of its Affiliates shall operate the Assets pursuant to this Section 12, Buyer shall provide Seller, within three (3) business days of Buyer's or its Affiliates' receipt thereof, copies of any citations, notices of noncompliance, and notices of violation with respect to the Permits or Buyer's or its Affiliates' operations thereunder.

12.8    In the event Buyer elects to operate the Assets under the Permits during the Application Period, Buyer shall not be deemed an agent, contractor, employee, successor or servant of Seller for purposes of such operations and Permits.  Subject to its continuing obligations and liabilities under the Permits, Seller shall have no rights or obligations in any way to direct, supervise or control the mining and reclamation activities of Buyer.  All of Buyer's and its Affiliates' operations, including any profits generated therefrom, shall be at the sole cost and expense of Buyer.

12.9    Until such time as the Buyer's bonds are accepted by the applicable Governmental Authority, Seller shall, upon providing reasonably notice to the Buyer, have the right, but not the obligation, to enter at all times onto the Permits, for the purpose of inspecting the Buyer's or its applicable Affiliates' operations.

## SECTION 13
## TAXES AND EXPENSES

13.1    <u>Taxes</u>.  Seller shall pay all transfer, sales and/or use taxes, if any, determined to be due as a result of the transactions contemplated by this Agreement.  Buyer will pay all other taxes, including recording fees (unless otherwise ordered by the Bankruptcy Court), and other such taxes and fees payable in connection with the sale and delivery of the Assets to the Buyer

and the consummation of the transactions contemplated under this Agreement.  From and after the Closing Date, Buyer shall be responsible for all ad valorem, real property, severance, unmined minerals, reclamation, black lung or similar taxes associated with the Assets and/or the use or mining thereof that have accrued after the Closing Date.  Seller shall be responsible for all ad valorem, real property, severance, unmined minerals, reclamation, black lung or similar taxes associated with the Assets and/or the use or mining thereof that have accrued and/or are due and payable prior to the Closing Date.  The 363/365 Order to be submitted to the Bankruptcy Court shall include provisions requiring Seller to pay all such taxes due for the period prior to the Closing Date.

13.2    <u>Expenses</u>.  Except as otherwise specifically provided in this Agreement, Buyer and Seller shall each bear their own fees and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants,  incurred in connection with this Agreement and in connection with all covenants and obligations required to be performed by any of them under this Agreement.

**SECTION 14**
**SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS AND**
**AGREEMENTS**

14.1    The representations, warranties and agreements of the parties contained in this Agreement shall not survive the Closing Date, except for the agreements that by their terms are to be performed by the parties following the Closing.

**SECTION 15**
**TERMINATION**

15.1    <u>Termination Events.</u>  Subject to the provisions of Section 15.2, this Agreement may be terminated and abandoned at or prior to the Closing as follows:

(a)    By written notice given by any party hereto upon the occurrence of a material default or breach by any other party with respect to the due and timely performance of any of such party's respective covenants and agreements contained herein, or with respect to the due compliance with any of such party's respective representations and warranties contained herein, and such default cannot be cured prior to Closing and has not been waived;

(b)    by either the Seller or the Buyer if the Closing shall not have been consummated on or before June 30, 2014; *provided*, *however*, that, at the time of such termination, the party seeking to terminate shall not be in material breach of its obligations under this Agreement, including its obligation to consummate the Closing on the terms and subject to the conditions set forth herein;

(c)    by either the Seller or the Buyer if the 363/365 Order shall not have become final and nonappealable on or before June 30, 2014;

(d)    upon the mutual written consent of the Buyer and of the Seller;

26

(e)      on or prior to the later of (A) May 30, 2014 and (B) one business day after the expiration of the two business day period referred to below, by Seller if Seller receives a bona fide proposal for an Alternative Transaction, which, in the good faith judgment of Seller's board of directors, may provide a higher and better economic recovery than the Acquisition; <u>provided</u> that Seller will provide notice by e-mail to Buyer promptly after receipt of such a bona fide proposal and provide Buyer with two Business Days to propose a revised transaction; and

(f)      automatically if an Alternative Transaction is consummated with any party other than Buyer.

Notwithstanding any provision in this Agreement or other writing to the contrary, Seller is permitted to respond to any inquiry and supply information regarding the Assets submitted by any potential counterparty to an Alternative Transaction.  Seller shall contemporaneously provide to Buyer any such information not previously provided to Buyer.

15.2   <u>Effect of Termination.</u>  In the event this Agreement is terminated pursuant to Section 15.1 hereof, this Agreement and the proposed transactions contemplated hereunder shall terminate and, except as provided in the following sentence, no party shall have any further obligation or liability hereunder.  With respect to terminations arising under Section 15.1(a), nothing herein shall relieve the breaching party from liability for default or breach of any covenant, agreement, representation or warranty set forth in this Agreement, and the rights of the non-breaching party or parties to pursue all legal remedies for such default or breach shall survive termination.  The breaching party shall be fully liable for any and all Damages sustained or incurred by the non-breaching party or parties as a result of such default or breach.

15.3   <u>Fees and Expenses.</u>  Except as otherwise provided in Section 15.2 hereof, in the event this Agreement is terminated for any reason and the Closing is not consummated, each party shall be responsible for its own costs, fees and expenses, including fees and expenses of its accountants, investment advisers and counsel.

**SECTION 16**
**PRORATIONS AND ADJUSTMENTS**

16.1   <u>Prorations and Adjustments</u>.

(a)      All ad valorem, real property, unmined minerals and similar taxes and assessments applicable to the Assets will be prorated and adjusted to the date of Closing and any necessary payments shall be made at the Closing.  Buyer and Seller acknowledge and agree that for purposes of Closing, the foregoing taxes and adjustments shall be approximated based on tax bills for calendar year 2013.  If it is subsequently determined that the adjustments were based on inaccurate numbers as a result of calendar year 2013 or other tax bills or other pro ratable items being more or less than the amount used for the approximations and resulting adjustments made at Closing, then a final post-Closing adjustment shall be made to reflect the actual amount of such tax bills.  Buyer and Seller agree to

confer for purposes of reaching mutual agreement concerning a final post-Closing adjustment.  Any amounts determined to be due by one party to the other party as a result of the post-Closing adjustment shall be paid within thirty (30) days after such party's receipt of written notice thereof.

(b)     Seller shall be responsible for all royalties and lease payments payable on or before the Closing Date, including amounts required as prepayments, deposits, advances, etc., all of which will inure to the benefit of Buyer, but be in addition to the consideration to be paid or received pursuant to Section 4 hereof.  Buyer shall be responsible for all such royalties and lease payments due or payable after the Closing Date, and Buyer shall assume, and shall indemnify and hold harmless Seller against, all liabilities and obligations relating thereto.

(c)     For a period of thirty (30) days following Closing, Seller shall advise and assist Buyer with regard to calculating any royalties, lease payments or related obligations or expenses that become due and payable during such thirty (30) day period.  During such thirty (30) day period, Seller shall pay such royalties, lease payments or related obligations or expenses on Buyer's behalf and shall invoice Buyer for reimbursement of all amounts paid.  Within ten (10) days after receipt of the Seller's invoice, Buyer shall reimburse Seller for all amounts paid by Seller as set forth above.  Any amounts due by Buyer under this Section 16.1(c) shall bear interest at the rate of five percent (5%) per annum from the date when due until paid. +

## SECTION 17
## MISCELLANEOUS

17.1     Records.  After the Closing, each party shall make available to the other party upon reasonable request and provide the other party with reasonable access to such party's books and records relating to the transactions contemplated by this Agreement as may be appropriate for use in connection with reasonable business purposes, including use in connection with the preparation of tax returns.

17.2     Exhibits and Schedules.  The Exhibits and Schedules to this Agreement are an integral part of this Agreement and are hereby incorporated by reference as a part hereof. Disclosure of information in any one Schedule shall be deemed to be disclosure in any other Schedule.

