1

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA (RICHMOND)

|  |  |  |
|---|---|---|
| In re | ) | Case No. 14-31848-KRH |
|  | ) | Richmond, Virginia |
| JAMES RIVER COAL COMPANY, | ) |  |
| et al., | ) | June 11, 2014 |
| Debtors. | ) | 2:08 PM |
|  | ) |  |

TRANSCRIPT OF UNSEALED PORTION OF HEARING ON:
MOTION FOR ENTRY OF AN ORDER AUTHORIZING ELLIOT MOSKOWITZ
FROM DAVIS POLK & WARDWELL LLP TO APPEAR AND PRACTICE PRO
HAC VICE ON BEHALF OF THE DEBTORS [ECF NO. 359];
DEBTORS' MOTION PURSUANT TO SECTIONS 107(B)(1) AND
107(C)(1) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9018
TO FILE UNDER SEAL EXHIBITS D AND E TO DEBTORS' MOTION
FOR ORDER AUTHORIZING DEBTORS TO (I) IMPLEMENT (A) KEY
EMPLOYEE INCENTIVE PLAN,(B) KEY EMPLOYEE RETENTION PLAN
AND (C) MODIFIED SEVERANCE PLAN AND (II) MAKE 2013 SAFETY
PAYMENTS [ECF NO. 301];
DEBTORS' MOTION FOR AN ORDER SETTING AN EXPEDITED HEARING
AND SHORTENING THE NOTICE PERIOD FOR DEBTORS' MOTION FOR
ORDER AUTHORIZING DEBTORS TO (I) IMPLEMENT (A) KEY
EMPLOYEE INCENTIVE PLAN, (B) KEY EMPLOYEE RETENTION PLAN
AND (C) MODIFIED SEVERANCE PLAN AND (II) MAKE 2013 SAFETY
PAYMENTS [ECF NO. 302]; AND
DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS TO
(I) IMPLEMENT (A) KEY EMPLOYEE INCENTIVE PLAN, (B) KEY
EMPLOYEE RETENTION PLAN AND (C) MODIFIED SEVERANCE PLAN
AND (II) MAKE 2013 SAFETY PAYMENTS [ECF NO. 299]
BEFORE THE HONORABLE KEVIN R. HUENNEKENS,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

Debtors:                    TYLER P. BROWN, ESQ.
                           HUNTON & WILLIAMS LLP
                           951 East Byrd Street
                           Richmond, VA 23219

2

```
 1   APPEARANCES (cont'd.):

 2   Debtors (cont'd.):        BRIAN M. RESNICK, ESQ.
                               ELLIOT MOSKOWITZ, ESQ.
 3                             MARSHALL S. HUEBNER, ESQ.
                               ANGELA LIBBY, ESQ.
 4                             DAVIS POLK & WARDWELL LLP
                               450 Lexington Avenue
 5                             New York, NY 10017

 6   U.S. Trustee:            ROBERT B. VAN ARSDALE, AUST
                               OFFICE OF THE UNITED STATES TRUSTEE
 7                             701 East Broad Street
                               Suite 4304
 8                             Richmond, VA 23219

 9   Official Creditors'       ALEXIS FREEMAN, ESQ.
     Committee:                AKIN GUMP STRAUSS HAUER & FELD LLC
10                             One Bryant Park
                               New York, NY 10036
11

12

13

14

15

16

17

18

19

20

21   Transcription Services:          eScribers
                                       700 West 192nd Street
22                                     Suite #607
                                       New York, NY 10040
23                                     (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

**Colloquy**

3

1            THE COURT OFFICER:  All rise.  Court is now in

2    session.  Please be seated and come to order.

3            THE CLERK:  James River Coal Company, items 1 and 2

4    on proposed amended agenda.

5            MR. BROWN:  Good afternoon, Your Honor.

6            THE COURT:  Good afternoon, Mr. Brown.

7            MR. BROWN:  Tyler Brown of Hunton & Williams, local

8    counsel for the debtors in these cases.

9            Your Honor, on the proposed agenda, our first matter

10   is a pro hac motion seeking the admission pro hac vice of

11   Mr. Elliot Moskowitz of the Davis Polk firm.  Mr. Moskowitz is

12   here in the courtroom and we'd ask that he be allowed to

13   participate today.

14           THE COURT:  All right, that motion is granted.

15           Welcome to the court.

16           MR. MOSKOWITZ:  Thank you, Your Honor.

17           MR. BROWN:  At this point I'll turn it over to

18   Mr. Resnick.

19           THE COURT:  All right.

20           MR. RESNICK:  Good afternoon, Your Honor.

21           THE COURT:  Good to see you again.

22           MR. RESNICK:  You as well, Your Honor.

23           Brian Resnick of Davis Polk & Wardwell, for the

24   debtors.  And with me, Your Honor, are my colleagues

25   Mr. Marshall Huebner, Elliot Moskowitz and Angela Libby.

**Colloquy**

4

1          Your Honor, we're here today to discuss the debtors'

2    motion to approve several compensation plans -- I'll refer to

3    that as the compensation motion; specifically, it's a key

4    employee incentive plan -- or KEIP -- a key employee retention

5    plan -- the KERP -- and a severance plan; as well as seeking

6    authority to make certain safety-related payments under the

7    debtors' ordinary-course annual incentive plan.  In connection

8    with the compensation motion, we also filed two motions to

9    seal certain exhibits and testimony; I'll refer to those as

10   the sealing motions.  As Your Honor is aware, the U.S. Trustee

11   has objected to the compensation motion and the sealing

12   motions and is the only party to have done so.

13          So before I dive into what will be a contested

14   hearing, I would note that the debtors remain committed to our

15   goal of resolving all issues with respect to our motions,

16   prior to the hearings.  Indeed, this is our fourth hearing and

17   our first contested matter.  We've been able to resolve all

18   issues with every party, for every single motion we filed in

19   the case, including all the first-days, the DIP, the two asset

20   sales from last week, and each time we've been able to bring

21   to Your Honor orders that have the consent and input of the

22   creditors' committee, the DIP lenders and surety bond

23   providers and the contractual counterparties and others.  So

24   we certainly meant what Mr. Huebner said on the first day that

25   we ask people to contact us, and people have done so.  And so,

**Colloquy**

5

1   so far it's been a very successful case from that perspective.

2          And other than with respect to the U.S. Trustee, this

3   matter is actually no different.  Not only do these

4   compensation plans reflect the considered judgment of the

5   board, specifically the compensation committee of the board,

6   and senior management, as well as the advice of Mercer, who is

7   the independent compensation consultant that was retained by

8   the compensation committee of the board, as well as Perella

9   Weinberg Partners, the restructuring advisors, and Davis Polk,

10  but also more so than any other motion that we filed, this

11  compensation motion reflects a true collaborative effort with

12  the creditors' committee and, in particular, with respect to

13  the two issues that are really at the core of the U.S.

14  Trustee's objection:  who should be part of the KEIP and the

15  KERP, and are the incentives for the KEIP properly

16  incentivizing?

17          In terms of the order of things today, we've agreed

18  with the U.S. Trustee to address the sealing motions first,

19  since those will guide how we will proceed with the

20  compensation motion.  And even before we get to the sealing

21  motion; we actually filed a motion to expedite on May 27th,

22  which was the day we filed the compensation motion.  I believe

23  that motion is actually no longer necessary since we ended up

24  adjourning the hearing till today, so I think we can consider

25  that withdrawn.

**Colloquy**

6

1        However, we did file a motion to expedite, yesterday,

2   along with the declaration of Agnes Tang of Perella Weinberg,

3   and so I request that Your Honor enter that motion to expedite

4   so we can address all the issues that are relevant today.

5        THE COURT:  Any objection?

6        It's granted.

7        MR. RESNICK:  Thank you, Your Honor.  And before I

8   move on to the motions, we filed four declarations in

9   connection with these matters and we have agreed with the U.S.

10  Trustee that we would submit these into the record as

11  affirmative testimony.  We filed two declarations of Peter

12  Socha, the debtors' chairman, president and CEO:  one was

13  filed with the initial compensation motion, and another was

14  filed yesterday with our reply.  Mr. Socha is in the courtroom

15  today; we intend to put him on the stand for some direct

16  testimony.  And then I understand that Mr. Van Arsdale intends

17  to cross-examine Mr. Socha.

18       The third declaration is that of John Dempsey of

19  Mercer.  As I mentioned, Mercer is the independent

20  compensation consultant that was retained by the compensation

21  committee of the debtors' board of directors.  Mr. Dempsey is

22  in the courtroom today and we intend to call him as well for

23  some direct testimony.  And I understand that Mr. Van Arsdale

24  has some cross-examination for him.

25       And lastly, yesterday we filed a declaration of Agnes

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document      Page 7 of 93
Opening Statement - Mr. Resnick (Sealing Motions)

7

1    Tang of Perella Weinberg Partners.  Ms. Tang is in the

2    courtroom today, but I understand that Mr. Van Arsdale will

3    not be cross-examining Ms. Tang and, therefore, we do not

4    intend to put Ms. Tang on the witness stand for direct.

5            These declarations are mainly in support of the

6    compensation motion, but Mr. Socha's and Ms. Tang's

7    declarations contain a few sentences supporting the sealing

8    motion as well.

9            So unless Your Honor has any questions at this point,

10   I'm happy to begin by addressing the sealing motions.

11           THE COURT:  You may begin.

12           MR. RESNICK:  Thank you, Your Honor.  Your Honor, we

13   have three things that are subject to the sealing motions; it

14   was actually four, but the fourth was Ms. Tang's testimony,

15   which we were requesting would be done in a closed courtroom.

16   Since Ms. Tang will not be addressing -- will not be

17   testifying today, as we've agreed with Mr. Van Arsdale, that

18   would not be necessary.

19           So the only three -- so the three documents that we

20   are proposing to have sealed, each of which contains

21   confidential commercial information of the debtors, under

22   Section 107(b) of the Bankruptcy Code, and would cause

23   substantial harm to the debtors if disclosed, are Exhibits D

24   and E to the compensation motion, and Ms. Tang's declaration.

25   Although the first two -- Exhibits D and E -- are subject to

1    one sealing motion and the latter to the supplemental sealing

2    motion, I would just address them together.

3            I view this information as being in two buckets;

4    number one is the KEIP information, and that consists of

5    Exhibit D and the Tang declaration; These documents contain

6    the KEIP threshold amounts and calculations and largely center

7    around what level of proceeds have to be realized through the

8    auction process in order for the KEIP participants to earn

9    their KEIP payments.  The other bucket, the second bucket, is

10   the KERP information, which is Exhibit E; that exhibit

11   contains the list of participants, their current salaries and

12   the KERP tiers and payments.

13           Now, a few important things to note about this

14   confidential information:  None of this information has been

15   withheld from the Court, the U.S. Trustee, or the

16   professionals to the creditors' committee and the DIP lenders.

17   No party, other than the U.S. Trustee, has objected either to

18   the compensation motion or the sealing motions.  No party has

19   contacted us informally, or contacted the creditors' committee

20   informally, requesting this information.  If anybody did

21   request that information from us, we certainly would have

22   worked out appropriate confidentiality arrangements and would

23   have been happy to provide, assuming it was being requested

24   for a proper purpose, not being a potential bidder who wants

25   to get their eyes on our views of value, or a potential -- or

**Opening Statement - Mr. Resnick (Sealing Motions)**

9

1    a competitor who would love to get their eyes on salary

2    information that's in Exhibit E.  But assuming they were

3    asking for a proper purpose, a creditor who thought they

4    needed it to evaluate the plans, we would have worked out an

5    appropriate confidentiality agreement.  But nobody has

6    contacted us.  And we get calls from a lot of creditors and a

7    lot of parties about a lot of things, but not this.  So

8    there's absolutely no aggrieved party here.  There's nobody

9    who wanted to see the information who was not able to see it.

10         Furthermore, Your Honor, the compensation motion

11   provides extensive detail that is more than sufficient for

12   parties-in-interest to analyze the plans, which probably

13   explains why nobody asked.  The motion describes the number of

14   participants, how the participants were selected, the cost of

15   the plans, how the cost compared to market practice, how

16   payments are determined, the process for developing the plans,

17   the negotiations with the UCC that led to the final versions.

18   That is really the need-to-know information.

19         If you look at it in more detail, with respect to the

20   KERP, who is getting it:  thirty-nine people who senior

21   management has said, in their judgment, are crucial to stick

22   around and are doing imperative services with respect to

23   running the company and the auction process.  A creditor

24   doesn't need to know which thirty-nine; I think they need to

25   know that senior management used their considered judgment,

**Opening Statement - Mr. Resnick (Sealing Motions)**

10

1  the board did the same, and the creditors' committee vetted

2  it.  What do people have to do to earn the KERP?  The motion

3  makes it very clear what the vesting figures are, how much

4  does it cost; that information is all -- it's all in the

5  motion.  It's a maximum of 1.4 million dollars if it is

6  completely earned.  Is the cost market?  There is plenty of

7  information in the motion about the cost being completely

8  market that is supported by the Dempsey declaration as well.

9           With respect to the KEIP, the motion also describes

10 who is getting it, how much it costs.  It costs zero unless

11 the minimum threshold is hit.  The minimum threshold is hit,

12 costs 892,000 dollars.  If the top-level threshold is hit, it

13 costs 2.7 million dollars.  Is the cost market?  Yes; that's

14 absolutely disclosed in the motion and the Dempsey

15 declaration.  What do people have to do to earn it?  The have

16 to achieve defined thresholds that have been specifically

17 negotiated with the creditors' committee and are subject to

18 scrutiny by this Court and the U.S. Trustee.

19           So let's talk about the very limited information that

20 has not been publicly disclosed and how that information

21 clearly constitutes confidential commercial information within

22 the meaning of Section 107(b) of the Bankruptcy Code.  Exhibit

23 D and the Tang Declaration contain the actual thresholds of

24 sale proceeds, or plan value, that need to be realized; this

25 information is almost never disclosed.  KEIP thresholds are

**Opening Statement - Mr. Resnick (Sealing Motions)**

11

1    premised upon the debtors' and their advisors' view as to what

2    levels of consideration are challenging to achieve.  This is a

3    case where we do not have a stalking-horse bidder, we do not

4    have a firm offer in hand, there's no floor or minimum bid

5    price.  It is an open auction.  Bids are due on June 30th, the

6    auction is scheduled for July 8th, and at the moment the sale

7    hearing is scheduled for July 10th.  Right now what we have

8    are indications of interest.  Management and the advisors are

9    working tirelessly to try to convert those indications of

10   interest into binding bids.

11        It is simply common sense, Your Honor, that

12   disclosure of the thresholds would likely result in precisely

13   the sort of commercial injury that Section 107(b) is designed

14   to protect against.  This is supported by Ms. Tang's

15   declaration where she said that public disclosure of these

16   thresholds and the formulae used to calculate total value

17   would likely prejudice the debtors' ability to attain the

18   highest value through the auction process and undermine

19   negotiations with potential purchasers or investors.

20   Unsurprisingly, Your Honor, courts regularly seal this type of

21   information.  We have cited several cases in our papers:

22   Coach America; Tribune; Furniture Brands.

23        Exhibit E is different; that exhibit consists of

24   sensitive information regarding the compensation of the KERP

25   participants, including their current salaries, work location,

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document      Page 12 of 93
Opening Statement - Mr. Resnick (Sealing Motions)

12

1    and tier level under the KERP.  This information is of course

2    not otherwise publicly available and virtually never

3    disclosed.  If a prospective employer knows to the penny what

4    that employee stands to earn from the debtors, that employer

5    knows basically how much it would take to hire that employee

6    away from the debtors.  As Mr. Socha said in his supplemental

7    declaration, to reveal the KERP participants' compensation

8    information publicly would give the debtors' competitors a

9    material and unfair advantage in recruiting the debtors' most

10   valuable employees and would thus undermine the very purpose

11   of the KERP.  Furthermore, Mr. Socha also stated in his

12   supplemental declaration that disclosure of certain employees'

13   compensation information, which would normally be unavailable

14   to other employees, would adversely affect company morale.

15       Recognizing these harms, this Court has offered

16   very -- ordered very similar individual employee compensation

17   information sealed in other cases, such as AMF Bowling,

18   Circuit City, and Greenbrier hotel.  This is by no means a

19   novel concept and, in fact, my understanding is that the U.S.

20   Trustee did not even object to the sealing in those three

21   cases.

22       In sum, Your Honor, all the information that the

23   debtors seek to keep confidential contains confidential

24   commercial information that is required to be protected under

25   Section 107(b) of the Bankruptcy Code.  The United States

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document     Page 13 of 93
Opening Statement - Ms. Freeman (Sealing Motions)

13

1    Trustee's objection simply concludes that the information is

2    not protected by 107(b), without actually giving any

3    substantive reason or support for that proposition.  In fact,

4    in its objection the U.S. Trustee nowhere refutes the debtors'

5    judgment that the disclosure of the information could

6    seriously jeopardize the ongoing auction process, could

7    provide the debtors' competitors with a roadmap for recruiting

8    the debtors' most valuable employees and can negatively --

9    would negatively affect employee morale.

10           Nobody has asked for this information, nobody was

11   denied the right to see it, there is no aggrieved party.

12   Courts seal this information regularly and Your Honor has in

13   several recent cases.  Accordingly, the debtors respectfully

14   request that Your Honor grant the sealing motions.

15           THE COURT:  All right, very good.

16           Does any party wish to be heard in connection with

17   the sealing motions?

18           MS. FREEMAN:  Good afternoon, Your Honor.  Alexis

19   Freeman from Akin Gump Strauss Hauer & Feld, on behalf of the

20   creditors' committee.

21           As Your Honor is aware, we filed a statement in

22   support of both the compensation motions as well as the

23   sealing motions.  As Mr. Resnick correctly noted, the

24   creditors' committee has not received any inquiries as it

25   relates to the information that has been filed under seal.  In

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document     Page 14 of 93
**Opening Statement - Mr. Van Arsdale (Sealing Motions)**

14

1       fact, some of the information that was provided to us was

2       provided on a professionals'-eyes-only basis, which the

3       committee's advisors thoroughly analyzed.  And with regard to

4       that information that was only provided to professionals, we

5       were able to analyze and provide a recommendation to the

6       committee with respect thereto.

7               As Mr. Resnick also noted, we have two primary

8       concerns with regard to unsealing -- or not sealing

9       information, which is in fact damaging the sale process.

10      Certainly if the threshold values are openly disclosed, we

11      have grave concern that that would negatively impact the bids

12      or potential offers that are made on the company.  Also, in

13      connection with regards to recruiting efforts, it is a

14      critical time right now for this company, and we are working

15      closely with the debtors throughout this strategic transaction

16      process and we also want to be sure that the company has the

17      human resources that it needs in order to get through this

18      process successfully.

19              Thank you.

20              THE COURT:  Thank you very much.

21              Any other party wish to be heard?

22              MR. VAN ARSDALE:  Robert Van Arsdale for the U.S.

23      Trustee.

24              Your Honor, we have listened to Mr. Resnick today and

25      have actually spoken with Mr. Resnick prior to today

**Opening Statement - Mr. Van Arsdale (Sealing Motions)**

15

1    concerning some of these matters.  I think that one of the

2    points that needs to be made is, before we can really discuss

3    107(b), we need to remember that before 107(b) comes 107(a),

4    which gives a pretty broad idea of what should be allowed as

5    public information.  The courts -- or the courtroom is open

6    unless the court orders it closed for a good reason; (b) puts

7    out those reasons.  I think it is very often that there's a

8    dispute as to whether one particular thing needs the reason --

9    the exact reasons found in 107(b) so that it should be allowed

10   to be sealed.  That is an extraordinary measure and we act on

11   that extraordinary measure.

12        And there are a couple of things that just -- as to

13   Exhibit E, for example, which does contain names and it

14   contains the salary level, and the concern seems to be that

15   some competitor who wants that type of person working for them

16   will look at that and be able to know exactly what salary they

17   have to meet.  Truly in reality, if you are out recruiting for

18   somebody, you know they exist, you want to know what they

19   make, you call them up; they'll tell you, because they want to

20   know whether they can get a better job someplace else or not.

21   You don't have to have the protection, that this omnibus

22   sealing motion gives you, to this list of people, for the

23   reason given.  I mean, the reason given can be overcome by a

24   simple phone call from somebody who's interested in that

25   person, and that person will tell them the whole thing.  And

**Opening Statement - Mr. Van Arsdale (Sealing Motions)**

16

1   there's no corporate reason not to provide that information

2   when what you're doing is allowing -- these numbers all

3   intermingle and to whether creditors are going to get anything

4   out of this case or not.

5          At the top of this line, we're spending five million

6   bucks for something.  Now, until somebody can tell you that

7   that five million dollars is going to buy you more than five

8   million dollars' worth of price increase, I think it's

9   important that everything be done in the terms that this

10  country allows it to be done in, which is in the open.  That's

11  our position and that's basically --

12         Your Honor, at this point that's really all I need to

13  say concerning this.

14         THE COURT:  All right, well, let me ask this

15  question.

16         MR. VAN ARSDALE:  Yes, sir.

17         THE COURT:  Obviously, I mean, you make a good point

18  about 107(a) and before you get to 107(b).  But the fact of

19  the matter is that I can always unseal something; but once

20  I've allowed it out, I can't seal it, I can't get it back.

21         MR. VAN ARSDALE:  Yes, sir.

22         THE COURT:  And if it's a close call, shouldn't I

23  seal it and subject to making it unsealed if it turns out not

24  to be proprietary or necessary to have sealed?  But that way

25  we at least have been able to preserve it for the short time,

**Opening Statement - Mr. Van Arsdale (Sealing Motions)**

17

1   for instance, in connection with an auction sale or something

2   of that sort where we might be worried about interfering with

3   the bidding process where, after you've had the bidding

4   process and had the auction sale, then some of the information

5   may not be as proprietary.

6        MR. VAN ARSDALE:  Well, and I think that's well

7   taken.  I do think, when you're looking in terms of a

8   bankruptcy case where at some point you're going to need --

9   the people who are impacted by this case are not just the five

10  people that have been appointed to the creditors' committee,

11  although they represent the others.  But there are people who

12  could be impacted by this.  To know whether -- again, whether

13  spending that three, four, five million dollars, to people --

14  on people, some of whom have been with the company for a long

15  time, some of whom may have helped put the company in the

16  position that it's in now -- and we're going to give them more

17  money for doing that -- those things need to be done in

18  anticipation of the release of the information -- the

19  nonrelease of the information.

20       I understand the Court's question and I think the

21  Court understands what I'm saying.

22       THE COURT:  I do.

23       MR. VAN ARSDALE:  So I will leave it at that.

24       THE COURT:  Thank you very much.

25       MR. VAN ARSDALE:  Yes, sir.

1          THE COURT:  Mr. Resnick, anything further?

2          MR. RESNICK:  Sure, Your Honor.  Mr. Van Arsdale

3   actually raised a great point with 107(a), and I probably

4   should have started with that.  And I didn't mean any

5   disrespect to that part of the statute.  We certainly do take

6   seriously the openness of the bankruptcy process, and I agree

7   that generally things should be open to public disclosure.  We

8   do, however, believe that 107(b) is there for a very important

9   purpose and that this information clearly satisfies that

10  purpose.