17.3     Notices.  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been given on the date of delivery in person or of deposit in the United States mail, postage prepaid, if sent by registered or certified mail, return receipt requested, addressed as follows:

If to Seller:     McCoy Elkhorn Coal Corporation
                  1148 Long Fork Road
                  Kimper, Kentucky 41539
                  Attn. President

28

|  |  |
|---|---|
| With Copy to: | Helena Racin Jackson |
|  | James River Coal Company |
|  | 120 Prosperous Place, Suite 110 |
|  | Lexington, Kentucky 40509 |
|  |  |
| If to Buyer: | Marshall Resources, Inc. |
|  | P.O. Box 2100 |
|  | Pikeville, Kentucky 41502-2100 |
|  | Attn. President |
|  |  |
| With Copy to: | Legal Department |
|  | 2408 Sir Barton Way, Suite 325 |
|  | Lexington, KY 40509 |
|  | Attn: General Counsel |

Any party to this Agreement may change its address for receipt of notices and other communications hereunder by giving appropriate written notice to the other parties to this Agreement in accordance with the provisions of this Section 17.3.

17.4   <u>Governing Law</u>.   This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Kentucky, without regard to its conflict of laws principles.

17.5   <u>Consent to Jurisdiction</u>. The Buyer and the Seller hereby irrevocably submit to the jurisdiction of the Pike County, Kentucky Circuit Court, in any action or proceeding arising out of or relating to this Agreement, and the Buyer and the Seller hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such Circuit Court.   The Buyer and the Seller hereby irrevocably waive, to the fullest extent they may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.

17.6   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party but all of which taken together shall constitute one and the same Agreement.

17.7   <u>Headings</u>.   The section headings in this Agreement are included for convenience only and shall not affect the interpretation of this Agreement.

17.8   <u>Construction</u>.   The parties have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

17.9   <u>Binding Effect</u>.   This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns.

29

17.10   <u>No Third Party Beneficiaries</u>.  It is the intention of the parties that nothing in this Agreement shall be deemed to create any right or cause of action in or on behalf of any person or entity other than the parties to this Agreement.

17.11   <u>Amendment and Waiver</u>.  This Agreement may be amended or modified only by written instrument executed by all of the parties hereto.  A waiver of any term or condition of this Agreement shall only be effective if in writing.  No waiver by either party of any breach of any of the covenants to be performed by the other party shall be construed as a waiver of any subsequent breach of the same term or condition, or a waiver of any other term or condition of this Agreement.

17.12   <u>Assignment</u>.   Neither party shall assign this Agreement, or any right or duty hereunder, voluntarily or involuntarily, by operation of law or otherwise, without the prior written consent of the other parties hereto.  The sale or transfer, or any attempted sale or transfer, of more than fifty percent (50%) of the issued and outstanding stock of a party, or such party's business, shall be considered an assignment for the purpose of this Section 17.12.

17.13   <u>Severability</u>.  If any provision of this Agreement is found to be contrary to law or unenforceable by a court of competent jurisdiction, the remaining provisions shall be severable and enforceable in accordance with their terms, unless such unlawful or unenforceable provision is material to the transactions contemplated hereby, in which case the parties shall negotiate in good faith a substitute provision.

17.14   <u>Entire Agreement</u>.  This Agreement, together with the instruments and agreements being executed concurrently herewith, constitute the entire agreement between the parties regarding the subject matter hereof and supersedes all prior agreements and understandings, whether written or oral, between the parties.

17.15   <u>Time of the Essence</u>.  Time is of the essence to the performance of the obligations set forth in this Agreement.

**IN WITNESS WHEREOF,** the parties hereto, through their duly authorized representatives, have caused this Agreement to be executed as of the day and year first above written.

**JAMES RIVER COAL COMPANY,** on behalf of Seller

By: _____

Name: SAMUEL M. HOPKINS

Title: VICE PRESIDENT


**Marshall Resources, Inc.,** on behalf of Buyer

By: _____

Name: J. MARK CAMPBELL

Title: VICE PRESIDENT

## SCHEDULE 2.1(a)
**Permits and Licenses**
(2 page(s) following this page)

## McCOY ELKHORN COAL CORPORATION PERMITS LIST

| KYDNR Permit # | Operation Name | MSHA ID No. | KY State File No. | KPDES Permit No. | Status |
|---|---|---|---|---|---|
| 898-4031 | Mine No. 12, Wolfpin Br. | 15-19314 | 10925.2 | KYG045388 | A1 |
| 898-4243 | Burke/Loadout | 15-16958 | | KYG041804 | A1 |
| 898-4244 | Burke Plant & Merry Br. Refuse Mine 31 & Mine 32 | 15-16958 15-19492 | 18851 | KY0031402 | A1 |
| 898-8144 | Burke Plant & Loadout | 15-16958 | x-fer from 898-8124 & 8093 | KYG045821 | A1 |
| 898-9012 | Cow Br. Slurry Impoundment | 15-16958 | | KYG044814 | A1 |
| 898-9106 | Refuse Fill, Wolfpin Br. | 15-16958 | | KYG045433 | ND |

## McCOY ELKHORN COAL CORPORATION
## COE Section 404 Permits

| Hearing Agency | Type of Permit | Permit or Application No. | Related KYDNR Permit No. |
|---|---|---|---|
| COE | Section 404 | 200401405 | 898-9106 |
| COE | Section 404 | LRL-2010-1114-mlc | 898-4244 |

## McCOY ELKHORN COAL CORPORATION LICENSES LIST

| Issuing Agency | Type of License | License No. | Expiration Date |
|---|---|---|---|
| KY Cabinet for Health Services | * Radioactive Materials License | 201-488-51 (Amendment No. 36) | 6/30/2014 |
| Department for Environmental Protection, Division of Air Quality | Air Quality Permit | S-06-298 | |

*       Buyer shall be required to obtain a new or replacement Radioactive Materials License relating to the F.M. Burke Preparation Plant and Loadout, specifically with regard to page 1(c), page 2(c) and page 3 (No. 12) set forth in such License.

**McCOY ELKHORN COAL CORPORATION MSHA ID NUMBERS**

| Issuing Agency | MSHA ID No. | Applicable Mine or Facility |
|---|---|---|
| MSHA | ** 15-19314 | Mine No. 12 |
| MSHA | ** 15-16958 | Long Fork Preparation Plant |
| MSHA | ** 15-19492 | Mine No. 31 |

** Seller will "abandon" these MSHA ID Nos. and Buyer will assume such MSHA ID Nos.

| Permit No. | Bond No. | Current Bond Amount |
|---|---|---|
| Encroachment 12-0098-99 | SUR0015595 | $25,000 |

## <u>SCHEDULE 2.1(b)</u>
### Real Property Interests
(4 page(s) following this page)

Special Warranty Deed by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. covering 14 tracts of surface property located on Long Fork of Johns Creek, in Pike County as evidenced by the following:

1.     That certain Deed of Conveyance dated September 19, 1978 by and between Dewey Stiltner and Earlane Stiltner, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 69;

2.     That certain Deed dated March 26, 1992 by and between Donnie R. May and Pricy May, his wife and McCoy Elkhorn Coal Corporation, which Deed is of record in the Pike County Court Clerk's Office in Deed Book 659, Page 95;

3.     That certain Deed dated March 26, 1992 by and between Edward Charles and Linda Charles, his wife and McCoy Elkhorn Coal Corporation, which Deed is of record in the Pike County Court Clerk's Office in Deed Book 659, Page 97;

4.     That certain Deed of Conveyance dated June 6, 1989 by and between Pinkie May and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 625, Page 42;

5.     That certain Deed of Conveyance dated October 17, 1989 by and between Earl Worrix and Jennifer Worrix, his wife, *et al.* and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 629, Page 271;

6.     That certain Deed of Conveyance dated November 29, 1984 by and between James Marshall Justice, Jr. and Darlene Justice, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 583, Page 561;

7.     That certain Deed of Conveyance dated October 16, 1981 by and between Lawrence Bostic and Thelma Bostic, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 567, Page 237;

8.     That certain Deed of Conveyance dated October 27, 1981 by and between Bennett Hunt and Buna Hunt, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 567, Page 338;

9.     That certain Deed of Conveyance dated September 5, 1980 by and between Gay Scott, widow, and McCoy Elkhorn Coal Corporation, which

Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 561, Page 274;

10.    That certain Deed of Conveyance dated July 14, 1978 by and between Tommy Coleman and Nolaine Coleman, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 548, Page 479;

11.    That certain Deed of Conveyance dated July 17, 1978 by and between Vicy Stiltner and John H. Stiltner, her husband and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 548, Page 503;

12.    That certain Deed dated November 10, 2004 by and between Johns Creek Processing Company and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 860, Page 314;

13.    That certain Deed of Conveyance dated September 19, 1978 by and between Victor Smith and Vada Smith, his wife and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 550, Page 68; and

14.    That certain Deed of Conveyance dated June 11, 2000, by and between Opal Green, et al and McCoy Elkhorn Coal Corporation, which Deed of Conveyance is of record in the Pike County Court Clerk's Office in Deed Book 804, Page 288.