11          I would stress again that the demoralization that

12  could happen at a company if people -- they know what each

13  other makes, that is not generally disclosed in a company.  I

14  don't think it's right that just because an individual may

15  decide to answer a question from a prospective employer about

16  how much they make, that that person's salary should be

17  broadcast to the entire world.  The only evidence in this

18  matter that has been submitted is justified -- or is in

19  support of the two concerns:  the demoralization and the fact

20  that competitors could try to pick off the debtors' important

21  employees.

22          And I would just reiterate that plenty of information

23  has been disclosed, and we would submit that enough

24  information has been disclosed about these plans, for

25  creditors to make an informed decision about them.

**Opening Statement - Mr. Resnick (Comp. Plans)**

19

1           THE COURT:  All right, thank you very much.

2           All right, with regard to the sealing motions, the

3   Court's going to grant those motions, subject to unsealing

4   them at an appropriate time if it ever was appropriate to

5   unseal them on, again, motion and opportunity to be heard.

6   But I can't seal them after the fact, as I indicated, once the

7   information's been disclosed.  And I think that the three

8   reasons espoused for sealing them are sound under the present

9   circumstance.  And I'm keenly aware that this is a focused

10  motion.  We're talking about three exhibits; we're not talking

11  about all of the exhibits that we have and all the paper that

12  has been filed, and such.  And so it is an open process; I'm

13  comfortable with that and the fact that the key players that

14  are going to be able to talk about these matters have had an

15  opportunity to review the information, as has the Court.

16          So the motion's granted; I'll ask you to submit an

17  order to that effect.

18          MR. RESNICK:  Thank you very much, Your Honor.

19          On to the compensation motion.  As Your Honor is

20  aware, the debtors are in the most critical stages of the

21  auction process that will largely determine the ultimate

22  recovery to stakeholders in this case.  In order to achieve

23  the best possible outcome, it is imperative that those

24  employees most able to drive value during this process are

25  appropriately incentivized and that the debtors do not suffer

**Opening Statement - Mr. Resnick (Comp. Plans)**

1    from the loss of key employees during this critical period.

2    It is equally as important, Your Honor, that there not be a

3    delay in implementing these plans.  Employees are watching for

4    the outcome of this motion as we speak and, in order for these

5    plans to serve their intended purpose, we believe that they

6    certainly cannot wait until July as has been suggested by the

7    U.S. Trustee in its objection.

8         In formulating these compensation plans, the debtors

9    have deliberately structured them in a way that would be

10   aligned with market norms for similarly situated Chapter 11

11   companies, and comply with the Bankruptcy Code.  The debtors

12   relied on the advice of Mercer, Perella Weinberg, and Davis

13   Polk and, in addition, the debtors shared their initial

14   versions of the compensation plans with the creditors'

15   committee and, after a period of very intense negotiations and

16   substantial modifications to the plans, obtained their support

17   for the plans that are before Your Honor today.

18        Importantly, as I mentioned, no party with an

19   economic interest in this case has objected to this motion.

20   The only party to object is the U.S. Trustee, and we believe

21   that this objection is wholly without merit.

22        Let's just take a brief look at the plans.  The KEIP:

23   The KEIP was specifically designed to align the interests of

24   certain key employees best able to drive value during the

25   debtors' auction process, with the interest of creditors.

1   These employees are the ones that are on the frontlines:

2   they're meeting with prospective buyers and investors; they're

3   taking them on site visits; and for some of these employees,

4   they will be negotiating the terms of a strategic transaction.

5   These are the individuals who'll be primarily responsible for

6   driving up the value in this case.

7          This plan is structured so that it provides for

8   payments based solely on the amount of sale proceeds or plan

9   value realized by the estate.  The cost of this plan is

10  absolutely zero unless the KEIP participants achieve a minimum

11  threshold of value for the debtors' estates.  If, and only if,

12  this minimum threshold is achieved, the total cost of the plan

13  would be approximately 893,000 dollars, split between nine

14  participants.  At the maximum, which would be the incredibly-

15  difficult-to-achieve value, the total cost of the plan's going

16  to be 2.7 million dollars, which Mr. Dempsey's analysis has

17  shown is well within market norms for similarly situated

18  Chapter 11 debtors and, importantly, would leave the KEIP

19  participants still undercompensated relative to similar --

20  people with similar positions at other companies.

21          Several significant adjustments to the KEIP were made

22  following discussions with the creditors' committee, including

23  increasing the total KEIP payment thresholds to provide for

24  more challenging targets; reducing the KEIP payments at the

25  minimum level and increasing them at the highest level, making

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document      Page 22 of 93
Opening Statement - Mr. Resnick (Comp. Plans)

22

1    the plan more incentivizing; and moving certain KERP

2    participants into the KEIP and adding one employee to the

3    KEIP.

4              Consistent with Section 503 of the Bankruptcy Code,

5    the KEIP is, without a doubt, primarily incentivizing and not

6    retentive.  In support of that position, we have the

7    declaration of Ms. Tang that is part of the record.  We also

8    have the statement in support that was filed by the creditors'

9    committee, whose own financial advisor, Blackstone, was

10   intimately involved in negotiating these targets.

11             With respect to the KERP, the KERP was designed to

12   ensure that the debtors retain certain of their critical

13   employees during the restructuring.  The maximum cost of the

14   KERP for thirty-nine employees is 1.4 million dollars and is

15   paid only to employees who stay with the company through the

16   end of this process:  through the closing of a sale or the

17   consummation of a plan.  The cost of this plan is aligned with

18   market practice for Chapter 11 plans identified by Mercer and,

19   importantly, once again, still leaves KERP participants

20   generally undercompensated relative to their peers at other

21   companies.

22             It is the considered view of the debtors' senior

23   management and the board that there is a real need to

24   compensate certain key employees in a way that maximizes the

25   likelihood that they will stay through the sale or

**Opening Statement - Mr. Resnick (Comp. Plans)**

23

1   restructuring process.  The debtors are thinly staffed, and

2   each and every one of the employees is absolutely critical.

3   The loss of any one of these employees could be devastating to

4   the company, and replacing any of these employees, presumably

5   with outside consultants if it's possible at all, would be far

6   more expensive than the KERP; and that is evident by

7   Mr. Socha's declaration, and you will hear that from Mr. Socha

8   himself.

9           The severance plan:  It's a modified severance plan

10  that represents certain changes to the debtors' pre-petition

11  severance plan, which was approved by this Court by the first-

12  day wages order.  This plan as modified will provide a safety

13  net across the debtors' workforce.

14          U.S. Trustee actually doesn't raise any specific

15  objections to the severance plan, which is understandable in

16  that it expressly by its terms complies with Section 503(c)(2)

17  of the Bankruptcy Code.  The only specific issue raised by the

18  U.S. Trustee is in footnote 4 of the objection, where the U.S.

19  Trustee notes that the motion does not address whether an

20  employee who's terminated for cause is entitled to severance.

21  We have clarified that in the revised order that was submitted

22  yesterday, to confirm that such an employee would not receive

23  a severance payment; that's if an employee is terminated for

24  cause.

25          Your Honor, the U.S. Trustee bases its objection

**Opening Statement - Mr. Resnick (Comp. Plans)**

24

1    primarily on a few erroneous points:  first, that the KEIP and

2    the KERP should be judged under Section 503(c)(1) of the

3    Bankruptcy Code rather than 503(c)(3), for two reasons -- one,

4    because the KEIP may be retentive and not incentivizing; and

5    two, that the debtors have failed to provide sufficient

6    evidence to show that the KERP does not include insiders --

7    and second, that the debtors have failed to establish that the

8    KEIP and the KERP satisfy the standard of Section 503(c)(3) of

9    the Bankruptcy Code, which requires that the payments be

10    justified by the facts and circumstances of the case, which,

11    as Your Honor knows, most courts have held it's simply the

12    same as the business-judgment rule.

13         The record from the pleadings and the four

14    declarations, as well as the testimony that you will hear

15    today, is crystal clear that the U.S. Trustee's objections

16    have no merit.  The debtors and their advisors carefully

17    structured the plans to comply with the requirements of the

18    Bankruptcy Code, including by ensuring that the payments to

19    insiders were primarily incentivizing, by using challenging

20    thresholds to earn the payments and by selecting participants

21    in the retention plan who were not insiders.

22         In sum, the plans are reasonable, they are market,

23    they are necessary, and they are justified by the facts and

24    circumstances of this case, and they easily satisfy the

25    business-judgment standard.

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document      Page 25 of 93
Opening Statement - Mr. Van Arsdale (Comp. Plans)

25

1          At this point I would turn the podium over to Mr. Van

2    Arsdale for his opening remarks.

3          THE COURT:  All right, very good.

4          Mr. Van Arsdale?

5          MR. VAN ARSDALE:  Your Honor, it is, I guess, my

6    privilege to stand here all alone one more time.

7          THE COURT:  Without any economic interest.

8          MR. VAN ARSDALE:  Without any economic --

9          THE COURT:  I heard that.

10         MR. VAN ARSDALE:  -- interest --

11         THE COURT:  Yeah.

12         MR. VAN ARSDALE:  -- which is as the Code designs it

13   to be --

14         THE COURT:  I know.

15         MR. VAN ARSDALE:  -- and which would be a crime if

16   there were an economic interest.  But I am alone in this one,

17   as I was in the last two, I think, because what we do and what

18   we try to do to is to make sure whether the system is

19   functioning as it's supposed to function.

20         Let's go back a little bit and figure out where these

21   KERPs and KEIPs and all this stuff came from.  To start off

22   with, what it came from was New York firms, big firms, in

23   bankruptcy, throwing out millions and millions of dollars to

24   people who drove them into bankruptcy in the first place.  It

25   was as if there was a pirate ship that was out there and the

**Opening Statement - Mr. Van Arsdale (Comp. Plans)**

26

1   pirates are all going along and everything was just fine, and

2   then the ship started to sink, the pirates got all the gold --

3   the main pirates got all the gold, threw it in the lifeboat,

4   went away and waived goodbye to the rest of the crew and the

5   creditors who financed the ship.  That's where it came from.

6   It's not something that the United States Trustee made up to

7   try to be annoying in these cases, which is what I'm sensing.

8   Okay?

9            Now, number one, the KEIP:  we have nine

10  individuals --

11           Get pen out.  I could do nine.  There's nine.

12           -- we have nine individuals who, by the most recent

13  filings of the debtor, three only are insiders.  In fact,

14  there are only three insiders in this whole company; three.

15  They threw in another six for the KEIP, okay, claiming that

16  they're not insiders either.  We'll get to some of that, I

17  hope, in the cross-examination that we get to do today with

18  Mr. Socha and the fellow from Mercer.

19           But all we're trying to do is to make sure that the

20  considerations are made and so that the judgment can be made

21  so that the debtor can't just come in and say, we're giving

22  them this, we're giving them this, everything is fine.  I will

23  say it is quite telling in this case that this system that

24  they have come up with has the full support of the creditors'

25  committee, that a lot of times that is not the case.  So we

**Colloquy**

27

1 have that to factor into what our position is.  But I do think

2 that we still need to go through this and see if what is being

3 presented in fact meets the requirements of the Code.  That's

4 all.

5           THE COURT:  Thank you.

6           MR. VAN ARSDALE:  Thank you.

7           THE COURT:  And you don't need to apologize for your

8 position; I understand it completely.

9           MR. VAN ARSDALE:  Yes, Your Honor.

10           THE COURT:  And the Court appreciates it.

11           MR. VAN ARSDALE:  Thank you.

12           THE COURT:  All right.

13           MR. MOSKOWITZ:  Good afternoon, Your Honor.  For the

14 record, Elliott Moskowitz of the law firm of Davis Polk &

15 Wardwell, representing the debtors.  It's a pleasure to be

16 before you, Your Honor.

17           In terms of the organization today, I will be

18 conducting the examination of the witnesses and then I'll turn

19 the podium back over to Mr. Resnick at the end for closing

20 remarks.

21           THE COURT:  Very good.

22           MR. MOSKOWITZ:  One, just, housekeeping matter, Your

23 Honor, before we call our witnesses.  I think we should -- it

24 may or may not be necessary, but let me just do it; I want to

25 just formally move the Court for the admission of the

1 declarations as affirmative testimony. And by "declarations",

2 I'm referring to the two that have been submitted by Peter

3 Socha, one that was submitted by John Dempsey, and one by

4 Ms. Agnes Tang.

5          THE COURT: Any objection, Mr. Van Arsdale?

6          MR. VAN ARSDALE: No, Your Honor.

7          THE COURT: Does any other party-in-interest have an

8 objection?

9          They're admitted.

10 (Two declarations of Peter Socha were hereby received into

11 evidence as a Debtors' Exhibit, as of this date.)

12 (Declaration of John Dempsey was hereby received into evidence

13 as a Debtors' Exhibit, as of this date.)

14 (Declaration of Agnes Tang was hereby received into evidence

15 as a Debtors' Exhibit, as of this date.)

16          MR. MOSKOWITZ: Thank you, Your Honor. The debtors

17 call as their first witness, Mr. John Dempsey of Mercer.

18          THE COURT: Please come forward, Mr. Dempsey.

19          MR. MOSKOWITZ: Your Honor, may I orient this

20 slightly towards the -- does this --

21          THE COURT: Yeah, it should turn.

22          MR. MOSKOWITZ: Does this move? Yeah? Okay.

23          THE COURT: Not that I know how to do that.

24          MR. MOSKOWITZ: I'm going to use my strength to move

25 this.

**John Dempsey - Direct**

29

1       Okay, thank you.  I could have done it myself.

2   That's fine.

3       THE COURT:  Whenever you need strength, it's always

4   good to get the court security officer's help.

5       MR. MOSKOWITZ:  Agreed.  Agreed.

6   (Witness sworn)

7   DIRECT EXAMINATION

8   BY MR. MOSKOWITZ:

9   Q.  Okay.  Good afternoon, sir.

10  A.  Good afternoon.

11  Q.  Would you please state your name for the record?

12  A.  John Dempsey.

13  Q.  And, Mr. Dempsey, what is your educational background?

14  A.  Have a bachelor's degree from Yale and a master's of

15  business administration from Ohio State University.

16  Q.  And what firm do you work for?

17  A.  Mercer (US) Inc.

18  Q.  How long have you worked for Mercer?

19  A.  Since 1985.

20  Q.  What type of work does Mercer do?

21  A.  Mercer's a global compensation and benefits consulting

22  firm and, within that panoply, I work in the talent business,

23  which advises employers, incentive and other rewards

24  arrangements for employees.

25  Q.  And has Mercer been retained with regard to James River

**John Dempsey - Direct**

30

1  Coal's compensation plans during its current restructuring?

2  A.  Yes, it has.

3  Q.  And what role has Mercer played in this case?

4  A.  I have worked with the company to present market

5  information on how these programs are typically designed in

6  restructurings, and I've also worked with them to design the

7  programs that are under consideration here today.

8  Q.  And other than with respect to the James River assignment

9  that you're working on now, do you have experience in other

10  restructurings?

11  A.  I do.  I have spent a substantial portion of my time over

12  the last decade advising organizations going through financial

13  restructurings.

14  Q.  And just approximately, how many times have you advised

15  Chapter 11 companies in forming compensation plans?

16  A.  More than ten.

17  Q.  And have you ever been admitted as an expert in

18  compensation plans in other Chapter 11 cases?

19  A.  Yes, I have --

20  Q.  Have any --

21  A.  -- on the occasions which are listed in my declaration.

22  Q.  And have any of these cases been outside of New York, by

23  the way?

24  A.  Yes.  I did one recently in New Jersey and I testified in

25  Dallas last year.  So there've been a number of them.

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document     Page 31 of 93
**John Dempsey - Direct**

31

1              MR. MOSKOWITZ:  Your Honor, at this point I would

2     move to qualify Mr. Dempsey as an expert in Chapter 11

3     compensation plans.  And this is something that we stipulated

4     to previously but I'd like -- my adversary for comment.

5              THE COURT:  All right.  Do you wish to voir dire the

6     witness at this point?

7              MR. VAN ARSDALE:  No, Your Honor.  No objection to

8     him.

9              THE COURT:  All right, he's qualified.

10             MR. MOSKOWITZ:  Thank you, Your Honor.

11    Q.  Mr. Dempsey, what steps did Mercer take to assist with the

12    developing of James River Coal's compensation plans?

13    A.  I provided information on the kinds of plans that have

14    been adopted in other cases.  I consulted with the --

15    Mr. Socha and with the debtors' advisors, in terms of the kind

16    of a case it was, what the objectives of the case are; in this

17    case, it was heavily influenced by the auction process that is

18    currently underway, so that I focused my advice toward

19    programs that would be suitable for that situation.  And then

20    we developed a plan design for the key employee incentive plan

21    and the key employee retention plan, which was reviewed,

22    again, with other advisors and with Mr. Socha and ultimately

23    discussed with the compensation committee of the board of

24    directors.

25        In addition to that, I presented an earlier iteration of

**John Dempsey - Direct**

32

1  the programs to the creditors' committee's financial and legal

2  advisors, and we had a dialogue about -- both about the market

3  comparables and also the plan design, and ultimately it

4  resulted in the program that you have in front of you today.

5  Q.  Thank you, Mr. Dempsey.  Let me ask you this question:

6  did Mercer take any steps to assess the reasonableness of the

7  compensation plans that are at issue today?

8  A.  I did.  I went back to that market data that I -- the

9  database I maintained, which included twenty-seven other cases

10 where key employee incentive plans were adopted in connection

11 with sales in bankruptcy.  And I looked at the eligibility.  I

12 looked at the cost of the program in, sort of, dollars and

13 then also with reference to the anticipated sale proceeds.

14 And I found that the program is -- at maximum is at the middle

15 of the market range, and it would be, you know, lower than

16 that at a -- at threshold or target performance levels.

17 Q.  And we'll dig into some of those details in just a couple

18 of minutes but, before we do that, on an overall conclusion,

19 based on your expert experience and on your work with these

20 debtors, what is your overall assessment of the debtors'

21 compensation plans?

22 A.  I think that they are reasonable and appropriate and -- to

23 the situation where we're trying to maximize the sale

24 proceeds, and that they are designed in a way that I

25 anticipate will be motivational for the participants and, with

**John Dempsey - Direct**

33

1  respect to the KERP participants, that will have some

2  retention benefit to keep people focused on their jobs while

3  all of this uncertainty is swirling.

4  Q.  Let's discuss each of these plans in turn, the KEIP and

5  the KERP.  With respect to the KEIP, who is covered by the

6  KEIP?

7  A.  There are nine individuals that are covered:  the chief

8  executive officer; the chief operating officer; the chief

9  accounting officer; five presidents of mines; and an assistant

10  general manager of a mine, who's functioning as a mine

11  president at this time.

12  Q.  And you said there are a total of how many people that are

13  in the KEIP?

14  A.  Nine.

15  Q.  Nine.  And how will these nine KEIP participants be paid

16  under the KEIP?  How does it work?

17  A.  There's a -- there's a minimum threshold, a target and a

18  maximum.  In order to receive anything, the total value has to

19  reach that minimum, and then payments increase for the total

20  value above the -- above that minimum threshold level.

21  Q.  And just so your testimony is clear; if the minimum

22  threshold value is not achieved, what do the KEIP participants

23  receive under the plan?

24  A.  Nothing.

25  Q.  And why is the KEIP structured this way?  Why does it vary

**John Dempsey - Direct**

34

1  payouts based on values achieved?

2  A.  Well, what we want to accomplish here in this case is we

3  want to maximize the value that is available to creditors.

4  And so the basic principle of incentive compensation is that

5  you provide a reward for achieving the outcome that you're

6  looking for.  And so here we have a group of executives

7  working to promote the value of the company through the

8  auction, and so we wanted to link the pay to that performance.

9  Q.  And you testified before that it is possible that zero

10 dollars will be paid out under the KEIP.  What is the maximum

11 amount that can be paid out under the KEIP?

12 A.  Approximately 2.7 million.

13 Q.  And that's the most, under any circumstance, that the KEIP

14 would pay out?

15 A.  That's correct.

16 Q.  Mr. Dempsey, you mentioned before in your testimony that

17 you assessed the reasonableness of the KEIP; do you recall

18 that testimony?

19 A.  Yes.

20 Q.  And have you prepared a slide for the benefit of the

21 Court, to lay out your analysis in that regard?

22 A.  I have.

23         MR. MOSKOWITZ:  And let's bring that slide up on the

24 screen, if we may.

25         And, Your Honor, we shared the slides that we're

**John Dempsey - Direct**

35

1  using, with the U.S. Trustee, prior to being here today of

2  course.

3          THE COURT:  Oh, very good.  When I look at this, I'm

4  looking at your slide; I'm not ignoring your testimony.

5          THE WITNESS:  I -- thank you, Your Honor.  I don't

6  actually have it in front of me, but I do remember what the

7  slide says, so I'll --

8          MR. MOSKOWITZ:  You don't have the --

9          THE COURT:  It should be able to --

10          MR. MOSKOWITZ:  Oh, is that right?

11          THE COURT:  -- be brought up on the screen right in

12  front of you.

13          MR. MOSKOWITZ:  If it's not on your screen, we can

14  give you a piece of paper with it, with the Court's

15  permission.

16          THE COURT:  Yes, please, let him have it in front of

17  him so we don't have any questions.

18          MR. MOSKOWITZ:  Will do, Your Honor.  May I approach?

19          THE COURT:  You may.

20          MR. MOSKOWITZ:  And in fact, Your Honor, we're going

21  to use two slides with Mr. Dempsey, and I'm just going to give

22  him two hard copies of that now so I don't have to --

23          THE COURT:  Please do.

24          MR. MOSKOWITZ:  Thank you.

25          THE WITNESS:  Thank you.

**John Dempsey - Direct**

36

1   BY MR. MOSKOWITZ:

2   Q.  All right, Mr. Dempsey, so just so we're looking at the

3   same thing; are you looking at a slide that is entitled "KEIP

4   Total Cost Relative to Company Value"?

5   A.  Yes, I am.

6   Q.  And, Mr. Dempsey, can you explain to the Court what this

7   slide is intended to depict and how it reflects your analysis?

8   A.  Basically, the graphic at the top plots the maximum plan

9   cost associated with all of the cases that I analyzed, and

10  that's -- so that's the Y-axis.  Now, on the X-axis we have

11  sale proceeds.  So as you might expect, the larger the value

12  of the company, the more is typically spent on incentive

13  compensation.

14      And so that dark line that runs from the lower right to

15  the upper left is the line best fit between the data points,

16  and the red line represents the cost of the program at the

17  minimum threshold target, and maximum.  And you can see that

18  the program is at threshold and target; it's below that trend

19  line and it's just reaching up to it.  So that's one of my

20  reasons for believing that the plan is a reas -- is reasonable

21  in the context of the assets we're trying to sell here.