A map showing the location of such fourteen (14) tracts of property, together with Seller's tract number reference follows as the last page to this Schedule 2.1(b).

Assignment of Lease by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc.

Partial Assignment of Lease by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc.

Assignment of Railroad Contracts and Agreements by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.    Billing Consolidation Agreement Dated April 12, 2006;
2.    Agreement No. CSX 0011710, Dated April 3, 1990, Real Estate/Land Only;
3.    Agreement No. L40724, Dated May 5, 1986 – Overhead Conveyor;
4.    Agreement No. COL37730, Dated June 12, 1979, Private Road Crossing; and

5.      Lease No. CO-L35596, Dated March 1, 1972, Real Estate/Land Only.

Assignment of Distance Waivers for Surface Mining Operations by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.      Waiver for Surface Mining Operations executed by David Hunt and Shelia Hunt on behalf of the Bud Hunt Jr. Heirs;
2.      Waiver for Surface Mining Operations executed by Joseph A. Collins and Jessica L. Collins;
3.      Waiver for Surface Mining Operations executed by Jason McCoy and Cindy McCoy;
4.      Waiver for Surface Mining Operations executed by Michael Blackburn and Christine Blackburn; and
5.      Waiver for Surface Mining Operations executed by Lester Varney.

Assignment of Above Grade Airspace Agreement and Permit, by and between McCoy Elkhorn Coal Corporation and Marshall Resources, Inc. relating to the following:

1.      Above Grade Airspace Agreement and Permit dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation.

### SCHEDULE 2.1(c)
**Improvements**

F. M. Burke Preparation Plant and Loadout, and all appurtenances related thereto.

| Location | Asset Type | Description |
|---|---|---|
| Burke Loadout | Loadout | Loadout, including all overland conveyance systems, stacking tubes and reclaim systems, all truck scales, sampler systems that are owned and located on the Real Property Interests prior to Closing |
| Burke Loadout | Locomotive Garage | 65'x20' Metal Building |
| Burke Plant | Preparation Plant | Preparation Plant, including all spare components and accessories heavy media vessel, all overland conveyor systems and stacking tubes, raw coal and clean coal silos and _____ reclaim systems and all refuse bins and associated hopper(s) and located on the Real Property Interests as of May 1, 2014. |
| Burke Plant | Pump Building | Plant - Pump House, including all pumps, water lines, electrical systems and other components or accessories necessary to operate the same and located on the Real Property Interests as of May 1, 2014. |
| Burke Plant | Water Tank | 500,000 Gallon Water Tank |
| Cow Branch | Refuse Impoundment | Cow Branch Impoundment, including all pumps, pipes, lines, electrical systems and other components or accessories necessary to operate the same and located on the Real Property Interests as of May 1, 2014. |
| Merry Branch | Coarse Refuse Fill | Merry Branch Coarse Refuse Fill |
| Main Office | Building | Main Office - 62'x63' Metal and Brick Structure - 1/2 2nd floor |
| Safety | Building | Safety Office 48'x24' Brick House |
| Shop | Building | 40'x60' Metal Building w/20'x16' Side Addition |
| Shop | Building | Bathhouse |
| Shop | Hoist | 10 Ton Overhead Hoist |
| Shop | Aircompressor | 10 HP |
| Burke Plant | Substation | Burke Plant at Merry Branch Substation, including all existing power lines and infrastructure |
| Warehouse | Building | Warehouse Building - 110'x50' Steel Structure, 2 Story, including all shelving and other fixtures |
| Warehouse | Building | Warehouse Shed, Steel Construction, 330'x18' |
| Burke Plant | Water Treatment Systems | Water Treatment Systems servicing Burke Plant, Cow Branch Impoundment, Merry Branch Coarse Refuse and Mine Nos. 12 |

| Location | Asset Type | Description |
|---|---|---|
|  |  | and 31, with all accessories and components with at least a 15-day chemical inventory |

**SCHEDULE 2.1(d)**
**Personal Property**

All items of personal property set forth and described in Schedule A to the Bill of Sale attached to this Agreement as <u>Exhibit E</u>.

## SCHEDULE 2.1(e)
## Designated Agreements

1.      Coal Mining Lease dated November 1, 1998 between WPP, LLC and Seller, as amended by that certain Amendment No. 1 to Coal Mining Lease dated December 2, 2009 between WPP, LLC and Seller.

2.      A portion of the property covered by the Surface Lease Agreement dated December 9, 1999 by and among Johns Creek Elkhorn Coal Corporation and McCoy Elkhorn Coal Corporation, known therein collectively as "Lessor," and Berkeley Energy Corporation.

3.      Railroad Contracts and Agreements relating to the following:

        a.      Billing Consolidation Agreement Dated April 12, 2006;

        b.      Agreement No. CSX 0011710, Dated April 3, 1990, Real Estate/Land Only;

        c.      Agreement No. L40724, Dated May 5, 1986 – Overhead Conveyor;

        d.      Agreement No. COL37730, Dated June 12, 1979, Private Road Crossing; and

        e.      Lease No. CO-L35596, Dated March 1, 1972, Real Estate/Land Only.

4.      Distance Waivers for Surface Mining Operations relating to the following:

        a.      Waiver for Surface Mining Operations executed by David Hunt and Shelia Hunt on behalf of the Bud Hunt Jr. Heirs;

        b.      Waiver for Surface Mining Operations executed by Joseph A. Collins and Jessica L. Collins;

        c.      Waiver for Surface Mining Operations executed by Jason McCoy and Cindy McCoy;

        d.      Waiver for Surface Mining Operations executed by Michael Blackburn and Christine Blackburn; and

        e.      Waiver for Surface Mining Operations executed by Lester Varney.

5.      Above Grade Airspace Agreement and Permit dated May 1, 2000, by and between the Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation.

| Name / Address | Contract / Lease # and Name | Execution Date | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|---|
| BERKELEY ENERGY CORPORATION 750 TOWN MOUNTAIN ROAD PIKEVILLE, KY 41501 | Surface Lease Agreement | 12/9/1999 | Johns Creek Elkhorn Coal Corporation, McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. (partial assignment) |
| COMMONWEALTH OF KENTUCKY TRANSPORTATION CABINET 200 METRO ST. FRANKFORT, KY 40622 | Above Grade Airspace Agreement and Permit | 5/1/2000 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| CSX TRANSPORTATION, INC. P.O. BOX 116628 ATLANTA, GA 30368-6628 | Billing Consolidation Agreement | 4/12/2006 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| CSX TRANSPORTATION, INC. P.O. BOX 116628 ATLANTA, GA 30368-6628 | Railroad Contract / Agreement Lease No. CO-L35596 (Real Estate / Land Only) | 3/1/1972 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| CSX TRANSPORTATION, INC. P.O. BOX 116628 ATLANTA, GA 30368-6628 | Railroad Contract / Agreement No. COL37730 (Private Road Crossing) | 6/12/1979 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| CSX TRANSPORTATION, INC. P.O. BOX 116628 ATLANTA, GA 30368-6628 | Railroad Contract / Agreement No. L40724 (Overhead Conveyor) | 5/5/1986 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| CSX TRANSPORTATION, INC. P.O. BOX 116628 ATLANTA, GA 30368-6628 | Railroad Contract /Agreement No. CSX 0011710 (Real Estate / Land Only) | 4/3/1990 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| DAVID HUNT AND SHEILA HUNT (BUD HUNT JR. HEIRS) 39 BEVINS BRANCH PIKEVILLE, KY 41501 | Waiver for Surface Mining Operations | 2/26/2014 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| JASON MCCOY AND CINDY MCCOY 550 LONG FORK ROAD KIMPER, KY 41539 | Waiver for Surface Mining Operations | 2/6/2014 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| JOSEPH A. COLLINS AND JESSICA L. COLLINS 500 LONG FORK ROAD KIMPER, KY 41539 | Waiver for Surface Mining Operations | 2/17/2014 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| LESTER VARNEY 401 HURRICANE ROAD KIMPER, KY 41539 | Waiver for Surface Mining Operations | 5/8/2014 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |

| Name / Address | Contract / Lease # and Name | Execution Date | Debtor | Cure Amount | Assignee |
|---|---|---|---|---|---|
| MICHAEL BLACKBURN AND CHRISTINE BLACKBURN 840 LONG FORK ROAD KIMPER, KY 41539 | Waiver for Surface Mining Operations | 2/4/2014 | McCoy Elkhorn Coal Corporation | $0.00 | Marshall Resources, Inc. |
| NATURAL RESOURCES PARTNERS DBA WPP LLC 5260 IRWIN ROAD HUNTINGTON, WV 25705 | Lease #279, WPP LLC | N/A | McCoy Elkhorn Coal Corporation | $2,664.89 | Marshall Resources, Inc. |

## SCHEDULE 2.2
**Excluded Assets**


All real property, personal property, permits of Seller other than the Assets identified in Section 2.1 of the Agreement and/or as set forth on the various Schedules referenced in Section 2.1.  Further, all personal property, equipment (other than heating, cooling or similar), and trade fixtures of Seller that are located in the Office Building, Safety Building, Warehouse, Locomotive Garage and Shop Building, unless specifically identified in Section 2.1 of the Agreement and/or as set forth on the various Schedules referenced in Section 2.1 shall likewise be Excluded Assets.

## **SCHEDULE 6.1(c)**
**Conflicts (Seller)**

None

## SCHEDULE 6.1(d)
### Consents (Seller)

1.      Consent to Assignment of Lease and Estoppel Certificate by and among WPP LLC, McCoy Elkhorn Coal Corporation and Marshall Resources, Inc.;

2.      Consent to Assignment of Contracts and Agreements by and among CSX Transportation, Inc., McCoy Elkhorn Coal Corporation and Marshall Resources, Inc.

3       Consent to Assignment of Above Grade Airspace Agreement and Permit between Commonwealth of Kentucky, Transportation Cabinet, and McCoy Elkhorn Coal Corporation and Marshall Resources, Inc.

## SCHEDULE 6.1(e)
### Real Property Interests – Encumbrances and Other Burdens

1.    * Revolving Loan, Mortgage, Security Agreement, Assignment of Rents and Leases, Fixture Filing and Financing Statement, dated as of February 26, 2007, from **JAMES RIVER COAL COMPANY, BDCC HOLDING COMPANY, INC., BELL COUNTY COAL CORPORATION, BLEDSOE COAL CORPORATION, BLEDSOE COAL LEASING COMPANY, BLUE DIAMOND COAL COMPANY, EOLIA RESOURCES, INC., JAMES RIVER COAL SERVICE COMPANY, JOHNS CREEK COAL COMPANY, JOHNS CREEK PROCESSING COMPANY, LEECO, INC., MCCOY ELKHORN COAL CORPORATION, SHAMROCK COAL COMPANY, INCORPORATED AND TRIAD MINING, INC.** (collectively, "Mortgagors"), to General Electric Capital Corporation, Mortgagee, in the maximum face principal amount of $35,000,000.00 of record as **Instrument No. 401078**, in **Mortgage Book 719, at Page 345**, in the Pike County Court Clerk's Office ("Office").

2.    * Amended and Restated Revolving Credit Agreement, dated as of January 28, 2010, and Amended and Restated Revolving Credit Agreement First Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases, Fixtures Filing and Financing Statement, dated as of March 3, 2010, from Mortgagors to Mortgagees, of record in **Mortgage Book 825, at Page 471**, in the Office.

3.    * Amended and Restated Revolving Credit Agreement Second Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases, Fixture Filing and Financing Statement, dated as of August 5, 2010, from Mortgagors to Mortgagee, of record in **Mortgage Book 838, at Page 645**, in the Office.

4,    * Second Amended and Restated Revolving Credit Agreement Third Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases, Fixture Filing and Financing Statement, dated as of August 22, 2011, from Mortgagors to Mortgagee, of record in **Mortgage Book 866, at Page 32**, in the Office.

5.    * UCC Financing Statement in favor of Mortgagee, naming Mortgagors as Debtors, recorded February 27, 2007, in **Fixture Filing Book 13, at Page 1**, in the Office, as amended by UCC Financing Statement Amendment recorded March 5, 2010, in **Fixture Filing Book 15, at Page 379**, in the Office, as amended by UCC Financing Statement Amendment recorded September 19, 2011, in **Fixture Filing Book17, at Page 102,** in the Office, and as continued by UCC Continuing of Financing Statement recorded January 17, 2012, in **Fixture Filing Book 17, at Page 242**, in the Office.

6.    *Super priority Debtor in Possession Credit Agreement, and the related Security Agreement, between the Debtors and Cantor Fitzgerald Securities, as Administrative Agent and Collateral Agent for the Debtor in Possession Lenders.

*     These items, to the extent effecting the Assets, will be released prior to or at the Closing.

**SCHEDULE 6.1(f)**
**Personal Property and Improvements – Encumbrances and other burdens**

1.  \* Revolving Loan, Mortgage, Security Agreement, Assignment of Rents and Leases, Fixture Filing and Financing Statement, dated as of February 26, 2007, from **JAMES RIVER COAL COMPANY, BDCC HOLDING COMPANY, INC., BELL COUNTY COAL CORPORATION, BLEDSOE COAL CORPORATION, BLEDSOE COAL LEASING COMPANY, BLUE DIAMOND COAL COMPANY, EOLIA RESOURCES, INC., JAMES RIVER COAL SERVICE COMPANY, JOHNS CREEK COAL COMPANY, JOHNS CREEK PROCESSING COMPANY, LEECO, INC., MCCOY ELKHORN COAL CORPORATION, SHAMROCK COAL COMPANY, INCORPORATED AND TRIAD MINING, INC.** (collectively, "Mortgagors"), to General Electric Capital Corporation, Mortgagee, in the maximum face principal amount of $35,000,000.00 of record as **Instrument No. 401078**, in **Mortgage Book 719, at Page 345**, in the Pike County Court Clerk's Office ("Office").

2.  \* Amended and Restated Revolving Credit Agreement, dated as of January 28, 2010, and Amended and Restated Revolving Credit Agreement First Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases, Fixtures Filing and Financing Statement, dated as of March 3, 2010, from Mortgagors to Mortgagees, of record in **Mortgage Book 825, at Page 471**, in the Office.

3.  \* Amended and Restated Revolving Credit Agreement Second Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases, Fixture Filing and Financing Statement, dated as of August 5, 2010, from Mortgagors to Mortgagee, of record in **Mortgage Book 838, at Page 645**, in the Office.

4,  \* Second Amended and Restated Revolving Credit Agreement Third Amendment to Mortgage, Security Agreement, Assignment of Rents and Leases, Fixture Filing and Financing Statement, dated as of August 22, 2011, from Mortgagors to Mortgagee, of record in **Mortgage Book 866, at Page 32**, in the Office.

5.  \* UCC Financing Statement in favor of Mortgagee, naming Mortgagors as Debtors, recorded February 27, 2007, in **Fixture Filing Book 13, at Page 1**, in the Office, as amended by UCC Financing Statement Amendment recorded March 5, 2010, in **Fixture Filing Book 15, at Page 379**, in the Office, as amended by UCC Financing Statement Amendment recorded September 19, 2011, in **Fixture Filing Book17, at Page 102,** in the Office, and as continued by UCC Continuing of Financing Statement recorded January 17, 2012, in **Fixture Filing Book 17, at Page 242**, in the Office.