22      And then the tabular information below compares the

23  maximum KEIP cost at two samples:  the whole population and

24  then a narrower group of organizations with sale proceeds

25  between 100 and 500 million.  And what you can see is that in

**John Dempsey - Direct**

37

1  each case the maximum cost, which will be a chall -- real

2  challenge to achieve, is just above the fiftieth percentile on

3  those samples.

4  Q.  So, Mr. Dempsey, looking at this slide and considering

5  your analysis, if the KEIP participants earn the maximum KEIP

6  payment, how would that compare to market median for total

7  compensation?

8  A.  What I just said is that the -- it would be consi -- just

9  above the median in terms relative to these programs.  But if

10  I understood the question, the -- I also did an analysis of

11  the compensation levels of the participants in the KEIP and

12  the KERP and, with respect to the KEIP, they will be below the

13  median -- substantially below the median even in the event

14  that a maximum payout occurs under the KEIP.

15  Q.  And summarizing, then, your conclusions about the KEIP,

16  what are your expert conclusions with respect to the KEIP?

17  A.  I believe that the KEIP is -- aligns well with the

18  objectives of the company and we're incenting the right things

19  and that the total cost is reasonable in the context of the

20  assets we're trying to sell and that the pay opportunities

21  are -- will be reasonable for each of the participants within

22  the plan, given their role in their industry.

23  Q.  And do you have an expert opinion as to whether or not the

24  KEIP is incentivizing?

25  A.  Yes; I believe that it is.

**John Dempsey - Direct**

38

1  Q.  Moving past the KEIP, let's discuss now the KERP.  What is

2  the purpose of a KERP in Chapter 11?

3  A.  KERPs are a method of incentive retention.  And so we have

4  employees that are facing substantial uncertainty in the

5  situation and they're worried about what will happen to them

6  as individuals and what will happen to the company, and we

7  want -- we don't want them to get distracted; we want them to

8  focus on continuing on with their piece of the activity,

9  whether that's, you know, managing a chunk of a mine or doing

10 the books, or whatever that might be.

11     And so we create KERPs to both recognize the efforts that

12 they're putting -- they're doing, and to provide an inducement

13 to stay with the company.  But it also has the effect of

14 bringing their pay closer to market, because you often --

15 other incentive plans aren't paying out, and then so there's

16 a -- you know, a compensation maintenance effect that comes

17 with these plans, as well.

18 Q.  And out of the debtors' more than 1,000 employees, how

19 many are covered by the KERP?

20 A.  Thirty-nine.

21 Q.  And do you know how these employees were selected?

22 A.  I presented Mr. Socha with a framework of, sort of -- to

23 use to assess the participants, and that was a function of

24 their criticality to the organization in its current

25 situation; how -- their flight risk; their -- degree of

**John Dempsey - Direct**

1  difficulty to replace them; whether there was bench strength

2  available to do their work if they were to leave.  And then

3  the company went through a process, which Mr. Socha led with

4  his team, of working through -- winnowing the population down

5  to a number that would fit, you know, from a cost standpoint,

6  within what we felt we could afford and that would be

7  consistent with market practice.

8  Q.  And how long does someone have to remain with the company

9  in order to get paid under the KERP?

10  A.  They have to remain with the company until the

11  consummation of a sale of all or substantially all the assets,

12  or a consummation of a plan of reorganization.

13  Q.  And if they choose to leave the company before any of

14  those events, do they get paid under the KERP?

15  A.  They do not.

16  Q.  And why is the KERP structured this way?

17  A.  Well, because we want to incent people to work through the

18  process; that's the -- that's the objective.

19  Q.  And what is the maximum amount that can be paid out under

20  the KERP if everyone stays through the triggering event?

21  A.  Approximately 1.4 million dollars.

22  Q.  And did you do anything to assess the reasonableness of

23  the KERP, in your work for the company?

24  A.  I did.  I looked at KERPs in that same universe of twenty-

25  seven, in situations where they had both a KEIP and a KERP,

**John Dempsey - Direct**

40

1  and I looked at the cost of the program relative to that

2  population.  And that's the --

3  Q.  Is there a slide --

4  A.  -- you know, the slide --

5  Q.  -- that you prepared that --

6  A.  Yes.

7  Q.  -- details this?

8  A.  Yes.  The KERP-total-cost slide.

9  Q.  And is that the slide that we have up --

10  A.  Yes, it is.

11  Q.  -- and on the screen right now?  If you could just go

12  through and explain for the Court what this slide is intended

13  to depict?

14  A.  So here we have the -- again, we have the all-companies

15  and the 100 to 500 million sale-proceeds buckets.  And you can

16  see that our program is relative to the all-companies

17  population; it's a bit above the fiftieth percentile and,

18  relative to just the companies between 100 and 500 million,

19  it's a little bit below the fiftieth percentile.  And as a

20  percentage of sale proceeds, it's below the fiftieth

21  percentile.

22  Q.  So just to state it another way, even if the KERP is

23  implemented and pays out every participant, how would the

24  compensation for these employees compare to compensation for

25  similar positions in the industry?

**John Dempsey - Direct**

41

1   A.  It would be below median.

2   Q.  And just to sum it all up, Mr. Dempsey, what expert

3   conclusions can you draw about the KERP?

4   A.   I believe the KERP is consistent with the kinds of

5   programs that I have seen be effective in other cases, and

6   that the cost is reasonable in the context of our situation.

7   Q.  And with respect to all of the company's proposed

8   compensation plans, do you believe the company has acted

9   appropriately with respect to the development and proposal of

10  these plans?

11  A.  I do.

12  Q.  And you base this on your --

13  A.  Well, I participated in the process.  There was an active

14  consultation with the debtor and the other -- debtors'

15  advisors, and then a consultation with the board of

16  directors -- or the compensation committee of the board of

17  directors, and a consultation and negotiations with the

18  creditors.  So, I mean, this went through multiple levels of

19  review and adaptation.  So I think that was a vigorous process

20  of vetting it before we arrived here today.

21          MR. MOSKOWITZ:  Thank you, Mr. Dempsey.

22          Subject to any redirect, I have nothing further, Your

23  Honor.

24          THE COURT:  All right.  Thank you very much.

25          Do you wish to cross-examine this witness, Mr. Van

**John Dempsey - Cross**

42

 1   Arsdale?

 2   CROSS-EXAMINATION

 3   BY MR. VAN ARSDALE:

 4   Q.   Mr. Dempsey, I just have a couple of questions.  On the

 5   first slide that we looked at --

 6   A.   Yes.

 7   Q.   -- and there was a comparison of different companies that

 8   you have put as data points on this slide, did you work on all

 9   these?

10   A.   No, I did not.  They're gathered from filings at --

11   with -- court filings in cases that were approved.

12   Q.   Okay.  And did you do that work yourself?

13   A.   I oversaw it.  I have a team of people that work through

14   the data.

15   Q.   Okay.  Are there any of these that you worked on?

16   A.   There are, although I'm not going to be able to tell you

17   which dot is which.

18   Q.   That was my next question.

19   A.   Well, I'll just admit that right upfront.

20   Q.   Might as well have some fun.

21       Okay, so -- but some of them you worked on, some of

22   them --

23   A.   Yes.

24   Q.   -- you didn't work on.  But you're certain that the

25   information that was gleaned from these files by your team is

**John Dempsey - Cross**

43

1  accurate?

2  A.  Yes.

3  Q.  All right.  Now, in looking at any particular dot, can you

4  tell me how many participants there were in that KEIP?

5  A.  I cannot recite the eligibility numbers; it does vary

6  quite substantially.  And you might imagine that the larger

7  ones will have many, many more participants than our plan, and

8  the smaller ones may well -- these very -- ones way over to

9  the right-hand side would only have perhaps one or two people

10  in them.

11  Q.  And is there a graph someplace that would show what the

12  cost is per participant in the KEIP?

13  A.  I have prepared slides.  I did not do that analysis in

14  this particular case, but it's something that I -- it's an

15  analysis I have done before.

16  Q.  And would that be relevant in making the decision about

17  whether the KEIP is something that's going to be good for the

18  company or not?

19  A.  Well, the way I think about it is I'm looking to make sure

20  that the individual pay opportunities are appropriate in the

21  context of the industry, not in the context -- and I look --

22  when I'm thinking about the whole plan, I think about the

23  value of the -- the cost of the plan relative to the value,

24  which is the analysis that I've presented.

25  Q.  All right, well, let's talk about the KEIP in James River

**John Dempsey - Cross**

44

1  Coal, for a minute.  Do you remember what the minimum -- if

2  you hit the minimum target, what the amount is?

3  A.  Well, it's about 900,000 dollars.

4  Q.  Nine hundred thousand dollars.  So does everybody get

5  100,000 dollars?

6  A.  That's not exactly how it works.  And we have --

7  Q.  Well, is there anything in your papers --

8  A.  -- sealed that information.

9  Q.  -- that tells us how that works?

10         MR. MOSKOWITZ:  Objection, Your Honor.  Let me just

11  note that we're now getting into the purview of sealed

12  testimony.  So --

13         MR. VAN ARSDALE:  Your Honor, I don't think is sealed

14  at all.  I asked him if there's anything in the papers here

15  that tell us how this works, and --

16         THE COURT:  Okay, and I'm going to let him answer

17  that question without revealing what the information is.  So

18  you understand what I'm going to allow you to say, so if we

19  get into -- and if we need to cross-examine about sealed

20  information, we'll seal the courtroom and --

21         MR. VAN ARSDALE:  Yes, sir.

22         THE COURT:  -- I won't allow you to conduct the

23  examination.

24         MR. VAN ARSDALE:  Yes, sir.

25         THE COURT:  But -- and so renew your objection if it

**John Dempsey - Cross**

45

1    needs to be stated.

2              MR. MOSKOWITZ:  Thank you, Your Honor.

3    A.   There are exhibits that list each participant and their --

4    what they would earn at threshold target, a maximum, in the

5    papers that were filed.

6    Q.   Okay.  So if you have a description -- a job description,

7    like CEO, and you have a percentage of total KERP -- right? --

8    those percentages, as we go down the --

9    A.   We're talking about --

10   Q.   -- the different nine --

11   A.   -- the KEIP here.

12   Q.   The KEIP.  I'm sorry.  You're right; the KEIP.

13        As that -- that percentage changes as we go through the

14   total nine?

15   A.   Yes.

16   Q.   Okay.  Does it change substantially?

17   A.   It does vary substantially, from person to person, what

18   their award is.

19              MR. MOSKOWITZ:  Let me just cut the witness off.  I

20   apologize, Your Honor, but, objection.  I think that to the

21   extent that the witness is going to testify about -- in a

22   manner that will reveal anything about the degree of

23   compensation for one participant versus another in the KEIP,

24   that is sealed.  It's not just the actual dollar amount; it's

25   the variance between -- or even whether there is a variance,

**Colloquy**

46

1   as between the participants.

2           THE COURT:  All right, so what I'd like to do at this

3   point, then, Mr. Van Arsdale, rather than you have to mince

4   around your questions, is to seal the courtroom for the brief

5   period that you want to conduct this part of your cross-

6   examination, and then we'll reopen it again as soon as we're

7   done with that -- for any redirect on that point, rather.

8           MR. VAN ARSDALE:  Yes, sir.

9           THE COURT:  Okay?

10          MR. MOSKOWITZ:  Thank you, Your Honor.

11          THE COURT:  So, now, I need the lawyers' help as far

12  as knowing who needs to stay and who needs to leave the

13  courtroom; and this will be for a short period of time.  We're

14  also going to need to disengage the phone line.  So anybody

15  that's on the phone, we're going to have to do that and then

16  we'll be able to call back in and reconnect you with the

17  phone.

18          Correct?  Okay.

19          UNIDENTIFIED SPEAKER:  Your Honor, we are comfortable

20  having Mr. Van Arsdale stay.  We think that's entirely

21  appropriate.

22          THE COURT:  Thank you, Mr. --

23          THE CLERK:  We should disconnect now?

24          THE COURT:  Yes, disconnect the phone line now.

25          All right, so everyone is satisfied that everybody

**Peter Socha - Direct**

47

1    that's in the courtroom now is somebody that can stay?

2              Okay, and the court security officer --

3              MR. MOSKOWITZ:  Yes, Your Honor.

4              THE COURT:  -- is now sealing the door, and the phone

5    line has been disconnected.

6        (Sealed portion omitted from the record)

7        (Pause)

8              THE COURT:  The courtroom has been reopened.

9              All right.  Let the record reflect that the courtroom

10   has now been reopened and the transcript, this portion, no

11   longer be sealed.

12             All right, we're good.

13             MR. MOSKOWITZ:  May I proceed, Your Honor?

14             THE COURT:  You may.

15             MR. MOSKOWITZ:  The debtors call as their next

16   witness, Peter Socha, chief executive officer of James River.

17             THE COURT:  Please come forward to be sworn,

18   Mr.

19   Socha.

20       (Witness sworn)

21   DIRECT EXAMINATION

22   BY MR. MOSKOWITZ:

23   Q.  Good afternoon, sir.

24   A.  Good afternoon.

25   Q.  Please state your name for the record.

**Peter Socha - Direct**

1   A.   Peter Socha.

2   Q.   And, Mr. Socha, where are you currently employed?

3   A.   I am the chief executive officer of James River Coal

4   Company.

5   Q.   Can you briefly tell the Court your educational

6   background?

7   A.   I have an undergraduate degree in mineral engineering and

8   I have a graduate degree in corporate finance.

9   Q.   And prior to joining James River, where were you employed?

10  A.   Immediately prior to joining James River, I was the

11  chairman of National Vision in Atlanta, Georgia and, prior to

12  that, I had been with several companies, doing restructurings.

13  Q.   And how long have you been employed with James River?

14  A.   Since March of 2003.

15  Q.   And what is your current position, with your full title,

16  at James River?

17  A.   Chairman, president, and chief executive officer.

18  Q.   And you've filled that position for how long?

19  A.   Since 2003.

20  Q.   Can you describe your role briefly at James River's CEO?

21  A.   Just typical CEO role.  I'm responsible for all strategy

22  for the company, the development and execution of all

23  strategy.  For me specifically, I get a little bit more

24  involved in the marketing -- in the sales, marketing and

25  pricing of coal.  C.K. Lane, who works with me, handles the

**Peter Socha - Direct**

49

1  mines, and then Sam handles the -- Sam Hopkins handles the

2  finance and accounting.

3  Q.  And, Mr. Socha, have you previously submitted declarations

4  in support of today's motion?

5  A.  Yes, I have.

6  Q.  And how many have you submitted?

7  A.  Two.

8  Q.  And are the statements in those declarations true and

9  accurate?

10  A.  Yes, they are.

11  Q.  And do you stand by those today?

12  A.  Yes, I do.

13  Q.  And you understand, do you not, that they are part of

14  today's record?

15  A.  Yes, I do.

16  Q.  Mr. Socha, did you have a role in the development of the

17  debtors' proposed compensation programs?

18  A.  Yes, I did.

19  Q.  And what was your role?

20  A.  Well, my role was to work with Mercer in developing the

21  plan.  You know, I know all the managers, I know all the

22  compensation information, and so it was logical that I was the

23  one that took more of a lead role in doing that.  C.K. and Sam

24  got involved as we were talking about people in their

25  individual business areas, but I was the primary interface

**Peter Socha - Direct**

50

1   with Perella, Mercer, Davis Polk, and the committee and their

2   professionals.

3   Q.   And the professionals that you just listed, those are the

4   advisors that assisted you in connection with the proposed

5   compensation plans?

6   A.   That is correct.

7   Q.   Okay.  And what was the genesis of the decision to even

8   develop compensation plans in the first place?  How did this

9   discussion begin?

10  A.   That came on the recommendation of advisors.  And we did

11  have a meeting with the committee and with their advisors, and

12  I believe it was discussed at the end of that.

13  Q.   And --

14  A.   We did wait until the committee was formed, until they had

15  hired advisors, and then we had our first meeting -- our

16  initial meeting.

17  Q.   And who made the decision that there should actually be

18  two programs:  both a retention plan and an incentive plan?

19  A.   That was discussed with our advisors.  The incentive plan

20  was designed -- or is designed because we are in the midst of

21  doing a sale process, and we felt, and I believe the committee

22  felt, that we want to do whatever we can to maximize the value

23  for the recovery for the creditors.  And then the retention

24  plan was designed to -- sorry.

25  Q.   Please.

**Peter Socha - Direct**

51

1  A.  -- was designed to keep people focused during the process

2  and not create an incentive for them to go out and to seek

3  other employment during the process.

4  Q.  So let's drill into each of these proposed plans.  Let's

5  start with the KEIP.  Do you believe that the KEIP is

6  necessary for the company?

7  A.  Yes, I do.

8  Q.  And just to reiterate, why is the KEIP necessary?

9  A.  Well, we are going through the sale process.  We've had --

10  for the last three weeks, we've had a -- been conducting site

11  visits.  We got initial indications of interest in early

12  May -- early to mid-May.  The last three weeks, we've been

13  doing site visits.  And the participants in the KEIP program

14  initially were the three -- that's -- that was discussed with

15  John earlier -- and that is because we are the ones who are

16  interfacing with the professionals, we are the ones who

17  ultimately will be coming up with the final prices, and final

18  package I hope.

19      The creditors' committee came back to us and they said,

20  well, we would really like to include people in the KEIP who

21  are actually doing the interfacing, as well, with the buyers.

22  So during the site visits -- and we saw the logic in that, so

23  we went ahead and included them.

24  Q.  Just so your testimony is clear; is it your testimony,

25  then, that it was the creditors' -- or the creditor

**Peter Socha - Direct**

1  committee's idea, during discussions, to increase the size of

2  the KEIP in terms of who would be participating in it?

3  A.  It was.  They wanted the people that were interfacing with

4  the buyers, who were actually out doing the site visits.  So

5  in the case of the mine presidents, the resource-group

6  presidents, or folks like that, if they were interfacing with

7  a buyer and they could potentially affect the price or affect

8  the valuation, the creditors' committee felt like they should

9  be included in the KEIP as well.

10       So what we did, how we got to the numbers -- or the

11  amounts, was we split what they were in the KERP -- they were

12  initially in the KERP -- we split that up, and that became --

13  half of it was their KEIP payment, I believe, at minimum, and

14  half of it was their KERP payment.

15  Q.  And did you agree -- once these suggestions had been made,

16  did you agree with the suggestion that the KEIP be

17  restructured in this way and that these individuals be placed

18  into the KEIP?

19  A.  We did.  We did.  We had some back-and-forth on it.  But

20  the logic -- I mean, what they were saying made sense.  What I

21  didn't -- if I didn't agree, it was because it seemed like it

22  was going from retention payments for which that employee

23  could feel some certainty of getting payment, to going at risk

24  on the payment, because, as we've already heard in testimony,

25  these are not layups; these thresholds are not layups at all.

**Peter Socha - Direct**

53

1   And so I felt like it was taking people from a more certain

2   environment to a lesser environment.

3       So I definitely had concerns about that.  On the other

4   hand, I saw where the committee was coming from, which was,

5   these are the people that are riding around in pickup trucks

6   with the buyers, having the conversations, and so we want to

7   do everything we can to maximize the value.  So, ultimately we

8   agreed with it.

9   Q.   Thank you.  Let's move on from the KEIP and start talking

10  about the KERP.  First of all, do you believe that the KERP is

11  necessary for the company?

12  A.   I do.

13  Q.   And why do you believe that?

14  A.   Well, to retain the employees.  This is obviously a

15  distracting time.  I think Brian Resnick from Davis said it

16  best in one of our early meetings:  potentially we have our

17  employees who are selling themselves out of a job, and keeping

18  people focused during that particular time -- we're very

19  thinly staffed, all right?  We have a very flat organization.

20  Between me and a coalminer, there're only four people.  It's

21  just the way our organization is org -- is set.  And so

22  keeping people focused on the task at hand, I think, was very

23  important.  And that's the purpose of the retention.

24      We did lose two people:  one prior to the Chapter 11, and

25  one shortly thereafter.  And when you lose key people and you

**Peter Socha - Direct**

54

1    don't have a lot of people, it hurts a great deal.

2    Q.  And what criteria did you use to determine who would go

3    into the KERP and who would not?  I understand you said you're

4    thinly staffed, but --

5    A.  Yeah.

6    Q.  -- what criteria did you --

7    A.  Yeah.

8    Q.  -- use to determine participation?

9    A.  Well, we started out -- there are 117 people in the

10   management group.  And by "management group" I mean that they

11   historically have been part of a restricted-stock program.  We

12   got some information from Mercer that laid out, sort of, who

13   to include, who not to include -- they gave us a matrix -- and

14   so we broke it down into the three tiers that you saw in the

15   program -- or you see in the program.  I sent it out to C.K.

16   and Sam and I said, okay, we can't do 117, it needs to be a

17   smaller number.  C.K. came back at ninety-eight.  So I said,

18   well, I'll just take that away from him, I'll do it myself.

19   So we ended up with the thirty-nine.

20       But the criteria on the first tier was it would be a

21   devastating loss to the company for us to lose that person; it

22   would be de -- we couldn't replace him, it would be multiples,

23   and the person we replaced them with would not be able to

24   perform at the same level.  So that would be terrible.  And

25   then we went down from there.  In all cases, if we had to

**Peter Socha - Direct**

1  replace that person, it would probably be with some type of a

2  contract person from outside and it would be at a

3  significantly higher cost than what we're paying that person

4  in compensation, plus the KERP payment.  That was the -- that

5  was the criteria:  would it cost us more or was it -- would it

6  be more cost-effective to pay them something as a bonus on

7  their payment?

8  Q.  Thank you, Mr. Socha.  Moving along.  Are you familiar

9  with the term "insiders" as it relates to discussions about

10  the compensation programs?

11  A.  Yes, sir.

12  Q.  Have you heard that term used before?

13  A.  Yes, sir.

14  Q.  And without revealing the substance of any privileged

15  conversations with your lawyers, do you understand, with

16  respect to retention plans, that the Bankruptcy Code treats

17  insiders differently?

18  A.  I do.

19  Q.  And are you familiar with the U.S. Trustee's suggestion in

20  its objection that the KERP may in fact contain insiders?

21  A.  I am.

22  Q.  And do you know whether any insiders are in fact included

23  in the KERP?

24  A.  There are not.  I mean, when I look at insiders, sort of,

25  from a layman's -- and I have the bankruptcy definition and

**Peter Socha - Direct**

56

1    we've gone through that -- it's do they develop and execute

2    our corporate strategy.  All right?  It's just real simple.

3    That's a layman's view of it.  Can they develop and can they

4    execute.  And the people that are in the KERP are not capable

5    of doing that; they don't -- not that they're not capable, but

6    they don't do it.