6.  \*Super priority Debtor in Possession Credit Agreement, and the related Security Agreement, between the Debtors and Cantor Fitzgerald Securities, as Administrative Agent and Collateral Agent for the Debtor in Possession Lenders.

\*      These items, to the extent effecting the Assets, will be released prior to or at the Closing.

## SCHEDULE 6.1(g)
### Good Standing of Real Property Leases

There are no defaults under any of the leases included in the Real Property Interests.

**SCHEDULE 6.1(h)**
**Permit Compliance**


During the Spring of 2013, Seller received Notices of Violation from the Kentucky Division of Water for all of the Permits being transferred pursuant to the Agreement between Seller and Buyer.  As a result, Seller responded to the Notices of Violation; revised any and all of the Discharge Monitoring Reports; and sent such revised Discharge Monitoring Reports to the Kentucky Division of Water for its review.   On December 30, 2013, The Commonwealth of Kentucky, Energy and Environment Cabinet, Division of Enforcement and Seller entered into an Agreed Order (a copy of which has been provided to Buyer) resolving any and all alleged violations and all like violations associated with the Permits, as well as all other permits of Seller, for the time period of January 1, 2011 through June 30, 2013, that may have occurred on or relating to the Permits.  Up to June 30, 2013, all of such issues are resolved, but Seller will remain responsible for all financial obligations that may be associated with the above-referenced Agreed Order and/or any similar, additional potential Notices of Violation from the Kentucky Division of Water or other agencies or organizations which may arise relating to Discharge Monitoring Reports for the time frame from June 30, 2013 through the Closing Date.  Further in this regard, Seller agreed to and the Permits are subject to a Corrective Action Plan (a copy of which Plan has been provided to Buyer) relating to any future Notices of Violation from the Division of Water for the Permits.  From and after Closing Date, as to any Notices of Violation that occur or are issued after the Closing Date relating to Buyer's operations under the Permits, Buyer rather than Seller, shall be obligated to take any and all actions and make any and all payments required under such Corrective Action Plan.

**<u>SCHEDULE 6.1(i)</u>**
**Legal Proceedings**

None; except to the extent set forth on <u>SCHEDULE 6.1(h)</u> Permit Compliance.

**<u>SCHEDULE 6.1(k)</u>**

**Bonds**

(1 page following this page)

| Permit # | Facility Name | Permit Acres | Bond Amount | Expiration Date | Status | Estimated Start of Reclamation work | Reclamation Status |
|---|---|---|---|---|---|---|---|
| 898-4031 | Mine No. 12 | 1,200.49 | $ 95,700 | 8/14/2015 | A1 | 2015 | Active |
| 898-4243 | Burke Loadout | 807.12 | $ 72,800 | 8/7/2014 | A1 | 2015/2021 | Active |
| 898-4244 | Burke Plant, Merry Br. Refuse, Mine 31 | 4,283.75 | $ 410,600 | 8/15/2014 | A1 | 2015/2021 | Active |
| 898-8144 | Burke Plant & Loadout | 45.73 | $ 266,700 | 3/1/2016 | A1 | 2015/2021 | Active |
| 898-9012 | Cow Branch Slurry Impoundment | 234.97 | $ 460,600 | 5/27/2016 | A1 | 2015 | Active |
| 898-9106 | Wolfpin Branch Refuse Area | 128.59 | $ 386,700 | 7/30/2014 | ND | | Undisturbed |
| 12-0098-99 | Above Grade Airspace Agreement, Wolfpin Branch Refuse Belt | | $ 25,000 | 2/17/2015 | | | |

**Total Bond Amount =    $ 1,718,100**

*KY DNR - Mine Status Codes*

|  | *Active Currently* |
|---|---|
| *A1 =* | *Being Mined* |
|  | *Active Not Currently Being* |
| *A2 =* | *Mined Active Temporary* |
| *O2 =* | *Cessation* |
| *ND =* | *No Disturbances* |

## <u>SCHEDULE 6.1(l)</u>
**Real Property Interests that are conveyed with No Warranty of Title**


   The title of each of the owners/lessors to the property, or interests therein, covered by the Assignment of Leases, Partial Assignment of Leases, Assignment of Railroad Contracts and Agreements, Assignment of Distance Waivers and Assignment of Above Grade Airspace Agreement and Permit attached to this Agreement respectively as Exhibits D, D-1, D-2, D-3, and D-4.

## <u>SCHEDULE 6.1(m)</u>
### Environmental Law Compliance

None.

**<u>SCHEDULE 6.1(n)</u>**
**Subsidence Disclosure**

Seller has no knowledge of any subsidence claims, either existing, potential or otherwise, relating to any of the Real Property Interests.

## **SCHEDULE 7.1(c)**
### **Conflicts (Buyer)**

None.

## **SCHEDULE 7.1(d)**
### **Consents (Buyer)**

None.

## SCHEDULE 10.1(f)
**Consents Required for Closing**


1.      Consent to Assignment of Lease and Estoppel Certificate by and among WPP LLC, McCoy Elkhorn Coal Corporation and Marshall Resources, Inc.

2.      Consent to Assignment of Contracts and Agreements by and among CSX Transportation, Inc., McCoy Elkhorn Coal Corporation and Marshall Resources, Inc.

3.      Consent to Assignment of Above Grade Airspace Agreement and Permit by and among Commonwealth of Kentucky, Transportation Cabinet, McCoy Elkhorn Coal Corporation and Marshall Resources, Inc.

**ANNEX B-1**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:   (212) 450-4000
Facsimile:   (212) 607-7973
Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac vice*)

*Counsel to the Debtors
and Debtors in Possession*

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Local Counsel to the Debtors
and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| In re: | **Chapter 11** |
| **JAMES RIVER COAL COMPANY,** *et al.*, | **Case No. 14-31848 (KRH)** |
|  | **(Jointly Administered)** |
| Debtors.[1] |  |

## ORDER (i) APPROVING THE SALES AND TRANSFERS OF CERTAIN ASSETS AND LIABILITIES RELATED TO THE McCOY ELKHORN MINING COMPLEX FREE AND CLEAR OF ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (iii) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of James River Coal Company and its

subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the

"**Debtors**"), for an order pursuant to sections 363 and 365 of chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-2 of

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia

(the "**Local Bankruptcy Rules**") (i) authorizing entry into an asset purchase agreement,

attached hereto as Exhibit 1 (the "**APA**"),[2] among Debtor James River Coal Company

("**James River**"), Debtor McCoy Elkhorn Coal Corporation ("**McCoy Elkhorn,**"), any

Debtor affiliate of McCoy Elkhorn that holds any interest in the Burke Assets (as defined

below) (collectively with James River and McCoy Elkhorn, the "**Sellers**"), and Marshall

Resources, Inc. (the "**Purchaser**") substantially on the terms and conditions set forth in

the Summary of Terms and Conditions attached as Exhibit D to the Motion;

(ii) approving the sale and transfer (the "**Sale**") of certain assets of the Sellers (the

"**Burke Assets**") to the Purchaser in accordance with the APA; (ii) authorizing the

assumption and assignment of certain executory contracts and unexpired leases in

connection therewith; and (iii) granting such other and further relief as is just and proper,

as more fully described in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

consideration of the Motion and the requested relief being a core proceeding under 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided; and no other or

further notice need be provided; and the relief requested in the Motion being in the best

interests of the Debtors, their estates, the creditors and other parties in interest; and the

Court having reviewed the Motion and having held a hearing with appearances of parties

in interest noted in the transcript thereof (the "**Hearing**"); and the Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion or the APA, as applicable.

establish just cause for the relief granted herein; and upon all of the proceedings had

before the Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AS FOLLOWS:**[3]

A.      On April 7, 2014 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

"**Chapter 11 Cases**").

B.      This Court has jurisdiction to hear and determine the Motion pursuant to

28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases and the Motion in this

District is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).

C.      The statutory predicates for the relief requested in the Motion are sections

363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local

Bankruptcy Rule 6004-2.