7        There're three groups of people who were, kind of, on the

8    borderline there; one would be the resource group presidents,

9    the mine presidents.  And I'll take Leeco as an example.  All

10   right?  The president of Leeco does not develop and execute

11   the corporate strategy for Leeco.  His mine plans -- when we

12   use the word -- term "president", that's a mining thing; it's

13   more community functions than anything else, because these

14   companies are historical in the area.

15       He recommends his mine plan; C.K. signs off on it.  He

16   recommends on his compensation plans.  All right?  C.K.

17   consolidates them; he and I sit down; I approve on them.  He

18   doesn't negotiate with major vendors.  All right?  We have a

19   centralized function for negotiating with major vendors.  He

20   doesn't sell his coal.

21       So when you look at it as Leeco being an independent

22   standalone entity, he would price and sell his coal, he would

23   know where it's going, he would negotiate with his vendors --

24   he doesn't -- he would be responsible for all compensation

25   decisions for his company -- he doesn't -- he would be

**Peter Socha - Direct**

57

1   responsible for all mine operating plans -- he doesn't.  And

2   so that's why those particular people were not considered

3   insiders.

4       The other -- a second group would be what I would call --

5   consider board visitors.  And they come to our board meetings.

6   In one case, he provides financial data for the board; in the

7   other case, he's a recording -- he's a recording secretary for

8   us.

9       And then the third case is -- we have one gentleman who is

10  listed in SEC filings as a sales -- as manager of the sales

11  group.  I make all the decisions, all right?  I price all the

12  coal -- either C.K. or I price all the coal.  So he is

13  responsible for customer relationships but, before he goes out

14  and he gives a price, either C.K. signs off on it or I sign

15  off on it, or both.

16      So those were the three categories of people; they are in

17  the KERP because in our judgment they are not insiders.

18  Q.  And so just so your testimony is clear, let's take the

19  flipside of it.  Who are the insiders of the company?

20  A.  Well, the ones who develop the corporate strategy, which

21  would be, as I said, myself, and I have general responsibility

22  plus I have sales responsibility -- sales and pricing; C.K.,

23  who's responsible for all the mines; and Sam, who's

24  responsible for all of the accounting and finance functions.

25  Q.  So, other --

**Peter Socha - Direct**

58

1   A.  And we have functioned like that since 2004.

2   Q.  And other than the three individuals that you just listed,

3   are there any other insiders, as you understand that term, at

4   the company?

5   A.  No, sir.

6   Q.  All right.  And just to discuss this for a few more

7   minutes; have you prepared a slide that helps the Court

8   understand, and helps you explain, the analysis that you

9   undertook when discussing the characteristics of an insider

10  with respect to KERP participants?

11  A.  Yes, sir, we have.

12  Q.  And is that the slide that we have on the screen right

13  now?  And in fact, we need to give that to you as well, with

14  the Court's permission.

15  A.  Thank you.

16         THE COURT:  You may.

17  A.  Yes, sir.

18  Q.  All right, Mr. Socha, can you -- you're looking at -- just

19  for the record; you're looking at a slide that is entitled

20  "The Three Members of Senior Management Are the Sole

21  Insiders".  Is that the slide that you're looking at?

22  A.  Yes, sir.

23  Q.  All right.  Mr. Socha, can you take us through this slide

24  and explain what it depicts in terms of your analysis?

25  A.  Well, as I described just a few minutes ago, the first

Case 14-31848-KRH    Doc 389    Filed 06/18/14    Entered 06/18/14 16:34:30    Desc Main
Document      Page 59 of 93
Peter Socha - Direct

59

1  characteristic -- are -- is that person involved in making the

2  debtors' critical financial and operational decisions;

3  clearly, C.K., Sam and I are involved in that.  In the

4  subsidiary level, C.K. is very involved in the operational

5  decisions and signing off on mine plans.  And then Sam does

6  the critical financial issues there.

7      Has the authority to make companywide or strategic

8  decisions:  clearly that applies to the three of us; it does

9  not apply to other employees in the company.

10      Exercise of sufficient authority over the debtors so as to

11  dictate corporate policy and the disposition of corporate

12  assets:  nothing is disposed, of corporate assets, that we're

13  not involved in.

14      Reports to the CEO:  that I've discussed.

15      Reports to the board of directors in the ordinary course:

16  in the last five years, only three members of management have

17  been at every board meeting, and that would be the three of

18  us.

19      And then regularly attends board meetings:  I did discuss

20  the exceptions noted on footnote 1 and was elected by the

21  board as an officer to manage the company.

22      So, yeah, these we took -- we didn't have this slide at

23  that time when we were looking at it, but these we took, and

24  we do look at the thirty-nine participants in the KERP and

25  they don't fit these criteria.

**Peter Socha - Direct**

60

1    Q.  So none of the thirty-nine participants in the KERP fit

2    these criteria?

3    A.  They do not.

4    Q.  What about the rest of the employees of the company?  I

5    think we had said that there over 1,000.  Do any other

6    employees at the company, whether in the KERP or not -- other

7    than the three insiders that you described before, do any of

8    them have these characteristics?

9    A.  No.  No, because, again, you're talking about making

10   critical financial and operational decisions.  And as I said,

11   we're a small company.  You know, we're large on the revenue

12   line, but we're basically a small company.

13   Q.  Let's test that for a second.

14   A.  Sure.

15   Q.  Are you familiar with the U.S. Trustee's allegation or

16   suggestion in its papers that maybe perhaps there are some job

17   titles that sound like they have some of these

18   characteristics, perhaps a president --

19   A.  Yeah.

20   Q.  -- if the job title is president?  Are you familiar with

21   that allegation that the U.S. --

22   A.  Right.  I mean --

23   Q.  -- Trustee made?

24   A.  -- I talked about that a little bit earlier in that the

25   fact that someone is a president of a resource group does not

**Peter Socha - Direct**

61

1    automatically make them an insider.  I can understand, from

2    Mr. Van Arsdale's perspective, why there might be some

3    question about that.  But the main thing for me is they're not

4    deciding where their product gets sold, even at the subsidiary

5    level.  So even though they're president of not the parent,

6    James River, but the Leeco subsidiary, they're not deciding

7    where that product gets sold, they're not deciding the pricing

8    on equipment, and they're not deciding on the compensation of

9    their management team.

10   Q.  Thank you, Mr. Socha.

11   A.  Thank you.

12   Q.  Let's move on to another topic.  Are you familiar with the

13   U.S. Trustee's suggestion in its papers that the restructuring

14   process could be handled by the debtors -- or at least aspects

15   of the restructuring process could be handled by the debtors'

16   retained professional and not some of the participants in the

17   KERP?

18   A.  I am.

19   Q.  Do you agree with that suggestion?

20   A.  No.

21   Q.  And why is that?

22   A.  Well, what we do is complementary to what the financial

23   advisors do.  You know, you and I were talking about this a

24   little bit over lunch.  The fact that we have two legal

25   counsel --

**Peter Socha - Direct**

**62**

1  Q.  Well, we're going into privileged conversations, my

2  friend.  Please.

3  A.  Okay.  Never mind.  Strike that.

4  Q.  Okay.

5  A.  That was a good story, too.

6  Q.  All right, well --

7  A.  No, because the investment bankers and the financial

8  advisors at Perella and at Deutsche Bank have very specialized

9  roles.  What we do is complementary to them; it's not a

10  replacement for them.

11  Q.  And what about cost?  Would the cost be different if we --

12  even if they could do the job, would the cost be different if

13  you brought in outside retained professionals to do the job

14  that salaried employees of the company are doing?

15  A.  Oh, it'd be much higher.  If we had to bring in a

16  financial person from outside as an advisor, it'd be huge.

17  Q.  Let's move on to another topic.  You testified briefly

18  before about the role of the creditors' committee in this

19  process, so I want to explore that a bit more.

20  A.  Um-hum.

21  Q.  What role did the creditors' committee and its advisors

22  play in the development of the proposed compensation plans?

23  A.  Critical.  I mean, we nego -- we came up with a plan; I

24  felt like it was a fair plan, it was a good plan.  We sent it

25  over to them.  They didn't just immediately jump up and down

**Peter Socha - Direct**

1    about it; they said, okay, let's talk about some things.  They

2    had some perspectives that were different than ours, and

3    ultimately we reached an agreement.

4        It was a protracted, I guess, two to two-and-a-half week

5    span -- about two, two and a half weeks -- where we had back-

6    and-forth with them and with their advisors.  And I think at

7    the end of the day we came up with something that was a --

8    represented the interests of all parties.

9    Q.  You testified before about the creditors' committee -- the

10   creditor committee's -- the creditors' committee's input with

11   respect to participants.  Did they also have any input with

12   respect to cost?

13   A.  Yeah.  They -- on the KEIP, they raised the threshold --

14   the first threshold, the initial threshold, and then they

15   raised the payout on the third threshold.  So there were

16   things like that.

17   Q.  Is it fair to say -- just summing it up, is it fair to say

18   that the plans have been substantially altered based on the

19   input of the creditors' committee?

20   A.  Hmm, I think altered, yes; substantially, no.  I mean, you

21   certainly -- we went from three to nine in the KEIP; that

22   would be -- that, to me, would be a substantial change.  But

23   it made sense.  Changing the thresholds -- I think the

24   thresholds just went up marginally.  And the payout at the

25   upper end of the KEIP went up a little bit as well.

**Peter Socha - Direct**

64

1  Q.  Well, is it fair to say that the creditors' committee was

2  deeply involved in discussions with respect to the --

3  A.  Heavily involved.

4  Q.  -- compensation --

5  A.  The advisors were -- the professional advisors, yes.

6  Q.  And do you know whether the committee, as a result of

7  those discussions, supports the plans in the form that they're

8  in today?

9  A.  They have supported them.

10  Q.  Moving to a final topic, Mr. Socha.

11  A.  Yes.

12  Q.  Is it important, in your judgment, for the Court to

13  approve the proposed compensation plans?

14  A.  I believe so.  I mean, we are right in the middle of a

15  sale process.  We're at the tail end of the -- a process that

16  really started in February and is concluding over the next two

17  or three weeks.  We're still conducting site visits.  We're

18  just in the negotiating -- starting the negotiating process

19  towards definitive agreements.  I think there is a great deal

20  of uncertainty, on the part of the employees, on what their

21  future entails.  And so I do think time is of the essence.

22       Where I might have disagreed with Mr. Van Arsdale a little

23  bit for setting, say, these things in July at the July omnibus

24  was that everything will be done by then, you know, we'll know

25  where everything is.  And I'm not sure that we want to set the

**Peter Socha - Direct**

1  incentive plan after the process that you're wanting to incent

2  has already been completed.

3  Q.  And are -- to your knowledge, are participants in these

4  programs watching and aware that these programs are being

5  proposed and the Court is going to consider them?

6  A.  Yes.  They're in the courtroom.

7  Q.  And what do you think the impact would be on the debtors

8  if the Court did not approve the proposed compensation plans?

9  A.  I think we run a significant risk of losing another two or

10  three or four key people; and again, when you don't have many

11  and you lose a couple -- and part of the problem is, getting

12  back to something Mr. Van Arsdale said earlier, in the

13  practical real world, the ones who leave first are the ones

14  you need the most; they're the best.  And so that's a

15  problem -- that would be a problem.

16          MR. MOSKOWITZ:  Thank you very much, Mr. Socha.

17          Nothing further on direct, Your Honor.

18          THE WITNESS:  Thank you, Mr. Moskowitz.

19          THE COURT:  All right, thank you.

20          Cross-examination on this witness, Mr. Van Arsdale?

21          MR. VAN ARSDALE:  Mr. Socha, I think I may have some

22  good news for you, because in spite of what I told your

23  counsel on the phone yesterday, I think you have answered a

24  lot of questions that we had.

25          And I don't have any further cross-examination for

**Colloquy**

66

1   him.

2          THE COURT:  All right, thank you.

3          The Court has one question for you, if I --

4          THE WITNESS:  Yes, sir.

5          THE COURT:  -- may ask you.  Would you please

6   identify for me who C.K. and Sam are?

7          THE WITNESS:  I'm sorry.  C.K. Lane is our chief

8   operating officer; he is my -- he is my right hand in every

9   way, in the operating area.  He manages all the mines.  He's

10  got a tremendous amount of responsibility.  Sam Hopkins runs

11  all of our finance and accounting functions here in Richmond

12  and he is my left hand on that.

13         So we have a very good team.  We function very well

14  as a team, Your Honor.

15         THE COURT:  All right, thank you very much for

16  answering --

17         THE WITNESS:  Okay.

18         THE COURT:  -- that question.

19         THE WITNESS:  Thank you.

20         THE COURT:  Anything further of this witness?

21         MR. MOSKOWITZ:  Nothing further of this witness, Your

22  Honor.

23         THE COURT:  Okay, you may step down.  Thank you for

24  your testimony --

25         THE WITNESS:  Thank you, Your Honor.

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document      Page 67 of 93
**Closing Argument - Mr. Resnick**

67

1           THE COURT:  -- this afternoon, sir.

2           MR. MOSKOWITZ:  Your Honor, as previously discussed,

3    we are not going to call Ms. Agnes Tang to the stand, because

4    there's going to be -- there would be no cross-examination of

5    her.  So we're just keeping things efficient.  But as

6    previously discussed, her testimony is now in the record and

7    we'll refer to it in closing argument.

8           THE COURT:  And I have it right here in front of me.

9           MR. MOSKOWITZ:  Excellent.  And with that, Your

10   Honor, with your permission, I will move the lectern back to

11   the way it was before.

12          THE COURT:  Okay.  We'll bring the muscle back --

13          MR. MOSKOWITZ:  Yeah, exactly.

14          THE COURT:  -- over and help you.

15          MR. MOSKOWITZ:  Thank you, Your Honor.  And I'll pass

16   the podium back to my colleague, Mr. Resnick.

17          THE COURT:  All right, thank you.

18          MR. RESNICK:  Thank you, Your Honor.  You've heard

19   testimony today that the proposed compensation plans are

20   urgently necessary to stabilize the debtors' workforce and

21   appropriate to maximize stakeholder recoveries, and also why

22   the plans pass muster under the Bankruptcy Code and relevant

23   case law.  You've heard from Mr. Socha, James River's CEO, as

24   well as John Dempsey of Mercer, and you have the

25   uncontroverted testimony of Ms. Tang in her declaration.

**Closing Argument - Mr. Resnick**

1   These witnesses explained why the compensation plans are

2   necessary and why adopting them is a sound exercise of the

3   business judgment.

4        So let's look at the two main issues that were raised

5   by Mr. Van Arsdale in the objection; first is that the KEIP is

6   primarily incentivizing.  The uncontroverted testimony of

7   Ms. Tang is that the KEIP thresholds are incentivizing, they

8   will be a challenge to achieve, they would return significant

9   value to the debtors' stakeholders if they are achieved; and

10   that testimony is, again, uncontroverted.  As Ms. Tang also

11   mentioned in her declaration, the debtor currently has

12   indications of interest, and the vast majority of those

13   indications of interest do not meet even the minimum threshold

14   set under the KEIP.

15        So, Your Honor, we believe that the evidence is clear

16   that the KEIP is in fact primarily incentivizing, which is

17   exactly what the case law requires.

18        In terms of the second issue -- whether the KERP

19   includes insiders -- you have heard from Mr. Socha the seven

20   factors that are cited in the case law, that we and I

21   personally went over with Mr. Socha in the process of

22   developing these plans; they were examined and all seven of

23   the factors very clearly point to the fact that there are

24   three insiders of this company, and that evidence is

25   uncontroverted as well.

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document      Page 69 of 93
**Closing Argument - Mr. Resnick**

69

1          Your Honor, I think that brings us to the business-

2     judgment test.  I think the evidence is quite clear that these

3     plans pass muster under Section 503 and the business-judgment

4     test.  You've heard testimony from Mr. Dempsey that these

5     plans are fair, reasonable and appropriate, they are within

6     market.  And particularly with respect to the KEIP, even at

7     the maximum KEIP payout levels, which are extremely

8     challenging to meet, the KEIP participants would be largely

9     undercompensated compared to peers at other companies.  The

10    KERP participants as well:  if we were to not implement the

11    KERP, the KERP participants would be undercompensated compared

12    to their peers at other coal companies.

13          So in conclusion, Your Honor, we believe that the

14    evidence is overwhelming that the motion satisfies the

15    business-judgment test and that these plans should be

16    approved.

17          Your Honor, I will try not to take offense to the New

18    York law-firm comment, but I'm actually glad that Mr. Van

19    Arsdale --

20          THE COURT:  You can speak to New Jersey; that was

21    referenced also.

22          MR. RESNICK:  Okay.  I don't believe --

23          THE COURT:  My law clerk's --

24          MR. RESNICK:  -- any of us are from New Jersey.

25          THE COURT:  -- from New Jersey, so she gets that a

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document     Page 70 of 93
**Closing Argument - Mr. Resnick**

70

1    lot.

2         MR. RESNICK:  Okay.  I'll take it as a compliment

3    anyway.

4         But when Mr. Arsdale was referencing the statute and

5    its promulgation in 2005 -- and I'm actually glad he did,

6    because the statute was promulgated at a time following Enron,

7    Adelphia, WorldCom and those cases where there actually

8    was -- there were -- there was corrupt management, there was

9    ineffective management and there was a concern that management

10   was sort of walking away with boatloads of millions.  This

11   case could not possibly be farther from that.  This company

12   sells coal.  The coal industry is in severe distress.  We have

13   phenomenal management of this company; they're good people,

14   they are hardworking people and they are doing the best they

15   can to steer this company in the right direction.  And the

16   company is a victim of declining coal prices, which is

17   certainly due to no fault of the KEIP or KERP participants.

18        So, Your Honor, with that I will turn the podium over

19   to -- I believe Ms. Freeman wants to make a statement on

20   behalf of the creditors' committee, in support of the

21   motions --

22        THE COURT:  All right.

23        MR. RESNICK:  -- motion.

24        THE COURT:  And I'll allow any party-in-interest that

25   wants to make statements in support of the motion, first; and

**Closing Argument - Ms. Freeman**

71

1   then parties that would want to speak against it, last.

2          MR. RESNICK:  Great.  Okay.  Your Honor, I should,

3   before I turn over the podium, just reiterate the importance

4   to the debtors of having this order entered.  At this juncture

5   we don't believe that it's appropriate to wait till July.  And

6   in fact, we'd respectfully request that, if Your Honor is

7   inclined to grant this motion, that the order be entered in

8   the today-tomorrow time frame so that the participants have

9   the comfort that we've been seeking that the programs are in

10  place.

11         THE COURT:  All right, thank you very much,

12  Mr. Resnick.

13         MS. FREEMAN:  Your Honor, again, Alexis Freeman on

14  behalf of the creditors' committee.

15         As you heard from testimony from Mr. Socha, and also

16  from Mr. Resnick, the creditors' committee was significantly

17  involved in this process.  The proposal that we had originally

18  received was not something that we were prepared to approve;

19  we did have a variety of concerns.  And just again, to run

20  through:  The specifics that we had were to make sure that the

21  targets, the thresholds, were appropriately challenging.  We

22  did negotiate for an increase in the proposed total value KEIP

23  payment threshold, to provide more challenging targets.  We

24  also reduced the KEIP payments at the minimum total value.

25  And in order to reach an agreement with the debtors on that

**Closing Argument - Ms. Freeman**

72

1    and in order to provide additional incentive to achieve better

2    recovery for unsecured creditors at the maximum level, we

3    agreed to increase the payments on those -- for those KEIP

4    employees.  Also, as you heard, we proposed that certain

5    members who were originally part of the KERP be moved to the

6    KEIP, because the creditors' committee believed that if there

7    was any involvement in certain of these employees to achieve

8    greater recovery, that they should be incentivized to do so.

9         One point that was not mentioned as it relates to the

10   severance is that we also negotiated a crediting mechanism in

11   connection with the severance, to ensure that there was no

12   so-called double-dipping, so that no employee received,

13   basically, two payments for being retained under this program.

14        As Mr. Dempsey was talking about comparables, the

15   creditors' committee, in connection with its analysis of this

16   program, reviewed and analyzed the comparables and also pulled

17   some of our own to ensure that what was being presented as

18   comps were in fact the right ones and that we agreed that they

19   provided market value.  And throughout the negotiation process

20   and with the improvements made, we agreed that those in fact

21   were the right comps.  And with the improvements made, we

22   believe that this in fact is beneficial to the company to

23   maintain operations, to get us through hopefully what will be

24   a successful sale, strategic transaction process.  And we

25   support the approval of the KEIP motion.

**Colloquy**

73

1          THE COURT:  All right, thank you very much --

2          MS. FREEMAN:  Thank you.

3          THE COURT:  -- Ms. Freeman.

4          Does any other party wish to speak in favor of the

5    motion?

6          All right, Mr. Van Arsdale, you wish to be heard?

7          MR. VAN ARSDALE:  Your Honor, I think, in the course

8    of the presentation earlier and in the cross-examination of

9    the witnesses, I think that the position of the U.S. Trustee

10   has been made clear and the concerns that we had have been

11   made clear.  We would sit by those before the Court, in the

12   context of this hearing.

13         THE COURT:  Thank you very much.

14         MR. VAN ARSDALE:  Yes, sir.

15         THE COURT:  All right, the Court has before it the

16   motion for an order authorizing the debtors to implement a key

17   employee incentive plan and key employee retention plan and

18   modified severance plan.  The Court is going to grant the

19   motion and enter an order authorizing those plans.  The Court

20   finds that the KEIP is properly incentivizing and that, based

21   on the testimony that I've heard today, that it is reasonable

22   and necessary, is the result of the sound exercise of the

23   debtors' business judgment, consistent with input from the

24   creditors' committee and the advices received from

25   professionals.  The Court also finds that the KERP is fair,

1  reasonable and appropriate, will allow the debtor to retain

2  the key employees that it needs to throughout this process and

3  to keep them appropriately focused.  It does not include any

4  insiders.

5         And I agree, I think, with -- the sentiment has been

6  expressed here this afternoon that this is an industry that is

7  not like we were seeing in -- prior to 2005.  This company has

8  been beset by economic woes of the times, driven by market

9  forces.  And I think that the employees are doing a wonderful

10 job in this case.  And for those employees that are in the

11 courtroom today, I want you to hear that from me, as well.

12 And I hope that you will continue to do this and that this

13 will help.  The order will be entered, at Mr. Resnick's

14 suggestion, either today or tomorrow; so you will see it.  And

15 I hope that we can all make something happen here.

16        Any other business that we need to take up today,

17 Mr. Resnick?

18        MR. RESNICK:  No.  Thank you very much, Your Honor.

19 That is it.

20        THE COURT:  Okay, and you'll submit an order to that

21 effect?

22        MR. RESNICK:  We will.  Thank you, Your Honor.

23        THE COURT:  Thank you very much.

24        And, Mr. Van Arsdale, thank you for your presentation

25 today.