D.      The Debtors continue to operate their business and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.      No trustee or examiner has been appointed in the Chapter 11 Cases.

F.      As evidenced by the certification of service previously filed with the

Court, and based on the representations of counsel at the Hearing: (i) proper, timely,

adequate and sufficient notice of the Motion, the Hearing and the Sale has been provided

in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy

Rules 2002, 6004, 6006 and 9007; (ii) such notice was good and sufficient, and

appropriate under the particular circumstances; and (iii) no other or further notice of the

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

Motion, the Hearing, the Sale or the entry of this Order shall be required.  Notice of the

Motion, the Sale and the Hearing was also posted electronically on the website

maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' Claims, Noticing and

Balloting Agent, at *http://dm.epiq11.com/JamesRiverCoal*.

      G.    The Debtors served the Notice of Sale and Assumption and Assignment

Notice on each Contract Counterparty under each Assumed Contract, and such parties

were provided with a reasonable opportunity to object and be heard with respect to the

Motion and the relief requested therein, ~~including~~and have been or will be provided with

reasonable opportunity to object and be heard with respect to the assumption and

assignment of the Assumed Contracts and any Cure Amounts in respect thereof in

accordance with the procedures set forth in the Motion (the "**Assumption Procedures**").

      H.    A reasonable opportunity to object or be heard regarding the relief

requested in the Motion has been afforded to all interested persons and entities, including

the following: (i) the Core Parties, (ii) the 2002 List Parties and (iii) all applicable

federal, state and local taxing and regulatory authorities.

      I.    The Debtors marketed the Burke Assets to potential purchasers, both

before and during the Chapter 11 Cases.  No other person, entity or group has offered to

purchase the Burke Assets for an amount that would provide a higher and better

economic value to the Debtors than that being provided by the Purchaser pursuant to the

APA.

      ~~I~~J.    As demonstrated by the record of the Hearing and the dockets in the

Chapter 11 Cases, the Debtors have demonstrated good and sufficient reasons for the

Court to approve the Motion and the Sale.

JK.    The "**Burke Assets**" will consist of James River's and its subsidiaries' and McCoy Elkhorn's right, title and interest in, to certain assets relating to the McCoy Elkhorn mining complex that are being transferred to the Purchaser pursuant to the APA.

KL.    The Debtors are the sole and lawful owners of the Burke Assets.

M.    Subject to entry of this Order, (i) the Debtors have full corporate power and authority to execute the APA and all other documents contemplated thereby, (ii) the Debtors have all of the power and authority necessary to consummate the transactions contemplated by the APA, and (iii) no government, regulatory or other consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to enter into the APA and consummate the transactions contemplated by the APA.

LN.    The purchase price to be paid by the Purchaser is fair and constitutes reasonably equivalent value and reasonable market value for the Burke Assets.

MO.    The Purchaser is a purchaser in good faith with respect to the Burke Assets, as that term is used in section 363(m) of the Bankruptcy Code. The APA was negotiated, proposed and entered into by the partiesDebtors and the Purchaser without collusion, in good faith, from arms' lengthand from arm's–length bargaining positions- and without collusion or fraud, and the Purchaser is entitled to all of the protections ofafforded under section 363(m) of the Bankruptcy Code with respect to the Burke Assets. None ofand any other applicable bankruptcy and non-bankruptcy law.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Sale or APA to be voided under section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person, and the purchase price

was not controlled by any agreement.  The Purchaser is not, and was not immediately prior to the Closing Date, an "affiliate" or "insider" of the Debtors as defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchasers and the Debtors immediately prior to the Closing Date.

~~N~~P.    Except as specifically provided in the APA, the Purchaser shall not assume or become liable for any obligation, claim, cause of action, charge, right of setoff, recoupment, rebate, chargeback, credit, return, interest, mortgage, option, pledge, lien, charge, security  interest, encumbrance, restriction, lease, license, easement, liability or adverse claim of any nature whatsoever, direct or indirect, whether accrued, absolute, contingent or otherwise ( collectively, an "**Encumbrance**" or "**Encumbrances** ~~(as defined below~~") relating to the Burke Assets being sold by the Debtors unless expressly stated in the APA or this Order.  Any such valid and enforceable Encumbrances shall attach to the proceeds of the Sale.

~~O~~Q.    Sound business reasons have been articulated for performing the obligations set forth in the APA and selling the Burke Assets as set forth in the Motion outside of a plan of reorganization, ~~and~~ it is a reasonable exercise of business judgment to execute, deliver and consummate the APA with the Purchaser and consummate the transactions contemplated thereby~~.~~, and such acts are in the best interests of the Debtors, their estates and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons, which include, but are not limited to, the following: (i) the APA constitutes the highest and best offer for the Burke Assets; (ii) the APA and the closing thereon will present the best opportunity for the Debtors to realize the value

of the Burke Assets; and (iii) the Sale will enable the Debtors to avoid the ongoing

expenditures related to the Burke Assets.

PR.    The Debtors may sell the Burke Assets free and clear of any and all

Encumbrances because, in each case, one or more of the standards set forth in section

363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of such

Encumbrances who did not object, or who withdrew their objections, to the Sale or the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy

Code.

S.    Except as expressly set forth in the APA, the transfer of the Assumed

Contracts to the Purchaser will not subject the Purchaser to any liability whatsoever prior

to the Closing Date or by reason of such transfer under the laws of the United States, any

state, territory, or possession thereof, or the District of Columbia, based, in whole or in

part, on any theory of law or equity.  The Debtors have demonstrated that it is an exercise

of their sound business judgment to assume and assign the Assumed Contracts to the

Purchaser in connection with the consummation of the transactions contemplated by the

APA.  The Assumed Contracts are an integral part of the Burke Assets being purchased

by the Purchaser and, accordingly, such assumption and assignment is reasonable,

enhances the value of the estates and does not constitute unfair discrimination.  The

Debtors have cured, or provided adequate assurance of cure with respect to, any default

existing prior to the date hereof under any of the Assumed Contracts within the meaning

of section 365(b)(1)(A) and (f)(2)(A) of the Bankruptcy Code.  The Purchaser has

provided adequate assurance of future performance of and under the Assumed Contracts

within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

~~Q~~T.    The terms and conditions set forth in the APA, including the total consideration to be realized by the Debtors, are fair and reasonable and the transaction contemplated by the APA is in the best interests of the Debtors, their creditors and their estates~~.~~, and the consideration constitutes reasonably equivalent value under the Bankruptcy Code and the laws of the United States, any state, territory, possession or the District of Columbia (including the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

U.    The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or other applicable laws.  The Purchaser is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, and there is no substantial continuity between the Purchaser and the Debtors.  The transactions contemplated by the APA do not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors.

~~R~~V.    A valid business purpose exists for approval of the transaction contemplated by the Motion pursuant to sections 363(b), (f) and (m) of the Bankruptcy Code.  The Debtors may sell, transfer and assign the Burke Assets free and clear of the Encumbrances in accordance with section 363 of the Bankruptcy Code.  As a condition to purchasing the Burke Assets, the Purchaser requires that: (a) the Burke Assets be sold free and clear of the Encumbrances; and (b) the Purchaser shall have no liability whatsoever for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors except those expressly provided in the APA or this Order.  The Purchaser will not enter into an APA and consummate the transactions contemplated thereby, thus adversely affecting the Debtors'

estates, if the sale to the Purchaser was not free and clear of Encumbrances or if the

Purchaser was or would be liable for any obligations of, or claims (including without

limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors,

except as otherwise explicitly provided in the APA or this Order.

~~S~~W.     The transfer of the Burke Assets to the Purchaser is or will be a legal,

valid and effective transfer of the Burke Assets, and will vest the Purchaser with all right,

title and interest in and to the Burke Assets, free and clear of Encumbrances, except those

explicitly and expressly excluded in the APA or this Order.

~~T~~X.     An injunction against creditors and third parties pursuing Encumbrances is

necessary to induce the Purchaser to close the Sale; the issuance of such an injunction is

therefore necessary to avoid irreparable injury to the Debtors' estates, and will benefit all

creditors.