**Colloquy**

75

1          THE CLERK:  All rise.

2          Court is now adjourned.

3      (Whereupon these proceedings were concluded at 3:52 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

1                              I N D E X

2       OPENING STATEMENTS:
               Page
        Mr. Resnick (re: Sealing)                    7, 18
3       Ms. Freeman (re: Sealing)                     13
        Mr. Van Arsdale (re: Sealing)                 14
4       Mr. Resnick (re: Comp. Plans)                 20
        Mr. Van Arsdale (re: Comp. Plans)             26

5

6                                                             VOIR
        WITNESSES:          DIRECT    CROSS    REDIRECT  RECROSS DIRE
7       For Debtors:
        John Dempsey:          29        42
8       Peter Socha:           47

9       RULINGS:                                   PAGE      LINE

10      Motion for entry of an order authorizing      3        14
        Elliot Moskowitz from Davis Polk & Wardwell
11      LLP to appear and practice pro hac vice
        on behalf of the debtors, granted.
12      Debtors' motion for an order setting an       7         6
        expedited hearing and shortening the notice
13      period for Debtors' motion for order
        authorizing Debtors to(i) implement
14      (a) key employee incentive plan, (b) key
        employee retention plan and (c) modified
15      severance plan and (ii) make 2013 safety
        payments, granted.
16      Debtors' motion to file under seal          20         3
        declaration of Agnes Tang, and Exhibits
17      D and E to Debtors' motion for order
        authorizing Debtors to (i) implement
18      (a) key employee incentive plan, (b) key
        employee retention plan and (c) modified
19      severance plan and (ii) make 2013 safety
        payments, granted, subject to unsealing
20      them at an appropriate time if it ever was
        appropriate to unseal them, on motion and
21      opportunity to be heard.
        Debtors' motion for order                   73        18
22      authorizing Debtors to (i) implement
        (a) key employee incentive plan, (b) key
23      employee retention plan and (c) modified
        severance plan and (ii) make 2013 safety
24      payments, granted.

25

1                          INDEX (cont'd.)

2    EXHIBITS:    DESCRIPTION                    I.D.     EVID

3    For Debtors:
                 Two declarations of Peter Socha          28
4                Declaration of John Dempsey              28
                 Declaration of Agnes Tang                28
5

6    CLOSING ARGUMENTS:                          Page
     Mr. Resnick                                  67
7    Ms. Freeman                                  71

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78

1

2                    C E R T I F I C A T I O N

3

4         I, Clara Rubin, the court approved transcriber, do

5    hereby certify the foregoing is a true and correct transcript

6    from the official electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9

10

11                                                June 18, 2014

12    _____         _____

13    CLARA RUBIN                          DATE

14

15

16

17

18

19

20

21

22

23

24

25

## A

**ability (1)**
11:17
**able (13)**
4:17,20;9:9;14:5;
15:16;16:25;19:14,
24;20:24;35:9;42:16;
46:16;54:23
**above (5)**
33:20,20;37:2,9;
40:17
**absolutely (4)**
9:8;10:14;21:10;
23:2
**accomplish (1)**
34:2
**Accordingly (1)**
13:13
**accounting (4)**
33:9;49:2;57:24;
66:11
**accurate (2)**
43:1;49:9
**achieve (8)**
10:16;11:2;19:22;
21:10;37:2;68:8;
72:1,7
**achieved (4)**
21:12;33:22;34:1;
68:9
**achieving (1)**
34:5
**across (1)**
23:13
**act (1)**
15:10
**acted (1)**
41:8
**active (1)**
41:13
**activity (1)**
38:8
**actual (2)**
10:23;45:24
**actually (15)**
5:3,21,23;7:14;
13:2;14:25;18:3;
23:14;35:6;50:17;
51:21;52:4;69:18;
70:5,7
**adaptation (1)**
41:19
**adding (1)**
22:2
**addition (2)**
20:13;31:25
**additional (1)**
72:1
**address (4)**
5:18;6:4;8:2;23:19
**addressing (2)**

**7:10,16**
**Adelphia (1)**
70:7
**adjourned (1)**
75:2
**adjourning (1)**
5:24
**adjustments (1)**
21:21
**administration (1)**
29:15
**admission (2)**
3:10;27:25
**admit (1)**
42:19
**admitted (2)**
28:9;30:17
**adopted (2)**
31:14;32:10
**adopting (1)**
68:2
**advantage (1)**
12:9
**adversary (1)**
31:4
**adversely (1)**
12:14
**advice (3)**
5:6;20:12;31:18
**advices (1)**
73:24
**advised (1)**
30:14
**advises (1)**
29:23
**advising (1)**
30:12
**advisor (2)**
22:9;62:16
**advisors (19)**
5:9;11:8;14:3;
24:16;31:15,22;32:2;
41:15;50:4,10,11,15,
19;61:23;62:8,21;
63:6;64:5,5
**advisors' (1)**
11:1
**affect (4)**
12:14;13:9;52:7,7
**affirmative (2)**
6:11;28:1
**afford (1)**
39:6
**afternoon (11)**
3:5,6,20;13:18;
27:13;29:9,10;47:23,
24;67:1;74:6
**again (13)**
3:21;17:12;18:11;
19:5;22:19;31:22;
40:14;46:6;60:9;
65:10;68:10;71:13,
19

**against (2)**
11:14;71:1
**agenda (2)**
3:4,9
**aggrieved (2)**
9:8;13:11
**Agnes (5)**
6:2,25;28:4,14;
67:3
**ago (1)**
58:25
**agree (6)**
18:6;52:15,16,21;
61:19;74:5
**agreed (9)**
5:17;6:9;7:17;29:5,
5;53:8;72:3,18,20
**agreement (3)**
9:5;63:3;71:25
**agreements (1)**
64:19
**ahead (1)**
51:23
**Akin (1)**
13:19
**Alexis (2)**
13:18;71:13
**align (1)**
20:23
**aligned (2)**
20:10;22:17
**aligns (1)**
37:17
**all-companies (2)**
40:14,16
**allegation (2)**
60:15,21
**allow (4)**
44:18,22;70:24;
74:1
**allowed (4)**
3:12;15:4,9;16:20
**allowing (1)**
16:2
**allows (1)**
16:10
**almost (1)**
10:25
**alone (2)**
25:6,16
**along (3)**
6:2;26:1;55:8
**altered (2)**
63:18,20
**Although (3)**
7:25;17:11;42:16
**always (2)**
16:19;29:3
**amended (1)**
3:4
**America (1)**
11:22
**AMF (1)**

**12:17**
**amount (6)**
21:8;34:11;39:19;
44:2;45:24;66:10
**amounts (2)**
8:6;52:11
**analysis (11)**
21:16;34:21;36:7;
37:5,10;43:13,15,24;
58:8;24;72:15
**analyze (2)**
9:12;14:5
**analyzed (3)**
14:3;36:9;72:16
**and-forth (1)**
63:6
**Angela (1)**
3:25
**annoying (1)**
26:7
**annual (1)**
4:7
**answered (1)**
65:23
**anticipate (1)**
32:25
**anticipated (1)**
32:13
**anticipation (1)**
17:18
**apologize (2)**
27:7;45:20
**applies (1)**
59:8
**apply (1)**
59:9
**appointed (1)**
17:10
**appreciates (1)**
27:10
**approach (1)**
35:18
**appropriate (11)**
8:22;9:5;19:4,4;
32:22;43:20;46:21;
67:21;69:5;71:5;74:1
**appropriately (4)**
19:25;41:9;71:21;
74:3
**approval (1)**
72:25
**approve (5)**
4:2;56:17;64:13;
65:8;71:18
**approved (3)**
23:11;42:11;69:16
**approximately (4)**
21:13;30:14;34:12;
39:21
**area (2)**
56:14;66:9
**areas (1)**
49:25

**argument (1)**
67:7
**around (4)**
8:7;9:22;46:4;53:5
**arrangements (2)**
8:22;29:24
**arrived (1)**
41:20
**Arsdale (44)**
6:16,23;7:2,17;
14:22,22;16:16,21;
17:6,23,25;18:2;25:2,
4,5,8,10,12,15;27:6,9,
11;28:5,6;31:7;42:1,
3;44:13,21,24;46:3,8,
20;64:22;65:12,20,
21;68:5;69:19;70:4;
73:6,7,14;74:24
**Arsdale's (1)**
61:2
**aspects (1)**
61:14
**assess (3)**
32:6;38:23;39:22
**assessed (1)**
34:17
**assessment (1)**
32:20
**asset (1)**
4:19
**assets (5)**
36:21;37:20;39:11;
59:12,12
**assignment (1)**
30:8
**assist (1)**
31:11
**assistant (1)**
33:9
**assisted (1)**
50:4
**associated (1)**
36:9
**assuming (2)**
8:23;9:2
**Atlanta (1)**
48:11
**attain (1)**
11:17
**attends (1)**
59:19
**auction (12)**
8:8;9:23;11:5,6,18;
13:6;17:1,4;19:21;
20:25;31:17;34:8
**authority (3)**
4:6;59:7,10
**authorizing (2)**
73:16,19
**automatically (1)**
61:1
**available (3)**
12:2;34:3;39:2

**award (1)**
45:18
**aware (5)**
4:10;13:21;19:9,
20;65:4
**away (4)**
12:6;26:4;54:18;
70:10

## B

**bachelor's (1)**
29:14
**back (11)**
16:20;25:20;27:19;
32:8;46:16;51:19;
54:17;65:12;67:10,
12,16
**back- (1)**
63:5
**back-and-forth (1)**
52:19
**background (2)**
29:13;48:6
**Bank (1)**
62:8
**bankers (1)**
62:7
**Bankruptcy (17)**
7:22;10:22;12:25;
17:8;18:6;20:11;
22:4;23:17;24:3,9,
18;25:23,24;32:11;
55:16,25;67:22
**base (1)**
41:12
**based (5)**
21:8;32:19;34:1;
63:18;73:20
**bases (1)**
23:25
**basic (1)**
34:4
**basically (5)**
12:5;16:11;36:8;
60:12;72:13
**basis (1)**
14:2
**became (1)**
52:12
**begin (3)**
7:10,11;50:9
**behalf (3)**
13:19;70:20;71:14
**believing (1)**
36:20
**below (7)**
36:18,22;37:12,13;
40:19,20;41:1
**bench (1)**
39:1
**beneficial (1)**
72:22

**benefit (2)**
33:2;34:20
**benefits (1)**
29:21
**beset (1)**
74:8
**best (6)**
19:23;20:24;36:15;
53:16;65:14;70:14
**better (2)**
15:20;72:1
**bid (1)**
11:4
**bidder (2)**
8:24;11:3
**bidding (2)**
17:3,3
**Bids (1)**
11:5,10;14:11
**big (1)**
25:22
**binding (1)**
11:10
**bit (9)**
25:20;40:17,19;
48:23;60:24;61:24;
62:19;63:25;64:23
**Blackstone (1)**
22:9
**board (16)**
5:5,5,8;6:21;10:1;
22:23;31:23;41:15,
16;57:5,5,6;59:15,17,
19,21
**boatloads (1)**
70:10
**bond (1)**
4:22
**bonus (1)**
55:6
**books (1)**
38:10
**borderline (1)**
56:8
**both (6)**
13:22;32:2;38:11;
39:25;50:18;57:15
**Bowling (1)**
12:17
**Brands (1)**
11:22
**Brian (2)**
3:23;53:15
**brief (2)**
20:22;46:4
**briefly (3)**
48:5,20;62:17
**bring (4)**
4:20;34:23;62:15;
67:12
**bringing (1)**
38:14
**brings (1)**

69:1
**broad (1)**
15:4
**broadcast (1)**
18:17
**broke (1)**
54:14
**brought (2)**
35:11;62:13
**BROWN (5)**
3:5,6,7,7,17
**bucket (2)**
8:9,9
**buckets (2)**
8:3;40:15
**bucks (1)**
16:6
**business (6)**
29:15,22;49:25;
68:3;73:23;74:16
**business- (1)**
69:1
**business-judgment (4)**
24:12,25;69:3,15
**buy (1)**
16:7
**buyer (1)**
52:7
**buyers (4)**
21:2;51:21;52:4;
53:6

## C

**calculate (1)**
11:16
**calculations (1)**
8:6
**call (10)**
6:22;15:19,24;
16:22;27:23;28:17;
46:16;47:15;57:4;
67:3
**calls (1)**
9:6
**came (8)**
25:21,22;26:5;
50:10;51:19;54:17;
62:23;63:7
**can (31)**
5:24;6:4;13:8;15:2,
20,23;16:6,19;26:20;
34:11;35:13;36:6,17,
25;39:19;40:15;41:3;
43:3;47:1;48:5,20;
50:22;53:7;56:3,3;
58:18,23;61:1;69:20;
70:15;74:15
**capable (2)**
56:4,5
**carefully (1)**
24:16
**case (29)**

4:19;5:1;11:3;
16:4;17:8,9;19:22;
20:19;21:6;24:10,24;
26:23,25;30:3;31:16,
16,17;34:2;37:1;
43:14;52:5;57:6,7,9;
67:23;68:17,20;
70:11;74:10
**cases (15)**
3:8;11:21;12:17,
21;13:13;26:7;30:18,
22;31:14;32:9;36:9;
41:5;42:11;54:25;
70:7
**categories (1)**
57:16
**cause (3)**
7:22;23:20,24
**center (1)**
8:6
**centralized (1)**
56:19
**CEO (6)**
6:12;45:7;48:20,
21;59:14;67:23
**certain (12)**
4:6,9;12:12;20:24;
22:1,12,24;23:10;
42:24;53:1;72:4,7
**certainly (7)**
4:24;8:21;14:10;
18:5;20:6;63:21;
70:17
**certainty (1)**
52:23
**chairman (3)**
6:12;48:11,17
**chall (1)**
37:1
**challenge (2)**
37:2;68:8
**challenging (6)**
11:2;21:24;24:19;
69:8;71:21,23
**change (2)**
45:16;63:22
**changes (2)**
23:10;45:13
**Changing (1)**
63:23
**Chapter (8)**
20:10;21:18;22:18;
30:15,18;31:2;38:2;
53:24
**characteristic (1)**
59:1
**characteristics (3)**
58:9;60:8,18
**chief (7)**
33:7,8,8;47:16;
48:3,17;66:7
**choose (1)**
39:13

**chunk (1)**
38:9
**Circuit (1)**
12:18
**circumstance (2)**
19:9;34:13
**circumstances (2)**
24:10,24
**cited (2)**
11:21;68:20
**City (1)**
12:18
**CK (13)**
48:25;49:23;54:15,
17;56:15,16;57:12,
14,22;59:3,4;66:6,7
**claiming (1)**
26:15
**clarified (1)**
23:21
**clear (9)**
10:3;24:15;33:21;
51:24;57:18;68:15;
69:2;73:10,11
**clearly (5)**
10:21;18:9;59:3,8;
68:23
**CLERK (3)**
3:3;46:23;75:1
**clerk's (1)**
69:23
**close (1)**
16:22
**closed (2)**
7:15;15:6
**closely (1)**
14:15
**closer (1)**
38:14
**closing (3)**
22:16;27:19;67:7
**Coach (1)**
11:22
**Coal (12)**
3:3;44:1;48:3,25;
56:20,22;57:12,12;
69:12;70:12,12,16
**coalminer (1)**
53:20
**Coal's (2)**
30:1;31:12
**Code (13)**
7:22;10:22;12:25;
20:11;22:4;23:17;
24:3,9,18;25:12;
27:3;55:16;67:22
**collaborative (1)**
5:11
**colleague (1)**
67:16
**colleagues (1)**
3:24
**comfort (1)**

Case 14-31848-KRH    Doc 389    Filed 06/18/14    Entered 06/18/14 16:34:30    Desc Main
Document    Page 81 of 93

JAMES RIVER COAL COMPANY, et al.
Case No. 14-31848-KRH

OPEN SESSION
June 11, 2014

71:9

**comfortable (2)**
19:13;46:19

**coming (2)**
51:17;53:4

**comment (2)**
31:4;69:18

**commercial (4)**
7:21;10:21;11:13;
12:24

**committed (1)**
4:14

**committee (38)**
4:22;5:5,8,12;6:21;
8:16,19;10:1,17;
13:20,24;14:6;17:10;
20:15;21:22;22:9;
26:25;31:23;41:16;
50:1,11,14,21;51:19;
52:8;53:4;62:18,21;
63:9,19;64:1,6;
70:20;71:14,16;72:6,
15;73:24

**committee's (5)**
14:3;32:1;52:1;
63:10,10

**common (1)**
11:11

**community (1)**
56:13

**companies (10)**
20:11;21:20;22:21;
30:15;40:18;42:7;
48:12;56:14;69:9,12

**Company (49)**
3:3;9:23;12:14;
14:12,14,16;17:14,
15;18:12,13;22:15;
23:4;26:14;30:4;
34:7;36:4,12;37:18;
38:6,13;39:3,8,10,13,
23;41:8;43:18;48:4,
22;51:6;53:11;54:21;
56:25;57:19;58:4;
59:9,21;60:4,6,11,12;
62:14;68:24;70:11,
13,15,16;72:22;74:7

**company's (1)**
41:7

**companywide (1)**
59:7

**comparables (3)**
32:3;72:14,16

**compare (2)**
37:6;40:24

**compared (3)**
9:15;69:9,11

**compares (1)**
36:22

**comparison (1)**
42:7

**compensate (1)**
22:24

**compensation (60)**
4:2,3,8,11;5:4,5,7,
8,11,20,22;6:13,20,
20;7:6,24;8:18;9:10;
11:24;12:7,13,16;
13:22;19:19;20:8,14;
29:21;30:1,15,18;
31:3,12,23;32:7,21;
34:4;36:13;37:7,11;
38:16;40:24,24;41:8,
16;45:23;49:17,22;
50:5,8;55:4,10;56:16,
24;61:8;62:22;64:4,
13;65:8;67:19;68:1

**competitor (2)**
9:1;15:15

**competitors (3)**
12:8;13:7;18:20

**complementary (2)**
61:22;62:9

**completed (1)**
65:2

**completely (3)**
10:6,7;27:8

**complies (1)**
23:16

**compliment (1)**
70:2

**comply (2)**
20:11;24:17

**comps (2)**
72:18,21

**concept (1)**
12:19

**concern (3)**
14:11;15:14;70:9

**concerning (2)**
15:1;16:13

**concerns (5)**
14:8;18:19;53:3;
71:19;73:10

**concluded (1)**
75:3

**concludes (1)**
13:1

**concluding (1)**
64:16

**conclusion (2)**
32:18;69:13

**conclusions (3)**
37:15,16;41:3

**conduct (2)**
44:22;46:5

**conducting (3)**
27:18;51:10;64:17

**confidential (5)**
7:21;8:14;10:21;
12:23,23

**confidentiality (2)**
8:22;9:5

**confirm (1)**
23:22

**connection (9)**

4:7;6:9;13:16;
14:13;17:1;32:10;
50:4;72:11,15

**consent (1)**
4:21

**consi (1)**
37:8

**consider (3)**
5:24;57:5;65:5

**consideration (2)**
11:2;30:7

**considerations (1)**
26:20

**considered (4)**
5:4;9:25;22:22;
57:2

**considering (1)**
37:4

**Consistent (4)**
22:4;39:7;41:4;
73:23

**consists (2)**
8:4;11:23

**consolidates (1)**
56:17

**constitutes (1)**
10:21

**consultant (2)**
5:7;6:20

**consultants (1)**
23:5

**consultation (3)**
41:14,15,17

**consulted (1)**
31:14

**consulting (1)**
29:21

**consummation (3)**
22:17;39:11,12

**contact (1)**
4:25

**contacted (3)**
8:19,19;9:6

**contain (5)**
7:7;8:5;10:23;
15:13;55:20

**contains (4)**
7:20;8:11;12:23;
15:14

**contested (2)**
4:13,17

**context (6)**
36:21;37:19;41:6;
43:21,21;73:12

**continue (1)**
74:12

**continuing (1)**
38:8

**contract (1)**
55:2

**contractual (1)**
4:23

**conversations (3)**

53:6;55:15;62:1

**convert (1)**
11:9

**copies (1)**
35:22

**core (1)**
5:13

**corporate (8)**
16:1;48:8;56:2,11;
57:20;59:11,11,12

**correctly (1)**
13:23

**corrupt (1)**
70:8

**cost (29)**
9:14,15;10:4,6,7,
13;21:9,12,15;22:13,
17;32:12;36:4,9,16,
23;37:1,19;39:5;
40:1;41:6;43:12,23;
55:3,5;62:11,11,12;
63:12

**cost-effective (1)**
55:6

**costs (4)**
10:10,10,12,13

**counsel (3)**
3:8;61:25;65:23

**counterparties (1)**
4:23

**country (1)**
16:10

**couple (4)**
15:12;32:17;42:4;
65:11

**course (4)**
12:1;35:2;59:15;
73:7

**Court (107)**
3:1,1,6,14,15,19,
21;6:5;7:11;8:15;
10:18;12:15;13:15;
14:20;15:6;16:14,17,
22;17:21,22,24;18:1;
19:1,15;23:11;25:3,7,
9,11,14;27:5,7,10,10,
12,21,25;28:5,7,18,
21,23;29:3,4;31:5,9;
34:21;35:3,9,11,16,
19,23;36:6;40:12;
41:24;42:11;44:16,
22,25;46:2,9,11,22,
24;47:2,4,8,14,17;
48:5;58:7,16;64:12;
65:5,8,19;66:2,3,5,
15,18,20,23;67:1,8,
12,14,17;69:20,23,
25;70:22,24;71:11;
73:1,3,11,13,15,15,
18,19,25;74:20,23;
75:2

**courtroom (14)**
3:12;6:14,22;7:2,

15;15:5;44:20;46:4,
13;47:1,8,9;65:6;
74:11

**courts (4)**
11:20;13:12;15:5;
24:11

**Court's (4)**
17:20;19:3;35:14;
58:14

**covered (3)**
33:5,7;38:19

**create (2)**
38:11;51:2

**crediting (1)**
72:10

**creditor (4)**
9:3,23;51:25;63:10

**creditors (9)**
9:6;16:3;18:25;
20:25;26:5;34:3;
41:18;50:23;72:2

**creditors' (29)**
4:22;5:12;8:16,19;
10:1,17;13:20,24;
17:10;20:14;21:22;
22:8;26:24;32:1;
51:19,25;52:8;62:18,
21;63:9,10,19;64:1;
70:20;71:14,16;72:6,
15;73:24

**crew (1)**
26:4

**crime (1)**
25:15

**criteria (6)**
54:2,6,20;55:5;
59:25;60:2

**critical (9)**
14:14;19:20;20:1;
22:12;23:2;59:2,6;
60:10;62:23

**criticality (1)**
38:24

**cross- (1)**
46:5

**cross-examination (5)**
6:24;26:17;42:2;
65:20,25;67:4;73:8

**cross-examine (3)**
6:17;41:25;44:19

**cross-examining (1)**
7:3

**crucial (1)**
9:21

**crystal (1)**
24:15

**current (5)**
8:11;11:25;30:1;
38:24;48:15

**currently (3)**
31:18;48:2;68:11

**customer (1)**
57:13

**cut (1)**
45:19

## D

**Dallas (1)**
30:25
**damaging (1)**
14:9
**dark (1)**
36:14
**data (5)**
32:8;36:15;42:8,
14;57:6
**database (1)**
32:9
**date (3)**
28:11,13,15
**Davis (7)**
3:11,23;5:9;20:12;
27:14;50:1;53:15
**day (4)**
4:24;5:22;23:12;
63:7
**de (1)**
54:22
**deal (2)**
54:1;64:19
**debtor (5)**
26:13,21;41:14;
68:11;74:1
**debtors (31)**
3:8,24;4:14;7:21,
23;12:4,6,23;13:13;
14:15;19:20,25;20:8,
11,13;21:18;22:12;
23:1;24:5,7,16;
27:15;28:16;32:20;
47:15;59:10;61:14;
65:7;71:4,25;73:16
**debtors' (30)**
4:1,7;6:12,21;11:1,
17;12:8,9;13:4,7,8;
18:20;20:25;21:11;
22:22;23:10,13;
28:11,13,15;31:15;
32:20;38:18;41:14;
49:17;59:2;61:15;
67:20;68:9;73:23
**decade (1)**
30:12
**decide (1)**
18:15
**deciding (4)**
61:4,6,7,8
**decision (4)**
18:25;43:16;50:7,
17
**decisions (6)**
56:25;57:11;59:2,
5,8;60:10
**declaration (18)**
6:2,18,25;7:24;8:5;

10:8,15,23;11:15;
12:7,12;22:7;23:7;
28:12,14;30:21;
67:25;68:11
**declarations (10)**
6:8,11;7:5,7;24:14;
28:1,1,10;49:3,8
**declining (1)**
70:16
**deeply (1)**
64:2
**defined (1)**
10:16
**definitely (1)**
53:3
**definition (1)**
55:25
**definitive (1)**
64:19
**degree (5)**
29:14;38:25;45:22;
48:7,8
**delay (1)**
20:3
**deliberately (1)**
20:9
**demoralization (2)**
18:11,19
**Dempsey (24)**
6:18,21;10:8,14;
28:3,12,17,18;29:12,
13;31:2,11;32:5;
34:16;35:21;36:2,6;
37:4;41:2,21;42:4;
67:24;69:4;72:14
**Dempsey's (1)**
21:16
**denied (1)**
13:11
**depict (2)**
36:7;40:13
**depicts (1)**
58:24
**describe (1)**
48:20
**described (2)**
58:25;60:7
**describes (2)**
9:13;10:9
**description (2)**
45:6,6
**design (3)**
30:6;31:20;32:3
**designed (9)**
11:13;20:23;22:11;
30:5;32:24;50:20,20,
24;51:1
**designs (1)**
25:12
**detail (2)**
9:11,19
**details (2)**
32:17;40:7

**determine (3)**
19:21;54:2,8
**determined (1)**
9:16
**Deutsche (1)**
62:8
**devastating (2)**
23:3;54:21
**develop (5)**
50:8;56:1,3,10;
57:20
**developed (1)**
31:20
**developing (4)**
9:16;31:12;49:20;
68:22
**development (4)**
41:9;48:22;49:16;
62:22
**dialogue (1)**
32:2
**dictate (1)**
59:11
**different (7)**
5:3;11:23;42:7;
45:10;62:11,12;63:2
**differently (1)**
55:17
**difficult-to-achieve (1)**
21:15
**difficulty (1)**
39:1
**dig (1)**
32:17
**DIP (3)**
4:19,22;8:16
**dire (1)**
31:5
**direct (6)**
6:15,23;7:4;29:7;
47:21;65:17
**direction (1)**
70:15
**directors (5)**
6:21;31:24;41:16,
17;59:15
**disagreed (1)**
64:22
**disclosed (10)**
7:23;10:14,20,25;
12:3;14:10;18:13,23,
24;19:7
**disclosure (5)**
11:12,15;12:12;
13:5;18:7
**disconnect (2)**
46:23,24
**disconnected (1)**
47:5
**discuss (6)**
4:1;15:2;33:4;
38:1;58:6;59:19
**discussed (7)**

31:23;50:12,19;
51:14;59:14;67:2,6
**discussing (1)**
58:9
**discussion (1)**
50:9
**discussions (5)**
21:22;52:1;55:9;
64:2,7
**disengage (1)**
46:14
**disposed (1)**
59:12
**disposition (1)**
59:11
**dispute (1)**
15:8
**disrespect (1)**
18:5
**distracted (1)**
38:7
**distracting (1)**
53:15
**distress (1)**
70:12
**dive (1)**
4:13
**documents (2)**
7:19;8:5
**dollar (1)**
45:24
**dollars (15)**
10:5,12,13;16:7;
17:13;21:13,16;
22:14;25:23;32:12;
34:10;39:21;44:3,4,5
**dollars' (1)**
16:8
**done (10)**
4:12,25;7:15;16:9,
10;17:17;29:1;43:15;
46:7;64:24
**door (1)**
47:4
**dot (2)**
42:17;43:3
**double-dipping (1)**
72:12
**doubt (1)**
22:5
**down (7)**
39:4;45:8;54:14,
25;56:17;62:25;
66:23
**draw (1)**
41:3
**drill (1)**
51:4
**drive (2)**
19:24;20:24
**driven (1)**
74:8
**driving (1)**

21:6
**drove (1)**
25:24
**due (2)**
11:5;70:17
**during (10)**
19:24;20:1,24;
22:13;30:1;51:1,3,
22;52:1;53:18

## E

**earlier (5)**
31:25;51:15;60:24;
65:12;73:8
**early (3)**
51:11,12;53:16
**earn (7)**
8:8;10:2,15;12:4;
24:20;37:5;45:4
**earned (1)**
10:6
**easily (1)**
24:24
**economic (5)**
20:19;25:7,8,16;
74:8
**educational (2)**
29:13;48:5
**effect (4)**
19:17;38:13,16;
74:21
**effective (1)**
41:5
**efficient (1)**
67:5
**effort (1)**
5:11
**efforts (2)**
14:13;38:11
**either (5)**
8:17;26:16;57:12,
14;74:14
**elected (1)**
59:20
**eligibility (2)**
32:11;43:5
**Elliot (2)**
3:11,25
**Elliott (1)**
27:14
**else (2)**
15:20;56:13
**employed (3)**
48:2,9,13
**employee (17)**
4:4,4;12:4,5,16;
13:9;22:2;23:20,22,
23;31:20,21;32:10;
52:22;72:12;73:17,
17
**employees (34)**
12:10,14;13:8;

Case 14-31848-KRH    Doc 389    Filed 06/18/14    Entered 06/18/14 16:34:30    Desc Main
Document    Page 83 of 93

JAMES RIVER COAL COMPANY, et al.