~~U~~Y.     The requirements of sections 363(b) and 363(f) of the Bankruptcy Code

and any other applicable law relating to the Sale of the Burke Assets have been satisfied.

**AND IT IS HEREBY ORDERED THAT:**

1.     The relief requested in the Motion is hereby GRANTED.

2.     The Motion, the APA and the transactions contemplated thereby are

approved, and the Debtors are authorized and empowered to enter into the APA, to

perform their obligations thereunder, and to take such action as is necessary to effectuate

the terms of the APA, without any further corporate authorization or order of this Court.

3.     The Debtors are hereby authorized, empowered and directed, pursuant to

sections 363(b) and (f) of the Bankruptcy Code, to sell the Burke Assets to the Purchaser

pursuant to and in accordance with the terms and conditions of the APA, and, pursuant to

section 363 of the Bankruptcy Code, title to the Burke Assets shall pass to the Purchaser

at closing, free and clear of any and all ~~mortgages, options, pledges, liens, charges,~~

~~security interests, encumbrances, restrictions, leases, licenses, easements, liabilities or~~

~~adverse claims~~Encumbrances, of any nature whatsoever, direct or indirect, whether

accrued, absolute, contingent, known, unknown, or otherwise ~~(collectively, the~~

~~"Encumbrances"),~~ whether arising before or subsequent to the commencement of the

Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or

otherwise, including federal or state laws or doctrines of successor or transferee liability.

All such Encumbrances upon the Burke Assets to be unconditionally released, discharged

and terminated, with all such Encumbrances to attach only to the proceeds of the Sale

with the same priority, validity, force and effect as they existed with respect to the Burke

Assets prior to the Closing Date except as may be set forth herein.

4.      The Debtors and the Purchaser are directed to comply, and shall comply,

with all provisions of the APA, including, but not limited to, executing and delivering the

APA, together with all additional instruments and documents that may be reasonably

necessary to implement the APA, in each case in accordance with the terms of the APA.

5.      The Purchaser shall not be required to seek or obtain relief from the

automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies

under the ~~the~~ APA or any other related document.  The automatic stay imposed by

section 362 of the Bankruptcy Code is modified solely to the extent necessary to

implement the preceding sentence.

6.      The transfer of the Burke Assets to the Purchaser pursuant to the APA constitutes a legal, valid and effective transfer and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Burke Assets so transferred.

7.      This Order also shall be construed, and constitute for any and all purposes, a complete and general assignment, conveyance and transfer of all right, title and interest of the Debtors and their estates to the Purchaser of (i) the Burke Assets and (ii) the Assumed Contracts.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

78.      This Order and the APA shall be binding upon, and shall inure to the benefit of the Debtors, the Purchaser, and their respective successors and assigns, including without limitation, any chapter 11 trustee hereinafter appointed for the Debtors or any trustee appointed in a chapter 7 case, and its estate and creditors, if any of these Chapter 11 Cases are converted from chapter 11.

89.      On the date of the closing of the transactions contemplated by the APA (the "**Closing Date**"), each of the creditors of the Debtors is authorized and directed to execute such documents and take all other actions as may be necessary to release the Encumbrances against or in the Burke Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

910.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances against or in the Burke Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, and releases of the Encumbrances that the person or entity has with respect to the Burke Assets or otherwise, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Burke Assets.

1011.   Effective upon the Closing Date, all parties and/or entities, including, but not limited to, all debt security holders, equity holders, governmental, tax and regulatory authorities, trade creditors, employees, litigation claimants and other creditors, asserting Encumbrances or contract rights against the Debtors and/or any of the Burke Assets, including the Assumed Contracts, are hereby permanently enjoined and precluded from, with respect to such Encumbrances:  (i) asserting, commencing or continuing in any manner any action against the Purchaser or any director, officer, agent, representative or employee of the Purchaser (all such entities are collectively referred to as the "**Protected Parties**") or against any Protected Party's Burke Assets or properties, including without limitation the Burke Assets; (ii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award, decree or order against the Protected Parties or any properties or Burke Assets of the Protected Parties, including without limitation the Burke Assets; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Protected Parties or any properties or Burke Assets of the Protected Parties, including without limitation the Burke Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Protected Parties; and (v) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Order or the APA.

11 12.   The provisions of this Order authorizing the sale of the Burke Assets free and clear of the Encumbrances (with such Encumbrances to attach to the proceeds of the Sale) shall be self-executing, and none of the Debtors, the Purchaser nor any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale; *provided, however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA.  Without in any way limiting the foregoing, the Purchaser is empowered to execute and file releases, termination statements, assignments, consents, cancellations or other instruments to effectuate, consummate and/or implement the provisions hereof with respect to such sale.

12 13.   A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

13 14.   The Purchaser is not a "successor" of the Debtors or their estates by reason of any theory of law or equity.  Consummation of the Sale and the transactions contemplated by the APA does not effect a *de facto* merger or consolidation of the Debtors and the Purchaser or result in the continuation of the Debtors' business under the Purchaser's control.  The Purchaser is not, and will not become by virtue of the Sale, the alter ego of, a successor in interest to, or a continuation of the Debtors, nor is the Purchaser otherwise liable for the Debtors' debts and obligations or incur any liability derived from the Burke Assets or the Assumed Contracts within the meaning of any federal, state or local revenue, pension, ERISA, tax, labor (including any WARN Act), employment, environmental or other law, rule or regulation,  unless otherwise

specifically provided for in the APA or pursuant to this Order.  For purposes of this paragraph of the Order, all references to the Purchaser shall include the affiliates, subsidiaries and shareholders of the Purchaser.

14_15.   All entities that are presently, or on the Closing Date may be, in possession of some or all of the Burke Assets are hereby directed to surrender possession of the Burke Assets to the Purchaser on the Closing Date.

15_16.   Nothing contained in any plan of reorganization (or liquidation) confirmed in these cases_the Chapter 11 Cases or the order of confirmation confirming any such plan shall conflict with or derogate from the provisions of the APA or the terms of this Order.

16_17.   The APA is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford, and is not in violation of creditors' and equity security interest holders' voting rights.

17_18.   The purchase by the Purchaser is a purchase in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code, and the Purchaser is entitled to the protection of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification or appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date.

18_19.   The sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Burke Assets shall be deemed to constitute reasonably equivalent value and fair consideration.

1920.    From and after entry of this Order, none of the Debtors nor any other person or entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Burke Assets either to the Debtors prior to the closing of the Sale for subsequent transfer to the Purchaser, or to the Purchaser in accordance with the terms and conditions of the APA and this Order.

2021.    The Debtors have demonstrated that the assumption by the applicable Debtors and assignment to the Purchaser of the Assumed Contracts is in the best interests of the Debtors, their creditors and their estates and represents a prudent exercise of the Debtors' business judgment.  The Assumed Contracts are an integral part of the Burke Assets and, accordingly, such assumptions and assignments are reasonable, enhance the value of the estate and do not constitute unfair discrimination.

2122.    The contracts and leases set forth on Schedule [_]2.1(e) to the APA (the "**Assumed Contracts**") are in full force and effect and (subject to, and upon the payment of, the Cure Amounts), no default on the part of the Debtors exists under the Assumed Contracts with respect to any material term, condition, covenant, payment obligation or other obligations thereunder, whether prepetition or postpetition in nature, other than anyand no counterparty to any such Assumed Contract shall be permitted to declare or enforce a default existingby the Debtors or the Purchaser thereunder or otherwise take action against the Purchaser as a result of the filing of the Chapter 11 Casesany of the Debtor's financial condition, change in control, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract.

2223.    The Debtors and the Purchaser have (i) cured, or provided adequate assurance of cure with respect to, any default by the Debtors existing prior to the date

hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(A)

of the Bankruptcy Code and (ii) compensated, or provided adequate assurance of

compensation, to the Contract Counterparties for any actual pecuniary loss to such party

resulting from a default by the Debtors prior to the date hereof under such Assumed

Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code in

accordance with the Assumption Procedures.  The Purchaser has provided adequate

assurance of its future performance of and under the Assumed Contracts within the

meaning of section 365(b)(1)(C) of the Bankruptcy Code in accordance with the

Assumption Procedures .