Case No. 14-31848-KRH

OPEN SESSION
June 11, 2014

18:21;19:24;20:1,3,
24;21:1,3;22:13,14,
15,24;23:2,3,4;29:24;
38:4,18,21;40:24;
53:14,17;59:9;60:4,
6;62:14;64:20;72:4,
7;74:2,9,10
**employees' (1)**
12:12
**employer (3)**
12:3,4;18:15
**employers (1)**
29:23
**employment (1)**
51:3
**end (6)**
22:16;27:19;50:12;
63:7,25;64:15
**ended (2)**
5:23;54:19
**engineering (1)**
48:7
**enough (1)**
18:23
**Enron (1)**
70:6
**ensure (3)**
22:12;72:11,17
**ensuring (1)**
24:18
**entails (1)**
64:21
**enter (2)**
6:3;73:19
**entered (3)**
71:4;7;74:13
**entire (1)**
18:17
**entirely (1)**
46:20
**entitled (3)**
23:20;36:3;58:19
**entity (1)**
56:22
**environment (2)**
53:2,2
**equally (1)**
20:2
**equipment (1)**
61:8
**erroneous (1)**
24:1
**espoused (1)**
19:8
**essence (1)**
64:21
**establish (1)**
24:7
**estate (1)**
21:9
**estates (1)**
21:11
**evaluate (1)**

9:4
**even (11)**
5:20;12:20;37:13;
40:22;45:25;50:7;
61:4,5;62:12;68:13;
69:6
**event (2)**
37:13;39:20
**events (1)**
39:14
**everybody (2)**
44:4;46:25
**everyone (2)**
39:20;46:25
**evidence (9)**
18:17;24:6;28:11,
12,14;68:15,24;69:2,
14
**evident (1)**
23:6
**exact (1)**
15:9
**exactly (4)**
15:16;44:6;67:13;
68:17
**examination (5)**
27:18;29:7;44:23;
46:6;47:21
**examined (1)**
68:22
**example (1)**
15:13;56:9
**Excellent (1)**
67:9
**exceptions (1)**
59:20
**execute (3)**
56:1,4,10
**execution (1)**
48:22
**executive (4)**
33:8;47:16;48:3,17
**executives (1)**
34:6
**Exercise (3)**
59:10;68:2;73:22
**Exhibit (11)**
8:5,10,10;9:2;
10:22;11:23,23;
15:13;28:11,13,15
**exhibits (6)**
4:9;7:23,25;19:10,
11;45:3
**exist (1)**
15:18
**expect (1)**
36:11
**expedite (3)**
5:21;6:1,3
**expensive (1)**
23:6
**experience (2)**
30:9;32:19

**expert (6)**
30:17;31:2;32:19;
37:16,23;41:2
**explain (4)**
36:6;40:12;58:8,24
**explained (1)**
68:1
**explains (1)**
9:13
**explore (1)**
62:19
**expressed (1)**
74:6
**expressly (1)**
23:16
**extensive (1)**
9:11
**extent (1)**
45:21
**extraordinary (2)**
15:10,11
**extremely (1)**
69:7
**eyes (2)**
8:25;9:1

## F

**facing (1)**
38:4
**fact (22)**
12:19;13:3;14:1,9;
16:18;18:19;19:6,13;
26:13;27:3;35:20;
55:20,22;58:13;
60:25;61:24;68:16,
23;71:6;72:18,20,22
**factor (1)**
27:1
**factors (2)**
68:20,23
**facts (2)**
24:10,23
**failed (2)**
24:5,7
**fair (6)**
62:24;63:17,17;
64:1;69:5;73:25
**familiar (5)**
55:8,19;60:15,20;
61:12
**far (3)**
5:1;23:5;46:11
**farther (1)**
70:11
**fault (1)**
70:17
**favor (1)**
73:4
**February (1)**
64:16
**feel (1)**
52:23

**Feld (1)**
13:19
**fellow (1)**
26:18
**felt (6)**
39:6;50:21,22;
52:8;53:1;62:24
**few (5)**
7:7;8:13;24:1;58:6,
25
**fiftieth (4)**
37:2;40:17,19,20
**figure (1)**
25:20
**figures (1)**
10:3
**file (1)**
6:1
**filed (15)**
4:8,18;5:10,21,22;
6:8,11,13,14,25;
13:21,25;19:12;22:8;
45:5
**files (1)**
42:25
**filings (4)**
26:13;42:10,11;
57:10
**filled (1)**
48:18
**final (4)**
9:17;51:17,17;
64:10
**finance (4)**
48:8;49:2;57:24;
66:11
**financed (1)**
26:5
**financial (10)**
22:9;30:12;32:1;
57:6;59:2,6;60:10;
61:22;62:7,16
**finds (2)**
73:20,25
**fine (3)**
26:1,22;29:2
**firm (5)**
3:11;11:4;27:14;
29:16,22
**firms (2)**
25:22,22
**first (18)**
3:9;4:17,24;5:18;
7:25;24:1;25:24;
28:17;42:5;50:8,15;
53:10;54:20;58:25;
63:14;65:13;68:5;
70:25
**first- (1)**
23:11
**first-days (1)**
4:19
**fit (4)**

36:15;39:5;59:25;
60:1
**five (7)**
16:5,7,7;17:9,13;
33:9;59:16
**flat (1)**
53:19
**flight (1)**
38:25
**flipside (1)**
57:19
**floor (1)**
11:4
**focus (1)**
38:8
**focused (7)**
19:9;31:18;33:2;
51:1;53:18,22;74:3
**folks (1)**
52:6
**following (2)**
21:22;70:6
**footnote (2)**
23:18;59:20
**forces (1)**
74:9
**form (1)**
64:7
**formally (1)**
27:25
**formed (1)**
50:14
**forming (1)**
30:15
**formulae (1)**
11:16
**formulating (1)**
20:8
**forward (2)**
28:18;47:17
**found (2)**
15:9;32:14
**four (6)**
6:8;7:14;17:13;
24:13;53:20;65:10
**fourth (2)**
4:16;7:14
**frame (1)**
71:8
**framework (1)**
38:22
**FREEMAN (7)**
13:18,19;70:19;
71:13,13;73:2,3
**friend (1)**
62:2
**front (5)**
32:4;35:6,12,16;
67:8
**frontlines (1)**
21:1
**full (2)**
26:24;48:15

**fun (1)**
42:20
**function (4)**
25:19;38:23;56:19;
66:13
**functioned (1)**
58:1
**functioning (2)**
25:19;33:10
**functions (3)**
56:13;57:24;66:11
**Furniture (1)**
11:22
**further (6)**
18:1;41:22;65:17,
25;66:20,21
**Furthermore (2)**
9:10;12:11
**future (1)**
64:21

## G

**gathered (1)**
42:10
**gave (1)**
54:13
**general (2)**
33:10;57:21
**generally (3)**
18:7,13;22:20
**genesis (1)**
50:7
**gentleman (1)**
57:9
**Georgia (1)**
48:11
**gets (3)**
61:4,7;69:25
**given (3)**
15:23,23;37:22
**gives (3)**
15:4,22;57:14
**giving (3)**
13:2;26:21,22
**glad (2)**
69:18;70:5
**gleaned (1)**
42:25
**global (1)**
29:21
**goal (1)**
4:15
**goes (1)**
57:13
**gold (2)**
26:2,3
**Good (24)**
3:5,6,20,21;13:15,
18;15:6;16:17;25:3;
27:13,21;29:4,9,10;
35:3;43:17;47:12,23,
24;62:5,24;65:22;

66:13;70:13
**goodbye (1)**
26:4
**graduate (1)**
48:8
**grant (4)**
13:14;19:3;71:7;
73:18
**granted (3)**
3:14;6:6;19:16
**graph (1)**
43:11
**graphic (1)**
36:8
**grave (1)**
14:11
**great (4)**
18:3;54:1;64:19;
71:2
**greater (1)**
72:8
**Greenbrier (1)**
12:18
**group (8)**
34:6;36:24;54:10,
10;56:8;57:4,11;
60:25
**groups (1)**
56:7
**guess (2)**
25:5;63:4
**guide (1)**
5:19
**Gump (1)**
13:19

## H

**hac (2)**
3:10,10
**half (3)**
52:13,14;63:5
**hand (5)**
11:4;53:4,22;66:8,
12
**handled (2)**
61:14,15
**handles (3)**
48:25;49:1,1
**happen (4)**
18:12;38:5,6;74:15
**happy (2)**
7:10;8:23
**hard (1)**
35:22
**hardworking (1)**
70:14
**harm (1)**
7:23
**harms (1)**
12:15
**Hauer (1)**
13:19

**hear (3)**
23:7;24:14;74:11
**heard (14)**
13:16;14:21;19:5;
25:9;52:24;55:12;
67:18,23;68:19;69:4;
71:15;72:4;73:6,21
**hearing (5)**
4:14,16;5:24;11:7;
73:12
**hearings (1)**
4:16
**heavily (2)**
31:17;64:3
**held (1)**
24:11
**help (4)**
29:4;46:11;67:14;
74:13
**helped (1)**
17:15
**helps (2)**
58:7,8
**hereby (3)**
28:10,12,14
**higher (2)**
55:3;62:15
**highest (2)**
11:18;21:25
**himself (1)**
23:8
**hire (1)**
12:5
**hired (1)**
50:15
**historical (1)**
56:14
**historically (1)**
54:11
**hit (4)**
10:11,11,12;44:2
**Hmm (1)**
63:20
**Honor (74)**
3:5,9,16,20,22,24;
4:1,10,21;6:3,7;7:9,
12,12;9:10;11:11,20;
12:22;13:12,14,18,
21;14:24;16:12;18:2;
19:18,19;20:2,17;
23:25;24:11;25:5;
27:9,13,16,23;28:6,
16,19;31:1,7,10;
34:25;35:5,18,20;
41:23;44:10,13;45:2,
20;46:10,19;47:3,13;
65:17;66:14,22,25;
67:2,10,15,18;68:15;
69:1,13,17;70:18;
71:2,6,13;73:7;74:18,
22
**hope (4)**
26:17;51:18;74:12,

15
**hopefully (1)**
72:23
**Hopkins (2)**
49:1;66:10
**hotel (1)**
12:18
**housekeeping (1)**
27:22
**Huebner (2)**
3:25;4:24
**huge (1)**
62:16
**human (1)**
14:17
**hundred (1)**
44:4
**Hunton (1)**
3:7
**hurts (1)**
54:1

## I

**idea (2)**
15:4;52:1
**identified (1)**
22:18
**identify (1)**
66:6
**ignoring (1)**
35:4
**imagine (1)**
43:6
**Immediately (2)**
48:10;62:25
**impact (2)**
14:11;65:7
**impacted (2)**
17:9,12
**imperative (2)**
9:22;19:23
**implement (2)**
69:10;73:16
**implemented (1)**
40:23
**implementing (1)**
20:3
**importance (1)**
71:3
**important (7)**
8:13;16:9;18:8,20;
20:2;53:23;64:12
**Importantly (3)**
20:18;21:18;22:19
**improvements (2)**
72:20,21
**Inc (1)**
29:17
**incent (2)**
39:17;65:1
**incenting (1)**
37:18

15
**incentive (15)**
4:4,7;29:23;31:20;
32:10;34:4;36:12;
38:3,15;50:18,19;
51:2;65:1;72:1;73:17
**incentives (1)**
5:15
**incentivized (2)**
19:25;72:8
**incentivizing (10)**
5:16;22:1,5;24:4,
19;37:24;68:6,7,16;
73:20
**inclined (1)**
71:7
**include (5)**
24:6;51:20;54:13,
13;74:3
**included (4)**
32:9;51:23;52:9;
55:22
**includes (1)**
68:19
**including (4)**
4:19;11:25;21:22;
24:18
**increase (5)**
16:8;33:19;52:1;
71:22;72:3
**increasing (2)**
21:23,25
**incredibly- (1)**
21:14
**Indeed (1)**
4:16
**independent (3)**
5:7;6:19;56:21
**indicated (1)**
19:6
**indications (5)**
11:8,9;51:11;
68:12,13
**individual (4)**
12:16;18:14;43:20;
49:25
**individuals (7)**
21:5;26:10,12;
33:7;38:6;52:17;58:2
**inducement (1)**
38:12
**industry (5)**
37:22;40:25;43:21;
70:12;74:6
**ineffective (1)**
70:9
**influenced (1)**
31:17
**informally (2)**
8:19,20
**information (51)**
7:21;8:3,4,10,14,
14,20,21;9:2,9,18;
10:4,7,19,20,21,25;

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Case 14-31848-KRH Doc 389 Filed 06/18/14 Entered 06/18/14 16:34:30 Desc Main
Document Page 85 of 93
JAMES RIVER COAL COMPANY, et al.
Case No. 14-31848-KRH
OPEN SESSION
June 11, 2014

11:21,24;12:1,8,13,
17,22,24;13:1,5,10,
12,25;14:1,4,9;15:5;
16:1;17:4,18,19;18:9,
22,24;19:15;30:5;
31:13;36:22;42:25;
44:8,17,20;49:22;
54:12
**information's (1)**
19:7
**informed (1)**
18:25
**initial (5)**
6:13;20:13;50:16;
51:11;63:14
**initially (2)**
51:14;52:12
**injury (1)**
11:13
**input (5)**
4:21;63:10,11,19;
73:23
**inquiries (1)**
13:24
**insider (2)**
58:9;61:1
**insiders (20)**
24:6,19,21;26:13,
14,16;55:9,17,20,22,
24;57:3,17,19;58:3,
21;60:7;68:19,24;
74:4
**instance (1)**
17:1
**intend (3)**
6:15,22;7:4
**intended (3)**
20:5;36:7;40:12
**intends (1)**
6:16
**intense (1)**
20:15
**interest (10)**
11:8,10;20:19,25;
25:7,10,16;51:11;
68:12,13
**interested (1)**
15:24
**interests (2)**
20:23;63:8
**interface (1)**
49:25
**interfacing (4)**
51:16,21;52:3,6
**interfering (1)**
17:2
**intermingle (1)**
16:3
**intimately (1)**
22:10
**into (17)**
4:13;6:10;11:10;
22:2;25:24;27:1;

28:10,12,14;32:17;
44:11,19;51:4;52:18;
54:3,14;62:1
**investment (1)**
62:7
**investors (2)**
11:19;21:2
**involved (10)**
22:10;48:24;49:24;
59:1,3,4,13;64:2,3;
71:17
**involvement (1)**
72:7
**issue (3)**
23:17;32:7;68:18
**issues (6)**
4:15,18;5:13;6:4;
59:6;68:4
**items (1)**
3:3
**iteration (1)**
31:25

**J**

**James (14)**
3:3;29:25;30:8;
31:12;43:25;47:16;
48:3,9,10,13,16,20;
61:6;67:23
**jeopardize (1)**
13:6
**Jersey (4)**
30:24;69:20,24,25
**job (8)**
15:20;45:6;53:17;
60:16,20;62:12,13;
74:10
**jobs (1)**
33:2
**John (7)**
6:18;28:3,12,17;
29:12;51:15;67:24
**joining (2)**
48:9,10
**judged (1)**
24:2
**judgment (10)**
5:4;9:21,25;13:5;
26:20;57:17;64:12;
68:3;69:2;73:23
**July (6)**
11:6,7;20:6;64:23,
23;71:5
**jump (1)**
62:25
**juncture (1)**
71:4
**June (1)**
11:5
**justified (3)**
18:18;24:10,23

**K**

**keenly (1)**
19:9
**keep (4)**
12:23;33:2;51:1;
74:3
**keeping (3)**
53:17,22;67:5
**KEIP (85)**
4:4;5:14,15;8:4,6,
8,9;10:9,25;20:22,23;
21:10,18,21,23,24;
22:2,3,5;24:1,4,8;
26:9,15;33:4,5,6,13,
15,16,22,25;34:10,
11,13,17;36:3,23;
37:5,5,11,12,14,15,
16,17,24;38:1;39:25;
43:4,12,17,25;45:11,
12,12,23;51:5,5,8,13,
20;52:2,9,13,16,18;
53:9;63:13,21,25;
68:5,7,14,16;69:6,7,
8;70:17;71:22,24;
72:3,6,25;73:20
**KEIPs (1)**
25:21
**KERP (58)**
4:5;5:15;8:10,12;
9:20;10:2;11:24;
12:1,7,11;22:1,11,11,
14,19;23:6;24:2,6,8;
33:1,5;37:12;38:1,2,
19;39:9,14,16,20,23,
25;40:22;41:3,4;
45:7;52:11,12,14;
53:10,10;54:3;55:4,
20,23;56:4;57:17;
58:10;59:24;60:1,6;
61:17;68:18;69:10,
11,11;70:17;72:5;
73:25
**KERPs (4)**
25:21;38:3,11;
39:24
**KERP-total-cost (1)**
40:8
**key (14)**
4:3,4;19:13;20:1,
24;22:24;31:20,21;
32:10;53:25;65:10;
73:16,17;74:2
**kind (2)**
31:15;56:7
**kinds (2)**
31:13;41:4
**knowing (1)**
46:12
**knowledge (1)**
65:3
**knows (3)**

12:3,5;24:11

**L**

**laid (1)**
54:12
**Lane (2)**
48:25;66:7
**large (1)**
60:11
**largely (3)**
8:6;19:21;69:8
**larger (2)**
36:11;43:6
**last (8)**
4:20;25:17;30:12,
25;51:10,12;59:16;
71:1
**lastly (1)**
6:25
**latter (1)**
8:1
**law (3)**
27:14;67:23;68:17,
20;69:23
**law-firm (1)**
69:18
**lawyers (1)**
55:15
**lawyers' (1)**
55:25;56:3
**lay (1)**
34:21
**layman's (2)**
55:25;56:3
**layups (2)**
52:25,25
**lead (1)**
49:23
**least (2)**
16:25;61:14
**leave (6)**
17:23;21:18;39:2,
13;46:12;65:13
**leaves (1)**
22:19
**lectern (1)**
67:10
**led (2)**
9:17;39:3
**Leeco (5)**
56:9,10,11,21;61:6
**left (2)**
36:15;66:12
**legal (2)**
32:1;61:24
**lenders (2)**
4:22;8:16
**lesser (1)**
53:2
**level (10)**
8:7;12:1;15:14;
21:25,25;33:20;

54:24;59:4;61:5;72:2
**levels (5)**
11:2;32:16;37:11;
41:18;69:7
**Libby (1)**
3:25
**lifeboat (1)**
26:3
**likelihood (1)**
22:25
**likely (2)**
11:12,17
**limited (1)**
10:19
**line (9)**
16:5;36:14,15,16,
19;46:14,24;47:5;
60:12
**link (1)**
34:8
**list (3)**
8:11;15:22;45:3
**listed (4)**
30:21;50:3;57:10;
58:2
**listened (1)**
14:24
**little (7)**
25:20;40:19;48:23;
60:24;61:24;63:25;
64:22
**local (1)**
3:7
**location (1)**
11:25
**logic (2)**
51:22;52:20
**logical (1)**
49:22
**long (5)**
17:14;29:18;39:8;
48:13,18
**longer (2)**
5:23;47:11
**look (9)**
9:19;15:16;20:22;
35:3;43:21;55:24;
56:21;59:24;68:4
**looked (5)**
32:11,12;39:24;
40:1;42:5
**looking (12)**
17:7;34:6;35:4;
36:2,3;37:4;43:3,19;
58:18,19,21;59:23
**lose (2)**
53:24,25;54:21;
65:11
**losing (1)**
65:9
**loss (3)**
20:1;23:3;54:21
**lot (7)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(7) information's - lot

JAMES RIVER COAL COMPANY, et al.