2324.   With respect to each Assumed Contract listed on Schedule A hereto2.1(e)

to the APA, the Cure Amount set forth on Schedule A heretosuch schedule opposite such

Assumed Contract to which no timely objection is filed in accordance with the

Assumption Procedures is the sole amount necessary to cure all monetary defaults by the

Debtors and to pay all actual pecuniary losses, if any, with respect to such Assumed

Contract pursuant to section 365(b)(1) of the Bankruptcy Code.

2425.   Pursuant to section 365 of the Bankruptcy Code, and subject to and

conditioned upon the closing of the Sale, the Debtors are hereby authorized to:

(a)  assume the Assumed Contracts and assign such contracts to the Purchaser, effective

upon the Closing Date; (b) execute and deliver to the Purchaser such documents or other

instruments as may be necessary to assign and transfer such Assumed Contracts to the

Purchaser, and (c) pay the required Cure Amounts, if any, at Closing (or as soon

thereafter as is reasonably practicable).

2526.   Upon the occurrence of the Closing Date, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. Any provision in any Assumed Contract that purports to declare a breach, default or termination as a result of a change of control of the Burke Assets or requires the consent of any non-debtor party for the assumption and assignment thereof is hereby deemed unenforceable under section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any liability with respect to the Assumed Contracts occurring after such assignment to and assumption by the Purchaser except as expressly provided in the APA.

2627.   All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the closing of the Sale (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured as set forth in the APA as of the Closing Date or as soon thereafter as practicable.  The Purchaser shall have no liability or obligation for any such defaults or other obligations arising or accruing prior to the Closing Date, except as otherwise expressly provided in the APA.

2728.   Each Contract Counterparty that has not filedor does not file a timely objection to the assumption and assignment of its Assumed Contract, including to any Cure Amount, is hereby forever barred, estopped and permanently enjoined from filing any such objection and from asserting, prosecuting or otherwise pursuing any of Debtors,

17

the Purchaser or any of their respective affiliates, successors or assigns or any of their

respective affiliates, agents, representatives, counsel and advisors, the Burke Assets or

any other assets or operations of any of the Debtors or the Purchaser on the basis that any

amounts in excess of the Cure Amount set forth opposite such Assumed Contract on

Schedule A hereto2.1(e) to the APA is owing with respect to any defaults under such

Assumed Contract and/or that any other conditions to assumption or assignment must be

satisfied in order for the Assumed Contract to be assumed by any of the Debtors and

assigned to the Purchaser.  All parties who have failed to raise with particularity that such

party's consent is required for the Debtors to assume and assign such Assumed Contract

are hereby deemed to have given the consent contemplated by Bankruptcy Code section

365(c)(1)(B) and (f)(1) to the assumption of such Assumed Contract by the Debtors and

the assignment of such Assumed Contract to the Purchaser.

2829.   The failure of the Debtors or the Purchaser to enforce at any time one or

more terms or conditions of any Assumed Contract shall not constitute a waiver of any

such terms or conditions, or of the Debtors' or the Purchaser's rights to enforce every

term and condition of the Assumed Contracts.

2930.   Upon the occurrence of the closing of the Sale, the Purchaser shall assume

all liabilities associated with the Assumed Contracts in accordance with the terms of the

APA.

31.      Notwithstanding anything to the contrary herein, no executory contract or

lease shall be considered an Assumed Contract under this Order unless and until such

executory contract or lease shall have been assumed by the Debtors in accordance with

the assumption procedures set forth in the Motion, including, without limitation, the

18

Debtors having served an Assumption Notice to the non-debtor counterparty to any executory contract or lease proposed to be assumed and provided ten (10) days from the service of such notices for the applicable non-debtor counterparty to the file an objection.

32.    Nothing in the injunction and release provisions of this Order shall be interpreted to bar, impair, prevent or otherwise limit any rights the Debtors' surety bond providers may have and claim from and after the Closing, that they may claim under the existing bonds, indemnity agreements, common law of suretyship or the Surface Mine Control and Reclamation Act and its state analogues with regard to any failure of the Purchaser to satisfy and perform the Assumed Liabilities from and after Closing.

33.    The Debtors will use commercially reasonable efforts to transfer the Excluded Assets that are not transferred to Opes Resources Inc. to Laurel Mountain Resources LLC or another Debtor affiliate promptly following the Closing Date.

34.    Nothing in this Order or the APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability (including, but not limited to, for reclamation and mitigation and any associated long-term protection requirements) to a "governmental unit" (as defined in section 101(27) of the Bankruptcy Code) that any entity could be subject to as and to the extent it is the owner or operator of property sold or transferred pursuant to this Order after the Closing Date; provided, however, that the foregoing shall not limit, diminish or otherwise alter the Debtors' or the Purchaser's defenses, claims, causes of action, or other rights under applicable nonbankruptcy law with respect to any liability that may exist to a governmental unit at owned or operated property.  Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or

the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police ore regulatory law governing such transfer or assignment.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order, subject to the Debtors' and the Purchaser's rights to assert in that forum or before this Court that any such laws are not in fact police or regulatory law or that such enforcement is impermissible under applicable law.

3035.   Any objections to the Motion or the relief requested therein that have not been adjourned, withdrawn or, waived, settled or otherwise resolved are hereby denied and overruled in all respects on the merits with prejudice.

3136.   The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

3237.   As of the time of the closing of the Sale, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.

3338.   The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof; *provided*, that, (a) an order of this Court has approved such modification, amendment, or supplement; (b) such modification, amendment or supplement is not material or (c) such modification, amendment or supplement is made in the ordinary course of business.

39.    To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the Burke Assets and the Assumed Contracts on account of the filing or pendency of the Chapter 11 Cases.

~~34~~40.    The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

~~35~~41.    Notice of the Motion as provided therein shall be deemed good and sufficient notice.

~~36~~42.    In the event of any inconsistencies between this Order, the Motion and the APA, this Order shall govern in all respects. However, the failure to specifically include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

43.    Nothing contained in any plan of reorganization or liquidation confirmed in the Chapter 11 Cases or any order of the Court confirming such plan or in any order in the Chapter 11 Cases, shall alter, conflict with, or derogate from, the provisions of the APA or the terms of this Order. The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order that may be entered by the Court in the Chapter 11 Cases, and the terms and provisions of this Order and the APA, as well as the rights and interests granted pursuant to this Order and the APA, shall continue in the Chapter 11 Cases or any superseding case and shall be specifically performable and enforceable against the Debtors, their estates and the

Purchaser, and each of their respective successors and permitted assigns, including any trustee or other fiduciary appointed.

3744.   Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rules 6004(h) and 6006(d)) or Local Bankruptcy Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  Time is of the essence in closing the Sale, and the Debtors and the Purchaser intend to close the Sale as soon as practicable. Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk their appeal being foreclosed as moot.

3845.   The provisions of this Order are nonseverable and mutually dependent.

3946.   This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order, the APA or any document related thereto.

Richmond, Virginia

Dated:_____, 2014


_____
KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY JUDGE


                              Entered on Docket: _____

WE ASK FOR THIS:

/s/ ~~Henry P. (Toby) Long, III~~Justin F. Paget
_____
Tyler P. Brown (VSB No. 28072)
 Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

*Local Counsel to the Debtors and Debtors in
Possession*

-and-

Marshall S. Huebner (admitted *pro hac vice*)
Brian M. Resnick (admitted *pro hac vice*)
Michelle M. McGreal (admitted *pro hac
vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7973

*Counsel to the Debtors and Debtors in
Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ ~~Henry P. (Toby) Long, III~~Justin F. Paget

# EXHIBIT 1
**APA**

[To come]



[To come]

| | |
|---|---|
| **Summary report:**<br>**Litéra® Change-Pro TDC 7.5.0.96 Document comparison done on 6/3/2014 6:13:33 PM** | |
| **Style name:** Color Legislative + Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS/AmericasActive/85960303/4 | |
| **Modified DMS:** iw://DMS/AmericasActive/85960303/12 | |
| **Changes:** | |
| Add | 103 |
| Delete | 78 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 181 |