Case No. 14-31848-KRH

9:6,7,7;26:25;54:1;
65:24;70:1
**love (1)**
9:1
**lower (2)**
32:15;36:14
**lunch (1)**
61:24

## M

**main (3)**
26:3;61:3;68:4
**mainly (1)**
7:5
**maintain (1)**
72:23
**maintained (1)**
32:9
**maintenance (1)**
38:16
**major (2)**
56:18,19
**majority (1)**
68:12
**makes (2)**
10:3;18:13
**making (5)**
16:23;21:25;43:16;
59:1;60:9
**manage (1)**
59:21
**management (14)**
5:6;9:21,25;11:8;
22:23;54:10,10;
58:20;59:16;61:9;
70:8,9,9,13
**manager (2)**
33:10;57:10
**managers (1)**
49:21
**manages (1)**
66:9
**managing (1)**
38:9
**manner (1)**
45:22
**many (8)**
30:14;33:12;38:19;
43:4,7,7;49:6;65:10
**March (1)**
48:14
**marginally (1)**
63:24
**market (18)**
9:15;10:6,8,13;
20:10;21:17;22:18;
24:22;30:4;32:2,8,
15;37:6;38:14;39:7;
69:6;72:19;74:8
**marketing (2)**
48:24,24
**Marshall (1)**

3:25
**master's (1)**
29:14
**material (1)**
12:9
**matrix (1)**
54:13
**matter (6)**
3:9;4:17;5:3;
16:19;18:18;27:22
**matters (3)**
6:9;15:1;19:14
**maximize (5)**
32:23;34:3;50:22;
53:7;67:21
**maximizes (1)**
22:24
**maximum (16)**
10:5;21:14;22:13;
32:14;33:18;34:10;
36:8,17,23;37:1,5,14;
39:19;45:4;69:7;72:2
**May (21)**
5:21;7:11;17:5,15;
18:14;24:4;27:24,24;
28:19;34:24;35:18,
19;43:8;47:13,14;
51:12;55:20;58:16;
65:21;66:5,23
**maybe (1)**
60:16
**mean (11)**
15:23;16:17;18:4;
41:18;52:20;54:10;
55:24;60:22;62:23;
63:20;64:14
**meaning (1)**
10:22
**means (1)**
12:18
**meant (1)**
4:24
**measure (2)**
15:10,11
**mechanism (1)**
72:10
**median (5)**
37:6,9,13,13;41:1
**meet (3)**
15:17;68:13;69:8
**meeting (5)**
21:2;50:11,15,16;
59:17
**meetings (3)**
53:16;57:5;59:19
**meets (1)**
27:3
**Members (3)**
58:20;59:16;72:5
**mentioned (5)**
6:19;20:18;34:16;
68:11;72:9
**Mercer (18)**

5:6;6:19,19;20:12;
22:18;26:18;28:17;
29:17,18,20,25;30:3;
31:11;32:6;49:20;
50:1;54:12;67:24
**Mercer's (1)**
29:21
**merit (2)**
20:21;24:16
**method (1)**
38:3
**middle (2)**
32:14;64:14
**mid-May (1)**
51:12
**midst (1)**
50:20
**might (7)**
17:2;36:11;38:10;
42:20;43:6;61:2;
64:22
**million (13)**
10:5,13;16:5,7,8;
17:13;21:16;22:14;
34:12;36:25;39:21;
40:15,18
**millions (3)**
25:23,23;70:10
**mince (1)**
46:3
**mind (1)**
62:3
**mine (9)**
33:10,10;38:9;
52:5;56:9,11,15;
57:1;59:5
**mineral (1)**
48:7
**mines (4)**
33:9;49:1;57:23;
66:9
**minimum (16)**
10:11,11;11:4;
21:10,12,25;33:17,
19,20,21;36:17;44:1,
2;52:13;68:13;71:24
**mining (1)**
56:12
**minute (1)**
44:1
**minutes (3)**
32:18;58:7,25
**modifications (1)**
20:16
**modified (3)**
23:9,12;73:18
**moment (1)**
11:6
**money (1)**
17:17
**morale (2)**
12:14;13:9
**more (22)**

5:10;9:11,19;16:7;
17:16;21:24;22:1;
23:6;25:6;30:16;
36:12;38:18;43:7;
48:23;49:23;53:1;
55:5,6;56:13;58:6;
62:19;71:23
**Moskowitz (39)**
3:11,11,16,25;
27:13,14,22;28:16,
19,22,24;29:5,8;31:1,
10;34:23;35:8,10,13,
18,20,24;36:1;41:21;
44:10;45:2,19;46:10;
47:3,13,15,22;65:16,
18;66:21;67:2,9,13,
15
**most (8)**
12:9;13:8;19:20,
24;24:11;26:12;
34:13;65:14
**motion (46)**
3:10,14;4:2,3,8,11,
18;5:10,11,20,21,21,
22,23;6:1,3,13;7:6,8,
24;8:1,2,18;9:10,13;
10:2,5,7,9,14;15:22;
19:5,10,19;20:4,19;
23:19;49:4;69:14;
70:23,25;71:7;72:25;
73:5,16,19
**motions (16)**
4:8,10,12,15;5:18;
6:8;7:10,13;8:18;
13:14,17,22,23;19:2,
3;70:21
**motion's (1)**
19:16
**motivational (1)**
32:25
**move (9)**
6:8;27:25;28:22,
24;31:2;53:9;61:12;
62:17;67:10
**moved (1)**
72:5
**moving (4)**
22:1;38:1;55:8;
64:10
**much (17)**
10:3,10;12:5;
14:20;17:24;18:16;
19:1,18;41:24;62:15;
65:16;66:15;71:11;
73:1,13;74:18,23
**multiple (1)**
41:18
**multiples (1)**
54:22
**muscle (1)**
67:12
**muster (2)**
67:22;69:3

**myself (1)**
29:1;54:18;57:21

## N

**name (2)**
29:11;47:25
**names (1)**
15:13
**narrower (1)**
36:24
**National (1)**
48:11
**necessary (11)**
5:23;7:18;16:24;
24:23;27:24;51:6,8;
53:11;67:20;68:2;
73:22
**need (17)**
9:24,24;10:24;
15:3;16:12;17:8,17;
22:23;27:2,7;29:3;
44:19;46:11,14;
58:13;65:14;74:16
**needed (1)**
9:4
**needs (8)**
14:17;15:2,8;45:1;
46:12,12;54:16;74:2
**need-to-know (1)**
9:18
**negatively (3)**
13:8,9;14:11
**nego (1)**
62:23
**negotiate (3)**
56:18,23;71:22
**negotiated (2)**
10:17;72:10
**negotiating (5)**
21:4;22:10;56:19;
64:18,18
**negotiation (1)**
72:19
**negotiations (4)**
9:17;11:19;20:15;
41:17
**net (1)**
23:13
**New (7)**
25:22;30:22,24;
69:17,20,24,25
**news (1)**
65:22
**next (3)**
42:18;47:15;64:16
**nine (13)**
21:13;26:9,11,11,
12;33:7,14,15,15;
44:4;45:10,14;63:21
**ninety-eight (1)**
54:17
**nobody (5)**

Case 14-31848-KRH Doc 389 Filed 06/18/14 Entered 06/18/14 16:34:30 Desc Main
Document Page 87 of 93

JAMES RIVER COAL COMPANY, et al.
Case No. 14-31848-KRH

OPEN SESSION
June 11, 2014

9:5,8,13;13:10,10
**None (2)**
8:14;60:1
**nonrelease (1)**
17:19
**normally (1)**
12:13
**norms (2)**
20:10;21:17
**note (3)**
4:14;8:13;44:11
**noted (3)**
13:23;14:7;59:20
**notes (1)**
23:19
**novel (1)**
12:19
**nowhere (1)**
13:4
**number (6)**
8:4;9:13;26:9;
30:25;39:5;54:17
**numbers (3)**
16:2;43:5;52:10

**O**

**object (2)**
12:20;20:20
**objected (3)**
4:11;8:17;20:19
**objection (16)**
5:14;6:5;13:1,4;
20:7,21;23:18,25;
28:5,8;31:7;44:10,
25;45:20;55:20;68:5
**objections (2)**
23:15;24:15
**objective (1)**
39:18
**objectives (2)**
31:16;37:18
**obtained (1)**
20:16
**Obviously (2)**
16:17;53:14
**occasions (1)**
30:21
**occurs (1)**
37:14
**off (7)**
18:20;25:21;45:19;
56:15;57:14,15;59:5
**offense (1)**
69:17
**offer (1)**
11:4
**offered (1)**
12:15
**offers (1)**
14:12
**OFFICER (10)**
3:1;33:8,8,9;47:2,

16;48:3,17;59:21;
66:8
**officer's (1)**
29:4
**often (2)**
15:7;38:14
**Ohio (1)**
29:15
**omitted (1)**
47:6
**omnibus (2)**
15:21;64:23
**once (4)**
16:19;19:6;22:19;
52:15
**one (28)**
6:12;8:1,4;15:1,8;
22:2;23:2,3;24:3;
25:6,16;26:9;27:22;
28:3,3;30:24;36:19;
43:9;45:23;49:23;
53:16,24,25;56:8;
57:6,9;66:3;72:9
**ones (10)**
21:1;43:7,8,8;
51:15,16;57:20;
65:13,13;72:18
**ongoing (1)**
13:6
**only (14)**
4:12;5:3;7:19;
14:4;18:17;20:20;
21:11;22:15;23:17;
26:13,14;43:9;53:20;
59:16
**open (5)**
11:5;15:5;16:10;
18:7;19:12
**opening (1)**
25:2
**openly (1)**
14:10
**openness (1)**
18:6
**operating (4)**
33:8;57:1;66:8,9
**operational (3)**
59:2,4;60:10
**operations (1)**
72:23
**opinion (1)**
37:23
**opportunities (2)**
37:20;43:20
**opportunity (2)**
19:5,15
**order (19)**
3:2;5:17;8:8;
14:17;19:17,22;20:4;
23:12,21;33:18;39:9;
71:4,7,25;72:1;73:16,
19;74:13,20
**ordered (1)**

12:16
**orders (2)**
4:21;15:6
**ordinary (1)**
59:15
**ordinary-course (1)**
4:7
**org (1)**
53:21
**organization (4)**
27:17;38:24;53:19,
21
**organizations (2)**
30:12;36:24
**orient (1)**
28:19
**originally (2)**
71:17;72:5
**others (2)**
4:23;17:11
**otherwise (1)**
12:2
**ours (1)**
63:2
**out (26)**
8:22;9:4;15:7,17;
16:4,20,23;25:20,23,
25;26:11;34:10,11,
14,21;38:15,18;
39:19;40:23;51:2;
52:4;53:17;54:9,12,
15;57:13
**outcome (3)**
19:23;20:4;34:5
**outside (5)**
23:5;30:22;55:2;
62:13,16
**over (14)**
3:17;25:1;27:19;
30:11;43:8;59:10;
60:5;61:24;62:25;
64:16;67:14;68:21;
70:18;71:3
**overall (2)**
32:18,20
**overcome (1)**
15:23
**oversaw (1)**
42:13
**overwhelming (1)**
69:14
**own (2)**
22:9;72:17

**P**

**package (1)**
51:18
**paid (7)**
22:15;33:15;34:10,
11;39:9,14,19
**panoply (1)**
29:22

**paper (2)**
19:11;35:14
**papers (6)**
11:21;44:7,14;
45:5;60:16;61:13
**parent (1)**
61:5
**part (9)**
5:14;18:5;22:7;
46:5;49:13;54:11;
64:20;65:11;72:5
**participant (4)**
40:23;43:12;45:3,
23
**participants (34)**
8:8,11;9:14,14;
11:25;21:10,14,19;
22:2,19;24:20;32:25;
33:1,15,22;37:5,11,
21;38:23;43:4,7;
46:1;51:13;58:10;
59:24;60:1;61:16;
63:11;65:3;69:8,10,
11;70:17;71:8
**participants' (1)**
12:7
**participate (1)**
3:13
**participated (1)**
41:13
**participating (1)**
52:2
**participation (1)**
54:8
**particular (6)**
5:12;15:8;43:3,14;
53:18;57:2
**particularly (1)**
69:6
**parties (3)**
9:7;63:8;71:1
**parties-in-interest (1)**
9:12
**Partners (2)**
5:9;7:1
**party (11)**
4:12,18;8:17,18;
9:8;13:11,16;14:21;
20:18,20;73:4
**party-in-interest (2)**
28:7;70:24
**pass (3)**
67:15,22;69:3
**past (1)**
38:1
**Pause (1)**
47:7
**pay (3)**
34:8,14;37:20;
38:14;43:20;55:6
**paying (2)**
38:15;55:3
**payment (10)**

21:23;23:23;37:6;
52:13,14,23,24;55:4,
7;71:23
**payments (14)**
4:6;8:9,12;9:16;
21:8,24;24:9,18,20;
33:19;52:22;71:24;
72:3,13
**payout (4)**
37:14;63:15,24;
69:7
**payouts (1)**
34:1
**pays (1)**
40:23
**peers (3)**
22:20;69:9,12
**pen (1)**
26:11
**penny (1)**
12:3
**people (39)**
4:25,25;9:20;10:2,
15;15:22;17:9,10,11,
13,14;18:12;21:20;
25:24;33:2,12;39:17;
42:13;43:9;49:24;
51:1,20;52:3;53:1,5,
18,20,22,24,25;54:1,
9;56:4,7;57:2,16;
65:10;70:13,14
**per (1)**
43:12
**percentage (3)**
40:20;45:7,13
**percentages (1)**
45:8
**percentile (1)**
37:2;40:17,19,21
**Perella (6)**
5:8;6:2;7:1;20:12;
50:1;62:8
**perform (1)**
54:24
**performance (2)**
32:16;34:8
**perhaps (3)**
43:9;60:16,18
**period (4)**
20:1,15;46:5,13
**permission (3)**
35:15;58:14;67:10
**person (12)**
15:15,25,25;45:17,
17;54:21,23;55:1,2,3;
59:1;62:16
**personally (1)**
68:21
**person's (1)**
18:16
**perspective (2)**
5:1;61:2
**perspectives (1)**

63:2

**Peter (5)**
6:11;28:2,10;
47:16;48:1

**phenomenal (1)**
70:13

**phone (7)**
15:24;46:14,15,17,
24;47:4;65:23

**pick (1)**
18:20

**pickup (1)**
53:5

**piece (2)**
35:14;38:8

**pirate (1)**
25:25

**pirates (3)**
26:1,2,3

**place (3)**
25:24;50:8;71:10

**placed (1)**
52:17

**plan (43)**
4:4,5,5,7;10:24;
21:7,8,9,12;22:1,17,
17;23:9,9,11,12,15;
24:21;31:20,20,21;
32:3;33:23;36:8,20;
37:22;39:12;43:7,22,
23;49:21;50:18,18,
19,24;56:15;62:23,
24,24;65:1;73:17,17,
18

**plans (52)**
4:2;5:4;9:4,12,15,
16;18:24;20:3,5,8,14,
16,17,22;22:18;
24:17,22;30:1,15,18;
31:3,12,13;32:7,10,
21;33:4;38:15,17;
41:8,10;50:5,8;51:4;
55:16;56:11,16;57:1;
59:5;62:22;63:18;
64:7,13;65:8;67:19,
22;68:1,22;69:3,5,15;
73:19

**plan's (1)**
21:15

**play (1)**
62:22

**played (1)**
30:3

**players (1)**
19:13

**pleadings (1)**
24:13

**Please (10)**
3:2;28:18;29:11;
35:16,23;47:17,25;
50:25;62:2;66:5

**pleasure (1)**
27:15

**plenty (2)**
10:6;18:22

**plots (1)**
36:8

**plus (2)**
55:4;57:22

**PM (1)**
75:3

**podium (5)**
25:1;27:19;67:16;
70:18;71:3

**point (13)**
3:17;7:9;16:12,17;
17:8;18:3;25:1;31:1,
6;46:3,7;68:23;72:9

**points (4)**
15:2;24:1;36:15;
42:8

**policy (1)**
59:11

**Polk (6)**
3:11,23;5:9;20:13;
27:14;50:1

**population (4)**
36:23;39:4;40:2,17

**portion (3)**
30:11;47:6,10

**position (8)**
16:11;17:16;22:6;
27:1,8;48:15,18;73:9

**positions (2)**
21:20;40:25

**possible (3)**
19:23;23:5;34:9

**possibly (1)**
70:11

**potential (4)**
8:24,25;11:19;
14:12

**potentially (2)**
52:7;53:16

**practical (1)**
65:13

**practice (3)**
9:15;22:18;39:7

**precisely (1)**
11:12

**prejudice (1)**
11:17

**premised (1)**
11:1

**prepared (5)**
34:20;40:5;43:13;
58:7;71:18

**pre-petition (1)**
23:10

**present (2)**
19:8;30:4

**presentation (2)**
73:8;74:24

**presented (5)**
27:3;31:25;38:22;
43:24;72:17

**preserve (1)**
16:25

**president (9)**
6:12;33:11;48:17;
56:10,12;60:18,20,
25;61:5

**presidents (5)**
33:9;52:5,6;56:8,9

**presumably (1)**
23:4

**pretty (1)**
15:4

**previously (4)**
31:4;49:3;67:2,6

**price (7)**
11:5;16:8;52:7;
56:22;57:11,12,14

**prices (2)**
51:17;70:16

**pricing (3)**
48:25;57:22;61:7

**primarily (6)**
21:5;22:5;24:1,19;
68:6,16

**primary (2)**
14:7;49:25

**principle (1)**
34:4

**prior (8)**
4:16;14:25;35:1;
48:9,10,11;53:24;
74:7

**privilege (1)**
25:6

**privileged (2)**
55:14;62:1

**pro (2)**
3:10,10

**probably (3)**
9:12;18:3;55:1

**problem (3)**
65:11,15,15

**proceed (2)**
5:19;47:13

**proceedings (1)**
75:3

**proceeds (8)**
8:7;10:24;21:8;
32:13,24;36:11,24;
40:20

**process (38)**
8:8;9:16,23;11:18;
13:6;14:9,16,18;17:3,
4;18:6;19:12,21,24;
20:25;22:16;23:1;
31:17;39:3,18;41:13,
19;50:21;51:1,3,9;
61:14,15;62:19;
64:15,15,18;65:1;
68:21;71:17;72:19,
24;74:2

**product (2)**
61:4,7

**professional (2)**
61:16;64:5

**professionals (7)**
8:16;14:4;50:2,3;
51:16;62:13;73:25

**professionals'-eyes-only (1)**
14:2

**program (13)**
32:4,12,14;36:16,
18;40:1,16;51:13;
54:11,15,15;72:13,16

**programs (12)**
30:5,7;31:19;32:1;
37:9;41:5;49:17;
50:18;55:10;65:4,4;
71:9

**promote (1)**
34:7

**promulgated (1)**
70:6

**promulgation (1)**
70:5

**proper (2)**
8:24;9:3

**properly (2)**
5:15;73:20

**proposal (2)**
41:9;71:17

**proposed (13)**
3:4,9;41:7;49:17;
50:4;51:4;62:22;
64:13;65:5,8;67:19;
71:22;72:4

**proposing (1)**
7:20

**proposition (1)**
13:3

**proprietary (2)**
16:24;17:5

**prospective (3)**
12:3;18:15;21:2

**protect (1)**
11:14

**protected (2)**
12:24;13:2

**protection (1)**
15:21

**protracted (1)**
63:4

**provide (11)**
8:23;13:7;14:5;
16:1;21:23;23:12;
24:5;34:5;38:12;
71:23;72:1

**provided (5)**
14:1,2,4;31:13;
72:19

**providers (1)**
4:23

**provides (3)**
9:11;21:7;57:6

**public (3)**
11:15;15:5;18:7

**publicly (1)**
10:20;12:2,8

**pulled (1)**
72:16

**purchasers (1)**
11:19

**purpose (8)**
8:24;9:3;12:10;
18:9,10;20:5;38:2;
53:23

**purview (1)**
44:11

**put (4)**
6:15;7:4;17:15;
42:8

**puts (1)**
15:6

**putting (1)**
38:12

---

## Q

**qualified (1)**
31:9

**qualify (1)**
31:2

**quite (3)**
26:23;43:6;69:2

---

## R

**raise (1)**
23:14

**raised (5)**
18:3;23:17;63:13,
15;68:4

**range (1)**
32:15

**rather (3)**
24:3;46:3,7

**reach (2)**
33:19;71:25

**reached (1)**
63:3

**reaching (1)**
36:19

**real (4)**
22:23;37:1;56:2;
65:13

**reality (1)**
15:17

**realized (3)**
8:7;10:24;21:9

**really (6)**
5:13;9:18;15:2;
16:12;51:20;64:16

**reas (1)**
36:20

**reason (6)**
13:3;15:6,8,23,23;
16:1

**reasonable (9)**
24:22;32:22;36:20;

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document       Page 89 of 93

JAMES RIVER COAL COMPANY, et al.
Case No. 14-31848-KRH

OPEN SESSION
June 11, 2014

reflects (2)
5:11;36:7
refutes (1)
13:4
regard (5)
14:3,8;19:2;29:25;
34:21
regarding (1)
11:24
regards (1)
14:13
regularly (3)
11:20;13:12;59:19
reiterate (1)
18:22;51:8;71:3
relates (1)
13:25;55:9;72:9
relationships (1)
57:13
relative (8)
21:19;22:20;36:4;
37:9;40:1,16,18;
43:23
release (1)
17:18
relevant (1)
6:4;43:16;67:22
relied (1)
20:12
remain (3)
4:14;39:8,10
remarks (2)
25:2;27:20
remember (3)
15:3;35:6;44:1
renew (1)
44:25
reopen (1)
46:6
reopened (2)
47:8,10
reorganization (1)
39:12
replace (3)
39:1;54:22;55:1
replaced (1)
54:23
replacement (1)
62:10
replacing (1)
23:4
reply (1)
6:14
Reports (2)
59:14,15
represent (1)
17:11
represented (1)
63:8
representing (1)
27:15
represents (2)
23:10;36:16

request (4)
6:3;8:21;13:14;
71:6
requested (1)
8:23
requesting (2)
7:15;8:20
required (1)
12:24
requirements (2)
24:17;27:3
requires (2)
24:9;68:17
Resnick (27)
3:18,20,22,23;6:7;
7:12;13:23;14:7,24,
25;18:1,2;19:18;
27:19;53:15;67:16,
18;69:22,24;70:2,23;
71:2,12,16;74:17,18,
22
Resnick's (1)
74:13
resolve (1)
4:17
resolving (1)
4:15
resource (2)
56:8;60:25
resource-group (1)
52:5
resources (1)
14:17
respect (21)
4:15;5:2,12;9:19,
22;10:9;14:6;22:11;
30:8;33:1,5;37:12,
16;41:7,9;55:16;
58:10;63:11,12;64:2;
69:6
respectfully (2)
13:13;71:6
responsibility (3)
57:21,22;66:10
responsible (7)
21:5;48:21;56:24;
57:1,13,23,24
rest (2)
26:4;60:4
restricted-stock (1)
54:11
restructured (1)
52:17
restructuring (6)
5:9;22:13;23:1;
30:1;61:13,15
restructurings (4)
30:6,10,13;48:12
result (3)
11:12;64:6;73:22
resulted (1)
32:4
retain (3)

22:12;53:14;74:1
retained (6)
5:7;6:20;29:25;
61:16;62:13;72:13
retention (11)
4:4;24:21;31:21;
33:2;38:3;50:18,23;
52:22;53:23;55:16;
73:17
retentive (2)
22:6;24:4
return (1)
68:8
reveal (2)
12:7;45:22
revealing (1)
44:17;55:14
revenue (1)
60:11
review (2)
19:15;41:19
reviewed (2)
31:21;72:16
revised (1)
23:21
reward (1)
34:5
rewards (1)
29:23
Richmond (1)
66:11
riding (1)
53:5
right (57)
3:14,19;11:7;
13:11,15;14:14;
16:14;18:14;19:1,2;
25:3;27:12;31:5,9;
35:10,11;36:2,14;
37:18;40:11;41:24;
42:19;43:3,25;45:7,
12;46:2,25;47:9,12;
53:19;56:2,10,16,18;
57:11;58:6,12,18,23;
60:22;62:6;64:14;
65:19;66:2,8,15;67:8,
17;70:15,22;71:11;
72:18,21;73:1,6,15
right-hand (1)
43:9
rise (2)
3:1;75:1
risk (3)
38:25;52:23;65:9
River (12)
3:3;29:25;30:8;
31:12;43:25;47:16;
48:3,9,10,13,16;61:6
River's (2)
48:20;67:23
roadmap (1)
13:7
Robert (1)

14:22
role (10)
30:3;37:22;48:20,
21;49:16,19,20,23;
62:18,21
roles (1)
62:9
rule (1)
24:12
run (2)
65:9;71:19
running (1)
9:23
runs (2)
36:14;66:10

**S**

safety (1)
23:12
safety-related (1)
4:6
salaried (1)
62:14
salaries (2)
8:11;11:25
salary (4)
9:1;15:14,16;18:16
sale (18)
10:24;11:6;14:9;
17:1,4;21:8;22:16,
25;32:13,23;36:11,
24;39:11;40:20;
50:21;51:9;64:15;
72:24
sale-proceeds (1)
40:15
sales (7)
4:20;32:11;48:24;
57:10,10,22,22
Sam (9)
49:1,1,23;54:16;
57:23;59:3,5;66:6,10
same (5)
10:1;24:12;36:3;
39:24;54:24
samples (2)
36:23;37:3
satisfied (1)
46:25
satisfies (2)
18:9;69:14
satisfy (2)
24:8,24
saw (3)
51:22;53:4;54:14
saying (2)
17:21;52:20
scheduled (2)
11:6,7
screen (5)
34:24;35:11,13;
40:11;58:12

Case 14-31848-KRH   Doc 389   Filed 06/18/14   Entered 06/18/14 16:34:30   Desc Main
Document      Page 90 of 93

JAMES RIVER COAL COMPANY, et al.
Case No. 14-31848-KRH

OPEN SESSION
June 11, 2014

**scrutiny (1)**
10:18
**seal (9)**
4:9;11:20;13:12,
25;16:20,23;19:6;
44:20;46:4
**sealed (11)**
7:20;12:17;15:10;
16:24;44:8,11,13,19;
45:24;47:6,11
**sealing (19)**
4:10,11;5:18,20;
7:7,10,13;8:1,1,18;
12:20;13:14,17,23;
14:8;15:22;19:2,8;
47:4
**seated (1)**
3:2
**SEC (1)**
57:10
**second (5)**
8:9;24:7;57:4;
60:13;68:18
**secretary (1)**
57:7
**Section (9)**
7:22;10:22;11:13;
12:25;22:4;23:16;
24:2,8;69:3
**security (2)**
29:4;47:2
**seeing (1)**
74:7
**seek (2)**
12:23;51:2
**seeking (3)**
3:10;4:5;71:9
**seemed (1)**
52:21
**seems (1)**
15:14
**selected (2)**
9:14;38:21
**selecting (1)**
24:20
**sell (4)**
36:21;37:20;56:20,
22
**selling (1)**
53:17
**sells (1)**
70:12
**senior (5)**
5:6;9:20,25;22:22;
58:20
**sense (3)**
11:11;52:20;63:23
**sensing (1)**
26:7
**sensitive (1)**
11:24
**sent (2)**
54:15;62:24

**sentences (1)**
7:7
**sentiment (1)**
74:5
**seriously (2)**
13:6;18:6
**serve (1)**
20:5
**services (1)**
9:22
**session (1)**
3:2
**set (3)**
53:21;64:25;68:14
**setting (1)**
64:23
**seven (3)**
39:25;68:19,22
**several (5)**
4:2;11:21;13:13;
21:21;48:12
**severance (10)**
4:5;23:9,9,11,15,
20,23;72:10,11;73:18
**severe (1)**
70:12
**shared (2)**
20:13;34:25
**ship (3)**
25:25;26:2,5
**short (2)**
16:25;46:13
**shortly (1)**
53:25
**show (2)**
24:6;43:11
**shown (1)**
21:17
**side (1)**
43:9
**sign (1)**
57:14
**significant (3)**
21:21;65:9;68:8
**significantly (2)**
55:3;71:16
**signing (1)**
59:5
**signs (2)**
56:15;57:14
**similar (4)**
12:16;21:19,20;
40:25
**similarly (2)**
20:10;21:17
**simple (2)**
15:24;56:2
**simply (3)**
11:11;13:1;24:11
**single (1)**
4:18
**sink (1)**
26:2

**sit (2)**
56:17;73:11
**site (6)**
21:3;51:10,13,22;
52:4;64:17
**situated (2)**
20:10;21:17
**situation (5)**
31:19;32:23;38:5,
25;41:6
**situations (1)**
39:25
**six (1)**
26:15
**size (1)**
52:1
**slide (20)**
34:20,23;35:4,7;
36:3,7;37:4;40:3,4,8,
9,12;42:5,8;58:7,12,
19,21,23;59:22
**slides (3)**
34:25;35:21;43:13
**slightly (1)**
28:20
**small (2)**
60:11,12
**smaller (1)**
43:8;54:17
**so-called (1)**
72:12
**Socha (30)**
6:12,14,17;12:6,
11;23:7;26:18;28:3,
10;31:15,22;38:22;
39:3;47:16,19;48:1,
2;49:3,16;55:8;
58:18,23;61:10;
64:10;65:16,21;
67:23;68:19,21;
71:15
**Socha's (2)**
7:6;23:7
**sold (2)**
61:4,7
**Sole (1)**
58:20
**solely (1)**
21:8
**somebody (4)**
15:18,24;16:6;47:1
**someone (2)**
39:8;60:25
**someplace (2)**
15:20;43:11
**soon (1)**
46:6
**sorry (3)**
45:12;50:24;66:7
**sort (7)**
11:13;17:2;32:12;
38:22;54:12;55:24;
70:10

**sound (4)**
19:8;60:17;68:2;
73:22
**span (1)**
63:5
**speak (4)**
20:4;69:20;71:1;
73:4
**SPEAKER (1)**
46:19
**specialized (1)**
62:8
**specific (2)**
23:14,17
**specifically (5)**
4:3;5:5;10:16;
20:23;48:23
**specifics (1)**
71:20
**spending (2)**
16:5;17:13
**spent (2)**
30:11;36:12
**spite (1)**
65:22
**split (3)**
21:13;52:11,12
**spoken (1)**
14:25
**stabilize (1)**
67:20
**staffed (3)**
23:1;53:19;54:4
**stages (1)**
19:20
**stakeholder (1)**
67:21
**stakeholders (2)**
19:22;68:9
**stalking-horse (1)**
11:3
**stand (5)**
6:15;7:4;25:6;
49:11;67:3
**standalone (1)**
56:22
**standard (2)**
24:8,25
**standpoint (1)**
39:5
**stands (1)**
12:4
**start (3)**
25:21;51:5;53:9
**started (4)**
18:4;26:2;54:9;
64:16
**starting (1)**
64:18
**state (4)**
29:11,15;40:22;
47:25
**stated (2)**

**12:11;45:1**
**statement (3)**
13:21;22:8;70:19
**statements (2)**
49:8;70:25
**States (2)**
12:25;26:6
**statute (3)**
18:5;70:4,6
**stay (6)**
22:15,25;38:13;
46:12,20;47:1
**stays (1)**
39:20
**steer (1)**
70:15
**step (1)**
66:23
**steps (2)**
31:11;32:6
**stick (1)**
9:21
**still (4)**
21:19;22:19;27:2;
64:17
**stipulated (1)**
31:3
**story (1)**
62:5
**strategic (4)**
14:15;21:4;59:7;
72:24
**strategy (5)**
48:21,23;56:2,11;
57:20
**Strauss (1)**
13:19
**strength (3)**
28:24;29:3;39:1
**stress (1)**
18:11
**Strike (1)**
62:3
**structured (5)**
20:9;21:7;24:17;
33:25;39:16
**stuff (1)**
25:21
**subject (6)**
7:13,25;10:17;
16:23;19:3;41:22
**submit (3)**
6:10;18:23;19:16;
74:20
**submitted (6)**
18:18;23:21;28:2,
3;49:3,6
**subsidiary (3)**
59:4;61:4,6
**substance (1)**
55:14
**substantial (5)**
7:23;20:16;30:11;

38:4;63:22
**substantially (7)**
37:13;39:11;43:6;
45:16,17;63:18,20
**substantive (1)**
13:3
**successful (2)**
5:1;72:24
**successfully (1)**
14:18
**suffer (1)**
19:25
**sufficient (3)**
9:11;24:5;59:10
**suggested (1)**
20:6
**suggestion (6)**
52:16;55:19;60:16;
61:13,19;74:14
**suggestions (1)**
52:15
**suitable (1)**
31:19
**sum (3)**
12:22;24:22;41:2
**summarizing (1)**
37:15
**summing (1)**
63:17
**supplemental (3)**
8:1;12:6,12
**support (12)**
7:5;13:3,22;18:19;
20:16;22:6,8;26:24;
49:4;70:20,25;72:25
**supported (3)**
10:8;11:14;64:9
**supporting (1)**
7:7
**supports (1)**
64:7
**supposed (1)**
25:19
**sure (8)**
14:16;18:2;25:18;
26:19;43:19;60:14;
64:25;71:20
**surety (1)**
4:22
**swirling (1)**
33:3
**sworn (3)**
29:6;47:17,20
**system (2)**
25:18;26:23

## T

**tabular (1)**
36:22
**tail (1)**
64:15
**talent (1)**

29:22
**talk (4)**
10:19;19:14;43:25;
63:1
**talked (1)**
60:24
**talking (8)**
19:10,10;45:9;
49:24;53:9;60:9;
61:23;72:14
**Tang (15)**
6:2;7:1,1,3,4,16;
8:5;10:23;22:7;28:4,
14;67:3,25;68:7,10
**Tang's (4)**
7:6,14,24;11:14
**target (6)**
32:16;33:17;36:17,
18;44:2;45:4
**targets (4)**
21:24;22:10;71:21,
23
**task (1)**
53:22
**team (6)**
39:4;42:13,25;
61:9;66:13,14
**telling (1)**
26:23
**tells (1)**
44:9
**ten (1)**
30:16
**term (4)**
55:9,12;56:12;58:3
**terminated (2)**
23:20,23
**terms (11)**
5:17;16:9;17:7;
21:4;23:16;27:17;
31:15;37:9;52:2;
58:24;68:18
**terrible (1)**
54:24
**test (4)**
60:13;69:2,4,15
**testified (4)**
30:24;34:9;62:17;
63:9
**testify (1)**
45:21
**testifying (1)**
7:17
**testimony (25)**
4:9;6:11,16,23;
7:14;24:14;28:1;
33:21;34:16,18;35:4;
44:12;51:24,24;
52:24;57:18;66:24;
67:6,19,25;68:6,10;
69:4;71:15;73:21
**thereafter (1)**
53:25

**therefore (1)**
7:3
**there're (2)**
53:20;56:7
**thereto (1)**
14:6
**there've (1)**
30:25
**thinking (1)**
43:22
**thinly (3)**
23:1;53:19;54:4
**third (3)**
6:18;57:9;63:15
**thirty-nine (7)**
9:20,24;22:14;
38:20;54:19;59:24;
60:1
**thoroughly (1)**
14:3
**though (1)**
61:5
**thought (1)**
9:3
**thousand (1)**
44:4
**three (26)**
7:13,19,19;12:20;
17:13;19:7,10;26:13,
14,14;51:10,12,14;
54:14;56:7;57:16;
58:2,20;59:8,16,17;
60:7;63:21;64:17;
65:10;68:24
**threshold (20)**
8:6;10:11,11,12;
14:10;21:11,12;
32:16;33:17,20,22;
36:17,18;45:4;63:13,
14,14,15;68:13;71:23
**thresholds (12)**
10:16,23,25;11:12,
16;21:23;24:20;
52:25;63:23,24;68:7;
71:21
**threw (2)**
26:3,15
**throughout (3)**
14:15;72:19;74:2
**throwing (1)**
25:23
**thus (1)**
12:10
**tier (2)**
12:1;54:20
**tiers (2)**
8:12;54:14
**till (2)**
5:24;71:5
**times (3)**
26:25;30:14;74:8
**tirelessly (1)**
11:9

**title (2)**
48:15;60:20
**titles (1)**
60:17
**today (28)**
3:13;4:1;5:17,24;
6:4,15,22;7:2,17;
14:24,25;20:17;
24:15;26:17;27:17;
30:7;32:4,7;35:1;
41:20;49:11;64:8;
67:19;73:21;74:11,
14,16,25
**today's (2)**
49:4,14
**today-tomorrow (1)**
71:8
**together (1)**
8:2
**told (1)**
65:22
**tomorrow (1)**
74:14
**took (3)**
49:23;59:22,23
**top (2)**
16:5;36:8
**topic (3)**
61:12;62:17;64:10
**top-level (1)**
10:12
**total (14)**
11:16;21:12,15,23;
33:12,18,19;36:4;
37:6,19;45:7,14;
71:22,24
**toward (1)**
31:18
**towards (2)**
28:20;64:19
**transaction (2)**
14:15;21:4;72:24
**transcript (1)**
47:10
**treats (1)**
55:16
**tremendous (1)**
66:10
**trend (1)**
36:18
**Tribune (1)**
11:22
**triggering (1)**
39:20
**trucks (1)**
53:5
**true (2)**
5:11;49:8
**Truly (1)**
15:17
**Trustee (20)**
4:10;5:2,18;6:10;
8:15,17;10:18;12:20;

13:4;14:23;20:7,20;
23:14,18,19,25;26:6;
35:1;60:23;73:9
**Trustee's (6)**
5:14;13:1;24:15;
55:19;60:15;61:13
**try (5)**
11:9;18:20;25:18;
26:7;69:17
**trying (4)**
26:19;32:23;36:21;
37:20
**turn (7)**
3:17;25:1;27:18;
28:21;33:4;70:18;
71:3
**turns (1)**
16:23
**twenty- (1)**
39:24
**twenty-seven (1)**
32:9
**two (28)**
4:8,19;5:13;6:11;
7:25;8:3;14:7;18:19;
24:3,5;25:17;28:2,
10;35:21,22;36:23;
43:9;49:7;50:18;
53:24;61:24;63:4,5,
5;64:16;65:9;68:4;
72:13
**two-and-a-half (1)**
63:4
**Tyler (1)**
3:7
**type (4)**
11:20;15:15;29:20;
55:1
**typical (1)**
48:21
**typically (2)**
30:5;36:12

## U

**UCC (1)**
9:17
**ultimate (1)**
19:21
**ultimately (5)**
31:22;32:3;51:17;
53:7;63:3
**Um-hum (1)**
62:20
**unavailable (1)**
12:13
**uncertainty (3)**
33:3;38:4;64:20
**uncontroverted (4)**
67:25;68:6,10,25
**under (21)**
4:6;7:21;12:1,24;
13:25;19:8;24:2;

Case 14-31848-KRH    Doc 389    Filed 06/18/14    Entered 06/18/14 16:34:30    Desc Main
Document    Page 92 of 93

JAMES RIVER COAL COMPANY, et al.
Case No. 14-31848-KRH

OPEN SESSION
June 11, 2014

30:7;33:16,23;34:10,
11,13;37:14;39:9,14,
19;67:22;68:14;69:3;
72:13
**undercompensated (4)**
21:19;22:20;69:9,
11
**undergraduate (1)**
48:7
**undermine (2)**
11:18;12:10
**understandable (1)**
23:15
**understands (1)**
17:21
**understood (1)**
37:10
**undertook (1)**
58:9
**underway (1)**
31:18
**unfair (1)**
12:9
**UNIDENTIFIED (1)**
46:19
**United (2)**
12:25;26:6
**universe (1)**
39:24
**University (1)**
29:15
**unless (4)**
7:9;10:10;15:6;
21:10
**unseal (2)**
16:19;19:5
**unsealed (1)**
16:23
**unsealing (2)**
14:8;19:3
**unsecured (1)**
72:2
**Unsurprisingly (1)**
11:20
**up (20)**
5:23;15:19;21:6;
26:6,24;34:23;35:11;
36:19;40:9;41:2;
51:17;52:12;54:19;
62:23,25;63:7,17,24,
25;74:16
**upfront (1)**
42:19
**upon (1)**
11:1
**upper (2)**
36:15;63:25
**urgently (1)**
67:20
**use (6)**
28:24;35:21;38:23;
54:2,8;56:12
**used (3)**

9:25;11:16;55:12
**using (2)**
24:19;35:1

## V

**valuable (2)**
12:10;13:8
**valuation (1)**
52:8
**value (25)**
8:25;10:24;11:16,
18;19:24;20:24;21:6,
9,11,15;33:18,20,22;
34:3;7;36:4,11;43:23,
23;50:22;53:7;68:9;
71:22,24;72:19
**values (2)**
14:10;34:1
**Van (44)**
6:16,23;7:2,17;
14:22,22;16:16,21;
17:6,23,25;18:2;25:1,
4,5,8,10,12,15;27:6,9,
11;28:5,6;31:7;
41:25;42:3;44:13,21,
24;46:3,8,20;61:2;
64:22;65:12,20,21;
68:5;69:18;73:6,7,
14;74:24
**variance (2)**
45:25,25
**variety (1)**
71:19
**vary (3)**
33:25;43:5;45:17
**vast (1)**
68:12
**vendors (3)**
56:18,19,23
**versions (2)**
9:17;20:14
**versus (1)**
45:23
**vesting (1)**
10:3
**vetted (1)**
10:1
**vetting (1)**
41:20
**vice (1)**
3:10
**victim (1)**
70:16
**view (4)**
8:3;11:1;22:22;
56:3
**views (1)**
8:25
**vigorous (1)**
41:19
**virtually (1)**
12:2

**Vision (1)**
48:11
**visitors (1)**
57:5
**visits (6)**
21:3;51:11,13,22;
52:4;64:17
**voir (1)**
31:5

## W

**wages (1)**
23:12
**wait (3)**
20:6;50:14;71:5
**waived (1)**
26:4
**walking (1)**
70:10
**wants (4)**
8:24;15:15;70:19,
25
**Wardwell (2)**
3:23;27:15
**watching (1)**
20:3;65:4
**way (14)**
16:24;20:9;22:24;
30:23;32:24;33:25;
39:16;40:22;43:8,19;
52:17;53:21;66:9;
67:11
**week (2)**
4:20;63:4
**weeks (4)**
51:10,12;63:5;
64:17
**Weinberg (4)**
5:9;6:2;7:1;20:12
**Welcome (1)**
3:15
**Whenever (1)**
29:3
**Whereupon (1)**
75:3
**whole (4)**
15:25;26:14;36:23;
43:22
**who'll (1)**
21:5
**wholly (1)**
20:21
**who's (5)**
15:24;23:20;33:10;
57:23,23
**whose (1)**
22:9
**Williams (1)**
3:7
**winnowing (1)**
39:4
**wish (6)**

13:16;14:21;31:5;
41:25;73:4,6
**withdrawn (1)**
5:25
**withheld (1)**
8:15
**within (6)**
10:21;21:17;29:22;
37:21;39:6;69:5
**without (7)**
13:2;20:21;22:5;
25:7,8;44:17;55:14
**witness (20)**
7:4;28:17;29:6;
31:6;35:5,25;41:25;
45:19,21;47:16,20;
65:18,20;66:4,7,17,
19,20,21,25
**witnesses (4)**
27:18,23;68:1;73:9
**woes (1)**
74:8
**wonderful (1)**
74:9
**word (1)**
56:12
**work (14)**
11:25;29:16,20,22;
32:19;33:16;39:2,17,
23;42:8,12,13,24;
49:20
**worked (7)**
8:22;9:4;29:18;
30:4,6;42:15,21
**workforce (2)**
23:13;67:20
**working (6)**
11:9;14:14;15:15;
30:9;34:7;39:4
**works (4)**
44:6,9,15;48:25
**world (2)**
18:17;65:13
**WorldCom (1)**
70:7
**worried (2)**
17:2;38:5
**worth (1)**
16:8

## X

**X-axis (1)**
36:10

## Y

**Yale (1)**
29:14
**Y-axis (1)**
36:10
**year (1)**
30:25

**years (1)**
59:16
**yesterday (5)**
6:1,14,25;23:22;
65:23
**York (3)**
25:22;30:22;69:18

## Z

**zero (3)**
10:10;21:10;34:9

## 1

**1 (2)**
3:3;59:20
**1,000 (2)**
38:18;60:5
**1.4 (3)**
10:5;22:14;39:21
**100 (3)**
36:25;40:15,18
**100,000 (1)**
44:5
**107a (3)**
15:3;16:18;18:3
**107b (10)**
7:22;10:22;11:13;
12:25;13:2;15:3,3,9;
16:18;18:8
**10th (1)**
11:7
**11 (8)**
20:10;21:18;22:18;
30:15,18;31:2;38:2;
53:24
**117 (2)**
54:9,16
**1985 (1)**
29:19

## 2

**2 (1)**
3:3
**2.7 (3)**
10:13;21:16;34:12
**2003 (2)**
48:14,19
**2004 (1)**
58:1
**2005 (2)**
70:5;74:7
**27th (1)**
5:21

## 3

**3:52 (1)**
75:3
**30th (1)**
11:5

**4**

**4 (1)**
    23:18

**5**

**500 (3)**
    36:25;40:15,18
**503 (2)**
    22:4;69:3
**503c1 (1)**
    24:2
**503c2 (1)**
    23:16
**503c3 (2)**
    24:3,8

**8**

**892,000 (1)**
    10:12
**893,000 (1)**
    21:13
**8th (1)**
    11:6

**9**

**900,000 (1)**
    44:3